# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| KINERA LOVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO.: |
| | ) | |
| DOLLAR GENERAL | ) | 3:06-CV-1147-MHT |
| CORPORATION, | ) | |
| d/b/a DOLGENCORP, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DOLGENCORP, INC.'S EVIDENTIARY SUBMISSION IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant Dolgencorp, Inc.[1] ("Dolgencorp"), incorrectly named in the complaint as "Dollar General Corporation, d/b/a Dolgencorp, Inc.," and submits its Evidentiary Submission in Support of its Motion for Summary Judgment.

1. Dolgencorp Employment Form.

2. Plaintiff Kinera Love's Deposition Transcript.

3. Acknowledgment Form.

4. Declaration of Charles McDonald with Attachments.

5. Plaintiff Kinera Love's Interrogatory Responses.

6. Declaration of Johnnie Todd.

7. Affidavit of Plaintiff Kinera Love.

---

[1] Defendant Dollar General Corporation was not Plaintiff's employer and, therefore, is incorrectly named in the Complaint. Plaintiff's employer was Dolgencorp, Inc., and accordingly, Dolgencorp's Motion for Summary Judgment is on behalf of Dolgencorp and Dollar General Corporation to the extent required, if at all.

8.    Dollar General Personnel Action Form dated October 24, 2005.

9.    Employee Handbook.

Respectfully submitted,

s/Christopher W. Deering
Bar No.:  ASB-5555-I71C

s/Ryan M. Aday
Bar No.:  ASB-3789-A54A

Christopher W. Deering, Esq.
Ryan M. Aday, Esq.
**Ogletree, Deakins, Nash,**
    **Smoak & Stewart, P.C.**
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone:  (205) 328-1900
Facsimile:  (205) 328-6000
E-mail: christopher.deering@odnss.com
E-mail: ryan.aday@odnss.com

*Attorneys for Defendant*
*Dolgencorp, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 21st 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Lateffah Muhammad – lateefahmuhammad@aol.com

s/Christopher W. Deering
Christopher W. Deering
Bar Number:  ASB-5555-I7IC
Attorney for Defendant,
Dolgencorp, Inc.

2

EXHIBIT 1

# DOLLAR GENERAL EMPLOYMENT FORM

**ENTER SOCIAL SECURITY NUMBER - 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**

*NOTE: FAILURE TO INPUT SOCIAL SECURITY NUMBER ACCURATELY WILL CAUSE THE EMPLOYEE TO EITHER NOT BE PAID OR BE PAID INCORRECTLY*

---

Write Name as it appears on the Social Security card to ensure the Social Security Administration properly credits social security benefits. *Managers should visually inspect the social security card for accuracy.*

Last Name: **Love**
First Name: **Kineria**
Middle Initial: **L.**

Street Address: **409 - A Toomer Cet. Opelika AL 36830**

Apt #: **409-A**   P.O. Box (if applicable): _____

City: **Opelika**   State: **AL**   Zip Code: **36830**

Phone Number (AREA CODE): **(334)** **737-0800** or **663-**   County: _____

**EMERGENCY CONTACT**
Name: **Climmie Love**
Phone: **(334) 737-0860**   Relationship: **mother**

Date of Birth: **09 - 26 - 1979**

Maiden Name: **Kineria L. Love**

Marital Status: **Single** [X]   Married [ ]

Gender: Male [ ]   Female [X]

**ETHNICITY** (Race/National Origin):
[ ] American Indian or Alaskan Native
[ ] Asian or Pacific Islander
[X] Black   [ ] Hispanic (Spanish origin)
[ ] White (Caucasian)   [ ] Multi Racial

---

**EMPLOYER SECTION**

[X] Part-Time (avg less than 30 hrs/week)
[ ] Full-Time (avg 30 or more hrs/week)
[ ] Temporary (seasonal, openings/relocations)

DATE HIRED: **3-3-05**

[X] New Hire   OR   [ ] Rehire

Store # or Cost Center: **6519**
Work State: **AL**

Employee's Position: (Check one below)
[ ] Store Manager   [ ] Ass't Manager
[ ] Lead Clerk (3rd Key)   [X] Clerk/Cashier
[ ] Learning Center Intern
[ ] OTHER _____ (DG Corp/Field Mgmt)

Hourly Base Rate $ **5.25** (paid weekly)
OR
Annual Base Salary $ _____
(Stores paid weekly) All others paid semi-monthly)

Store paychecks are distributed at the store each Friday before midnight.

Supervisor: **Tiffany Cross**

Work Schedule _____
(Store weekly scheduled hours will vary based on business needs)

Shift Code _____

---

**LOCAL TAXES by WORK STATE**

INDIANA: In which County do you live? _____

MARYLAND: In which County do you live? _____
Do you live in Baltimore City? [ ]YES [ ]NO

NEW YORK: Do you live in New York City? [ ]YES [ ]NO
Are you a resident of Yonkers City? [ ]YES [ ]NO

PENNSYLVANIA: Do you live in a:
[ ] Township OR [ ] Borough OR [ ] City?

What is the name of the Township/Borough/City? _____

In which County & Public School District do you live?
County: _____
School District: _____

**KENTUCKY:**

|  | YES | NO |
|---|---|---|
| Employees working in BOONE COUNTY | | |
| Do you live AND work in the Boone County School District? | | |
| Do you work ONLY in the Boone County School District? | | |
| Employees working in CUMBERLAND COUNTY | | |
| Do you live in the Cumberland County School District? | | |
| Employees working in JEFFERSON COUNTY | | |
| Do you live in the Jefferson County School District? | | |
| Employees working in LEXINGTON/FAYETTE URBAN COUNTY | | |
| Do you live in the Lex/Fayette Urban Co. School District? | | |
| Employees working in MARSHALL COUNTY | | |
| Do you live in the Marshall County School District? | | |
| Employees working in SCOTT COUNTY | | |
| Do you live in the Scott County School District? | | |
| Employees working in WARREN COUNTY | | |
| Do you live in the Warren County School District? | | |
| Do you live in the Bowling Green School District? | | |

This document is intended to comply with Section 41-10-30 of the S.C. Code of Laws, 1976, as amended.

X **Kineria Love**
**Employee Signature** (I certify the above information is correct)

X **Tiffany Cross**
**Manager/Supervisor Signature**

DEFENDANT'S EXHIBIT
K. Love

EXHIBIT 2



In The Matter Of:

## KINERA LOVE
v.
## DOLLAR GENERAL CORPORATION, ET AL.

## NO. 3:03-CV-1147-MHT

---

## KINERA LOVE
## October 30, 2007

---



TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

THE HIGHEST QUALITY IN COURT REPORTING

(Pages 1 to 4)

## Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CIVIL ACTION NO. 3:06-CV-1147-MHT

KINERA LOVE,
       Plaintiff,

vs.

DOLLAR GENERAL CORPORATION, d/b/a
DOLGENCORP, INC.,
       Defendant.


DEPOSITION
OF
KINERA LOVE
October 30, 2007

REPORTED BY:  Laura H. Nichols
       Certified Realtime Reporter,
       Registered Professional
       Reporter and Notary Public

## Page 2

S T I P U L A T I O N

    IT IS STIPULATED AND AGREED,
by and between the parties, through their
respective counsel, that the deposition of
KINERA LOVE may be taken before Laura H.
Nichols, Commissioner, Certified Realtime
Reporter, Registered Professional Reporter
and Notary Public;

    That it shall not be necessary
for any objections to be made by counsel
to any questions, except as to form or
leading questions, and that counsel for
the parties may make objections and assign
grounds at the time of trial, or at the
time said deposition is offered in
evidence, or prior thereto.

## Page 3

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Ms. Lateefah Muhammad
    Attorney at Law
    3805 West MLK Highway
    P.O. Box 1096
    Tuskegee, Alabama 36087
    334.727.1997


FOR THE DEFENDANT:
    Mr. Ryan M. Aday
    Attorney at Law
    Ogletree, Deakins, Nash,
      Smoak & Stewart, P.C.
    One Federal Place, Suite 1000
    1819 5th Avenue North
    Birmingham, Alabama 35203

## Page 4

INDEX OF EXAMINATION

| | Page: |
|---|---|
| EXAMINATION BY MR. ADAY | 6 |
| EXAMINATION BY MS. MUHAMMAD | 126 |
| REEXAMINATION BY MR. ADAY | 178 |
| REEXAMINATION BY MS. MUHAMMAD | 190 |

INDEX OF EXHIBITS

| | Page: |
|---|---|
| Defendant's Exhibit 1 | 21 |
| Defendant's Exhibit 2 | 23 |
| Defendant's Exhibit 3 | 25 |
| Defendant's Exhibit 4 | 26 |
| Defendant's Exhibit 5 | 75 |
| Defendant's Exhibit 6 | 105 |
| Defendant's Exhibit 7 | 112 |
| Defendant's Exhibit 8 | 113 |
| Plaintiff's Exhibit 9 | 143 |
| Plaintiff's Exhibit 10 | 146 |
| Plaintiff's Exhibit 11 | 149 |

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 5 to 8)

Page 5

1    INDEX OF EXHIBITS (Continuing)
2
3                        Page:
4    Plaintiff's Exhibit 12        155
5    Plaintiff's Exhibit 13        163
6    Plaintiff's Exhibit 14        169
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 6

1            I, Laura H. Nichols, a
2    Certified Realtime Reporter and Registered
3    Professional Reporter of Birmingham,
4    Alabama, and a Notary Public for the State
5    of Alabama at Large, acting as
6    Commissioner, certify that on this date,
7    as provided by the Federal Rules of Civil
8    Procedure of the United States District
9    Court, and the foregoing stipulation of
10    counsel, there came before me at the
11    offices of the Alabama State Bar, 415
12    Dexter Avenue, Montgomery, Alabama, on
13    October 30, 2007, commencing at 10:31
14    a.m., KINERA LOVE, witness in the above
15    cause, for oral examination, whereupon the
16    following proceedings were had:
17
18            KINERA LOVE,
19    being first duly sworn, was examined and
20    testified as follows:
21
22    EXAMINATION BY MR. ADAY:
23        Q.    Ms. Love, my name is Ryan

Page 7

1    Aday.  I represent Dollar General in the
2    lawsuit that you have filed.  We are here
3    today for you to give your deposition.
4    Have you ever been deposed before?
5        A.    No.
6        Q.    This is your first deposition,
7    correct?
8        A.    Yes.
9        Q.    Okay.  Well, in that case,
10    let's go over just a few ground rules.  If
11    you answer a question, I will assume that
12    you understood it.  If you don't
13    understand my question, please tell me
14    that and I will rephrase it.  You
15    understand that your answers today are
16    under oath, correct?
17        A.    Correct.
18        Q.    Are you currently taking any
19    medications?
20        A.    Yes.
21        Q.    Okay.  What are those?
22        A.    I have them with me.
23        Q.    Okay.

Page 8

1        A.    It is a generic brand for
2    Zoloft.
3        Q.    If I could ask you, if you
4    could answer out loud so the court
5    reporter could take everything down.
6            MS. MUHAMMAD:  Is it written
7    on there?
8        A.    Yes, sertraline.
9            (Off-the-record discussion.)
10        Q.    (BY MR. ADAY:)  Now, you are
11    going to have to answer out loud for the
12    court reporter.  What is the name of the
13    medications that you have just handed to
14    the court reporter?
15        A.    This is clonazepam.
16        Q.    Clonazepam?  And what was the
17    other one?
18        A.    It is sertraline.
19        Q.    How do you spell that?
20        A.    It is S-E-R-T-R-A-L-I-N-E.
21        Q.    Are these the only medications
22    that you are taking right now?
23        A.    Yes.

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 9 to 12)

Page 9

1    Q.   Okay.  Why are you taking
2  these medications?
3    A.   Because I suffer with promatic
4  (sic) stress disorder.
5        MS. MUHAMMAD:  Post-traumatic
6  stress?
7    A.   I'm sorry.  Excuse me.  Yes.
8  Post -- excuse me.  I am --
9    Q.   (BY MR. ADAY:)  Ms. Love, we
10  just need you to answer out loud so that
11  the court reporter can take down
12  everything.
13    A.   Okay.
14    Q.   Now, I will start my question
15  again.  Why are you taking these two
16  medications?
17    A.   I suffer from -- it is pro --
18  it is pro -- pro --
19    Q.   Are you able to testify under
20  oath today, Ms. Love?
21    A.   I mean, I am -- maybe I am
22  just nervous.
23    Q.   Are these medications in any

Page 10

1  way affecting your ability to testify
2  today?
3    A.   No, it is supposed to help me.
4    Q.   Okay.  So far I have asked you
5  why you took these medications and you
6  can't answer me.  We have got a lot of
7  questions to go over -- through today.
8  And I want to know right off the start
9  here if these medications are going to
10  impair your ability to testify truthfully
11  today?
12    A.   Huh-uh.
13    Q.   Is that a yes or a no?
14    A.   No.
15    Q.   Okay.  So I'm going to ask
16  this question for the last time:  Why are
17  you taking these medications?
18    A.   Because I have been diagnosed
19  with promatic (sic) stress disorder.
20    Q.   Promatic (sic) stress
21  disorder?
22    A.   Yes.
23    Q.   And who diagnosed with you

Page 11

1  with promatic (sic) stress disorder?
2    A.   Dr. Gam.
3    Q.   When did he diagnose you with
4  this?
5    A.   I can't exactly recall the
6  date.
7    Q.   Did he prescribe these
8  medications to you?
9    A.   Dr. Keith Bufford.
10    Q.   Who was that?
11    A.   Dr. Keith Bufford.
12    Q.   How do you spell his last
13  name?
14    A.   B-U-F-F-O-R-D.
15    Q.   Okay.  What is your current
16  address, Ms. Love?
17    A.   409-A Toomer Circle, Opelika,
18  Alabama, 36801.
19    Q.   Okay.  Who lives there with
20  you?
21    A.   My mother.
22    Q.   Who else?
23    A.   That is all.

Page 12

1    Q.   Okay.  And what is your
2  birthday?
3    A.   9/26/1979.
4    Q.   Social Security number?
5    A.   41 --
6        MS. MUHAMMAD:  I object.
7  Because of the fact that this document may
8  become a public document, I object to her
9  putting her Social in.
10    Q.   (BY MR. ADAY:)  What are the
11  last four digits of your Social Security
12  number?
13    A.   6715.
14    Q.   Have you ever sued anybody
15  besides Dollar General?
16    A.   Yes, I had a suit against
17  Winn-Dixie for a slip and fall.
18    Q.   What court was that in?
19    A.   Lee County.
20    Q.   And what was the outcome of
21  that case?
22    A.   Well, I settled out, so --
23    Q.   You settled the case?

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 13 to 16)

Page 13

1    A.   Yeah.
2    Q.   You received money; is that
3  correct?
4    A.   Yes.
5    Q.   Have you ever been sued by
6  anybody?
7    A.   No.
8    Q.   Have you ever been arrested?
9    A.   Yes.
10    Q.   What were you arrested for?
11    A.   I was arrested for driving
12  with no license.
13    Q.   And what kind of punishment
14  did you receive for that?
15    A.   Fine.
16    Q.   Did you receive any jail time?
17    A.   No.
18    Q.   Have you ever been convicted
19  of any crime other than the driving
20  without a license?
21    A.   No.
22    Q.   Have you ever appeared as a
23  witness in a lawsuit?

Page 14

1    A.   No.
2    Q.   Have you ever filed an Equal
3  Employment Opportunity Commission charge
4  other than the one that is a part of this
5  case?
6    A.   No.
7    Q.   Are you married, Ms. Love?
8    A.   No.
9    Q.   Do you have any children?
10    A.   No.
11    Q.   Do you have a foster child?
12    A.   I have -- I have -- I mean, I
13  have foster kids but --
14    Q.   My question is:  Do you have a
15  foster child?
16    A.   No.
17    Q.   What is your mother's name?
18    A.   Climmie Love.
19    (Off-the-record discussion.)
20    Q.   (BY MR. ADAY:)  How do you
21  spell that?
22    A.   C-L-I-M-M-I-E.
23    Q.   And what is your father's

Page 15

1  name?
2    A.   John Ogletree.
3    Q.   Okay.  And your mom lives with
4  you, correct?
5    A.   Yes.
6    Q.   Okay.  Where does your father
7  live?
8    A.   He stays in Waverly, Alabama.
9    Q.   I'm sorry?
10    A.   Waverly.
11    Q.   Waverly, Alabama?  I take it
12  they are not married, correct?
13    A.   No.
14    Q.   When did they separate?
15    A.   They separated probably
16  about -- I can't really recall how long it
17  has been.
18    Q.   Do you remember how old you
19  were?
20    A.   No.
21    Q.   Have you ever filed for
22  bankruptcy?
23    A.   No.

Page 16

1    Q.   Did you ever have a foster
2  child named Climmie Love?
3    A.   No.
4    Q.   Did you ever claim a person
5  named Climmie Love as a dependent on your
6  tax returns?
7    A.   Yes.
8    Q.   Who is this person?
9    A.   Apparently they must have made
10  a mistake, they who did my filing and I
11  didn't notice it until --
12    MS. MUHAMMAD:  Answer the
13  question that he asked you.
14    MR. ADAY:  I'm sorry.  Could
15  you read back my question?
16    (Record read.)
17    A.   My mother.
18    Q.   (BY MR. ADAY:)  And you
19  claimed her as a dependent, correct?
20    A.   Yes.
21    Q.   So if your tax return says
22  that Climmie Love is a foster child, that
23  is incorrect, right?

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

Page 17

1    A.    Yes.
2    Q.    Did you ever claim any other
3 individuals as dependents?
4    A.    Did I claim what?  Can you
5 rephrase --
6    Q.    Let me repeat the question.
7 Have you claimed any other individuals as
8 dependents on your tax returns?
9    A.    Yes.
10    Q.    Who are those people?
11    A.    Gaylen McGhee.
12    Q.    I'm sorry.
13    A.    Gaylen.
14    Q.    How do you spell that?
15    A.    G-A-Y-L-E-N.
16    Q.    And the last name?
17    A.    McGhee.
18    Q.    Any others besides Gaylen
19 McGhee?
20    A.    No, sir.
21    Q.    That is the only one?
22    A.    I can't recall at the moment.
23    Q.    Why did you claim Gaylen

Page 18

1 McGhee as a dependent on your tax returns?
2    A.    Because she is my niece.
3    Q.    Was she living with you at
4 some point?
5    A.    Well, I mean, I was doing for
6 her like half of the year.
7    Q.    I'm sorry.  You said you were
8 "like doing for her," what does that mean?
9    A.    Taking care of her, you know,
10 for six months.
11    Q.    Where did you go to high
12 school?
13    A.    I went to Loachapoka High
14 School.
15    Q.    Is that in Loachapoka,
16 Alabama?
17    A.    Yes.
18    Q.    Did you graduate?
19    A.    No, I got my GED.
20    Q.    What year did you get your
21 GED?
22    A.    I got my GED in '03.
23    Q.    Did you have any post-high

Page 19

1 school education?
2    A.    No.  Wait a minute.  You
3 said -- could you rephrase that?
4    Q.    My question was: Did you have
5 any post-high school education.  That is,
6 did you have any other education besides
7 high school?
8    A.    Yes.  Yes.
9    Q.    Okay.  Where was that?
10    A.    CTU, that is Colorado Tech
11 University.
12    Q.    Okay.  And what did you study
13 there?
14    A.    Business administration.
15    Q.    Did you receive a degree from
16 Colorado Tech?
17    A.    No.
18    Q.    Is that an online college?
19    A.    Yes.
20    Q.    And what years did you take
21 classes with Colorado Tech?
22    A.    '07, this year.
23    Q.    What made you decide to apply

Page 20

1 for a job with Dollar General?
2    A.    Well, I needed a job, and I
3 know I am a good worker and a reliable
4 person.
5    Q.    How did you come to find out
6 that a job opening was available?
7    A.    Well, they had it posted
8 outside.
9    Q.    And what did that posting say?
10    A.    "Help wanted."
11    Q.    Okay.  Who did you talk to?
12    A.    Tiffany Cross.
13    Q.    And what store was that at?
14    A.    I want to say it is 15 -- 1515
15 Second Avenue, Opelika, that is next to
16 Kroger.  It used to be Kroger.
17    Q.    That is the Opelika store next
18 to the old Kroger?
19    A.    Uh-huh.
20    Q.    And did you fill out a job
21 application?
22    A.    Yes.
23    Q.    Okay.

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

Page 21

1      MR. ADAY:  Let me mark a
2  document as Defendant's Exhibit 1.
3      (Whereupon, Defendant's
4      Exhibit 1 was marked for
5      identification.)
6      Q.    (BY MR. ADAY:)  Ms. Love, I'm
7  going to ask you to look at this.  Do you
8  recognize this document as your job
9  application at Dollar General?
10     A.    Yes.
11     Q.    Is that your signature at the
12  bottom?
13     A.    Yes.
14     Q.    And as you see right below
15  your signature, by signing, you have
16  certified that the information you have
17  provided is true and correct; is that
18  right?
19     A.    Yes.
20     Q.    After you submitted your job
21  application with Dollar General, did you
22  interview with anybody?
23     A.    Tiffany Cross.

Page 22

1      Q.    What was Tiffany Cross's
2  position?
3      A.    She was the store manager.
4      Q.    Okay.  Do you remember when
5  you interviewed with her, approximately?
6      A.    No.
7      Q.    It would be sometime right
8  after your application, correct?
9      A.    Yes.
10     Q.    And what date were you hired
11  at Dollar General?
12     A.    I'm not exactly for sure.
13     Q.    If Dollar General's records
14  said March 3rd, 2005, you wouldn't have
15  any reason to dispute that, would you?
16     A.    Well, I thought -- I mean, I'm
17  not exactly for sure what date, but if I'm
18  not mistaken, it was in April.
19     Q.    If we had records that showed
20  it was March, do you think that would be
21  wrong for any reason or you just don't
22  remember?  I'm sorry.
23     Could it be correct that you

Page 23

1  were hired in March?  I am just trying to
2  establish when you were hired.
3      A.    I mean, I thought it was
4  April, though.
5      Q.    Fair enough.  All right.  What
6  position were you hired as?
7      A.    I was hired as a cashier.
8      Q.    Okay.  And when you
9  interviewed with Tiffany Cross, do you
10  remember anything you all talked about
11  during that interview?
12     A.    She just mainly -- just asked
13  me, you know, what days can I work and
14  stuff, hours, you know, just the basic --
15     Q.    Did she ask you about your
16  prior work experience?
17     A.    Yes.
18     (Whereupon, Defendant's
19     Exhibit 2 was marked for
20     identification.)
21     MR. ADAY:  I am going to mark
22  a document as Defendant's Exhibit 2.
23     Q.    (BY MR. ADAY:)  Ask you to

Page 24

1  take a look at that, Ms. Love.  I will
2  represent to you, Ms. Love, that this is a
3  document you signed entitled, "Employment
4  Acknowledgment" down at the bottom.  Do
5  you recall signing this document?
6      A.    I can't -- I don't remember
7  it.
8      Q.    But that is your signature at
9  the bottom, correct?
10     A.    Yes.
11     Q.    It is dated 3/1/2005, correct?
12     A.    Yes.
13     Q.    If you look with me underneath
14  where it says "Employment Acknowledgment"
15  in the first paragraph, it says, "I
16  acknowledge that I have received a copy of
17  the Dollar General employee handbook
18  outlining the policies and procedures of
19  Dollar General.  I have read the table of
20  contents and know what kind of information
21  I can find in the handbook."
22     And by signing that, you
23  acknowledged that, correct?

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

Page 25

1    A.   Yes.
2         (Whereupon, Defendant's
3         Exhibit 3 was marked for
4         identification.)
5         MR. ADAY:  I am going to mark
6    a document as Defendant's Exhibit 3.
7         MS. MUHAMMAD:  I am going to
8    object to any documents that display
9    Ms. Love's Social, that if these become a
10   public record, I want the objection on the
11   record to show that we object to her
12   Social Security number being displayed in
13   full.
14        MR. ADAY:  Okay.  And in
15   accordance with the Federal Rules, we will
16   redact any such document that is made a
17   part of public record.
18        Q.   (BY MR. ADAY:)  Okay.  I was
19   going to introduce Defendant's Exhibit 3.
20   If you could take a look at this document,
21   Ms. Love.  Is that your signature at the
22   bottom?
23        A.   Yes.

Page 26

1         Q.   Okay.  And this document is
2    entitled, "Antidiscrimination and
3    Harassment Policy," correct?
4         A.   Yes.
5         Q.   And this document outlines
6    Dollar General's antidiscrimination and
7    complaint reporting procedure, correct?
8         A.   Yes.
9         MR. ADAY:  Okay.  I have got
10   another document I am going to mark as
11   Defendant's Exhibit 4.
12        (Whereupon, Defendant's
13        Exhibit 4 was marked for
14        identification.)
15        Q.   (BY MR. ADAY:)  And, Ms. Love,
16   if you would, do you recognize that
17   document?
18        A.   Yes.
19        Q.   Were you provided a copy of
20   Dollar General's 2005 employee handbook
21   when you began your employment with Dollar
22   General?
23        A.   Yes.

Page 27

1         Q.   And, again, we have already
2    went through it in Defendant's Exhibit 2
3    that you acknowledged that you received
4    and understood this document, correct?
5         A.   Yes.
6         Q.   Okay.  Ms. Love, back to your
7    first position at Dollar General, it is
8    correct that you started at the Opelika
9    store; is that right?
10        A.   Correct.
11        Q.   And you began as a cashier,
12   correct?
13        A.   Yes.
14        Q.   Okay.  Tell me about your job
15   duties as a cashier at the Opelika store.
16        A.   I would take orders, you know,
17   ring up orders, you know -- can I take a
18   brief break?
19        MR. ADAY:  We can, Ms. Love, I
20   would like to get on the record that we
21   are under some time constraints with the
22   bar here, they are closed from 12:00 to
23   1:00 and do close at 4:30, so we can take

Page 28

1    a break, but we need to make these as
2    brief as possible.
3         A.   Okay.
4         (Whereupon, a break was had
5         from 10:57 a.m. until 11:02
6         a.m.)
7         MR. ADAY:  Are we ready to go
8    back on?
9         MS. MUHAMMAD:  Sure.
10        Q.   (BY MR. ADAY:)  Okay.  Just
11   coming back from a break, we were talking
12   about your cashier position at the Opelika
13   Dollar General store.  I had asked a
14   question what your job duties were.  I
15   will ask the question again, if you can
16   tell me what your job duties were?
17        A.   My job duties were to scan
18   items, set up, unload the trucks, recount
19   sales.  You know, I was doing different --
20   just different stuff.  So it was basically
21   like scan items and unpack, you know, the
22   little totes and stuff and set up the
23   store.

Page 29

1    Q.    Did you stock shelves?
2    A.    Yes.
3    Q.    Did you check people out in
4  the cashier line?
5    A.    Yes.
6    Q.    Okay.  Who was your immediate
7  supervisor?
8    A.    Tiffany Cross.
9    Q.    And she was the store manager,
10 correct?
11   A.    Yes.
12   Q.    And who was the assistant
13 store manager at that time?
14   A.    At that point in time, the
15 assistant store manager was Julie
16 Morrison.
17       (Off-the-record discussion.)
18   Q.    (BY MR. ADAY:)  Ms. Love, if
19 you could do your best to answer out for
20 the court reporter, it is going to speed
21 things up today.
22       Now, how long did you work at
23 the Opelika location?

Page 30

1    A.    I worked there about three
2  months before I transferred -- yeah, about
3  three months.
4    Q.    Okay.  And where did you
5  transfer to?
6    A.    To the store in Auburn off
7  South College Street.
8    Q.    And did you transfer stores as
9  a cashier?
10   A.    No.
11   Q.    You received a promotion,
12 correct?
13   A.    Yes.
14   Q.    And what did you get promoted
15 to?
16   A.    Third key manager.
17   Q.    Okay.  Did you apply for that
18 promotion?
19   A.    Well, when I was at the Kroger
20 store, the Dollar General next to Kroger,
21 I was -- I applied there, but I
22 transferred to the one in Auburn.
23   Q.    Okay.  How did you make your

Page 31

1  interest known that you wanted to be a
2  third key?
3    A.    Well, I went to Tiffany and
4  told her that I was interested in the
5  position.  And she knowed the way I was
6  working, she knowed that, you know, I
7  would be a good third key.
8    Q.    So you told Tiffany, you
9  didn't fill out any paperwork or anything
10 like that?
11   A.    Well, I mean, at first, I
12 talked it over with Tiffany before I
13 filled out the paperwork.
14   Q.    How did you know there was a
15 third key position available?
16   A.    Because we didn't have one at
17 the store.
18   Q.    At which store, at the Opelika
19 store or the Auburn store?
20   A.    At the Opelika store or the
21 Auburn store.
22   Q.    Who told you that you had
23 received the third key position?

Page 32

1    A.    Tiffany Cross.
2    Q.    Okay.  Did she discuss making
3  that decision with anybody that you know
4  of?
5    A.    I'm not for sure.
6    Q.    Do you know if Charles
7  McDonald was involved in making that
8  decision to promote you to third key?
9    A.    No, I can't recall.  I mean, I
10 can't recall at the moment.
11   Q.    If Charles McDonald was
12 involved in that decision to promote you
13 to third key, would you have any reason to
14 dispute that?
15   A.    No.
16   Q.    Did you receive a pay raise as
17 a result of your promotion to third key?
18   A.    Yes.
19   Q.    Okay.  What was your pay rate
20 as a cashier?
21   A.    My pay rate as a cashier, I
22 want to say like five fifteen.  I'm not
23 exactly for sure.

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

Page 33

1    Q.    To the best of your
2  recollection?
3    A.    I would say probably -- I
4  think it started off minimum wage at that
5  time which was five fifteen or five
6  thirty-five.  I'm not for sure.
7    Q.    What did your wage get
8  increased to when you became third key?
9    A.    Seven twenty-five.
10   Q.    That is a pretty big pay
11  increase, wouldn't you say?
12   A.    Yes.
13   Q.    Did Tiffany tell you you were
14  going to have to transfer to the Auburn
15  store?
16   A.    She asked me would I like to
17  transfer to the Auburn store.
18   Q.    Okay.  And what did you say?
19   A.    And I told her yeah, I would.
20  I mean, because I had already worked with
21  Jeff and stuff, and Jeff liked the way I
22  worked.  And, you know, I liked, you know,
23  working down there, so it wasn't no

Page 34

1  problem.
2    Q.    When you say Jeff, are you
3  referring to Jeff Jennings?
4    A.    Yes.
5    Q.    When did you work with him
6  before?
7    A.    I can't exactly recall the
8  dates and the time I worked with him, but
9  I have worked with the store on South
10  College in Auburn, the one at Midway
11  Plaza, the one on 51.  The only one I
12  probably worked with probably once or
13  twice was Pepperell Parkway store; but all
14  the rest of stores I have worked on
15  different occasions there.
16   Q.    Okay.  So you worked at more
17  than just the Opelika store before
18  transferring to Auburn?
19   A.    Yes, anytime they needed some
20  help, I didn't have no problem going to
21  help out.
22   Q.    Do you remember what store
23  specifically you worked with Jeff Jennings

Page 35

1  before you transferred to the Auburn
2  store?
3    A.    I can't remember the dates and
4  stuff, you know.  But I know I done worked
5  with him -- I know at least over four or
6  five times before I transferred down
7  there.
8    Q.    Was your prior work experience
9  with Mr. Jennings one of the reasons why
10  you decided to transfer to the Auburn
11  store?
12   A.    Could you rephrase that again?
13   Q.    Sure.  You were saying that
14  you had worked with Jeff Jennings
15  previously before you transferred to the
16  Auburn store, correct?
17   A.    Yes.
18   Q.    I'm asking you, was that one
19  of the reasons why you decided to transfer
20  to the Auburn store was your previous work
21  experience with Jeff Jennings?
22   A.    I mean, yes.
23   Q.    Okay.

Page 36

1    A.    I mean -- I didn't -- he
2  didn't have no problem about me working
3  with him and I didn't have no problem
4  about working down there.
5    Q.    Okay.  Fair enough.  Do you
6  remember approximately when you
7  transferred to the Auburn store?
8    A.    No.
9    Q.    Okay.  Now, let's talk a
10  little bit about your time at the Auburn
11  store.  Tell me about your job duties as a
12  third key at the Auburn store.
13   A.    My job duties as a third key
14  was to open, close the store, set up
15  plan-o-grams, count the tills, do sales
16  count, do the invoice and etcetera.
17      (Off-the-record discussion.)
18   Q.    (BY MR. ADAY:)  What job
19  duties did you have to do as the third key
20  that you did not have to do as a cashier?
21   A.    Well, the job duties as a
22  third key that you didn't have to do as a
23  cashier is you don't -- you don't have to

Page 37

1  open -- when you was -- when I was a
2  cashier, I didn't have to open the store,
3  get everything together, set the tills up,
4  you know, count the register and stuff
5  down.
6       But when you are a third key,
7  you have to do everything that assistant
8  manager would do, practically; it is about
9  the same.
10      Q.   What would you have to do that
11 is the same as the assistant manager?
12      A.   Well, basically, you know, you
13 will be running the shift, for one.  I
14 mean, it is all the same -- it is just a
15 pay increase if you take the assistant
16 manager position, it is more money, but
17 you still be doing the same as a third key
18 would do.
19      Q.   So it is your testimony that
20 there's no difference in job duties
21 between a third key and assistant store
22 manager?
23      A.   Exactly.

Page 38

1       Q.   Then why would an assistant
2  store manager make more than a third key?
3       A.   Well, it is because -- I
4  ran -- I don't know exactly why, but I was
5  doing the same thing, even though I wasn't
6  assistant manager.  But I was -- I was
7  doing everything that the store manager
8  would do.
9       Q.   Tell me specifically what the
10 same things you would do as a third key
11 that the store manager would do.
12      A.   Like I said, the sales count,
13 invoice, payroll, setting up
14 plan-o-grams -- that is when you reset the
15 shelf and everything by booklet, change
16 prices.  I mean, everything -- I was doing
17 all -- everything that an assistant
18 manager and the store manager would do, I
19 was doing.
20      Q.   Did the assistant store
21 manager supervise your work?
22      A.   Did the district store
23 manager?

Page 39

1       Q.   Did the assistant store
2  manager supervise your work?
3       A.   Well, when I transferred down
4  there to the store in Auburn, the
5  assistant store manager, he had just -- he
6  was fixing to leave right then.  But he --
7  you know, he seen my work and, I mean, he
8  didn't have no problem with my work.
9       Q.   I'm going to strike that the
10 as unresponsive.  My question was:  Did
11 the assistant store manager supervise your
12 work?
13      A.   Yes.
14      Q.   So that is a difference
15 between a third key and an assistant store
16 manager, correct?
17      A.   No.  I mean, he would just --
18      Q.   The assistant store manager
19 supervises the third key; that is what you
20 just told me, correct?
21      A.   Yes.
22      Q.   Who was the assistant store
23 manager at the Auburn store at the time

Page 40

1  you transferred?
2       A.   All I know, his name was
3  Terrell.
4       Q.   You don't remember his last
5  name?
6       A.   No.
7       Q.   What happened to Terrell?
8       A.   He was in school, and when he
9  got finished with school, he went back --
10 he moved back home.
11      Q.   So he left Dollar General?
12      A.   Yes.
13      Q.   Were you interested in
14 becoming assistant store manager?
15      A.   Yes.
16      Q.   How did you make that interest
17 known?
18      A.   I went to Jeff Jennings and
19 told him that I was interested in the
20 position, and he -- and I let him know,
21 you know, that I wanted the position.
22      Q.   Was the assistant store
23 manager position ever posted?

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 41 to 44)

Page 41

1    A.    Yes.
2    Q.    What did that posting say?
3    A.    Well, he put -- they put --
4    they put -- he put a sign outside that
5    said "help wanted" and needed for, you
6    know, a cashier and assistant manager
7    position.
8    Q.    Do you know how long that
9    posting was up at the store?
10    A.    No.
11    Q.    I guess, how long was that
12    position available from the time of the
13    posting until the time it was filled; do
14    you have any recollection?
15    A.    No, I can't recall.
16    Q.    Did you fill out any paperwork
17    to apply for the assistant store manager
18    position?
19    A.    No.
20    Q.    You said you talked to Jeff
21    Jennings about it, correct?
22    A.    Yes.
23    Q.    When did you talk to Jeff

Page 42

1    Jennings about it?
2    A.    I'm not exactly for sure.  I
3    can't recall.
4    Q.    Would August of 2005 sound
5    correct?
6    A.    I can't recall.
7    Q.    July 2005 to August 2005, do
8    you have any recollection?
9    A.    I'm not for sure.
10    Q.    Did you talk to him before the
11    position was filled?
12    A.    Yes.
13    Q.    Tell me about that
14    conversation.  Let me rephrase my
15    question.  Do you remember anything that
16    you talked about with Jeff Jennings about
17    the assistant store manager position?
18    A.    Yes.  I just told him that I
19    was qualified -- you know, that I was
20    interested in the position and that I was
21    qualified for it.  He also agreed with me
22    that I was qualified for it.  And he told
23    me that he would have to talk with

Page 43

1    Charles, and he would get back with me.
2    Q.    That is Charles McDonald?
3    A.    Yes.
4    Q.    So Charles McDonald was
5    involved in determining the assistant
6    store manager position?
7    A.    Yes.
8    Q.    But you don't remember if he
9    was involved in the decision to promote
10    you to third key?
11    A.    No, I'm not for sure.
12    Q.    Did Tiffany Cross ever mention
13    that she had to consult with Charles
14    McDonald before promoting you to third
15    key?
16    A.    No.
17    Q.    But like you said earlier, if
18    he was involved, you wouldn't have any
19    reason to dispute that, would you?
20    A.    No.
21    Q.    Do you remember who filled the
22    assistant store manager position?
23    A.    Who filled it?

Page 44

1    Q.    Yes.
2    A.    Are you saying who made the
3    decision?
4    Q.    Let me rephrase my question.
5    I take it that you did not receive the
6    assistant store manager position; is that
7    correct?
8    A.    No.
9    Q.    Do you remember who did?
10    A.    Yes.
11    Q.    Who was that?
12    A.    Donna Taffy.
13          (Off-the-record discussion.)
14    Q.    (BY MR. ADAY:)  Could it have
15    been Donna Tally?
16    A.    Tally.
17    Q.    But you don't remember her
18    name specifically?
19    A.    It is Tally or Taffy, but --
20    Q.    And, again, who made this
21    decision to promote Donna Tally to
22    assistant store manager?
23    A.    Charles McDonald, her uncle.

11

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 45 to 48)

Page 45

1    Q.    Do you remember when Ms. Tally
2 received the position?
3    A.    Two weeks after she was hired.
4    Q.    But do you remember
5 specifically what approximate dates?
6    A.    No.
7    Q.    Did you know Ms. Tally at that
8 time?
9    A.    No.
10    Q.    Do you know anything about her
11 prior work experience before coming to
12 Dollar General?
13    MS. MUHAMMAD:  Objection.
14 Calls for speculation.
15    MR. ADAY:  I'm just asking her
16 if she knew.  That is not speculation at
17 all.
18    MS. MUHAMMAD:  Yes, it is.
19    Q.    (BY MR. ADAY:)  I'm asking you
20 if you knew Ms. Tally's work experience.
21 Do you know where she worked before she
22 worked for Dollar General?
23    A.    She worked at some kind of

Page 46

1 plant.  She was working at a plant or
2 something.
3    Q.    Is that all you know about her
4 prior work experience?
5    A.    Yes.
6    Q.    So if Ms. Tally had prior
7 managerial experience with a different
8 job, you would have no reason to dispute
9 that, would you?
10    A.    No.
11    Q.    Did you complain to anybody
12 about Ms. Tally receiving this position?
13    A.    I called ERC and made a
14 complaint.
15    Q.    Okay.  What did you tell the
16 ERC?
17    A.    I told them that -- that I was
18 not being treated fairly and they
19 overlooked me, you know; and I let them
20 know that Donna Tally is Charles
21 McDonald's niece, and instead of him
22 coming, you know, asking me about the
23 position, he just was going to look over

Page 47

1 me and give it to his niece; so I made a
2 complaint about it.
3    Q.    So that is why you thought she
4 got it, because she was his niece?
5    A.    Yes.
6    Q.    Do you remember when you
7 called the ERC?
8    A.    No.
9    Q.    If Dollar General had
10 documents that said you called on
11 September 30th of 2005, would you have any
12 reason to think that would be wrong?
13    A.    I'm not for sure.  I can't
14 recall.  I can't say.
15    Q.    So it could have been
16 September 30th, 2005; you just don't
17 remember?
18    A.    No.
19    Q.    Is there any reason why you
20 would have waited six weeks after
21 Ms. Tally was promoted to call ERC?
22    A.    Well, I know I didn't wait no
23 six weeks.

Page 48

1    Q.    How long did you wait then
2 after?
3    A.    I'm not for sure but I know I
4 didn't wait six weeks.
5    Q.    So less than six weeks?
6    A.    I can't -- I'm not for sure.
7    Q.    You don't have any
8 recollection how long after Ms. Tally
9 received the position that you called ERC?
10    A.    I can't remember.
11    Q.    Around the time of Ms. Tally's
12 promotion to assistant store manager, was
13 there ever an asset protection audit
14 conducted at the store?
15    A.    An asset protection audit?
16    Q.    Yes.
17    A.    I can't recall.
18    Q.    Did you have an opportunity to
19 work with Jack Trawick while you were at
20 the Auburn store?
21    A.    Work with Jack Trawick?  No.
22    Q.    Did he ever come to the store
23 and ask you about anything?

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 49 to 52)

Page 49

1    A.   Yes, he did.
2    Q.   Did Jack Trawick critique your
3 work at any time?
4    A.   Critique my work, what do you
5 mean?  Did he praise --
6    Q.   Was he critical of your work
7 at the store?
8    A.   I mean, he liked my work, I
9 reckon.  I don't know.  I can't recall.
10   Q.   Did he ever give you any kind
11 of constructive criticism about your work
12 performance?
13   A.   No.  I mean -- no.
14   Q.   Who were your coworkers at the
15 Auburn store that you can remember?
16   A.   I know Jamie Jennings.
17   Q.   Jamie Jennings?
18   A.   Yeah.  I assume that was
19 Jeff's stepdaughter, and I think she had
20 his last name but I'm not for sure.
21   Q.   Again, Ms. Love, I just asked
22 you to tell me, to the best of your
23 recollection, your coworkers at the Auburn

Page 50

1 store.  Who were they?
2    A.   I know Jeff Jennings and Donna
3 Taffy and Jamie, but I don't know what her
4 last name is.
5    Q.   Okay.  Anybody else?
6    A.   I can't remember the other
7 two.
8    Q.   But there were two more that
9 you worked with?
10   A.   Yes.
11   Q.   Did you ever work with a
12 person named Candice Harrison?
13   A.   Who?
14   Q.   Candice Harrison.
15   A.   Candice?  Yes.  That probably
16 was the other one.
17   Q.   I need you to answer fully.
18 That was probably what?
19   A.   Yes, I remember -- well,
20 Candice -- I am trying to think.  I'm not
21 for sure but I think that was the other
22 girl's name.  I'm not for sure.
23   Q.   Okay.  Would you have any

Page 51

1 reason to dispute that Candice Harrison
2 did work with you at the Auburn store
3 while you were there?
4    A.   I mean, no, I don't have no
5 dispute.  I just can't remember.
6    Q.   Okay.  Did you ever have any
7 conversations with Candice Harrison while
8 you were there?
9    A.   No.  I mean, no more than
10 work-related.
11   Q.   Do you remember any of those
12 conversations?
13   A.   No.
14   Q.   You don't know Candice
15 Harrison at all, do you?  Do you know her
16 personally?
17   A.   No.
18   Q.   Okay.  Did you ever tell her
19 it was okay for her to take a candy bar --
20   A.   No.
21   Q.   -- from Dollar General?
22   A.   No.
23   Q.   Did you ever say it was okay

Page 52

1 for her to take it because it was just the
2 two of you in the store?
3    A.   No.
4    Q.   Did she tell you that she
5 wanted to pay for it?
6    A.   I didn't talk -- no, I mean,
7 we didn't even discuss nothing like that.
8    Q.   You don't remember being in
9 the store with her one night, and it was
10 just the two of you?
11   A.   I mean, we probably have been
12 in the store just the two of us, because
13 when I used to close, it would just be me
14 and the cashier.
15   Q.   Are you aware that Candice
16 Harrison reported this to Dollar General?
17   A.   No.
18   Q.   But if she did, you would have
19 no way to know one way or the other, would
20 you?
21   A.   What now?
22   Q.   If she did report it, you
23 would have no way of knowing if she did or

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 53 to 56)

Page 53

1    didn't; is that correct?
2        A.    Yes.
3        Q.    So if Dollar General had
4    documents showing that she did report that
5    you said it was okay for her to take a
6    candy bar without paying for it, you have
7    nothing to dispute that, do you?
8        A.    I know I didn't -- you know, I
9    didn't say it to her, though.
10       Q.    And that is fine. I
11   understand you are denying this. However,
12   you wouldn't deny that she might have made
13   a complaint to Dollar General about that?
14       A.    No.
15       Q.    You sure you don't remember
16   Ms. Harrison?
17       A.    I probably would remember her
18   if I see her but --
19       Q.    But you said it was possible
20   that the two of you were in the store
21   together by yourself, correct?
22       A.    Like I said, it was possible.
23   There were two other employees that I

Page 54

1    couldn't remember their names but I
2    probably would remember their faces.
3        Q.    Okay.  Fair enough.  Did Donna
4    Tally and you ever work alone in the store
5    together?
6        A.    I trained Donna Tally.
7        Q.    That wasn't my question.  My
8    question was did you and Donna Tally ever
9    work alone in the store together?
10       A.    Yes.  Yes.
11       Q.    Did you ever ask Donna Tally
12   to give you a discount on pajamas?
13       A.    No.
14       Q.    Did you ever ask Donna Tally
15   to give you a discount on a gallon of milk
16   and a gallon of iced tea?
17       A.    No.
18       Q.    And, again, I will ask you, if
19   Dollar General had documents showing that
20   Donna Tally did make this complaint that
21   you had asked for unauthorized discounts,
22   you don't have any way to dispute that, do
23   you?

Page 55

1        A.    No.
2        Q.    Are you aware that Dollar
3    General investigated these complaints?
4        A.    No.
5        Q.    Do you recall meeting with
6    Jack Trawick and Johnnie Todd?
7        A.    Yes.
8        Q.    Do you recall why you had to
9    meet with them?
10       A.    They told me they wanted to
11   get to know me better.
12       Q.    You think they came to meet
13   with you because they wanted to get to
14   know you better?
15       A.    That is what he said.  He
16   didn't say nothing about this was an
17   investigation.
18       Q.    So you don't know if you were
19   actually the one being investigated or
20   not, do you?
21       A.    No.
22       Q.    It is possible you were the
23   one; isn't that right?

Page 56

1        A.    He didn't say.  He just said I
2    want to get to know you better.
3        Q.    Is it possible you were the
4    one being investigated?
5        A.    I don't know.
6        Q.    You don't know, correct?
7        A.    Yes.
8        Q.    Let's talk about that meeting
9    with Jack Trawick and Johnnie Todd for a
10   minute.
11       A.    Okay.
12       Q.    What do you remember Jack
13   Trawick asking you specifically?
14       A.    He would ask me personal
15   questions like:  How many kids does I
16   have, my married status, how long I have
17   been staying in Lee County, what is my
18   goals ten years from now.  So at that
19   point, I told him I don't think I should
20   answer any more questions unless I have a
21   witness -- an attorney present because he
22   had him a witness there so --
23       Q.    I'm sorry.  Can you say that

14

KINERA LOVE

DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE

October 30, 2007

(Pages 57 to 60)

Page 57

1  again?  He didn't have a what?
2      A.   I told him that I don't think
3  I should answer any more questions because
4  I didn't have a witness or an attorney --
5  or an attorney there.
6          So when I asked him that, when
7  I made that statement, he snatched my keys
8  out of my hand; took the store keys off
9  and throwed my keys back at me and told me
10  to leave off the premises right now, I am
11  being suspended.
12         I'm asking him why I am being
13  suspended.  So, therefore, he should have
14  told me then that I refused the
15  investigation or whatever.  But he did not
16  state nothing about no investigation at
17  all.
18     Q.   I understand.  But you just
19  testified that you were not going to
20  answer any more questions without an
21  attorney present, correct?
22     A.   Witness.  He had a witness.
23  So if you --

Page 58

1      Q.   Excuse me.  Johnnie Todd was
2  also in the meeting, that's correct?
3      A.   Excuse me.
4      Q.   Was Johnnie Todd also in the
5  meeting?
6      A.   Yes.
7      Q.   Okay.  Do you know Johnnie
8  Todd?
9      A.   I worked with her probably
10  once or twice in her store.
11     Q.   Okay.  Do you know why she was
12  there?
13     A.   No, but --
14     Q.   Do you have any reason to
15  believe that Johnnie Todd is an untruthful
16  person?
17     A.   I don't know her so I can't
18  say that.
19     Q.   Just to recap your testimony,
20  you told Mr. Trawick that you were not
21  going to answer any more questions without
22  having a witness or an attorney present?
23     A.   Yes.

Page 59

1      Q.   Why would you want an attorney
2  present?
3      A.   I said a witness or an
4  attorney.  Because, therefore -- I mean,
5  he had a witness.
6      Q.   Okay.  And do you have any
7  idea why Mr. Trawick was asking you these
8  questions?
9      A.   No, he just told me he wanted
10  to get to know me better.
11     Q.   Do you think that was part of
12  his job, just to ask questions for no
13  reason?
14     A.   I mean, if he was doing an
15  investigation, he was supposed to state
16  it.  He was supposed to say, look --
17     Q.   But you weren't conducting
18  that investigation, now, were you,
19  Ms. Love?
20     A.   Was I what?
21     Q.   You weren't in charge of that
22  investigation, were you?
23     A.   Was I in charge?

Page 60

1      Q.   Were you in charge of that
2  investigation?
3      A.   No.
4      Q.   No, you were not; is that
5  correct?
6      A.   Yes.
7      Q.   Mr. Trawick was the one asking
8  the questions, wasn't he?
9      A.   Yes.
10     Q.   Do you think Mr. Trawick was
11  just trying to be friendly?
12     A.   I don't know.
13     Q.   But regardless, you weren't
14  going to answer any of his questions after
15  he asked those few without a lawyer or a
16  witness present?
17     A.   Correct.
18     Q.   Did you feel that you needed a
19  witness or a lawyer present to answer
20  questions like you just testified to?
21     A.   Yes, because if I didn't have
22  a witness or an attorney -- or an attorney
23  present, he could have said I said

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 61 to 64)

Page 61

1  anything.  It would be my word against
2  theirs.
3      Q.    But Ms. Todd was there,
4  correct, wasn't she?
5      A.    Yes.
6      Q.    Were there any other positions
7  besides the assistant store manager
8  position at the Opelika store that you
9  applied for at Dollar General?
10     A.    I applied for another store --
11  what is that?  Midway Plaza store, Midway
12  Plaza, Tim --
13     Q.    What position did you apply
14  for at that store?
15     A.    It was an assistant manager
16  position too.
17     Q.    When did you do that?
18     A.    I'm not exactly sure.
19     Q.    Who did you talk to?
20     A.    Tim.  I don't know his last
21  name.
22     Q.    You don't remember his last
23  name?

Page 62

1      A.    No.
2      Q.    How did you apply for it?
3      A.    I called him to ask about the
4  position because I had heard that he had a
5  position -- an assistant manager position
6  was available, so I called him and asked
7  him over the phone.
8      Q.    Were you interviewed for the
9  position?
10     A.    Well, no.  He had already --
11  he -- no.
12     Q.    Had that position already been
13  filled when you asked him?
14     A.    No.
15     Q.    Do you know who filled the
16  position?
17     A.    I'm not for sure.
18     Q.    Did anybody at Dollar General
19  ever contact you about that position?
20     A.    Well, Tim, he told me when I
21  called him and talked to him about the
22  position, he told me that he had to talk
23  it over with Charles McDonald and he would

Page 63

1  call me back.
2          So I called him back probably
3  about like a week later, and he told me
4  Charles said that he doesn't think I am
5  ready.
6      Q.    Now, this was the assistant
7  store manager position at the Meatway
8  (sic) Plaza store?
9      A.    Yes.
10         MS. MUHAMMAD:  I think it is
11  Midway Plaza.
12     Q.    (BY MR. ADAY:)  Midway Plaza,
13  that sound more like it.  Midway Plaza
14  store.
15     A.    Midway.
16     Q.    But you don't remember when
17  you talked to Tim?
18     A.    No.
19     Q.    You don't remember Tim's last
20  name?
21     A.    No.
22     Q.    You didn't submit any
23  paperwork?

Page 64

1      A.    No.
2      Q.    You don't know who got that
3  position?
4      A.    No.
5      Q.    How did you even know that
6  position was available?
7      A.    A guy name Cedric that was
8  working there, he had told me about the
9  position.
10     Q.    A guy named Cedric, is that
11  correct?
12     A.    Uh-huh.
13     Q.    Do you remember Cedric's last
14  name?
15     A.    No.
16     Q.    What store did Cedric work at?
17     A.    Midway Plaza.
18     Q.    How did you know Cedric?
19     A.    Because I used to work over
20  there to help out when they were
21  shorthanded.
22     Q.    Did you have a conversation
23  with Cedric about this assistant store

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 65 to 68)

Page 65

1  manager position?
2      A.    We didn't really conversate
3  about it.  He was just telling me that it
4  was available.
5      Q.    Why did he tell you it was
6  available?
7      A.    Why?
8      Q.    Why did he tell you that?  Did
9  he just come out of the blue and say this
10  position is available?  Tell me about what
11  happened.
12      A.    He just, you know, yeah, he
13  was just telling me out of the blue it was
14  available, you know.
15      Q.    Out of the blue?
16      (Pause.)
17      Q.    (BY MR. ADAY:)  Do you think
18  you were discriminated against when you
19  were promoted to third key?
20      A.    Do I think I was discriminated
21  against when I was promoted to third key?
22      Q.    Yes.
23      A.    No.

Page 66

1      Q.    But you think you were
2  discriminated against because you weren't
3  promoted to assistant store manager?
4      A.    Exactly, yes.
5      Q.    And those two events happened
6  within a few months of each other; isn't
7  that correct?
8      A.    I'm not exactly for sure.
9      Q.    But you only worked for Dollar
10  General from March of '05 until October of
11  '05, correct?
12      A.    Yes.
13      Q.    And that happened
14  approximately in July or August of 2005;
15  is that fair?
16      A.    Yeah.
17      Q.    Do you find it strange that
18  you would receive promotion and then not
19  receive a promotion but claim because you
20  didn't receive a promotion it was
21  discriminatory?
22      A.    Yes, because he knew I was
23  qualified and he looked over me.

Page 67

1      Q.    Do you find it odd that they
2  would promote you and then decide not to
3  promote you if they had any kind of
4  discriminatory intent?
5      A.    No.
6      Q.    Do you find it strange that
7  you received a promotion and then you
8  didn't receive a promotion and now you are
9  claiming that because you didn't receive
10  it, it must be discriminatory; do you find
11  that strange?
12      A.    Because it was discriminatory,
13  no, I don't find it strange.
14      Q.    How was it discriminatory?
15      A.    How?
16      Q.    Yes.
17      A.    Because --
18      Q.    I believe you testified before
19  that Donna Tally was Charles McDonald's
20  niece, correct?
21      A.    Yes.
22      Q.    Okay.  Is there any other
23  reason why you think Donna Tally got that

Page 68

1  position?
2      A.    Because she -- only thing I
3  can say is because she was his niece,
4  because she wasn't qualified more than I
5  was because I had to train her.
6      Q.    Okay.
7      A.    So if I --
8      Q.    Fair enough.  Do you need to
9  take a break, Ms. Love?
10      A.    I'm all right.
11      Q.    You said you had worked with
12  Johnnie Todd before; is that correct?
13      A.    Once -- probably once or
14  twice, occasionally.  I'm not exactly for
15  sure.
16      Q.    Are you aware that you had
17  signed an affidavit saying you had never
18  worked with her before?
19      A.    I said probably.  I can't
20  really recall.
21      Q.    Okay.  Now, after your meeting
22  with Jack Trawick and Johnnie Todd, what
23  happened after you left that meeting?

17

Page 69

1      A.   What happened?
2      Q.   Did you leave the store?
3      A.   Yes, I left the store.
4      Q.   Did they --
5      A.   I was terrified, I was crying.
6  He embarrassed me in front of a customer,
7  employees.  I left --
8      Q.   My question --
9      A.   I know what you are saying.
10     Q.   My question was:  Did you
11 leave the store after that?
12     A.   Yes.
13     Q.   Who contacted you next from
14 Dollar General?
15     A.   Who contacted me when?
16     Q.   Did you have any other contact
17 with Dollar General after you left the
18 store that day?
19     A.   No.
20     Q.   Nobody called you?
21     A.   No.
22     Q.   You didn't come back in the
23 store for any reason?

Page 70

1      A.   No.
2      Q.   You didn't have a meeting with
3  Charles McDonald?
4      A.   Not the same day.  I had a
5  meeting --
6      Q.   That is what I am asking, what
7  happened next?
8      A.   Oh.  Oh.  Well, after that,
9  probably about -- I'm not exactly for sure
10 how long it was, but Jeff called me and
11 asked me could I come down to the store
12 for a meeting at -- you know, at 4:00, and
13 I told him "sure."  So when I got there,
14 he asked me to come to the back.
15          So when I got to the back,
16 Charles McDonald was back there, Jeff
17 Jennings and Donna Taffy was back there,
18 and Charles stated that he had to
19 terminate me because I refused an
20 investigation.
21     Q.   Did you understand what he was
22 talking about when he told you that?
23     A.   I said -- no, I didn't.  I

Page 71

1  said, "I did not refuse an investigation."
2      Q.   But you did just tell me that
3  you refused to answer any more questions
4  without a witness or an attorney?
5      A.   But he --
6      Q.   Isn't that correct, that you
7  refused to answer any more questions
8  without a witness or an attorney present
9  from Mr. Trawick?
10     A.   Yes.
11     Q.   Okay.  What else happened
12 during that meeting that you can remember?
13     A.   He -- I don't know.  He said I
14 refused the investigation.  And I said,
15 "No, I did not refuse the investigation.
16 I just refused to discuss my personal
17 business with Mr. Trawick."
18          And he -- and I was telling him
19 what happened, you know, when we was back
20 there in the meeting and stuff.  And --
21     Q.   But you made the determination
22 of what questions you were going to answer
23 and which questions you were not going to

Page 72

1  answer; isn't that correct, Ms. Love?
2      A.   No.
3      Q.   You decided not to answer
4  certain questions that Mr. Trawick asked
5  you.
6      A.   Because --
7      Q.   Yes or no, you decided not to
8  answer certain questions that Mr. Trawick
9  asked you; isn't that correct?
10     A.   Yes.
11     Q.   And you weren't the one making
12 the decisions on which questions could be
13 asked; isn't that right?
14     A.   Yes.
15          MR. ADAY:  Actually, Lateefah,
16 this would probably be a good time -- we
17 have to get out at noon anyway for the
18 Bar.  They close from noon until 1:00.  If
19 it is okay with you, without getting into
20 something else, I can get into another
21 topic --
22          (Off-the-record discussion.)
23          (Whereupon, a lunch break was

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 73 to 76)

Page 73

1 had from 11:46 a.m. until 1:07
2 p.m.)
3    MR. ADAY: Is everybody ready?
4    MS. MUHAMMAD: Yes.
5    MR. ADAY: We can go back on.
6    Q.   (BY MR. ADAY:) Okay,
7 Ms. Love, we are continuing the deposition
8 after the lunch break. I believe when we
9 took our break, we were asking about your
10 final meeting with Charles McDonald; is
11 that correct?
12    A.   Yes.
13    Q.   I would like to go back just a
14 little bit in the timeline and ask you
15 just a few more questions about your
16 meeting with Jack Trawick and Johnnie
17 Todd.
18       During that meeting, did you
19 ever mention that you wanted to use a tape
20 recorder?
21    A.   No. I mean -- no.
22    Q.   Did you ever say that your
23 lawyer wouldn't want you to talk?

Page 74

1    A.   Excuse me?
2    Q.   Did you ever say during that
3 meeting that your lawyer would not want
4 you to talk?
5    A.   My lawyer?
6    Q.   Yes.
7    A.   No.
8    Q.   If Johnnie Todd said that you
9 said those things, would she be lying?
10    A.   Yes.
11    Q.   Why would she lie?
12    A.   I don't know why she would
13 lie, but --
14    MS. MUHAMMAD: Finish your
15 statement.
16    A.   I don't know why she would
17 lie, but it is -- you know, she didn't
18 tell me -- it wasn't nothing -- it didn't
19 come up about a --
20    MR. ADAY: I'm going to strike
21 that as nonresponsive.
22    Q.   (BY MR. ADAY:) I asked why
23 would she lie?

Page 75

1    A.   Why would she lie? I wouldn't
2 think she would lie but you never know. I
3 didn't have a witness.
4    Q.   But she was a witness, she was
5 there, right?
6    A.   Yes. She was his witness, not
7 my witness, though.
8    Q.   So you went into that meeting
9 knowing it was a you against Dollar
10 General type situation; is that what you
11 are saying?
12    A.   No.
13    (Whereupon, Defendant's
14    Exhibit 5 was marked for
15    identification.)
16    MR. ADAY: I have a document I
17 want to mark as Defendant's 5, ask you to
18 look at that.
19    Q.   (BY MR. ADAY:) I just want
20 you to confirm that that is your signature
21 at the bottom of this document?
22    A.   Yes.
23    Q.   And you see above your

Page 76

1 signature where it says, "I certify that
2 all information above is true and
3 correct." Do you see that?
4    A.   Yes.
5    Q.   Did you so certify by signing
6 this document?
7    A.   Yes.
8    MS. MUHAMMAD: Do you have
9 copies of these for me?
10    MR. ADAY: Not of this one.
11 Not of this one. Just the court
12 reporter's.
13    (Off-the-record discussion.)
14    MR. ADAY: Can we go off the
15 record for a second.
16    MS. MUHAMMAD: Sure.
17    (Off-the-record discussion.)
18    MR. ADAY: Okay. Can we go
19 back on?
20    MS. MUHAMMAD: Sure.
21    Q.   (BY MR. ADAY:) All right.
22 Ms. Love, have you ever sought any
23 treatment for any kind of mental or

19

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 77 to 80)

Page 77

1 psychological problems you may have had?
2     A.    No.
3     Q.    You never have?
4     A.    No, I mean not since -- until
5 now.
6     Q.    When is "since until now"?
7     A.    I mean, I can't exactly
8 remember the date when I first seen my
9 doctor, Dr. Gam.  He is a psychologist.
10     Q.    And did you have a visit with
11 Dr. Gam?
12     A.    Yes.
13     Q.    When did that visit occur?
14     A.    I'm not for sure what date it
15 was.
16     Q.    Can you give me an approximate
17 date?
18     A.    I can't recall.
19     Q.    Was it sometime in 2007?
20     A.    Yes.
21     Q.    Who referred you to Dr. Gam?
22     A.    I referred myself.  I mean, I
23 just got the phonebook and, you know --

Page 78

1     Q.    Well, if Dr. Gam's report says
2 you were referred by an ex-patient of his,
3 who would he be referring to?
4     A.    Huh-uh.
5     Q.    You have to answer out loud
6 for the court reporter?
7     A.    Excuse me?
8     Q.    You have to answer out loud
9 for the court reporter.  I know it is hard
10 sometimes.
11     A.    It had to have been probably
12 my godmother.
13     Q.    Who was that?
14     A.    Dorothy Wilson.
15     Q.    Is she the one who first told
16 you about Dr. Gam?
17     A.    Yes.
18     Q.    Did your lawyer refer you to
19 go see Dr. Gam?
20     A.    No.
21     Q.    How many times have you
22 visited Dr. Gam?
23     A.    I see Dr. Gam twice a week.

Page 79

1     Q.    When is the last time you saw
2 him?
3     A.    Yesterday.
4     (Off-the-record discussion.)
5     Q.    (BY MR. ADAY:)  Let's go
6 through your visits with Dr. Gam.  When
7 you first met with Dr. Gam, do you recall
8 what kind of conversation you had?
9     A.    Well, when I had my first
10 visit, he did an evaluation on me.
11     Q.    Okay.  What did he do exactly?
12     A.    It just -- a lot of
13 questions -- a lot of questions you had to
14 answer yes or no to.
15     Q.    Were you truthful with him --
16     A.    Yes.
17     Q.    -- in the examination?  Did
18 you think he was a good doctor?
19     A.    Yes.
20     Q.    Did you tell him about your
21 childhood?
22     A.    Yes.  I mean --
23     Q.    What did you tell him about

Page 80

1 your childhood?
2     A.    I had a good childhood.
3     Q.    Did you tell him about your
4 mother and father?
5     A.    Yes.
6     Q.    Did you tell him that you are
7 not close to your father?
8     A.    Yes.
9     Q.    Did you describe him as not
10 being a good person?
11     A.    I mean, no, I didn't describe
12 him not being a good person; it is just we
13 wasn't close.
14     Q.    So if Dr. Gam's report said
15 you described him as not being a good
16 person, that is not right?
17     A.    I mean, we just wasn't close.
18 I mean --
19     MS. MUHAMMAD:  I'm going to
20 object to this line of questioning,
21 relevance.
22     MR. ADAY:  That is fine, but
23 you have put mental anguish damages as an

Page 81

1  issue in this case and I have a right to
2  know each and every thing that she talked
3  about with her doctor or that could have
4  caused mental anguish.
5       MS. MUHAMMAD: I don't have a
6  problem with that but my concern is you
7  are getting into is an area that had
8  nothing to do with the mental anguish of
9  this particular action.
10      MR. ADAY: Maybe so. That is
11  what we are trying to figure out today.
12      Q.   (BY MR. ADAY:) Do you have
13  any reason to believe that Dr. Gam's
14  examination of you has been flawed in any
15  way?
16      A.   No.
17      Q.   Has he diagnosed you with any
18  mental illness?
19      A.   Yes.
20      Q.   What did he diagnose you with?
21      A.   Promatic (sic) stress
22  disorder.
23      Q.   I want you to say that again

Page 82

1  for the court reporter?
2      A.   Promatic (sic) stress -- I
3  might not be pronouncing it right, but I
4  think it is promatic (sic) (sic) -- pro --
5      MS. MUHAMMAD: Perhaps you
6  might show her something that might help
7  her in her recollection.
8      MR. ADAY: She should know
9  what she was diagnosed with. I'm just
10  asking her for her recollection.
11      Q.   (BY MR. ADAY:) Do you
12  remember what he diagnosed you with?
13      A.   I know it was a stress
14  disorder.
15      Q.   Do you know what type of
16  stress disorder?
17      A.   No.
18      Q.   Back on your childhood, you
19  told me before that your parents
20  separated, correct?
21      A.   Yes.
22      Q.   Were you approximately fifteen
23  years old when that happened?

Page 83

1      A.   I'm not for sure.
2      Q.   If Dr. Gam's report says that
3  you said you were fifteen years old when
4  that happened, would it be wrong?
5      A.   I'm not -- I just don't recall
6  because I don't remember, so I know -- I
7  don't think I told him I was fifteen, but
8  I'm not for sure.
9      Q.   Were you old enough to know
10  what was going on at the time?
11      A.   I'm not for sure.
12      Q.   You mean to tell me you don't
13  have any recollection of your parents
14  separating?
15      A.   I know they were separated,
16  but I don't know how old I was. I can't
17  remember how old I was, though.
18      Q.   Were you a teenager?
19      A.   I can't remember.
20      Q.   Were you five years old? You
21  have no recollection of when this
22  happened?
23      MS. MUHAMMAD: I believe that

Page 84

1  was her testimony, she doesn't remember.
2      Q.   (BY MR. ADAY:) Was your
3  parents' separation hard on you?
4      A.   No, I don't remember though.
5      Q.   You don't remember any details
6  of your parents' separation? May I remind
7  you, you are under oath today? Is it your
8  testimony today that you don't remember
9  any details of your parents' separation?
10  Do you remember when it happened?
11      A.   I don't remember exactly how
12  old I was and --
13      Q.   I'm asking you: Do you
14  remember when it happened?
15      A.   No.
16      Q.   Do you remember where you were
17  living when it happened?
18      A.   I was -- I think -- I'm not
19  for sure. I was staying in Loachapoka for
20  I know about fifteen years, so when it
21  happened, it had to be somewhere down
22  there; but I'm not for sure.
23      Q.   Do you remember any of the

21

KINERA LOVE                                                                KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.                                        October 30, 2007

(Pages 85 to 88)

Page 85

1    events that led to your parents'
2    separation?
3         A.   No.
4         Q.   You don't remember any
5    arguments that you were privy to or I
6    should say that you witnessed between your
7    parents?
8         A.   No.
9         Q.   So it is your testimony today
10   that your parents separated, but you have
11   no recollection of it; is that correct?
12        A.   Yes.
13        Q.   Do you expect me to believe
14   that?
15            MS. MUHAMMAD:  Objection.
16            MR. ADAY:  Withdrawn.
17        Q.   (BY MR. ADAY:)  How do you
18   feel emotionally?  Was it difficult on you
19   having parents separated?
20        A.   I can't remember.
21        Q.   What about today?  Is it hard
22   on you today that your parents are
23   separated?

Page 86

1         A.   No.
2         Q.   You don't care if they are
3    separated or together?
4         A.   No.
5         Q.   How long did you live with
6    your parents?
7         A.   I can't remember.  I don't
8    recall.
9         Q.   You don't remember how many
10   years you lived with your mother and
11   father?
12        A.   Talking about when they was
13   together --
14        Q.   When they were together.
15        A.   -- or when they were
16   separated?
17        Q.   When they were together.
18        A.   I can't recall because -- if
19   that is the case, I would remember when
20   they were separated.
21           (Off-the-record discussion.)
22        Q.   (BY MR. ADAY:)  But you
23   testified before, you can't remember if

Page 87

1    you were a child, a teenager or an adult
2    when your parents separated; is that true?
3         A.   I just can't remember how old
4    I was when they separated and what was the
5    cause of the separation.
6         Q.   Were you a teenager when they
7    separated?
8         A.   I don't recall.  I can't
9    remember.
10        Q.   Were you an adult when they
11   separated?  Were you over the age of five
12   when they separated?
13            MS. MUHAMMAD:  Again, object.
14   I think she said she didn't remember.
15        Q.   (BY MR. ADAY:)  Were you over
16   the age of five when they separated?
17        A.   I don't remember.
18        Q.   Do you smoke?
19        A.   Yes.
20        Q.   How much do you smoke?
21        A.   Probably about a half a pack a
22   day.
23        Q.   If Dr. Gam's report said that

Page 88

1    you smoked more than a half a pack a day,
2    would that be incorrect?
3         A.   It all depends.  If I am
4    stressed, I smoke more.
5         Q.   Well, that leads me to the
6    next question.  Why do you smoke?
7         A.   Why do I smoke?  Well, I --
8    because really, I just be stressed out so
9    much.
10        Q.   Could you tell me some of the
11   things that stress you out?
12        A.   (No audible response.)
13        Q.   Let me withdraw that last
14   question.  You testified previously that
15   you cared for a foster child at some point
16   in time; is that correct?
17        A.   No.
18        Q.   You have never had a foster
19   child?
20        A.   No.
21        Q.   You did not testify --
22        A.   I said I had a niece named
23   Gaylen McGhee.

22

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 89 to 92)

Page 89

1  Q.   Is it your testimony that you
2  have never had a foster child?
3  A.   Correct.
4  Q.   Even if that appears on your
5  tax returns, your testimony is that you
6  have never had a foster child?
7  A.   Yes.
8  Q.   Okay.  Well, then, you have
9  testified that you have supported your
10  niece, correct?
11  A.   Yes.
12  Q.   Why have you had to support
13  your niece?
14  A.   Well, because at that time,
15  her mother wasn't working.
16  Q.   Who is her mother?
17  A.   Who is her mother?
18  Q.   Yes.
19  A.   Marcie McGhee.
20  (Off-the-record discussion.)
21  Q.   (BY MR. ADAY:)  Are you
22  related to Marcie McGhee?
23  A.   No, my brother had a baby by

Page 90

1  her, had Gaylen by her.
2  Q.   So she would have been your
3  sister-in-law if they had been married?
4  A.   Yes.
5  Q.   And can you tell me a little
6  bit about the situation which led to your
7  having to take care of her child?
8  A.   She wasn't working.
9  Q.   Is there any other reason you
10  had to take care of her child?
11  A.   Well, she is my niece.  I
12  mean, and I don't want my niece going
13  lacking for nothing.
14  Q.   Did that cause you stress,
15  having to take care of --
16  A.   Yes, when you are not really
17  able to do it.
18  Q.   I understand.  I am just
19  asking you.  I mean, I completely
20  understand.  Have you ever supported a
21  nephew of yours?
22  A.   Not lately, I know I haven't.
23  Q.   I'm sorry.  Can you speak up?

Page 91

1  A.   Oh, not that I know of.
2  Q.   Well, you would know if you
3  supported a child --
4  A.   I mean, I do for all my nieces
5  and nephews.
6  Q.   Because on your tax returns, I
7  will represent to you that you have
8  claimed that you have supported a niece, a
9  nephew and a foster child and have taken
10  deductions on your taxes based on them
11  being one of your dependents.  Okay.  So I
12  am asking you, have you supported a
13  nephew?
14  A.   Yes.
15  Q.   Who was that?
16  A.   Justin McGhee.
17  Q.   Why didn't you tell me that
18  earlier?  I asked you earlier how many
19  children did you support, and you just
20  told me your niece.
21  A.   I forgot.
22  Q.   Are you having memory
23  problems, Ms. Love?

Page 92

1  A.   No.
2  Q.   Because you can't -- I mean,
3  if I can characterize your testimony, you
4  don't remember when your parents separated
5  or any of the circumstances around that;
6  and you are not remembering children that
7  you have supported that you have claimed
8  on your tax returns as being dependents;
9  is that correct?
10  MS. MUHAMMAD:  Objection.
11  A.   Because I --
12  MS. MUHAMMAD:  I don't know if
13  you asked her about that particular nephew
14  before.
15  A.   He asked me about --
16  MR. ADAY:  I believe I did.
17  Q.   (BY MR. ADAY:)  I asked how
18  many children you have supported.  You
19  told me your niece; and now you told me
20  your nephew?
21  A.   You also asked me about the
22  foster child.
23  Q.   Yes.

Page 93

1    A.    You asked me who was Climmie
2  Love.  You didn't say nothing about who
3  else --
4    Q.    We will let the record speak
5  for itself on that.  You have supported
6  Justin McGhee in addition to your niece,
7  who was --
8    A.    Gaylen McGhee.
9    Q.    Are there any other children
10 that you have supported?
11   A.    No.
12   Q.    Why did you have to support
13 Justin McGhee?
14   A.    Because she wasn't working
15 either.
16   Q.    Is that Marcie's son?
17   A.    Yes.
18   Q.    Are there any other reasons
19 why you had to support Justin McGhee other
20 than his mother not working?
21   A.    That is the only reason.
22   Q.    Did you provide financially
23 for Justin McGhee?

Page 94

1    A.    Yes.
2    Q.    Did you provide for his
3  clothes?
4    A.    Yes.
5    Q.    Provide for his food?
6    A.    Yes.
7    Q.    Provide activities?
8    A.    Yes.
9    Q.    And you did that on top of
10 working, correct?
11   A.    Yes.
12   Q.    Did that add stress to your
13 life?
14   A.    It is stressful when you are
15 trying to do something when you are really
16 not able, but it didn't, you know,
17 interfere -- you know, bother me as
18 much as what I am --
19   Q.    Trust me.  I understand, if it
20 caused you stress, that is all I am
21 asking.  I understand it is not easy.  Do
22 you want to get married some day?
23   A.    Yes.

Page 95

1    Q.    Have you been upset that you
2  haven't gotten married to this point in
3  time?
4    A.    No.
5    Q.    Do you have any friends?
6    A.    Friends?  Yes.
7    Q.    I noticed in Dr. Gam's report
8  that he said you don't visit friends?
9    A.    I mean, I have a social -- but
10 I don't visit nobody.  I don't go nowhere.
11   Q.    Do they come visit at your
12 house?
13   A.    They have, but I don't -- I
14 don't go visit.
15   Q.    Who are some of your friends?
16   A.    Who are some of my friends?
17 Marcie McGhee, Jennifer Shealy.
18   Q.    I'm sorry.  Can you speak up?
19   A.    Jennifer Shealy.
20   Q.    Would you say that Tiffany
21 Cross is one of your friends?
22   A.    Yes.
23   Q.    Do you have a close

Page 96

1  relationship with Tiffany Cross?  Are you
2  all good friends, I should say?
3    A.    Yes, we are good friends.
4    Q.    You are good friends with
5  Marcie McGhee, I take it?
6    A.    Yes.
7    Q.    You are supporting her
8  children, I assume you all are friends; is
9  that correct?
10   A.    Yes.
11   Q.    Have you had any relationship
12 with your father since your mother and
13 father separated?
14   A.    Not really.
15   Q.    When is the last time you saw
16 him?
17   A.    I can't recall.
18   Q.    Has it been over ten years?
19   A.    No.
20   Q.    Less than ten years?
21   A.    Uh-huh.
22   Q.    Can you give me the
23 approximate time, the last time you saw

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 97 to 100)

Page 97

1  him?
2      A.   No.
3      Q.   Does that upset you that you
4  haven't had the opportunity to have a
5  relationship with your father?
6      A.   No.
7      Q.   Why not?
8      A.   I mean, it just don't.
9      Q.   Did he ever do anything to
10 you?
11     A.   No.
12     Q.   Is he still alive?
13     A.   What?
14     Q.   Is he still alive?
15     A.   Yes.
16     Q.   Do you have any brothers or
17 sisters?
18     A.   Yes.
19     Q.   How many?
20     A.   I have two brothers and one
21 whole sister and three half-sisters.
22     Q.   Who are your brothers?
23     A.   Lonnie Love, Alvin Ogletree,

Page 98

1  Salissa Love --
2      Q.   Is that your sister?
3      A.   Yes.
4      Q.   I was going to say, who is
5  your whole sister?
6      A.   Whole sister, yeah.
7      Q.   Salissa?
8      A.   Yes, S-A-L-I-S-S-A.
9      Q.   And who are your half-sisters?
10     A.   Okay.  Sharonda Webb,
11 Elaine -- I don't know what her married
12 name is, but it was Ogletree, and Melody
13 Ogletree.
14         MS. MUHAMMAD:  Would you spell
15 those so that the court reporter would
16 have the spellings.
17     Q.   (BY MR. ADAY:)  My next
18 question; yes, please, if you could spell
19 those names for the court reporter?
20     A.   Elaine, E-L-A-I-N-E, Melody is
21 M-E-L-O-D-Y.  Excuse me.  I am sorry.
22     Q.   Do you have a good
23 relationship with all your brothers and

Page 99

1  sisters?
2      A.   Yes.
3      Q.   Do they all still live in the
4  Auburn/Opelika area?
5      A.   Yes.
6      Q.   Why did you tell Dr. Gam that
7  your father wasn't a good person?
8          MS. MUHAMMAD:  Objection.  We
9  don't know if she told him that, do we?
10 Has she testified to that?
11         MR. ADAY:  I will rephrase.
12     Q.   (BY MR. ADAY:)  Dr. Gam's
13 report says that you told him that your
14 father was not a good person; is that
15 correct?
16     A.   I don't recall telling him
17 that.
18     Q.   Okay.  Now, Ms. Love, I'm
19 going to ask you a few questions because I
20 have to, okay?  I have to ask you, have
21 you ever been sexually assaulted in your
22 life?
23     A.   No.

Page 100

1      Q.   Have you ever lost a loved
2  one, a close relative?
3      A.   Yes.
4      Q.   Who is that?
5      A.   My grandmother.
6      Q.   What was her name?
7      A.   Ann Liz McCrae --
8      Q.   You have to speak up.
9      A.   Ann Liz McCrae.  Excuse me.
10     Q.   And when did she die?
11     A.   She died in -- I think it was
12 like '03.
13     Q.   Were you close with her?
14     A.   Yes.
15     Q.   How old was she when she died?
16     A.   She was -- I think she was
17 like eighty-four or eighty-five.
18     Q.   Had she been sick?
19     A.   Yes.
20     Q.   Did you have to care for her
21 while she was sick?
22     A.   No.
23     Q.   Who cared for her?

25

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

Page 101

1    A.    My auntie.
2    Q.    Ms. Love, do you find that you
3 are able to remember some things clearly
4 and other things you can't remember very
5 well?
6    A.    Do I find myself remembering
7 some things clearly?  Yes.
8    Q.    Okay.  Because you just
9 testified you remembered the year and age
10 of your grandmother at the time of her
11 death, but you also testified that you
12 couldn't remember any details of your
13 parents' separation.  And I am asking you,
14 do you have memory problems?
15    A.    No.
16    Q.    Is it possible that you don't
17 recall some of the details of your
18 employment at Dollar General?
19    A.    Is it possible I what now?
20    Q.    Is it possible that you don't
21 remember some of the details of your
22 employment at Dollar General?
23    A.    No.

Page 102

1    Q.    You are saying you remember
2 everything about your employment at Dollar
3 General?
4    A.    Yes.
5    Q.    But you don't remember when
6 your parents were separated?
7    A.    No.
8    Q.    If Dr. Gam said that you had
9 memory problems, would he be incorrect?
10    A.    I can't --
11    Q.    You have no reason to doubt
12 him though, right?
13    A.    No.
14    Q.    You said he was a good doctor,
15 correct?
16    A.    Yes, I did.
17    Q.    How old is your father?
18    A.    My father is -- I want to say
19 he is about sixty-two or sixty-three.  I'm
20 not exactly for sure, though.
21    Q.    Are you a member of a church,
22 Ms. Love?
23    A.    Yes.

Page 103

1    Q.    What church is that?
2    A.    Mount Pelia in Waverly,
3 Alabama.
4    (Off-the-record discussion.)
5    Q.    (BY MR. ADAY:)  Do you attend
6 church regularly?
7    A.    Yes.
8    Q.    Do you have friends at church?
9    A.    Mostly everybody in church is
10 my relative.
11    Q.    Well, my question was do you
12 have friends at church?
13    A.    Yes.
14    Q.    Do you ever go on activities
15 with your church?
16    A.    No.
17    Q.    Do you ever go to parties with
18 your church group?
19    A.    No.
20    Q.    Would you consider yourself an
21 outgoing person?
22    A.    No.
23    Q.    Do you feel that you are good

Page 104

1 at facing problems and overcoming those
2 problems?
3    A.    Yes.
4    Q.    Earlier in the deposition, we
5 talked about Candice Harrison and Donna
6 Tally.  And we talked about that they made
7 complaints that you had asked -- you had
8 let -- strike that.
9    Why do you think Donna Tally
10 would say that you asked her for discounts
11 on pajamas and on a gallon of iced tea and
12 on a gallon of milk?
13    A.    Because I think she would say
14 that because when I -- that I called -- I
15 called ERC and made a complaint about --
16 against Charles, her uncle.
17    Q.    But you deny the merits of
18 those --
19    A.    Excuse me?
20    Q.    You deny that her complaint
21 has any merit, right?
22    A.    Yes.
23    Q.    But you don't deny that it

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

Page 105

1  happened, correct?
2       A.   I mean, it didn't happen.
3       Q.   But I think you testified
4  earlier that if we had documents to show
5  that it did happen, you would have no way
6  to refute that, would you?
7       A.   I can't understand you.
8  Rephrase.
9       Q.   If Dollar General has
10  documents that show that she did make a
11  complaint, you wouldn't have any way to
12  refute that, now, would you?
13       A.   I mean I wouldn't have --
14       Q.   The existence of the
15  complaint, correct?
16       A.   Correct.
17       Q.   Okay.  We have covered that.
18  Let me move on.  All right.  Ms. Tally, I
19  am going to show you a document -- I'm
20  sorry, Ms. Love -- that I am going to mark
21  as Defendant's Exhibit 6.
22            (Whereupon, Defendant's
23            Exhibit 6 was marked for

Page 106

1            identification.)
2       Q.   (BY MR. ADAY:)  Take a look at
3  that.  Do you recognize that document,
4  Ms. Love?
5       A.   Yes.
6            MR. ADAY:  Let the record
7  reflect that it is Plaintiff's Initial
8  Disclosures.
9       Q.   (BY MR. ADAY:)  I will just
10  ask you a few questions about this.  Who
11  is Jean Love?
12       A.   That is my mother.  Her name
13  is Climmie Jean Love.
14       Q.   So that is Climmie Love, your
15  mother?
16       A.   Yes.
17       Q.   Have you discussed your case
18  with her?
19       A.   Well, I really didn't have to
20  discuss it with her because when I was
21  going through the problems I was having at
22  Dollar General, she was a witness, she
23  would see how it would terrify me, the way

Page 107

1  I was being treated.
2       Q.   So you didn't have any
3  conversations with her about this case?
4       A.   I mean, I talked to her about
5  it, but she actually witnessed it herself
6  because --
7       Q.   My question is, did you have
8  any conversations with her about your
9  lawsuit that you filed against Dollar
10  General?
11       A.   Yes.
12       Q.   What did you talk to her
13  about?
14       A.   I can't recall.
15       Q.   So if you didn't talk to her
16  about your case, what would she know about
17  your lawsuit?
18       A.   I am saying that I didn't
19  discuss it with her about my lawsuit, it
20  was just she witnessed what I was going
21  through when I was there.
22       Q.   What did she witness, exactly?
23       A.   She witnessed how terrified I

Page 108

1  was when I would get off at work at night
2  because I would come home crying.
3       Q.   Anything else?
4       A.   (No audible response.)
5       Q.   Okay.  Tiffany Cross, she was
6  your store manager at Opelika, correct?
7       A.   Yes.
8       Q.   She is a friend of yours,
9  correct?
10       A.   Yes.
11       Q.   Do you know if she still works
12  for Dollar General?
13       A.   I'm not for sure.
14       Q.   Did you have any conversations
15  with her about your case?
16       A.   I can't recall at the moment.
17       Q.   Are you aware she was
18  terminated from Dollar General?
19       A.   No.
20       Q.   Are you aware she was
21  terminated for bouncing checks at Dollar
22  General?
23       A.   No.

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

Page 109

1   Q.   Marcie McGhee, I think you
2   testified is a friend of yours, correct?
3   A.   Yes.
4   Q.   You have taken care of her
5   children, correct?
6   A.   Yes.
7   Q.   Have you had conversations
8   with her about your case?
9   A.   No.  No.
10   Q.   Even though she submitted an
11   affidavit that you have produced through
12   your lawyer, you have never talked to her
13   about your case?
14   A.   I mean, she wrote an affidavit
15   about when they wouldn't hire her.
16   Q.   Did you talk to her about
17   that?
18   A.   Did I talk to her about it?
19   Q.   (Nodding.)
20   A.   She was asking questions why
21   they wouldn't hire her.
22   Q.   Okay.  Jamie Jennings, was
23   that a co-workers of yours?

Page 110

1   A.   Jamie Jennings, that is Jeff
2   Jennings' stepdaughter.  That is -- I
3   don't know if that is really her last
4   name, but I just assumed it because that
5   is his stepdaughter.
6   Q.   Was she a coworker of yours
7   was my question.
8   A.   Yes.
9   Q.   Did you ever have any
10   conversations with her about the case?
11   A.   No.
12   Q.   Okay.  Johnnie, I assume is
13   Johnnie Todd; is that correct?
14   A.   Correct.
15   Q.   Did you have any conversations
16   with Johnnie Todd about your case?
17   A.   No.
18   Q.   Julie Morrison, is that a
19   coworker of yours?
20   A.   She was the store manager at
21   the Dollar General next to Kroger.
22   Q.   Did you ever have any
23   conversations with her about your case?

Page 111

1   A.   No.
2   Q.   Tammy Stevenson?
3   A.   No.
4   Q.   Never had any conversations
5   with her about your case?
6   A.   No.
7   Q.   Donna Tally?
8   A.   No.
9   Q.   Wanda, last name unknown --
10   who is Wanda?
11   A.   She is the lady that I talked
12   to when I called ERC.
13   Q.   Okay.  And Jamie Jennings, you
14   put her down on your initial disclosures
15   because she would be able to testify just
16   to your overall job performance; is that
17   correct?
18   A.   Jamie who?
19   Q.   Jamie Jennings.
20   A.   Yes.
21   Q.   Same with Julie Morrison?
22   A.   Yes.  And Tammy Stevenson.
23   Q.   And the same with Donna Tally?

Page 112

1   A.   And Donna Tally, yes, because
2   I trained her.
3        (Whereupon, Defendant's
4        Exhibit 7 was marked for
5        identification.)
6        MR. ADAY:  I will mark a
7   document as Defendant's Exhibit 7.
8        Q.   (BY MR. ADAY:)  I ask that you
9   take a look at it.
10        MS. MUHAMMAD:  Do you have
11   copies for me?
12        MR. ADAY:  I think so.
13        Q.   (BY MR. ADAY:)  Do you
14   recognize that document, Ms. Love?
15        A.   Yes.
16        Q.   And that is your response to
17   Dollar General's interrogatories to you;
18   is that correct?
19        A.   Yes.
20        Q.   I would like to turn your
21   attention to Page 6.  Is that your
22   signature?
23        A.   Yes.

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 113 to 116)

| Page 113 | Page 115 |
|---|---|

Page 113

1    Q.    And by signing, you have
2  signified that everything is true and
3  correct on this document?
4    A.    Correct.
5        (Whereupon, Defendant's
6        Exhibit 8 was marked for
7        identification.)
8        MR. ADAY: I will mark a
9  document as Defendant's Exhibit 8.
10        MS. MUHAMMAD: I don't think I
11  have a 6.  Do you have a copy for me of 6?
12        MR. ADAY:  Initial
13  disclosures.
14    Q.    (BY MR. ADAY:)  Have you seen
15  that document before, Ms. Love?
16    A.    Yes.
17    Q.    Okay.  And that is your
18  response to our Request for Production of
19  Documents; is that correct?
20    A.    Uh-huh.
21    Q.    Everything in here is true and
22  correct to the best of your ability?
23    A.    Yes.

Page 114

1    Q.    And you have already produced,
2  through your lawyer, some additional
3  documents today; is that right?
4    A.    Correct.
5    Q.    Are there any other documents
6  that you intend to produce in this case in
7  response to our Request for Production?
8    A.    No, not at this moment, no.
9    Q.    Are you thinking there's a
10  possibility you could find any additional
11  documents responsive to any of these
12  requests?
13    A.    No.
14    Q.    Okay.
15    A.    No.
16    Q.    Ms. Love, we are going to ask
17  you some general background questions.
18  Before coming to Dollar General, where did
19  you work?
20    A.    Before I came to Dollar
21  General, I worked at One Source and
22  Sodexho.
23        (Off-the-record discussion.)

Page 115

1    A.    S-O-D-E-X-H-O.
2    Q.    (BY MR. ADAY:)  What did you
3  do for One Source and Sodexho?
4    A.    Custodian.
5    Q.    Where was your work location?
6    A.    Tuskegee.  Tuskegee
7  University.  It should be on Page 3.
8    Q.    That was immediately prior to
9  working at Dollar General, correct?
10    A.    Yes.
11    Q.    Okay.  And how long did you
12  work there?
13    A.    I worked there 2000 -- from
14  July 2000 to February of 2005.
15    Q.    Okay.  And where did you work
16  before Tuskegee University, Sodexho and
17  One Source?
18    A.    Taco Bell.
19    Q.    What did you do at Taco Bell?
20    A.    I was a lead cashier.
21    Q.    What does that mean to be a
22  lead cashier?
23    A.    It is just like a shift

Page 116

1  leader.
2    Q.    What does that mean?
3    A.    That means you be running a
4  shift, you are over a shift, supervisor
5  over a shift.
6    Q.    So if a cashier would have a
7  problem, they would come to you?
8    A.    Yes.
9    Q.    Did you have a manager at Taco
10  Bell that oversaw the whole restaurant?
11    A.    Yes, a store manager.
12    Q.    Okay.  Did you have assistant
13  store manager as well?
14    A.    Well, I don't think we had one
15  at our store.
16    Q.    Was there any position between
17  cashier and store manager?
18    A.    Probably assistant store
19  manager, but, you know, we didn't have one
20  so --
21    Q.    You didn't have one at the
22  time?
23    A.    Huh-uh.

29

KINERA LOVE                                                    KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.                            October 30, 2007

(Pages 117 to 120)

Page 117

1    Q.    Were your job duties as a
2  cashier the typical job duties you would
3  expect of a cashier, you rang up food
4  purchases?
5    A.    Take orders.
6    Q.    Take orders?  Did you do any
7  other job duties there?
8    A.    Schedule, make the schedule
9  up, make orders, not orders -- like
10 invoices -- do invoices, I mean,
11 everything that the store managers would
12 do, the lead cashier would fill in and do
13 it, you know, if he had some --
14   Q.    Did the other cashiers have to
15 report to you in any way?
16   A.    Well, they -- if they were
17 going to be late or something, I could
18 take the call and let the store manager
19 know they were going to be late or
20 whatever like that.
21   Q.    Anything else?
22   A.    That would be all.
23   Q.    What did you do before Taco

Page 118

1  Bell?
2    A.    I worked at Health Data.
3    Q.    What did you do for Health
4  Data?
5    A.    Data input operator.
6    Q.    Okay.  What did that entail
7  your doing for them?
8    A.    Filing auto accidents.
9    Q.    How long were you there?
10   A.    I was there from July 1998
11 until December 1998.
12         (Off-the-record discussion.)
13   Q.    (BY MR. ADAY:)  And where did
14 you work before Health Data?
15         (Off-the-record discussion.)
16   A.    Young's Plant Farm.
17         (Off-the-record discussion.)
18   Q.    (BY MR. ADAY:)  And you are
19 looking at your interrogatory responses
20 right now, correct?
21   A.    Uh-huh.
22   Q.    Did that get cut off, do you
23 see anywhere on your responses that says

Page 119

1  Young's Plant Farm?
2    A.    It must have got cut off
3  because Greg Philpot was my supervisor.
4    Q.    And what did you do for
5  Young's Plant Farm?
6    A.    I was like -- what is it,
7  scanner?
8    Q.    I'm sorry?
9    A.    I was a scanner.
10   Q.    What did you do?
11   A.    The scanner?  That is when the
12 pots and everything go inside the machine
13 and I have got to make sure everything
14 stays on track.
15   Q.    Did you work for Burger King
16 before?
17   A.    Yes.  Before Young's.
18   Q.    Was that your first job?
19   A.    Yes.
20   Q.    Have you had any other jobs
21 before Dollar General?
22   A.    No.  Talking about before
23 Dollar General?

Page 120

1    Q.    Before Dollar General, did you
2  have any other jobs other than what we
3  have talked about here?
4    A.    Oh, these are the only ones.
5    Q.    You never worked for Auburn?
6    A.    Auburn University?  I worked
7  for Southern Management at Auburn
8  University but that is where I am at now.
9    Q.    That is afterwards?
10   A.    Yeah.
11   Q.    That is my next question.
12 Southern Management, what are you doing
13 for them?
14   A.    Custodian.  I am a crew
15 leader.
16   Q.    Southern Management.  Okay.
17 Is that a custodian company?
18   A.    Uh-huh.
19   Q.    Okay.  And your work location
20 is Auburn University?
21   A.    Yes.
22   Q.    And you make six ninety-five
23 an hour, correct?

30

KINERA LOVE

DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE

October 30, 2007

(Pages 121 to 124)

Page 121

1    A.    Well, my pay went up now since
2 then.
3    Q.    Okay.  What is your pay now?
4    A.    Seven fifty.
5    Q.    Do you supervise anybody in
6 that job?
7    A.    Yes.  Well, I am a crew
8 leader/trainer.
9    Q.    What does that mean?
10    A.    That means all the new
11 employees, I train them.
12    Q.    Now, at any of these jobs that
13 you listed, were you ever disciplined for
14 any reason?
15    A.    No.
16    Q.    Did you ever make any kind of
17 complaint to management about anything?
18    A.    No.
19    Q.    You never complained about
20 anything, any kind of complaint?
21    A.    Not that I can recall.
22    Q.    You never had a written
23 disciplinary form at any of these

Page 122

1 employers?
2    A.    A written disciplinary --
3 like --
4    Q.    Were you ever disciplined at
5 any of these employers?
6    A.    No.  No.
7    Q.    Were you ever counseled on
8 your job performance?
9    A.    No.
10    Q.    Were you evaluated on your job
11 performance?
12    A.    Yes, I was evaluated.
13    Q.    Did you ever receive a poor
14 evaluation?
15    A.    No.
16    Q.    Why are you suing Dollar
17 General, Ms. Love?
18    A.    Because they did
19 discrimination toward me.
20    Q.    What do you hope to get out of
21 this lawsuit?
22    A.    Well, I really haven't thought
23 about what I hope to get.  My thing is,

Page 123

1 don't no company need to or nobody need to
2 be discriminated toward nobody, against
3 nobody.  You know, they need to treat
4 everybody the same, no matter if it is
5 your niece, your stepdaughter, you still
6 ought to be treated the same.
7         MR. ADAY:  Can we take a quick
8 break?  I think I am almost done.
9         MS. MUHAMMAD:  Sure.
10         (Off-the-record discussion.)
11    Q.    (BY MR. ADAY:)  Ms. Love, I
12 just have a few more questions for you.  I
13 want to make sure I know everything, okay.
14 You are suing Dollar General because you
15 did not get the assistant store manager
16 position; is that correct?
17    A.    I am suing Dollar General
18 because of discrimination -- okay.
19    Q.    I want to know all your claims
20 against Dollar General.  Are you --
21    A.    Discrimination.
22    Q.    Are you suing because you did
23 not get the assistant store manager?

Page 124

1    A.    I am suing because of
2 discrimination.  I was being -- they
3 discriminated -- I was being
4 discrimination (sic) against because --
5    Q.    And, once again, I'm going to
6 strike this as unresponsive because I want
7 to know your claims in this lawsuit.
8    A.    Okay.
9    Q.    The first one I am saying, I'm
10 not asking why, I am saying are you suing
11 because you did not get the assistant
12 store manager position at the Auburn
13 store?
14    A.    I'm not suing because of that.
15    Q.    You are not suing because of
16 that?
17    A.    (No audible response.)
18    Q.    Are you suing because you
19 didn't get the assistant store manager at
20 the Midway Plaza store?
21    A.    No.
22    Q.    Are you suing because you were
23 terminated from Dollar General?

Page 125

1    A.    I am suing because I was
2  treated unfairly and discrimination
3  towards me.
4    Q.    That is it, that is the only
5  reason?
6    A.    That is the only one.
7    Q.    And it doesn't have anything
8  to do with your not getting the assistant
9  store manager position, correct?
10    A.    I mean, it really doesn't but
11  they looked over me.  So maybe you could
12  say it started with that, the way they --
13  you know, the way they treated me, but the
14  reason why is because I was treated
15  unfairly and discrimination.
16    MS. MUHAMMAD:  I think her
17  Complaint sets it out.
18    MR. ADAY:  I'm entitled to ask
19  why she sued the company and what she
20  expects to get out of it.
21    MS. MUHAMMAD:  But she is not
22  a lawyer.
23    MR. ADAY:  I understand.  And

Page 126

1  I'm not asking for a lawyer answer.
2    Q.    (BY MR. ADAY:)  Any other
3  reason why you are suing Dollar General?
4    A.    No.
5    Q.    I have nothing further at this
6  time.
7
8  EXAMINATION BY MS. MUHAMMAD:
9    Q.    Just for clarification,
10  Ms. Love, I have a few questions I need to
11  ask you.  In your Complaint, you included
12  mental anguish as a reason to sue Dollar
13  General, are you now saying that you are
14  not suing Dollar General for mental
15  anguish?
16    A.    No.
17    Q.    Okay.  In addition to the
18  discrimination charge -- strike that.
19    Because of the discrimination
20  charge that you said occurred when Dollar
21  General overlooked you for the position
22  that you were in line for, are you now
23  saying that that was not discrimination?

Page 127

1    A.    No.
2    MR. ADAY:  Object to the form.
3    Q.    (BY MS. MUHAMMAD:)  So is it
4  your testimony that your being overlooked
5  for the position as manager of the store
6  in Opelika is the same thing as being
7  discriminated against?
8    A.    Yes.
9    MR. ADAY:  Object to the form.
10    Q.    (BY MS. MUHAMMAD:)  Is that
11  your testimony?
12    A.    Yes.
13    MR. ADAY:  Object to the form.
14  She has testified on these areas.
15    Q.    (BY MS. MUHAMMAD:)  In your
16  Complaint, you also show that you were
17  demanding relief from Dollar General for
18  back pay.  Are you now testifying that you
19  don't want back pay?
20    A.    No.
21    MR. ADAY:  Object to the form.
22  Legal conclusion.
23    Q.    (BY MS. MUHAMMAD:)  When

Page 128

1  Mr. Aday asked you earlier about those
2  things that you wanted from Dollar
3  General, you did not include back pay.
4  Are you now saying that you would like to
5  get back pay?
6    A.    Yes.
7    MR. ADAY:  Object to the form.
8  Legal conclusion.
9    Q.    (BY MS. MUHAMMAD:)  When
10  Mr. Aday asked you earlier, you didn't
11  mention anything about actual,
12  compensatory, liquidated and punitive
13  damages.  Are you saying you don't want
14  any damages in this case now?
15    A.    No.
16    MR. ADAY:  Object to the form.
17  Same objection.
18    Q.    (BY MS. MUHAMMAD:)  In your
19  Complaint, you claim that you have been
20  subjected to emotional pain and suffering
21  as a result of your claim of
22  discrimination against Dollar General.
23  Are you saying now that you do not claim

Page 129

1  emotional pain and suffering?
2      A.   No.
3          MR. ADAY:  Object to the form.
4  Same objection.
5      Q.   (BY MS. MUHAMMAD:)  In your
6  Complaint against Dollar General, you show
7  that you are asking for reasonable costs
8  and expenses, including reasonable
9  attorney's fees.  When you told Mr. Aday a
10  few moments ago that you had no further
11  claims or you weren't seeking anything
12  more, are you now saying that you don't
13  want reasonable costs and expenses,
14  including reasonable attorney's fees?
15      A.   No.
16          MR. ADAY:  Object to the form.
17  Same objection.
18      Q.   (BY MS. MUHAMMAD:)  In your
19  Complaint against Dollar General, you are
20  claiming future pecuniary losses.  Are you
21  now saying that you don't have a claim for
22  that against Dollar General?
23      A.   No.

Page 130

1          MR. ADAY:  Same objection.
2      Q.   (BY MS. MUHAMMAD:)  If you
3  will, look at Exhibit 6 with me, please,
4  Plaintiff's Initial Disclosures.  When
5  Mr. Aday asked you earlier what were you
6  claiming against Dollar General, what did
7  you want from Dollar General, did you look
8  at Item Number 3 in your Plaintiff's
9  Initial Disclosures?
10      A.   No.
11      Q.   So when you answered him to
12  say that there was nothing else that you
13  wanted, that was not a correct answer, was
14  it?
15      A.   Yes -- no, I mean it wasn't a
16  correct answer.
17      Q.   So if you look at your Initial
18  Disclosures, does it say what it is that
19  you said you want from Dollar General?
20      A.   Yes.
21      Q.   What does it show, ma'am?
22          MR. ADAY:  Object to the form.
23  Legal conclusions.

Page 131

1      Q.   (BY MS. MUHAMMAD:)  You can
2  answer.
3      A.   Oh.  It shows that --
4      Q.   Item Number 3-A shows what?
5      A.   Back pay.
6      Q.   Okay?  And what amount are you
7  asking for back pay?
8      A.   Forty-five thousand plus the
9  interest of twelve percent.
10      Q.   Okay.  And for compensatory
11  damages in 3-B, what are you asking for?
12      A.   Forty-five thousand --
13          MR. ADAY:  Same objection to
14  this whole line of questioning.
15      A.   Forty-five thousand plus
16  interest at twelve percent.
17      Q.   (BY MS. MUHAMMAD:)  In Item
18  Number 3-C, what are you asking?
19      A.   1.5 -- 1.5 million --
20      Q.   For what?
21      A.   -- plus interest.
22      Q.   So, now, since you have looked
23  at the document that Mr. Aday offered into

Page 132

1  evidence as Exhibit Number 6, those
2  answers that you just gave, are those the
3  correct answers you want the record to
4  reflect on what it is you are asking for
5  from Dollar General?
6      A.   Yes.
7          MR. ADAY:  Object to the form.
8      Q.   (BY MS. MUHAMMAD:)  You
9  earlier testified that you had complained
10  to ERC.  What is ERC?
11      A.   ERC is where you call if you
12  are having problems on your job or
13  something and you are not being treated
14  right or harassment, discrimination, you
15  call there and make a complaint.
16      Q.   And is that an office within
17  Dollar General?
18      A.   Yes.
19          MR. ADAY:  Object to the form.
20      Q.   (BY MS. MUHAMMAD:)  And I
21  believe you testified that you talked to
22  Wanda, someone by the name of Wanda or
23  Wendy?

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 133 to 136)

Page 133

1    A.    Wendy.
2    Q.    Wendy?
3    A.    Yes.
4    Q.    When you called ERC and spoke
5  with Wendy, what was your conversation
6  with Wendy?
7    A.    Well, I just -- I told Wendy
8  that I wasn't being treated fair, they
9  overlooked me on the job. I explained it
10  to her, you know, that I was training
11  Donna, and instead of them giving me the
12  position, they gave it to Donna.
13        And I let them know that I was
14  going through, you know, being treated
15  discrimination (sic) against.
16    Q.    You told Wendy that you felt
17  that you were being discriminated against?
18    A.    Yes.
19    Q.    Did you ever receive any
20  written performance evaluations from any
21  of your supervisors while you were
22  employed at Dollar General?
23    A.    No.

Page 134

1    Q.    Specifically the one at
2  Opelika, did you receive any evaluations
3  there, written evaluations?
4    A.    I can't recall, no.
5    Q.    I believe you testified
6  earlier that you had worked at a store in
7  Opelika, a store in Auburn, a store on
8  Pepperell Parkway. Is that in Opelika
9  also?
10    A.    I worked at the one on 51, at
11  Marvin.
12    Q.    So you worked at Auburn,
13  Opelika, Marvin -- was there another one?
14    A.    Midway Plaza.
15    Q.    Of the four Dollar Generals
16  that you worked in, did any of those
17  supervisors ever do a written evaluation
18  of your performance?
19    A.    I can't -- I'm not for sure.
20  If they did, it was probably Tiffany, but
21  I worked at all of them so -- all of them
22  was talking about how good a worker I am
23  so didn't nobody have a problem about me

Page 135

1  coming to their store. I'm not for sure
2  they did. I haven't seen it.
3    Q.    So if we request of Mr. Aday
4  to produce records showing your
5  performance evaluations, if there are any,
6  they would be in your personnel file?
7    A.    It should be.
8        MR. ADAY:  Object to the form.
9    Q.    (BY MS. MUHAMMAD:)  During
10  Mr. Aday's questioning, he asked you about
11  an employee by the name of Candice
12  Harrison and that she had filed a
13  complaint against you. Did you ever
14  receive notice of that complaint?
15    A.    No.
16    Q.    You may not be able to dispute
17  the complaint, but can you dispute whether
18  or not the complaint is true or false?
19    A.    Yes.
20    Q.    And is that complaint true or
21  false?
22    A.    False.
23    Q.    Had you heard anything about

Page 136

1  that complaint before today?
2    A.    No.
3    Q.    You also heard Mr. Aday ask
4  you questions about a complaint filed by
5  Donna Tally. And do you have any notice
6  or did you receive any notice of that
7  complaint?
8    A.    No.
9    Q.    I believe Ms. Harrison's
10  complaint had to do with a candy bar. Are
11  you familiar with anything about a candy
12  bar being brought up as a complaint?
13        MR. ADAY:  I'm going to object
14  to the form. She has already testified to
15  what she knows about this. This is trying
16  to rehabilitate and regurgitate testimony
17  that has already been given. I'm not
18  going to allow her to contradict her prior
19  sworn testimony.
20    A.    I called -- no.
21    Q.    (BY MS. MUHAMMAD:)  Okay.  No
22  is your answer.  That is fine.
23        Mr. Aday asked you questions

Page 137

1  regarding a conference that you had with
2  Jack Trawick and Johnnie Todd. When you
3  told them during that conference that you
4  did not want to answer any more questions
5  without a witness or an attorney present,
6  had either of them asked you anything
7  about a candy bar being given to someone
8  or offered to someone?
9      A.   No.
10      Q.   Had either of them asked you
11  anything about milk and tea and whatever
12  else it was --
13      A.   No.
14      Q.   -- at that time Donna Tally
15  was supposed to complain about?
16      A.   No.
17      Q.   None of that had been
18  discussed during that conference with
19  them?
20      A.   No.
21      Q.   At the time that Jack Trawick
22  asked you for the store keys, did you know
23  anything about those complaints being

Page 138

1  filed by --
2      A.   No.
3      Q.   -- Donna Tally?
4      A.   No.
5      Q.   By Candice Harrison?
6      A.   No.
7      Q.   Did at any time during the
8  conversation or conference that you had
9  with Jack and Johnnie, was there any
10  question asked of you about a complaint
11  that was filed by anyone against you?
12      A.   No.
13      Q.   Had you ever met with Jack
14  Trawick before that particular instance
15  when he and Johnnie Todd met with you?
16      A.   Yes.
17      MR. ADAY: Object to the form.
18      Q.   (BY MS. MUHAMMAD:) Okay.
19  Tell us about that meeting that you had.
20      A.   He came into the store right
21  after I called ERC the first time. And he
22  told me that he was there to do an
23  investigation. Now, he did, you know,

Page 139

1  present that he was investigating me when
2  he came in the first time.
3      Q.   Do you remember the date of
4  that investigation?
5      A.   No. All I know is that
6  Jeff -- Jeff Jennings, the store manager,
7  he was gone to a meeting in Phenix City.
8      (Off-the-record discussion.)
9      A.   He asked me what was going on,
10  you know, asked me why did I call ERC and
11  stuff. He told me that he was here to get
12  a statement and -- get my statement.
13      So I was telling him about, you
14  know, how they looked over me and
15  everything for the position and stuff.
16  And then he asked me who got -- who -- is
17  the position still available and stuff
18  like that. I am like, "No, Charles
19  McDonald's niece, Donna Taffy, got the
20  position."
21      And I was just telling him that
22  I wasn't being treated fairly and it was
23  just discrimination -- they were doing

Page 140

1  discrimination towards me. And that is
2  why I called ERC and made a complaint.
3      Q.   (BY MS. MUHAMMAD:) Who else
4  was in the store with you at the time?
5      A.   No one but me and Jack, Jack
6  Trawick.
7      Q.   Did he record that
8  conversation that you all had?
9      A.   I'm not for sure. He had a
10  recorder with him, but he didn't present
11  it in my presence.
12      Q.   He didn't tell you that he was
13  recording it?
14      A.   Huh-uh.
15      Q.   Did you see him making any
16  notes?
17      A.   He did have a notepad with
18  him.
19      Q.   And you saw him writing
20  down --
21      A.   Yes.
22      Q.   -- on the pad? Was this
23  meeting with Jack Trawick that you are

35

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 141 to 144)

Page 141

1    testifying about now prior to the one
2    where he and Johnnie Todd came to you?
3        A.    Came back?
4        Q.    Right.
5        A.    It was before -- before they
6    came the second time.  The second time,
7    that is when he brought the witness --
8    Johnnie Todd with him.  The first time he
9    came by himself.
10       Q.    During that conversation, did
11   he talk about any complaints being made
12   against you?
13       A.    No.  He just talked -- he
14   asked me about the complaint that I made
15   when I called ERC.
16       Q.    Did at any time you have a
17   conversation with Tiffany Cross regarding
18   the conversation you had with Jack
19   Trawick, the first conversation?
20       A.    Yes.  Tiffany called me that
21   evening.
22       Q.    And when you say that evening,
23   what evening are you talking about?

Page 142

1        A.    The evening of when Jack
2    Trawick came out to do the investigation.
3        Q.    When he first came to you?
4        A.    The first time.  The first
5    time, when he came by himself.
6        Q.    Regarding the ERC complaint?
7        A.    Exactly.
8        Q.    Okay.  Tiffany Cross called
9    you that evening?
10       A.    Yes.
11       Q.    What did you all talk about?
12       A.    Well, she was asking me about
13   the complaint.  And I mean, she said, "Why
14   you made a complaint?"  I was telling her
15   why I made the complaint.  She was like,
16   "Well, you know, Jack Trawick -- after you
17   made the complaint he came up to the store
18   where they were having the store manager
19   meeting.  And he -- you know, I
20   overheard him tell Charles McDonald and
21   Johnnie -- what is his name, Jeff
22   Jennings -- that they needed to get rid of
23   you because you may cause trouble."

Page 143

1        So, you know, and I was like
2    well, I just -- you know, I did what I
3    feel was right because they did look over
4    me and they treated me unfairly and it was
5    discrimination towards me so -- at that
6    point, I just --
7        Q.    Is Tiffany Cross black or
8    white?
9        A.    She is white.  She is also
10   Charles McDonald's niece.
11       Q.    I am going to show you what is
12   going to be marked as Plaintiff's Exhibit
13   9.
14       (Off-the-record discussion.)
15       (Whereupon, Plaintiff's
16       Exhibit 9 was marked for
17       identification.)
18       Q.    (BY MS. MUHAMMAD:)  Ms. Love,
19   you are looking at an affidavit that was
20   prepared and signed by Tiffany Cross.
21   Would Ms. Cross have any reason to
22   fabricate an affidavit, as far as you
23   know?

Page 144

1        A.    No.
2        MS. MUHAMMAD:  Let me take a
3    look at that.
4        Q.    (BY MS. MUHAMMAD:)  A moment
5    ago, you testified that Ms. Cross had
6    called you.  And on Page 1 of Ms. Cross's
7    affidavit, Number -- Item Number 2 reads,
8    "I recall an incident that occurred in the
9    Phenix City store on an occasion when
10   there was a managers' meeting.  Jack
11   Trawick had just returned from the Auburn
12   store, investigating a complaint that
13   Kinera Love called into ERC because she
14   did not get the position of assistant
15   manager.  Jack was talking to Charles
16   McDonald and Jeff Jennings.  And I heard
17   him tell Jeff and Charles that they needed
18   to get rid of Kinera because she could
19   cause them some trouble."
20       Is that what she said to you?
21       A.    Yes.
22       Q.    She also indicates in her
23   affidavit in Item Number 3, "I recall

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 145 to 148)

Page 145

1 that, instead of them hiring Kinera whom I
2 know was capable and qualified for the
3 assistant manager position, they hired a
4 white female, Donna Tally, Charles' niece.
5 I know that Donna had no managerial
6 experience when they hired her. I know
7 that she had been on a job at Dollar
8 General for only two weeks before the
9 position was given to her. I know that
10 she came to Dollar General from a factory
11 assembly line, and I know Kinera was in
12 line to be promoted to the assistant
13 manager position."
14        MR. ADAY: I'm going to
15 object. The document speaks for itself,
16 Lateefah.
17    Q.    (BY MS. MUHAMMAD:) Would
18 Tiffany Cross have any reason to fabricate
19 any of this information that she shows in
20 her affidavit?
21    A.    No.
22        MR. ADAY: Object to the form.
23 Asked and answered.

Page 146

1        MS. MUHAMMAD: Somehow we have
2 got two affidavits attached to --
3        MR. ADAY: I was going to
4 bring that up.
5        MS. MUHAMMAD: The one from
6 Marcie McGhee should not be attached to --
7 when Rita did copies, that is how that
8 happened.
9    Q.    (BY MS. MUHAMMAD:) You
10 mentioned earlier or you testified
11 earlier, Ms. Love, that you assisted your
12 brother's child, who is your niece by
13 Ms. Marcie McGhee. And Ms. McGhee filed
14 an affidavit with this case to EEOC on
15 your behalf. Are you familiar with that
16 affidavit?
17    A.    Yes.
18        (Whereupon, Plaintiff's
19        Exhibit 10 was marked for
20        identification.)
21    Q.    (BY MS. MUHAMMAD:) I will ask
22 you the same question about Ms. McGhee.
23 Would she have any reason to fabricate an

Page 147

1 affidavit on your behalf?
2    A.    No.
3    Q.    Did at any time you present an
4 application for employment to Ms. McGhee
5 from Dollar General?
6    A.    Yes.
7    Q.    When you presented that
8 application to her, did she complete it
9 and submit it back to the store for
10 employment?
11    A.    Yes.
12    Q.    Do you know if she was
13 interviewed by someone in the store?
14    A.    Yes, she was interviewed by
15 Jeff Jennings.
16    Q.    And do you know the results of
17 that application?
18    A.    Well, at first, when he asked
19 me about did I know anyone that was
20 looking for a job, I said, "Yes, my
21 friend, Marcie McGhee." And my opinion,
22 he thought --
23    Q.    Now, I'm not asking for your

Page 148

1 opinion.
2    A.    Okay.
3    Q.    I can't ask for your opinion.
4 I want to know what you know. Did
5 Ms. McGhee get the job?
6    A.    No.
7    Q.    Who made the decision about
8 that? Do you know?
9        MR. ADAY: Object to the form.
10 She has no knowledge of that.
11    Q.    (BY MS. MUHAMMAD:) Do you
12 know who made the decision?
13    A.    My -- my opinion is Jeff --
14    Q.    No. I can't take your
15 opinion, now. I want to know, do you
16 know?
17        MR. ADAY: Same objection.
18    Q.    (BY MS. MUHAMMAD:) Do you
19 know? If you don't know, say you don't
20 know.
21    A.    Huh-uh.
22    Q.    Okay. But you do know that
23 she did not get the position?

37

KINERA LOVE                                                    KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.                            October 30, 2007

(Pages 149 to 152)

Page 149

1    A.   Yes.
2         MS. MUHAMMAD:  We are going to
3    mark this one, I believe, as Plaintiff's
4    Exhibit 11.
5         (Whereupon, Plaintiff's
6         Exhibit 11 was marked for
7         identification.)
8    Q.   (BY MS. MUHAMMAD:)  This is an
9    affidavit, Ms. Love, that I believe, on
10   the last page, it shows it was signed by
11   you.
12   A.   Yes.
13   Q.   Do you recognize that
14   affidavit?
15   A.   Yes.
16   Q.   Is that your signature?
17   A.   Yes.
18   Q.   On those two previous
19   affidavits, I didn't ask you about the
20   signatures on those.  Let me just have you
21   take a look at those.
22        MR. ADAY:  Object to the form.
23   She can't authenticate somebody else's

Page 150

1    affidavit.
2    Q.   (BY MS. MUHAMMAD:)  No.  Do
3    you recognize those signatures to be
4    Marcie McGhee and Tiffany Cross?
5         MR. ADAY:  Same objection.
6    A.   Yes.
7    Q.   (BY MS. MUHAMMAD:)  You did
8    testify that they are your friends?
9    A.   Yes.
10   Q.   You have seen their
11   handwriting before?
12   A.   Yes.
13   Q.   How did you get to become the
14   third key manager?
15        MR. ADAY:  Object to the form.
16   Asked and answered, previous testimony.
17        MS. MUHAMMAD:  Did she testify
18   about that earlier?
19        MR. ADAY:  She testified on
20   how she was promoted to third key.  We had
21   a whole line of questioning on that.
22        MS. MUHAMMAD:  And the person
23   within Dollar General who actually made

Page 151

1    the decision?
2         MR. ADAY:  We will let her
3    testimony stand.  If you have a specific
4    question -- I'm not going to tell what
5    your own client testified to but we have
6    already covered that line of questioning
7    and I am allowed to object to it as asked
8    and answered.
9         MS. MUHAMMAD:  Well, and
10   unless we see that that is different, then
11   I won't have any argument with that.
12   Q.   (BY MS. MUHAMMAD:)  But my
13   primary concern about asking how did you
14   become third key manager, you were already
15   employed by Dollar General at that point,
16   weren't you?
17   A.   Yes.
18   Q.   Did you have to do a
19   reapplication --
20   A.   No.
21        MR. ADAY:  Objection.
22   Q.   (BY MS. MUHAMMAD:)  -- for the
23   position of third key manager?

Page 152

1    A.   No.
2         MR. ADAY:  Object to the form.
3    Asked and answered.
4    A.   No.  They evaluated how they
5    liked the way I was working and --
6    Q.   (BY MS. MUHAMMAD:)  So there
7    was no requirement for you to do a written
8    reapplication?
9    A.   No.
10   Q.   During your employment with
11   Dollar General and the work that you did
12   at all of the four stores that you worked,
13   did you receive any reprimands or
14   disciplinary actions from any of the
15   supervisors who supervised you in any of
16   those stores?
17   A.   No one but Tiffany Cross and
18   Julie Morrison.  They, you know,
19   recommended -- you know, they was -- they
20   used to help me out going to other stores,
21   so I could get my hours --
22   Q.   No.  Let me make sure you
23   understand what I am asking.  Reprimand,

Page 153

1　not recommend.
2　　　A.　Oh.
3　　　Q.　Reprimand, in other words,
4　some kind of disciplinary action against
5　you --
6　　　A.　Oh, no.  No.
7　　　Q.　-- by any supervisor --
8　　　A.　Oh, no.
9　　　Q.　-- that you worked under as a
10　Dollar General employee?
11　　　A.　No.
12　　　Q.　So the first and only
13　disciplinary action that you received came
14　from Charles McDonald --
15　　　A.　Exactly.
16　　　Q.　-- when you were terminated
17　from Dollar General?
18　　　A.　Yes.
19　　　Q.　There had been no previous
20　warning to you in writing --
21　　　A.　No, no verbal writing, no --
22　　　Q.　-- when you were suspended as
23　an employee by Charles McDonald?

Page 154

1　　　MR. ADAY:  Object to the form,
2　mischaracterizes prior testimony.
3　　　MS. MUHAMMAD:  Well, I will
4　strike the question.
5　　　Q.　(BY MS. MUHAMMAD:)  Who
6　suspended you from your employment?
7　　　A.　Jack Trawick suspended me.
8　　　Q.　Okay.  When you were suspended
9　by Mr. Trawick, were you given a reason
10　for your suspension --
11　　　A.　No.
12　　　Q.　-- by Mr. Trawick?
13　　　A.　No.
14　　　Q.　Were you given a reason for
15　your suspension by Mr. McDonald?
16　　　A.　No.
17　　　Q.　Were you given a reason for
18　your suspension by Mr. Jennings?
19　　　A.　No.
20　　　Q.　Were you given a reason for
21　your suspension by Wendy?
22　　　A.　No, ERC, no, they weren't even
23　aware of it.

Page 155

1　　　Q.　Did you have the occasion to
2　talk with someone at ERC about your
3　suspension?
4　　　A.　Yes, I called up there after I
5　got -- after I -- after Jack Trawick,
6　Mr. Trawick suspended me, because when I
7　called Jeff, he was not able to answer --
8　he didn't know what was going on, that is
9　what he stated.
10　　　So I called ERC to see whether
11　they were aware of my suspension so they
12　could tell me, you know, when can I start
13　back to work.  But they was not aware of
14　it neither.
15　　　MS. MUHAMMAD:  I am going to
16　mark this one Plaintiff's Exhibit 12.
17　　　(Whereupon, Plaintiff's
18　　　Exhibit 12 was marked for
19　　　identification.)
20　　　Q.　(BY MS. MUHAMMAD:)  Ms. Love,
21　do you recognize the document that has
22　been labeled as Plaintiff's Exhibit 12?
23　　　A.　Yes.

Page 156

1　　　Q.　That is a copy of a telephone
2　bill; is that not correct?
3　　　A.　Yes.
4　　　Q.　Who is the provider?
5　　　A.　Sprint.
6　　　Q.　Sprint?  And this is a cell
7　phone bill?
8　　　A.　Yes.
9　　　Q.　Whose bill is this?
10　　　A.　It is my bill.
11　　　Q.　And what date is this bill
12　for?
13　　　A.　From October the 4th to
14　November 3rd.
15　　　Q.　Of what year?
16　　　A.　I want to -- think it is
17　2005.
18　　　Q.　2005?
19　　　A.　Yes.
20　　　Q.　The same year that you were
21　terminated by Dollar General?
22　　　A.　Yes.
23　　　Q.　And I believe the same month,

Page 157

1  you were terminated in October of 2005?
2      A.    Yes.
3      Q.    On Page 7 of this bill, you
4  have a highlighted area for a particular
5  date.  What date is that that you have
6  highlighted?
7      A.    The 10th/22nd of 2005.
8      Q.    Why did you highlight that
9  date?
10     A.    Because that is the date when
11 I called ERC and asked them about why I
12 was suspended.
13     Q.    And on that date is the same
14 date that you spoke with Wendy?
15     A.    I'm not -- I can't -- I'm not
16 exactly for sure --
17     Q.    Who did you talk to?
18     A.    -- exactly.
19     Q.    You don't know the person you
20 talked to, but did you speak with someone
21 in the office of ERC?
22     A.    Yes.
23     Q.    And that number shows to be an

Page 158

1  800 number?
2      A.    Yes.
3      Q.    And it shows that you made two
4  calls?
5      A.    Yes.
6      Q.    The first call was for how
7  long?
8      A.    For 2.0 minutes.
9      Q.    And the second call was how
10 long?
11     A.    Eleven minutes.
12     Q.    So you spoke with someone in
13 that office on two different occasions on
14 the same day?
15     A.    Same day, yes.
16     Q.    Were you given an answer, to
17 your satisfaction, as to when you would be
18 reemployed or your suspension would be --
19     A.    No.  When I -- I called Jeff.
20 I asked Jeff.  He was not -- he said he
21 didn't know.  So I called ERC, and they
22 was not aware of it.  So I called Jeff
23 back because ERC told me that my store

Page 159

1  manager should be able to assist me with
2  that information.
3          So then I called Jeff back, and
4  I asked Jeff would he call Charles,
5  because he didn't even want to give me
6  Charles' number, he wouldn't give me
7  Charles' number so I could call Charles.
8  So I asked him would he call Charles and
9  he told me that he would, he would call me
10 back.  So a couple of days later, he
11 called me and that is when he asked me to
12 come down to the store for the meeting.
13     Q.    Jeff Jennings called you --
14     A.    Uh-huh.
15     Q.    -- and said come for the
16 meeting?
17     A.    Yes.
18     Q.    Two days after the day you had
19 spoken with him on the 22nd of October --
20     A.    Yes.
21     Q.    -- 2005?  Were you -- strike
22 that.  Was your suspension ever lifted at
23 any time before termination?

Page 160

1      A.    Not that I know.
2      Q.    So your employment went from
3  suspension to termination?
4      A.    Termination, exactly, yes.
5      Q.    What were you given as the
6  reason for your suspension?
7      A.    I said -- I think refused --
8  failed to refuse the investigation or
9  something.
10         MR. ADAY:  I'm going to
11 object.  That directly contradicts her
12 prior testimony, that she didn't know the
13 reason.  You were asked that,
14 Ms. Muhammad.
15     Q.    (BY MS. MUHAMMAD:)  I said
16 suspension, not the termination.
17     A.    Oh, I don't know.
18     Q.    You were never given a reason
19 for your suspension?
20     A.    No.
21     Q.    For your termination, what
22 reason were you given?
23     A.    Refused the investigation.

40

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 161 to 164)

Page 161

1    Q.    Did you know anything about
2  the reason that was given prior to them
3  telling you that on the day of your
4  termination?
5    A.    No.
6    Q.    Had anyone counseled with you
7  regarding your -- excuse me.  Strike that.
8         Had anyone counseled with you,
9  any supervisor, any manager of Dollar
10 General, regarding your termination, prior
11 to the actual termination occurring?
12   A.    No.  The only thing is that,
13 when Tiffany told me about that Charles --
14   Q.    Was Tiffany acting at that
15 point as your manager or just as a friend
16 or someone who overheard a conversation?
17   A.    Someone that just overheard a
18 conversation.
19   Q.    No, I mean someone in
20 management --
21   A.    No.
22   Q.    -- authority, who can say to
23 you, "Ms. Love, you are going to be

Page 162

1  terminated if thus and so."  Did anyone
2  counsel you --
3    A.    No.
4    Q.    -- in that regard?
5    A.    No.
6         MR. ADAY:  Object to the form.
7    Q.    (BY MS. MUHAMMAD:)  During the
8  period of employment with Dollar General,
9  did anyone in management or any authority
10 position over you write you up for any
11 reason as a reprimand or for any
12 deficiency in your job?
13   A.    No.
14        MR. ADAY:  Object to the form.
15 Asked and answered, at least three times.
16   Q.    (BY MS. MUHAMMAD:)  Was there
17 ever an occasion that you refused to do
18 your duty as --
19   A.    No.
20   Q.    -- an employee?
21   A.    No.
22   Q.    What was your attendance like
23 at work?

Page 163

1    A.    Oh, I had good attendance.  I
2  always came to work.  I ain't never called
3  in.  I mean, I was a good employee, still
4  is, never missed a day on my job now.
5    Q.    Wherever they needed you to
6  go, in either of those four stores to help
7  out, you were available to do so?
8    A.    Yes.  Anytime someone called
9  in, I was there.
10        MS. MUHAMMAD:  I am going to
11 mark this as Plaintiff's Exhibit Number
12 13, is it?
13        THE REPORTER:  Yes, ma'am.
14        (Whereupon, Plaintiff's
15        Exhibit 13 was marked for
16        identification.)
17   Q.    (BY MS. MUHAMMAD:)  Ms. Love,
18 I want you to look at this document with
19 me --
20        MR. ADAY:  Do you have an
21 extra copy of that, Lateefah?
22        MS. MUHAMMAD:  Oh, yeah.
23   Q.    (BY MS. MUHAMMAD:)  -- this

Page 164

1  decision on unemployment compensation
2  claim.  When you were terminated at Dollar
3  General, you made a application for
4  unemployment compensation?
5    A.    Yes, ma'am.
6    Q.    Were you approved for
7  unemployment compensation when you
8  applied?
9    A.    Yes.
10   Q.    At some point, there was a
11 hearing held; is that not correct?
12   A.    Yes.
13   Q.    And during that hearing,
14 someone from Dollar General appeared on
15 behalf of Dollar General; is that correct?
16   A.    Yes.
17   Q.    Who was that person?
18   A.    Charles McDonald.
19   Q.    Was there any other person
20 appearing for Dollar General in that
21 hearing?
22   A.    No.  No.
23   Q.    And according to the decision

41

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

Page 165

1  of the Department of Industrial Relations,
2  Dollar General appealed your being awarded
3  unemployment compensation, didn't they?
4     A.  Yes.
5     Q.  Do you recall the testimony
6  that Mr. McDonald gave to the hearing
7  officer?
8     A.  Yes.  He was -- he stated that
9  the reason why he terminated me is because
10 that the assistant manager said that I was
11 stealing drinks and a bag of chips.
12    Q.  Okay.  And the hearing officer
13 considered that misconduct?
14    A.  Exactly.
15    Q.  Now, we have heard that there
16 was a report --
17    MR. ADAY:  Let me object to
18 the form.  That is not what the document
19 says.
20    A.  I mean -- you don't see drinks
21 and chips on there?
22    MR. ADAY:  I am objecting to
23 the form of the question.

Page 166

1     Q.  (BY MS. MUHAMMAD:)  I am
2  reading from the second paragraph under
3  findings.  "The store manager received
4  report that the claimant offered two
5  employees, one of whom was the assistant
6  manager, drinks and chips at no charge.
7  They both insisted on paying for their
8  purchases.  After they reported this, the
9  manager spoke with the Asset
10 Protection" --
11    MR. ADAY:  This document speaks
12 for itself.  We don't have to read the
13 entire document.
14    Q.  (BY MS. MUHAMMAD:)  So she was
15 correct in saying there was this
16 allegation about her --
17    MR. ADAY:  Ms. Muhammad, that
18 is misrepresenting what the document says
19 as to the reason for her termination.  The
20 last sentence of that paragraph is the
21 department's finding on the reason for her
22 termination, along with the conclusions.
23 Anyway, I objected to the form.  You can

Page 167

1  continue with your questions.
2     Q.  (BY MS. MUHAMMAD:)  The
3  internal investigation that this finding
4  says was the reason for your discharge --
5  for your failure to cooperate with the
6  internal investigation was the reason for
7  your discharge had to do with drinks and
8  chips?
9     A.  Exactly, yes.
10    Q.  Now, earlier, you heard a
11 complaint was made about a candy bar?
12    A.  Yes.
13    Q.  And you also heard a complaint
14 made about milk and tea?
15    A.  Yes.  I don't even drink tea.
16    Q.  So where is all of this
17 information coming from regarding some
18 alleged misconduct on your part?
19    MR. ADAY:  Object to the form.
20 Speculation.
21    A.  I don't know.
22    Q.  (BY MS. MUHAMMAD:)  Were there
23 ever any criminal charges brought against

Page 168

1  you --
2     A.  No.
3     Q.  -- for stealing?
4     A.  No.
5     Q.  Was there ever any allegation
6  made directly to you for having taken
7  anything from Dollar General?
8     A.  No.
9     Q.  Did the investigation involve
10 fingerprinting?
11    A.  No.
12    Q.  Were you ever submitted to
13 take any kind of photographs?
14    A.  No.
15    Q.  Were you ever asked to
16 identify any kind of candy bar, tea or
17 milk --
18    A.  No.
19    Q.  -- or any item out of Dollar
20 General that was involved in any kind of
21 misconduct on your behalf, on your part?
22    A.  No.
23    MS. MUHAMMAD:  You have a copy

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

Page 169

1    of this one, Mr. Aday.  I am marking a
2    copy of this one as Plaintiff's Exhibit
3    14.
4              (Whereupon, Plaintiff's
5              Exhibit 14 was marked for
6              identification.)
7         Q.    (BY MS. MUHAMMAD:)  You are
8    looking at a statement that was issued by
9    the Internal Medicine Associates, P.C.
10   Are these bills from your visits with
11   Dr. John Gam, the psychologist that you
12   testified earlier about having seen?
13        A.    Yes.
14        Q.    Was this the first bill that
15   you received or this is a subsequent bill?
16        A.    This is a subsequent bill.
17        Q.    So the first bill that you
18   would have received would have been prior
19   to July 19th, 2007, or would --
20        A.    Well, I don't believe this is
21   an accurate bill because I believe it is
22   higher than this --
23        Q.    Okay.

Page 170

1         A.    -- because I am still going to
2    him so it is --
3         Q.    All right.  Let me go back and
4    ask you this:  Does this bill reflect when
5    you first began seeing Dr. Gam?
6         A.    Yes.
7         Q.    Okay.  So July 19th, 2007
8    would have been your first visit with him?
9         A.    Yes.
10        Q.    When you testified earlier
11   that you didn't recall what date you went
12   to see him initially, now that you see
13   this document, you know that that is the
14   date that you saw him for the first time?
15        A.    Yes.
16        Q.    And on this statement, it
17   says, "Comprehensive or complete
18   psychological evaluation."
19        A.    Yes.
20        Q.    Is that what he gave you
21   initially?
22        A.    Yes.
23        Q.    How have you, Ms. Love,

Page 171

1    characterized what you have experienced as
2    a result of your termination from Dollar
3    General?
4              MR. ADAY:  Object to the form.
5         A.    Lack of enjoyment.  I am
6    nervous all the time.  I am scared to
7    speak out.  I am shaking right now.  I am
8    just scared -- I'm just terrified, I
9    mean --
10        Q.    (BY MS. MUHAMMAD:)  Dollar
11   General terminated you.  Is this the first
12   time you have been terminated from a job?
13        A.    Yes.
14        Q.    And how has that affected you
15   on your subsequent jobs?
16        A.    I'm scared to -- like now --
17            (Off-the-record discussion.)
18        A.    You know, it makes you
19   nervous -- just put nervous.  I mean --
20        Q.    (BY MS. MUHAMMAD:)  Are you
21   afraid?
22        A.    Yes.
23        Q.    Do you wonder if the new

Page 172

1    employer is going to do you like Dollar
2    General did?
3         A.    Yes.
4              MR. ADAY:  Object to the form.
5         Q.    (BY MS. MUHAMMAD:)  Were there
6    other blacks working at Dollar General
7    when you were there?
8         A.    No.
9         Q.    You were the only black person
10   employed at Dollar General --
11        A.    Yes.
12        Q.    -- in those four stores in
13   which you worked?
14        A.    Yes, I was the only one at the
15   store next to Kroger's.  I was the only
16   one at the store on South College Street,
17   and I was the only one at the store on
18   Marvin Parkway.  At Midway Plaza, it was
19   me and a guy named Cedric.
20        Q.    Didn't you testify earlier
21   that Cedric left?
22        A.    Yes, he left.  But I'm saying
23   I worked with him before he left.

KINERA LOVE

DOLLAR GENERAL CORPORATION, ET AL.

Page 173

1  Q.  Before he left?
2  A.  Yeah.
3  Q.  At the Auburn store where you
4  worked, were you the only black?
5  A.  Yes.
6  Q.  When you were hired by Dollar
7  General, did you see it as an opportunity
8  to advance?
9  A.  Yes.
10  Q.  Did anyone give you any reason
11  to think that you could not advance at
12  Dollar General when you were hired?
13  A.  No.
14  Q.  Did you expect that you would
15  be subjected to racial discrimination?
16  A.  No.  No.
17  Q.  Had you ever been subjected to
18  racial discrimination before?
19  A.  No.
20  Q.  When you applied for the job
21  to become assistant manager of a store,
22  did you expect that you would get that
23  position?

Page 174

1  A.  Yes.
2  Q.  Julie Morrison had trained you
3  well, hadn't she?
4  A.  Yes.
5  MR. ADAY:  Object to the form.
6  Q.  (BY MS. MUHAMMAD:)  Had you
7  been a white woman, you probably would
8  have gotten the job, wouldn't you?
9  MR. ADAY:  Object to the form.
10  A.  Yes.
11  MR. ADAY:  That is pure
12  speculation, and you know it, Lateefah,
13  come on.
14  Q.  (BY MS. MUHAMMAD:)  You had
15  the requisite skills, did you?
16  A.  Yes.
17  MR. ADAY:  Object to the form.
18  Q.  (BY MS. MUHAMMAD:)  You had
19  been trained --
20  A.  Yes.
21  Q.  -- by a Dollar General
22  manager?
23  A.  Yes.

Page 175

1  Q.  Had anyone ever told you that
2  you didn't have the skills to be a
3  manager?
4  A.  Well, he didn't say it in that
5  form, but he said he don't think I am
6  ready yet, Charles McDonald.
7  Q.  Did he tell you that?
8  A.  No, he didn't personally tell
9  me.  He told the store manager.
10  Q.  Okay.  And the store manager
11  told you?
12  A.  Yes.
13  Q.  Do you know what that meant?
14  A.  He said that he don't think I
15  am ready to perform that duty, that job --
16  that position.
17  Q.  But, I mean, in detail, do you
18  know what that meant?
19  A.  Yes.
20  Q.  You do?
21  A.  (Nodding.)
22  Q.  I mean, in terms of him saying
23  that, that you were not ready?

Page 176

1  A.  I mean, he means that he don't
2  like --
3  MR. ADAY:  Object to the form.
4  Speculating as to what he meant.
5  Q.  (BY MS. MUHAMMAD:)  You can
6  answer.
7  A.  I mean, he meant that he don't
8  think I am ready to perform that job that
9  I applied for.
10  Q.  Okay.  Now, you testified
11  earlier, when Mr. Aday asked you what were
12  you doing in terms of your duties, were
13  you not doing managerial duties?
14  A.  Yes.
15  MR. ADAY:  Object to the form.
16  Q.  (BY MS. MUHAMMAD:)  And the
17  work performance that you did at Dollar
18  General, did anyone ever tell you that it
19  wasn't up to standards?
20  A.  No.
21  MR. ADAY:  Object to the form.
22  Lateefah, we have asked that at least
23  three times in this deposition about work

KINERA LOVE

DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE

October 30, 2007

(Pages 177 to 180)

Page 177

1  performance and evaluations.  If you ask
2  it again, it looks like you are trying to
3  change her prior testimony.
4         MS. MUHAMMAD:  No, I think she
5  is consistent in her testimony.
6         MR. ADAY:  She may be in that
7  regard but we have had several things that
8  have been asked and answered several
9  times.
10        Q.    (BY MS. MUHAMMAD:)  How are
11  you paying for your visits with Dr. Gam?
12        A.    I am paying out of my pocket.
13        Q.    You don't have health
14  insurance to cover this, do you?
15        A.    No.
16        Q.    Would you be seeing Dr. Gam
17  had you not experienced the termination at
18  Dollar General?
19        A.    No.
20        MR. ADAY:  Object to the form.
21        MS. MUHAMMAD:  I have nothing
22  further.  Thank you.
23

Page 178

1  REEXAMINATION BY MR. ADAY:
2        Q.    Ms. Love, I do have something
3  further.  In fact, I have got several
4  things further.  When I asked you why you
5  sued Dollar General, you told me it was
6  because of discrimination, correct, and I
7  asked you was there anything else, and you
8  said no, is that correct?  It is correct,
9  isn't it?
10        A.    No.
11        Q.    After your lawyer started
12  asking you questions about your Complaint
13  and your Initial Disclosures, you changed
14  that answer, didn't you?
15        A.    Well, I didn't -- I must have
16  didn't understand what you were asking me
17  about.
18        Q.    I asked you before if you
19  didn't understand my question, that you
20  tell me that, correct, and if you
21  answered, I would assume you understood
22  it, isn't that correct?
23        A.    Yes.

Page 179

1        Q.    And you did not draft your
2  complaint, did you, your lawyer drafted
3  your complaint; isn't that correct?
4        A.    No.
5        Q.    You drafted that complaint
6  yourself?
7        A.    Yes.
8        Q.    You did?  Ms. Muhammad did not
9  draft that complaint?  Did you file that
10  complaint with the court?  Did you draft
11  and file the complaint, the document that
12  starts the lawsuit with the court?  Is
13  that what your testimony is?
14        A.    No.
15        Q.    Have you been to law school?
16        A.    No.
17        Q.    So you completely changed your
18  answer after questioning from your lawyer
19  as to documents your lawyer prepared as to
20  why you are suing Dollar General, isn't
21  that right?
22        A.    No.
23        Q.    But when I asked you, you said

Page 180

1  discrimination, that was all; isn't that
2  correct?
3        A.    No.
4        Q.    The truth is, you really don't
5  know why you are suing Dollar General,
6  isn't that right?
7        A.    I know why I am suing Dollar
8  General.
9         MR. ADAY:  Withdraw the
10  question.
11        Q.    (BY MR. ADAY:)  You are right.
12  You have already answered me.  Okay.  You
13  said that Tiffany Cross overheard a
14  conversation with Jack Trawick and other
15  managers saying something to the extent
16  that they were planning to get rid of you;
17  is that your testimony?
18        A.    Yes.
19        Q.    Where did that conversation
20  occur?
21        A.    Talking about when she told me
22  or where she heard it from?
23        Q.    Where did she hear it?  Where

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 181 to 184)

Page 181

1  did Tiffany Cross hear that conversation?
2      A.   When they was at the store in
3  Phenix City where they was having the
4  training meeting, store manager training
5  meeting.
6      Q.   How did you know they were
7  having a store manager's training meeting?
8      A.   Because Jeff had me to open
9  that day because he had go to the store
10 manager meeting.
11     Q.   I had asked you before if you
12 had ever worked with Jack Trawick and you
13 said no.
14     A.   I said Jeff.
15     Q.   Different question.  I had
16 asked you before if you had ever worked
17 with Jack Trawick and your testimony was
18 that you had not; is that correct?
19     A.   I didn't say I worked with
20 Jack Trawick.
21     Q.   Okay.  Tiffany Cross is a good
22 friend of yours, isn't she?
23     A.   Yes.

Page 182

1      Q.   And you didn't know the
2  circumstances of her termination with
3  Dollar General, did you?
4      A.   No.
5      Q.   You didn't know that she
6  bounced checks, did you?
7      A.   No.
8          MS. MUHAMMAD:  Asked and
9  answered.
10         MR. ADAY:  You are right.
11     Q.   (BY MR. ADAY:)  I will ask you
12 a few questions about your affidavit,
13 which was marked as --
14     A.   Exhibit 11.
15     Q.   -- which was previously marked
16 as Plaintiff's Exhibit 11.
17     A.   Yes.
18     Q.   I believe it was your prior
19 testimony that after your meeting with
20 Jack Trawick and Johnnie Todd that they
21 did not give you a reason for your
22 suspension; is that correct?
23     A.   Yes.

Page 183

1      Q.   Would you like to look at the
2  middle of Page 3, the middle of the first
3  paragraph where it says, "When I asked him
4  why, he said, 'You are being suspended.'
5  I asked him why I was being suspended and
6  he said because I refused the
7  investigation."  Would you like to change
8  your prior answer?
9      A.   He did not -- he did not tell
10 me that.
11     Q.   Well, were you lying then or
12 are you lying now because you signed this
13 affidavit under oath.  So which one is it?
14     A.   He didn't -- he didn't -- he
15 didn't tell me that.
16     Q.   So your affidavit is
17 incorrect; is that what you are saying?
18 It must be; is that correct?  You don't
19 know because you can't remember, can you?
20 You can't remember a lot of things we
21 talked about today; isn't that right,
22 Ms. Love?  That is a yes or no question.
23 I am entitled to an answer on it.

Page 184

1      A.   Yes, I can remember.
2      Q.   But you can't remember some
3  things, can you?  Isn't that right,
4  Ms. Love?  I mean --
5      A.   No.
6      Q.   You just changed your prior
7  testimony based on your own affidavit, so
8  you don't know if you are testifying under
9  oath, in writing or today in a deposition,
10 you don't know --
11         MS. MUHAMMAD:  Objection.
12 Argumentative.
13         MR. ADAY:  I am going to
14 reiterate my question.  I don't think I
15 got an answer to it.
16     Q.   (BY MR. ADAY:)  Isn't it true
17 that sometimes you just can't remember
18 some things?
19     A.   May I take a break?
20         MR. ADAY:  Sure.  I am
21 entitled to an answer to my question,
22 though, Ms. Love.  We will take a break
23 after you answer my question.

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                    http://www.TylerEaton.com

Page 185

1  MS. MUHAMMAD: You can see she
2  needs to compose herself. I mean, if you
3  don't mind, let her compose herself.
4  MR. ADAY: We will take a
5  break, but I want an answer to my
6  question.
7  MS. MUHAMMAD: Well, I'm not
8  saying that she shouldn't answer your
9  question.
10  MR. ADAY: That is fine.
11  Absolutely. Absolutely. We will take a
12  short break.
13  (Whereupon, a break was had
14  from 3:07 p.m. until 3:10 p.m.)
15  (Record read.)
16  A. No.
17  Q. (BY MR. ADAY:) But you
18  admitted that you changed your testimony
19  with regard to whether Jack Trawick told
20  you you were being suspended because you
21  refused to participate in the
22  investigation; isn't that right?
23  A. Jack Trawick didn't tell me

Page 186

1  that.
2  Q. All right. We have already
3  gone through that. Okay. I would like to
4  ask you a few questions about a document
5  that has been previously marked. It is a
6  Department of Industrial Relations
7  finding. I think it has already been
8  marked as Plaintiff's Exhibit 13.
9  MS. MUHAMMAD: 13.
10  Q. (BY MR. ADAY:) The appeals
11  board at the Department of Industrial
12  Relations denied your unemployment
13  compensation, correct? You were denied
14  unemployment benefits; isn't that right?
15  A. No.
16  Q. After the appeal was taken --
17  A. Oh.
18  Q. -- isn't that right?
19  A. No, I still got my
20  unemployment.
21  Q. Okay. I would like to direct
22  your attention to the bottom paragraph
23  where it says "Decision." Do you see

Page 187

1  where it says the claim is disqualified
2  under these provisions of the unemployment
3  compensation law, and then it goes over on
4  the back.
5  So do you understand by being
6  disqualified meaning you didn't get any
7  more benefits; is that correct?
8  A. Yes, but I still got my
9  benefits.
10  Q. You did for a little while,
11  then they stopped; is that correct? Do
12  you remember?
13  A. Yes. Yes, I remember.
14  Q. Tell me what happened.
15  A. I got my benefits from, I want
16  to say November until -- from November
17  until I want to say February.
18  Q. But at some point they
19  stopped; is that right?
20  A. Yes.
21  Q. All right. Now, you testified
22  earlier about the allegations about
23  "drinks and chips" you heard for the first

Page 188

1  time at the unemployment compensation
2  hearing; is that correct?
3  A. Yes.
4  Q. You would agree with me that
5  iced tea and milk are drinks, aren't they?
6  A. What?
7  Q. You would agree with me that
8  iced tea and milk are drinks, aren't they?
9  A. Yes.
10  Q. Okay.
11  A. But on the phone, he said a
12  soda pop. He said a soda pop.
13  Q. You didn't mention that in
14  response to your lawyer, did you?
15  A. In the hearing. I am saying
16  in the hearing, he said a soda and a bag
17  of chips.
18  Q. That is not my question. I'm
19  going to strike it as unresponsive.
20  Strike it as unresponsive. My question is
21  iced tea and milk are drinks, aren't they?
22  A. Yes. I know what you are
23  saying, yes.

47

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 189 to 192)

Page 189

1    Q.    And based on this document
2  too, the unemployment compensation board
3  did not find that you were terminated for
4  stealing but that you were terminated for
5  failing to cooperate with an internal
6  investigation; isn't that right?  I will
7  direct your attention --
8    A.    Yes.
9    Q.    I will direct your attention
10  to the paragraph marked "Conclusions."
11  And I will read from it, "The evidence
12  presented shows that the claimant was
13  discharged from her employment for failure
14  to comply with the investigation."  So
15  they found that that was the reason you
16  were terminated; isn't that right?
17    A.    Uh-huh.
18    Q.    Is that a yes?
19    A.    Yes.
20    Q.    Is Johnnie Todd white or
21  black?
22    A.    Black.
23    Q.    But she was the witness in the

Page 190

1  meeting with you and Jack Trawick; isn't
2  that right?
3    A.    Yes.
4    MR. ADAY: I think I am done.
5    MS. MUHAMMAD:  Let me just for
6  clarification's sake --
7
8  REEXAMINATION BY MS. MUHAMMAD:
9    Q.    Did Jack Trawick give you an
10  opportunity to get a lawyer?
11    A.    No.
12    Q.    When you told him that you
13  didn't want to answer any more questions
14  without a witness or an attorney present?
15    A.    No.  Only thing, when I told
16  him that, he snatched my keys out of my
17  hand, took the store keys, throwed my keys
18  back at me and told me I was being
19  suspended -- he told me I was being
20  suspended and I needed to leave off the
21  premises right now before he called the
22  law.  He didn't say nothing about no --
23  giving me no days, getting no attorney or

Page 191

1  no witness -- I wouldn't have been calling
2  the ERC asking about why I was being
3  suspended.  I would be calling trying to
4  set up an appointment with them.
5    Q.    And on your affidavit, the
6  questions Mr. Aday was just asking you,
7  you didn't prepare this affidavit, did
8  you?  Who prepared this affidavit for your
9  signature?
10    A.    I mean, for my signature, I
11  signed my own affidavit.
12    Q.    But I'm saying who actually
13  typed it up and prepared it for you?
14    A.    You.
15    Q.    Okay.  And could there have
16  been an error --
17    MR. ADAY:  Object to the form.
18  Speculation.
19    Q.    (BY MS. MUHAMMAD:)  Could
20  there have been an error in the
21  preparation of this without --
22    A.    Yes.
23    Q.    -- your knowing that the error

Page 192

1  was there?
2    A.    Yes.
3    MR. ADAY:  Same objection.
4    Q.    (BY MS. MUHAMMAD:)  You are
5  not changing your testimony that you
6  didn't know what you were being suspended
7  for, you did not know?
8    A.    I didn't know, no.
9    Q.    Despite the fact that the
10  affidavit says that you were suspended
11  because of your refusal to be a part of
12  the investigation?
13    A.    Yes -- no, I didn't know
14  nothing about no investigation because he
15  didn't say anything about it.
16    Q.    The only time that you heard
17  anything about an investigation and your
18  refusing to be a part of an
19  investigation --
20    A.    Was when I got terminated.
21    Q.    -- was when you were
22  terminated?
23    A.    Yes.

48

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

KINERA LOVE
October 30, 2007

(Pages 193 to 195)

Page 193

1    MS. MUHAMMAD:  That is all.
2    MR. ADAY:  I am done.
3    (Deposition concluded at 3:17 p.m.)
4    FURTHER THE DEPONENT SAITH NOT
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 194

1    DEPONENT'S CERTIFICATE
2
3        I, KINERA LOVE, the witness herein,
4    have read the transcript of my testimony
5    and the same is true and correct, to the
6    best of my knowledge.  Any corrections
7    and/or additions, if any, are listed
8    separately.
9
10
11        KINERA LOVE
12        c/o Ms. Lateefah Muhammad
          3805 West MLK Highway
13        P.O. Box 1096
          Tuskegee, Alabama 36087
14
15
16        Sworn to and subscribed before me,
17    this the      day of          , 2007, to
18    certify which witness my hand and seal of
19    office.
20
21
22
23        NOTARY PUBLIC

Page 195

1    C E R T I F I C A T E
2
3
4    STATE OF ALABAMA
5    JEFFERSON COUNTY
6
7        I hereby certify that the
8    above and foregoing deposition was taken
9    down by me in stenotypy, and the questions
10   and answers thereto were reduced to
11   typewriting under my supervision, and that
12   the foregoing represents a true and
13   correct transcript of the deposition given
14   by said witness upon said hearing.
15       I further certify that I am
16   neither of counsel nor of kin to the
17   parties to the action, nor am I in anywise
18   interested in the result of said cause.
19
20
21
22
23       COMMISSIONER-NOTARY PUBLIC
         ACCR LICENSE NO. 3

49

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

---

**A**

ability
10:1,10 113:22
able
9:19 90:17 94:16 101:3
111:15 135:16 155:7
159:1
Absolutely
185:11,11
accidents
118:8
ACCR
195:23
accurate
169:21
acknowledge
24:16
acknowledged
24:23 27:3
Acknowledgment
24:4,14
acting
6:5 161:14
action
1:5 81:9 153:4,13 195:17
actions
152:14
activities
94:7 103:14
actual
128:11 161:11
Aday
3:13 4:4,6 6:22 7:1 8:10
9:9 12:10 14:20 16:14
16:18 21:1,6 23:21,23
25:5,14,18 26:9,15
27:19 28:7,10 29:18
36:18 44:14 45:15,19
63:12 65:17 72:15 73:3
73:5,6 74:20,22 75:16
75:19 76:10,14,18,21
79:5 80:22 81:10,12
82:8,11 84:2 85:16,17
86:22 87:15 89:21
92:16,17 98:17 99:11,12
103:5 106:2,6,9 112:6,8
112:12,13 113:8,12,14
115:2 118:13,18 123:7,11
125:18,23 126:2 127:2,9
127:13,21 128:1,7,10,16
129:3,9,16 130:1,5,22
131:13,23 132:7,19
135:3,8 136:3,13,23
138:17 145:14,22 146:3
148:9,17 149:22 150:5
150:15,19 151:2,21
152:2 154:1 160:10
162:6,14 163:20 165:17
165:22 166:11,17 167:19
169:1 171:4 172:4 174:5

174:9,11,17 176:3,11,15
176:21 177:6,20 178:1
180:9,11 182:10,11
184:13,16,20 185:4,10,17
186:10 190:4 191:6,17
192:3 193:2
Aday's
135:10
add
94:12
addition
93:6 126:17
additional
114:2,10
additions
194:7
address
11:16
administration
19:14
admitted
185:18
adult
87:1,10
advance
173:8,11
affidavit
68:17 109:11,14 143:19,22
144:7,23 145:20 146:14
146:16 147:1 149:9,14
150:1 182:12 183:13,16
184:7 191:5,7,8,11
192:10
affidavits
146:2 149:19
afraid
171:21
age
87:11,16 101:9
ago
129:10 144:5
agree
188:4,7
agreed
2:3 42:21
ain't
163:2
Alabama
1:2 3:8,19 6:4,5,11,12
11:18 15:8,11 18:16
103:3 194:13 195:4
alive
97:12,14
allegation
166:16 168:5
allegations
187:22
alleged
167:18
allow
136:18

allowed
151:7
Alvin
97:23
amount
131:6
and/or
194:7
anguish
80:23 81:4,8 126:12,15
Ann
100:7,9
answer
7:11 8:4,11 9:10 10:6
16:12 29:19 50:17
56:20 57:3,20 58:21
60:14,19 71:3,7,22 72:1
72:3,8 78:5,8 79:14
126:1 130:13,16 131:2
136:22 137:4 155:7
158:16 176:6 178:14
179:18 183:8,23 184:15
184:21,23 185:5,8
190:13
answered
130:11 145:23 150:16
151:8 152:3 162:5,11
177:8 178:21 180:12
182:9
answers
7:15 132:2,3 195:10
antidiscrimination
26:2,6
anybody
12:14 13:6 21:22 32:3
46:11 50:5 62:18 121:5
anytime
34:19 163:8
anyway
72:17 166:23
anywise
195:17
Apparently
16:9
appeal
186:16
appealed
165:2
appeals
186:10
appeared
13:22 164:14
appearing
164:20
appears
89:4
application
20:21 21:9,21 22:8 147:4
147:8,17 164:3
applied
30:21 61:9,10 164:8

173:20 176:9
apply
19:23 30:17 41:17 61:13
62:2
appointment
191:4
approved
164:6
approximate
45:5 77:16 96:23
approximately
22:5 36:6 66:14 82:22
April
22:18 23:4
area
81:7 99:4 157:4
areas
127:14
argument
151:11
Argumentative
184:12
arguments
85:5
arrested
13:8,10,11
asked
10:4 16:13 23:12 28:13
33:16 49:21 54:21 57:6
60:15 62:6,13 70:11,14
72:4,9,13 74:22 91:18
92:13,15,17,21 93:1
104:7,10 128:1,10 130:5
135:10 136:23 137:6,10
137:22 138:10 139:9,10
139:16 141:14 145:23
147:18 150:16 151:7
152:3 157:11 158:20
159:4,8,11 160:13
162:15 168:15 176:11,22
177:8 178:4,7,18 179:23
181:11,16 182:8 183:3,5
asking
35:18 45:15,19 46:22
56:13 57:12 59:7 60:7
70:6 73:9 82:10 84:13
90:19 91:12 94:21
101:13 109:20 124:10
126:1 129:7 131:7,11,18
132:4 142:12 147:23
151:13 152:23 178:12,16
191:2,6
assaulted
99:21
assembly
145:11
asset
48:13,15 166:9
assign
2:14
assist

159:1
assistant
29:12,15 37:7,11,15,21
38:1,6,17,20 39:1,5,11
39:15,18,22 40:14,22
41:6,17 42:17 43:5,22
44:6,22 48:12 61:7,15
62:5 63:6 64:23 66:3
116:12,18 123:15,23
124:11,19 125:8 144:14
145:3,12 165:10 166:5
173:21
assisted
146:11
Associates
169:9
assume
7:11 49:18 96:8 110:12
178:21
assumed
110:4
attached
146:2,6
attend
103:3
attendance
162:22 163:1
attention
112:21 186:22 189:7,9
attorney
3:5,14 56:21 57:4,5,21
58:22 59:1,4 60:22,22
71:4,8 137:5 190:14,23
attorney's
129:9,14
Auburn
30:6,22 31:19,21 33:14,17
34:10,18 35:1,10,16,20
36:7,10,12 39:4,23
48:20 49:15,23 51:2
120:5,6,7,20 124:12
134:7,12 144:11 173:3
Auburn/Opelika
99:4
audible
88:12 108:4 124:17
audit
48:13,15
August
42:4,7 66:14
auntie
101:1
authenticate
149:23
authority
161:22 162:9
auto
118:8
available
20:6 31:15 41:12 62:6
64:6 65:4,6,10,14

139:17 163:7
**Avenue**
3:18 6:12 20:15
**awarded**
165:2
**aware**
52:15 55:2 68:16 108:17
    108:20 154:23 155:11,13
    158:22
**a.m**
6:14 28:5,6 73:1

**B**

**baby**
89:23
**back**
16:15 27:6 28:8,11 40:9
    40:10 43:1 57:9 63:1,2
    69:22 70:14,15,16,17
    71:19 73:5,13 76:19
    82:18 127:18,19 128:3,5
    131:5,7 141:3 147:9
    155:13 158:23 159:3,10
    170:3 187:4 190:18
**background**
114:17
**bag**
165:11 188:16
**bankruptcy**
15:22
**bar**
6:11 27:22 51:19 53:6
    72:18 136:10,12 137:7
    167:11 168:16
**based**
91:10 184:7 189:1
**basic**
23:14
**basically**
28:20 37:12
**becoming**
40:14
**began**
26:21 27:11 170:5
**behalf**
146:15 147:1 164:15
    168:21
**believe**
58:15 67:18 73:8 81:13
    83:23 85:13 92:16
    132:21 134:5 136:9
    149:3,9 156:23 169:20
    169:21 182:18
**Bell**
115:18,19 116:10 118:1
**benefits**
186:14 187:7,9,15
**best**
29:19 33:1 49:22 113:22
    194:6

**better**
55:11,14 56:2 59:10
**big**
33:10
**bill**
156:2,7,9,10,11 157:3
    169:14,15,16,17,21 170:4
**bills**
169:10
**Birmingham**
3:19 6:3
**birthday**
12:2
**bit**
36:10 73:14 90:6
**black**
143:7 172:9 173:4 189:21
    189:22
**blacks**
172:6
**blue**
65:9,13,15
**board**
186:11 189:2
**booklet**
38:15
**bother**
94:17
**bottom**
21:12 24:4,9 25:22 75:21
    186:22
**bounced**
182:6
**bouncing**
108:21
**Box**
3:7 194:13
**brand**
8:1
**break**
27:18 28:1,4,11 68:9
    72:23 73:8,9 123:8
    184:19,22 185:5,12,13
**brief**
27:18 28:2
**bring**
146:4
**brother**
89:23
**brothers**
97:16,20,22 98:23
**brother's**
146:12
**brought**
136:12 141:7 167:23
**Bufford**
11:9,11
**Burger**
119:15
**business**
19:14 71:17

**B-U-F-F-O-R-D**
11:14

**C**

**C**
3:1 195:1,1
**call**
47:21 63:1 117:18 132:11
    132:15 139:10 158:6,9
    159:4,7,8,9
**called**
46:13 47:7,10 48:9 62:3
    62:6,21 63:2 69:20
    70:10 104:14,15 111:12
    133:4 136:20 138:21
    140:2 141:15,20 142:8
    144:6,13 155:4,7,10
    157:11 158:19,21,22
    159:3,11,13 163:2,8
    190:21
**calling**
191:1,3
**calls**
45:14 158:4
**Candice**
50:12,14,15,20 51:1,7,14
    52:15 104:5 135:11
    138:5
**candy**
51:19 53:6 136:10,11
    137:7 167:11 168:16
**capable**
145:2
**care**
18:9 86:2 90:7,10,15
    100:20 109:4
**cared**
88:15 100:23
**case**
7:9 12:21,23 14:5 81:1
    86:19 106:17 107:3,16
    108:15 109:8,13 110:10
    110:16,23 111:5 114:6
    128:14 146:14
**cashier**
23:7 27:11,15 28:12 29:4
    30:9 32:20,21 36:20,23
    37:2 41:6 52:14 115:20
    115:22 116:6,17 117:2,3
    117:12
**cashiers**
117:14
**cause**
6:15 87:5 90:14 142:23
    144:19 195:18
**caused**
81:4 94:20
**Cedric**
64:7,10,16,18,23 172:19,21
**Cedric's**

**64:13**
**cell**
156:6
**certain**
72:4,8
**CERTIFICATE**
194:1
**certified**
1:21 2:7 6:2 21:16
**certify**
6:6 76:1,5 194:18 195:7
    195:15
**change**
38:15 177:3 183:7
**changed**
178:13 179:17 184:6
    185:18
**changing**
192:5
**characterize**
92:3
**characterized**
171:1
**charge**
14:3 59:21,23 60:1 126:18
    126:20 166:6
**charges**
167:23
**Charles**
32:6,11 43:1,2,4,13 44:23
    46:20 62:23 63:4
    67:19 70:3,16,18 73:10
    104:16 139:18 142:20
    143:10 144:15,17 145:4
    153:14,23 159:4,6,7,7,8
    161:13 164:18 175:6
**check**
29:3
**checks**
108:21 182:6
**child**
14:11,15 16:2,22 87:1
    88:15,19 89:2,6 90:7,10
    91:3,9 92:22 146:12
**childhood**
79:21 80:1,2 82:18
**children**
14:9 91:19 92:6,18 93:9
    96:8 109:5
**chips**
165:11,21 166:6 167:8
    187:23 188:17
**church**
102:21 103:1,6,8,9,12,15
    103:18
**Circle**
11:17
**circumstances**
92:5 182:2
**City**
139:7 144:9 181:3

**Civil**
1:5 6:7
**claim**
16:4 17:2,4,23 66:19
    128:19,21,23 129:21
    164:2 187:1
**claimant**
166:4 189:12
**claimed**
16:19 17:7 91:8 92:7
**claiming**
67:9 129:20 130:6
**claims**
123:19 124:7 129:11
**clarification**
126:9
**clarification's**
190:6
**classes**
19:21
**clearly**
101:3,7
**client**
151:5
**Climmie**
14:18 16:2,5,22 93:1
    106:13,14
**clonazepam**
8:15,16
**close**
27:23 36:14 52:13 72:18
    80:7,13,17 95:23 100:2
    100:13
**closed**
27:22
**clothes**
94:3
**college**
19:18 30:7 34:10 172:16
**Colorado**
19:10,16,21
**come**
20:5 48:22 65:9 69:22
    70:11,14 74:19 95:11
    108:2 116:7 159:12,15
    174:13
**coming**
28:11 45:11 46:22 114:18
    135:1 167:17
**commencing**
6:13
**Commission**
14:3
**Commissioner**
2:7 6:6
**COMMISSIONER-NOTARY**
195:22
**company**
120:17 123:1 125:19
**compensation**
164:1,4,7 165:3 186:13

187:3 188:1 189:2
compensatory
128:12 131:10
complain
46:11 137:15
complained
121:19 132:9
complaint
26:7 46:14 47:2 53:13
54:20 104:15,20 105:11
105:15 121:17,20 125:17
126:11 127:16 128:19
129:6,19 132:15 135:13
135:14,17,18,20 136:1,4
136:7,10,12 138:10
140:2 141:14 142:6,13
142:14,15,17 144:12
167:11,13 178:12 179:2
179:3,5,9,10,11
complaints
55:3 104:7 137:23 141:11
complete
147:8 170:17
completely
90:19 179:17
comply
189:14
compose
185:2,3
Comprehensive
170:17
concern
81:6 151:13
concluded
193:3
conclusion
127:22 128:8
conclusions
130:23 166:22 189:10
conducted
48:14
conducting
59:17
conference
137:1,3,18 138:8
confirm
75:20
consider
103:20
considered
165:13
consistent
177:5
constraints
27:21
constructive
49:11
consult
43:13
contact
62:19 69:16

contacted
69:13,15
contents
24:20
continue
167:1
continuing
5:1 73:7
contradict
136:18
contradicts
160:11
conversate
65:2
conversation
42:14 64:22 79:8 133:5
138:8 140:8 141:10,17
141:18,19 161:16,18
180:14,19 181:1
conversations
51:7,12 107:3,8 108:14
109:7 110:10,15,23 111:4
convicted
13:18
cooperate
167:5 189:5
copies
76:9 112:11 146:7
copy
24:16 26:19 113:11 156:1
163:21 168:23 169:2
CORPORATION
1:10
correct
7:7,16,17 13:3 15:4,12
16:19 21:17 22:8,23
24:9,11,23 26:3,7 27:4
27:8,10,12 29:10 30:12
35:16 39:16,20 41:21
42:5 44:7 53:1,21 56:6
57:21 58:2 60:5,17
61:4 64:11 65:7,11
67:20 68:12 71:6 72:1
72:9 73:11 76:3 82:20
85:11 88:16 89:3,10
92:9 94:10 96:9 99:15
102:15 105:1,15,16
108:6,9 109:2,5 110:13
110:14 111:17 112:18
113:3,4,19,22 114:4
115:9 118:20 120:23
132:3 156:2 164:11,15
166:15 178:6,8,8,20,22
179:3 180:2 181:18
182:22 183:18 186:13
187:7,11 188:2 194:5
195:13
corrections
194:6
costs

129:7,13
counsel
2:5,11,13 6:10 162:2
195:16
counseled
122:7 161:6,8
count
36:15,16 37:4 38:12
County
12:19 56:17 195:5
couple
159:10
court
1:1 6:9 8:4,12,14 9:11
12:18 29:20 76:11 78:6
78:9 82:1 98:15,19
179:10,12
cover
177:14
covered
105:17 151:6
coworker
110:6,19
coworkers
49:14,23
co-workers
109:23
crew
120:14 121:7
crime
13:19
criminal
167:23
critical
49:6
criticism
49:11
critique
49:2,4
Cross
20:12 21:23 23:9 29:8
32:1 43:10 52:21 96:1
108:5 141:17 142:8
143:7,20,21 144:5
145:18 150:4 152:17
180:13 181:1,21
Cross's
22:1 144:6
crying
69:5 108:2
CTU
19:10
current
11:15
currently
7:18
custodian
115:4 120:14,17
customer
69:6
cut

118:22 119:2
C-L-I-M-M-I-E
14:22
c/o
194:12

_____

D

damages
80:23 128:13,14 131:11
Data
118:2,4,5,14
date
6:6 11:6 22:10,17 77:8,14
77:17 139:3 156:11
157:5,5,9,10,13,14
170:11,14
dated
24:11
dates
34:8 35:3 45:5
day
69:18 70:4 87:22 88:1
94:22 158:14,15 159:18
161:3 163:4 181:9
194:17
days
23:13 159:10,18 190:23
Deakins
3:15
death
101:11
December
118:11
decide
19:23 67:2
decided
35:10,19 72:3,7
decision
32:3,8,12 43:9 44:3,21
148:7,12 151:1 164:1,23
186:23
decisions
72:12
deductions
91:10
Defendant
1:12 3:12
Defendant's
4:13,14,15,16,17,18,19,20
21:2,3 23:18,22 25:2,6
25:19 26:11,12 27:2
75:13,17 105:21,22
112:3,7 113:5,9
deficiency
162:12
degree
19:15
demanding
127:17
denied

186:12,13
deny
53:12 104:17,20,23
denying
53:11
Department
165:1 186:6,11
department's
166:21
dependent
16:5,19 18:1
dependents
17:3,8 91:11 92:8
depends
88:3
DEPONENT
193:4
DEPONENT'S
194:1
deposed
7:4
deposition
1:15 2:5,16 7:3,6 73:7
104:4 176:23 184:9
193:3 195:8,13
describe
80:9,11
described
80:15
Despite
192:9
detail
175:17
details
84:5,9 101:12,17,21
determination
71:21
determining
43:5
Dexter
6:12
diagnose
11:3 81:20
diagnosed
10:18,23 81:17 82:9,12
die
100:10
died
100:11,15
difference
37:20 39:14
different
28:19,20 34:15 46:7
151:10 158:13 181:15
difficult
85:18
digits
12:11
direct
186:21 189:7,9
directly

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

160:11 168:6
**discharge**
167:4,7
**discharged**
189:13
**disciplinary**
121:23 122:2 152:14
153:4,13
**disciplined**
121:13 122:4
**disclosures**
106:8 111:14 113:13 130:4
130:9,18 178:13
**discount**
54:12,15
**discounts**
54:21 104:10
**discriminated**
65:18,20 66:2 123:2
124:3 127:7 133:17
**discrimination**
122:19 123:18,21 124:2,4
125:2,15 126:18,19,23
128:22 132:14 133:15
139:23 140:1 143:5
173:15,18 178:6 180:1
**discriminatory**
66:21 67:4,10,12,14
**discuss**
32:2 52:7 71:16 106:20
107:19
**discussed**
106:17 137:18
**discussion**
8:9 14:19 29:17 36:17
44:13 72:22 76:13,17
79:4 86:21 89:20 103:4
114:23 118:12,15,17
123:10 139:8 143:14
171:17
**disorder**
9:4 10:19,21 11:1 81:22
82:14,16
**display**
25:8
**displayed**
25:12
**dispute**
22:15 32:14 43:19 46:8
51:1,5 53:7 54:22
135:16,17
**disqualified**
187:1,6
**district**
1:1,2 6:8 38:22
**DIVISION**
1:3
**doctor**
77:9 79:18 81:3 102:14
**document**
12:7,8 21:2,8 23:22 24:3

24:5 25:6,16,20 26:1,5
26:10,17 27:4 75:16,21
76:6 105:19 106:3
112:7,14 113:2,9,15
131:23 145:15 155:21
163:18 165:18 166:11,13
166:18 170:13 179:11
186:4 189:1
**documents**
25:8 47:10 53:4 54:19
105:4,10 113:19 114:3,5
114:11 179:19
**doing**
18:5,8 28:19 37:17 38:5
38:7,16,19 59:14 118:7
120:12 139:23 176:12,13
**DOLGENCORP**
1:11
**Dollar**
1:10 7:1 12:15 20:1 21:9
21:21 22:11,13 24:17,19
26:6,20,21 27:7 28:13
30:20 40:11 45:12,22
47:9 51:21 52:16 53:3
53:13 54:19 55:2 61:9
62:18 66:9 69:14,17
75:9 101:18,22 102:2
105:9 106:22 107:9
108:12,18,21 110:21
112:17 114:18,20 115:9
119:21,23 120:1 122:16
123:14,17,20 124:23
126:3,12,14,20 127:17
128:2,22 129:6,19,22
130:6,7,19 132:5,17
133:22 134:15 145:7,10
147:5 150:23 151:15
152:11 153:10,17 156:21
161:9 162:8 164:2,14,15
164:20 165:2 168:7,19
171:2,10 172:1,6,10
173:6,12 174:21 176:17
177:18 178:5 179:20
180:5,7 182:3
**Donna**
44:12,15,21 46:20 50:2
54:3,6,8,11,14,20 67:19
67:23 70:17 104:5,9
111:7,23 112:1 133:11,12
136:5 137:14 138:3
139:19 145:4,5
**Dorothy**
78:14
**doubt**
102:11
**Dr**
11:2,9,11 77:9,11,21 78:1
78:16,19,22,23 79:6,7
80:14 81:13 83:2 87:23
95:7 99:6,12 102:8
169:11 170:5 177:11,16

**draft**
179:1,9,10
**drafted**
179:2,5
**drink**
167:15
**drinks**
165:11,20 166:6 167:7
187:23 188:5,8,21
**driving**
13:11,19
**duly**
6:19
**duties**
27:15 28:14,16,17 36:11,13
36:19,21 37:20 117:1,2
117:7 176:12,13
**duty**
162:18 175:15
**d/b/a**
1:10

---

## E

**E**
3:1,1 195:1,1
**earlier**
43:17 91:18,18 104:4
105:4 128:1,10 130:5
132:9 134:6 146:10,11
150:18 167:10 169:12
170:10 172:20 176:11
187:22
**EASTERN**
1:3
**easy**
94:21
**education**
19:1,5,6
**EEOC**
146:14
**eighty-five**
100:17
**eighty-four**
100:17
**either**
93:15 137:6,10 163:6
**Elaine**
98:11,20
**Eleven**
158:11
**else's**
149:23
**embarrassed**
69:6
**emotional**
128:20 129:1
**emotionally**
85:18
**employed**
133:22 151:15 172:10

**employee**
24:17 26:20 135:11
153:10,23 162:20 163:3
**employees**
53:23 69:7 121:11 166:5
**employer**
172:1
**employers**
122:1,5
**employment**
14:3 24:3,14 26:21 101:18
101:22 102:2 147:4,10
152:10 154:6 160:2
162:8 189:13
**enjoyment**
171:5
**entail**
118:6
**entire**
166:13
**entitled**
24:3 26:2 125:18 183:23
184:21
**Equal**
14:2
**ERC**
46:13,16 47:7,21 48:9
104:15 111:12 132:10,10
132:11 133:4 138:21
139:10 140:2 141:15
142:6 144:13 154:22
155:2,10 157:11,21
158:21,23 191:2
**error**
191:16,20,23
**establish**
23:2
**etcetera**
36:16
**evaluated**
122:10,12 152:4
**evaluation**
79:10 122:14 134:17
170:18
**evaluations**
133:20 134:2,3 135:5
177:1
**evening**
141:21,22,23 142:1,9
**events**
66:5 85:1
**everybody**
73:3 103:9 123:4
**evidence**
2:17 132:1 189:11
**exactly**
11:5 22:12,17 32:23 34:7
37:23 38:4 42:21 61:18
66:4,8 68:14 70:9 77:7
79:11 84:11 102:20
107:22 142:7 153:15

157:16,18 160:4 165:14
167:9
**examination**
4:1,4,5 6:15,22 79:17
81:14 126:8
**examined**
6:19
**excuse**
9:7,8 58:1,3 74:1 78:7
98:21 100:9 104:19
161:7
**Exhibit**
4:13,14,15,16,17,18,19,20
4:21,22,23 5:4,5,6 21:2
21:4 23:19,22 25:3,6,19
26:11,13 27:2 75:14
105:21,23 112:4,7 113:6
113:9 130:3 132:1
143:12,16 146:19 149:4
149:6 155:16,18,23
163:11,15 169:2,5
182:14,16 186:8
**EXHIBITS**
4:10 5:1
**existence**
105:14
**expect**
85:13 117:3 173:14,22
**expects**
125:20
**expenses**
129:8,13
**experience**
23:16 35:8,21 45:11,20
46:4,7 145:6
**experienced**
171:1 177:17
**explained**
133:9
**extent**
180:15
**extra**
163:21
**ex-patient**
78:2
**E-L-A-I-N-E**
98:20

---

## F

**F**
195:1
**fabricate**
143:22 145:18 146:23
**faces**
54:2
**facing**
104:1
**fact**
12:7 178:3 192:9
**factory**

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

145:10
failed
160:8
failing
189:5
failure
167:5 189:13
fair
23:5 36:5 54:3 66:15
68:8 133:8
fairly
46:18 139:22
fall
12:17
false
135:18,21,22
familiar
136:11 146:15
far
10:4 143:22
Farm
118:16 119:1,5
father
15:6 80:4,7 86:11 96:12
96:13 97:5 99:7,14
102:17,18
father's
14:23
February
115:14 187:17
Federal
3:17 6:7 25:15
feel
60:18 85:18 103:23 143:3
fees
129:9,14
felt
133:16
female
145:4
fifteen
32:22 33:5 82:22 83:3,7
84:20
fifty
121:4
figure
81:11
file
135:6 179:9,11
filed
7:2 14:2 15:21 107:9
135:12 136:4 138:1,11
146:13
filing
16:10 118:8
fill
20:20 31:9 41:16 117:12
filled
31:13 41:13 42:11 43:21
43:23 62:13,15
final

73:10
financially
93:22
find
20:5 24:21 66:17 67:1,6
67:10,13 101:2,6 114:10
189:3
finding
166:21 167:3 186:7
findings
166:3
fine
13:15 53:10 80:22 136:22
185:10
fingerprinting
168:10
Finish
74:14
finished
40:9
first
6:19 7:6 24:15 27:7 31:11
77:8 78:15 79:7,9
119:18 124:9 138:21
139:2 141:8,19 142:3,4
142:4 147:18 153:12
158:6 169:14,17 170:5,8
170:14 171:11 183:2
187:23
five
32:22 33:5,5 35:6 83:20
87:11,16
fixing
39:6
flawed
81:14
following
6:16
follows
6:20
food
94:5 117:3
foregoing
6:9 195:8,12
forgot
91:21
form
2:12 121:23 127:2,9,13,21
128:7,16 129:3,16
130:22 132:7,19 135:8
136:14 138:17 145:22
148:9 149:22 150:15
152:2 154:1 162:6,14
165:18,23 166:23 167:19
171:4 172:4 174:5,9,17
175:5 176:3,15,21
177:20 191:17
Forty-five
131:8,12,15
foster
14:11,13,15 16:1,22 88:15

88:18 89:2,6 91:9
92:22
found
189:15
four
12:11 35:5 134:15 152:12
163:6 172:12
friend
108:8 109:2 147:21 161:15
181:22
friendly
60:11
friends
95:5,6,8,15,16,21 96:2,3,4
96:8 103:8,12 150:8
front
69:6
full
25:13
fully
50:17
further
126:5 129:10 177:22
178:3,4 193:4 195:15
future
129:20

_____ G _____

gallon
54:15,16 104:11,12
Gam
11:2 77:9,11,21 78:16,19
78:22,23 79:6,7 99:6
102:8 169:11 170:5
177:11,16
Gam's
78:1 80:14 81:13 83:2
87:23 95:7 99:12
Gaylen
17:11,13,18,23 88:23 90:1
93:8
GED
18:19,21,22
general
1:10 7:1 12:15 20:1 21:9
21:21 22:11 24:17,19
26:22 27:7 28:13
30:20 40:11 45:12,22
47:9 51:21 52:16 53:3
53:13 54:19 55:3 61:9
62:18 66:10 69:14,17
75:10 101:18,22 102:3
105:9 106:22 107:10
108:12,18,22 110:21
114:17,18,21 115:9
119:21,23 120:1 122:17
123:14,17,20 124:23
126:3,13,14,21 127:17
128:3,22 129:6,19,22
130:6,7,19 132:5,17

133:22 145:8,10 147:5
150:23 151:15 152:11
153:10,17 156:21 161:10
162:8 164:3,14,15,20
165:2 168:7,20 171:3,11
172:2,6,10 173:7,12
174:21 176:18 177:18
178:5 179:20 180:5,8
182:3
Generals
134:15
General's
22:13 26:6,20 112:17
generic
8:1
getting
72:19 81:7 125:8 190:23
girl's
50:22
give
7:3 47:1 49:10 54:12,15
77:16 96:22 159:5,6
173:10 182:21 190:9
given
136:17 137:7 145:9 154:9
154:14,17,20 158:16
160:5,18,22 161:2
195:13
giving
133:11 190:23
go
7:10 10:7 18:11 28:7
73:5,13 76:14,18 78:19
79:5 95:10,14 103:14,17
119:12 163:6 170:3
181:9
goals
56:18
godmother
78:12
goes
187:3
going
8:11 10:9,15 21:7 23:21
25:5,7,19 26:10 29:20
33:14 34:20 39:9
46:23 57:19 58:21
60:14 71:22,23 74:20
80:19 83:10 90:12 98:4
99:19 105:19,20 106:21
107:20 114:16 117:17,19
124:5 133:14 136:13,18
139:9 143:11,12 145:14
146:3 149:2 151:4
152:20 155:8,15 160:10
161:23 163:10 170:1
172:1 184:13 188:19
good
20:3 31:7 72:16 79:18
80:2,10,12,15 96:2,3,4
98:22 99:7,14 102:14

103:23 134:22 163:1,3
181:21
gotten
95:2 174:8
graduate
18:18
grandmother
100:5 101:10
Greg
119:3
ground
7:10
grounds
2:15
group
103:18
guess
41:11
guy
64:7,10 172:19
G-A-Y-L-E-N
17:15

_____ H _____

H
1:20 2:6 6:1
half
18:6 87:21 88:1
half-sisters
97:21 98:9
hand
57:8 190:17 194:18
handbook
24:17,21 26:20
handed
8:13
handwriting
150:11
happen
105:2,5
happened
40:7 65:11 66:5,13 68:23
69:1 70:7 71:11,19
82:23 83:4,22 84:10,14
84:17,21 105:1 146:8
187:14
harassment
26:3 132:14
hard
78:9 84:3 85:21
Harrison
50:12,14 51:1,7,15 52:16
53:16 104:5 135:12
138:5
Harrison's
136:9
health
118:2,3,14 177:13
hear
180:23 181:1

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

heard
62:4 135:23 136:3 144:16
165:15 167:10,13 180:22
187:23 192:16

hearing
164:11,13,21 165:6,12
188:2,15,16 195:14

held
164:11

help
10:3 20:10 34:20,21 41:5
64:20 82:6 152:20
163:6

high
18:11,13 19:7

higher
169:22

highlight
157:8

highlighted
157:4,6

Highway
3:6 194:12

hire
109:15,21

hired
22:10 23:1,2,6,7 45:3
145:3,6 173:6,12

hiring
145:1

home
40:10 108:2

hope
122:20,23

hour
120:23

hours
23:14 152:21

house
95:12

Huh–uh
10:12 78:4 116:23 140:14
148:21

_____

**I**

iced
54:16 104:11 188:5,8,21

idea
59:7

identification
21:5 23:20 25:4 26:14
75:15 106:1 112:5 113:7
143:17 146:20 149:7
155:19 163:16 169:6

identify
168:16

illness
81:18

immediate
29:6

immediately
115:8

impair
10:10

incident
144:8

include
128:3

included
126:11

including
129:8,14

incorrect
16:23 88:2 102:9 183:17

increase
33:11 37:15

increased
33:8

INDEX
4:1,10 5:1

indicates
144:22

individuals
17:3,7

Industrial
165:1 186:6,11

information
21:16 24:20 76:2 145:19
159:2 167:17

initial
106:7 111:14 113:12 130:4
130:9,17 178:13

initially
170:12,21

input
118:5

inside
119:12

insisted
166:7

instance
138:14

insurance
177:14

intend
114:6

intent
67:4

interest
31:1 40:16 131:9,16,21

interested
31:4 40:13,19 42:20
195:18

interfere
94:17

internal
167:3,6 169:9 189:5

interrogatories
112:17

interrogatory
118:19

interview
21:22 23:11

interviewed
22:5 23:9 62:8 147:13,14

introduce
25:19

investigated
55:3,19 56:4

investigating
139:1 144:12

investigation
55:17 57:15,16 59:15,18
59:22 60:2 70:20 71:1
71:14,15 138:23 139:4
142:2 160:8,23 167:3,6
168:9 183:7 185:22
189:6,14 192:12,14,17,19

invoice
36:16 38:13

invoices
117:10,10

involve
168:9

involved
32:7,12 43:5,9,18 168:20

issue
81:1

issued
169:8

item
130:8 131:4,17 144:7,23
168:19

items
28:18,21

_____

**J**

Jack
48:19,21 49:2 55:6 56:9
56:12 68:22 73:16
137:2,21 138:9,13 140:5
140:5,23 141:18 142:1
142:16 144:10,15 154:7
155:5 180:14 181:12,17
181:20 182:20 185:19,23
190:1,9

jail
13:16

Jamie
49:16,17 50:3 109:22
110:1 111:13,18,19

Jean
106:11,13

Jeff
33:21,21 34:2,3,23 35:14
35:21 40:18 41:20,23
42:16 50:2 70:10,16
110:1 139:6,6 142:21
144:16,17 147:15 148:13
155:7 158:19,20,22
159:3,4,13 181:8,14

JEFFERSON
195:5

Jeff's
49:19

Jennifer
95:17,19

Jennings
34:3,23 35:9,14,21 40:18
41:21 42:1,16 49:16,17
50:2 70:17 109:22
110:1,2 111:13,19 139:6
142:22 144:16 147:15
154:18 159:13

job
20:1,2,6,20 21:8,20 27:14
28:14,16,17 36:11,13,18
36:21 37:20 46:8 59:12
111:16 117:1,2,7 119:18
121:6 122:8,10 132:12
133:9 145:7 147:20
148:5 162:12 163:4
171:12 173:20 174:8
175:15 176:8

jobs
119:20 120:2 121:12
171:15

John
15:2 169:11

Johnnie
55:6 56:9 58:1,4,7,15
68:12,22 73:16 74:8
110:12,13,16 137:2
138:9,15 141:2,8 142:21
182:20 189:20

Julie
29:15 110:18 111:21
152:18 174:2

July
42:7 66:14 115:14 118:10
169:19 170:7

Justin
91:16 93:6,13,19,23

_____

**K**

Keith
11:9,11

key
30:16 31:2,7,15,23 32:8
32:13,17 33:8 36:12,13
36:19,22 37:6,17,21
38:2,10 39:15,19 43:10
43:15 65:19,21 150:14
150:20 151:14,23

keys
57:7,8,9 137:22 190:16,17
190:17

kids
14:13 56:15

kin
195:16

kind
13:13 24:20 45:23 49:10
67:3 76:23 79:8 121:16
121:20 153:4 168:13,16
168:20

Kinera
1:7,17 2:6 6:14,18 144:13
144:18 145:1,11 194:3,11

King
119:15

knew
45:16,20 66:22

know
10:8 18:9 20:3 23:13,14
24:20 27:16,17 28:19,21
31:6,14 32:3,6 33:22,22
35:4,4,5 37:4,12 38:4
39:7 40:2,20,21 41:6,8
42:19 45:7,10,21 46:3
46:19,20,22 47:22 48:3
49:9,16 50:2,3 51:14,15
52:19 53:8,8 55:11,14
55:18 56:2,5,6 58:7,11
58:17 59:10 60:12
61:20 62:15 64:2,5,18
65:12,14 69:9 70:12
71:13,19 74:12,16,17
75:2 77:23 78:9 81:2
82:8,13,15 83:6,9,15,16
84:20 90:22 91:1,2
92:12 94:16,17 98:11
99:9 107:16 108:11
110:3,19 117:13,19
123:3,13,19 124:7
125:13 133:10,13,14
137:22 138:23 139:5,10
139:14 142:16,19 143:1
143:2,23 145:2,5,6,9,11
147:12,16,19 148:4,4,8
148:12,15,16,19,19,20,22
152:18,19 155:8,12
157:19 158:21 160:1,12
160:17 161:1 167:21
170:13 171:18 174:12
175:13,18 180:5,7 181:6
182:1,5 183:19 184:8,10
188:22 192:6,7,8,13

knowed
31:5,6

knowing
52:23 75:9 191:23

knowledge
148:10 194:6

known
31:1 40:17

knows
136:15

Kroger
20:16,16,18 30:19,20
110:21

Kroger's

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

172:15

**L**

L
2:1
labeled
155:22
Lack
171:5
lacking
90:13
lady
111:11
Large
6:5
late
117:17,19
Lateefah
3:4 72:15 145:16 163:21
174:12 176:22 194:12
lately
90:22
Laura
1:20 2:6 6:1
law
3:5,14 179:15 187:3
190:22
lawsuit
7:2 13:23 107:9,17,19
122:21 124:7 179:12
lawyer
60:15,19 73:23 74:3,5
78:18 109:12 114:2
125:22 126:1 178:11
179:2,18,19 188:14
190:10
lead
115:20,22 117:12
leader
116:1 120:15
leader/trainer
121:8
leading
2:13
leads
88:5
leave
39:6 57:10 69:2,11
190:20
led
85:1 90:6
Lee
12:19 56:17
left
40:11 68:23 69:3,7,17
172:21,22,23 173:1
Legal
127:22 128:8 130:23
let's
7:10 36:9 56:8 79:5

license
13:12,20 195:23
lie
74:11,13,17,23 75:1,2
life
94:13 99:22
lifted
159:22
liked
33:21,22 49:8 152:5
line
29:4 80:20 126:22 131:14
145:11,12 150:21 151:6
liquidated
128:12
listed
121:13 194:7
little
28:22 36:10 73:14 90:5
87:10
live
15:7 86:5 99:3
lived
86:10
lives
11:19 15:3
living
18:3 84:17
Liz
100:7,9
Loachapoka
18:13,15 84:19
location
29:23 115:5 120:19
long
15:16 29:22 41:8,11 48:1
48:8 56:16 70:10 86:5
115:11 118:9 158:7,10
Lonnie
97:23
look
21:7 24:1,13 25:20 66:23
59:16 75:18 106:2
112:9 130:3,7,17 143:3
144:3 149:21 163:18
183:1
looked
66:23 125:11 131:22
139:14
looking
118:19 143:19 147:20
169:8
looks
177:2
losses
129:20
lost
100:1
lot
10:6 79:12,13 183:20
loud

8:4,11 9:10 78:5,8
Love
1:7,17 2:6 6:14,18,23 9:9
9:20 11:16 14:7,18 16:2
16:5,22 21:6 24:1,2
25:21 26:15 27:6,19
29:18 49:21 59:19 68:9
72:1 73:7 76:22 91:23
93:2 97:23 98:1 99:18
101:2 102:22 105:20
106:4,11,13,14 112:14
113:15 114:16 122:17
123:11 126:10 143:18
144:13 146:11 149:9
155:20 161:23 163:17
170:23 178:2 183:22
184:4,22 194:3,11
loved
100:1
Love's
25:9
lunch
72:23 73:8
lying
74:9 183:11,12

**M**

M
3:13
machine
119:12
making
32:2,7 72:11 140:15
management
120:7,12,16 121:17 161:20
162:9
manager
22:3 29:9,13,15 30:16
37:8,11,16,22 38:2,6,7
38:11,18,18,21,23 39:2,5
39:11,16,18,23 40:14,23
41:6,17 42:17 43:6,22
44:6,22 48:12 61:7,15
62:5 63:7 65:1 66:3
108:6 110:20 116:9,11,13
116:17,19 117:18 123:15
123:23 124:12,19 125:9
127:5 139:6 142:18
144:15 145:3,13 150:14
151:14,23 159:1 161:9,15
165:10 166:3,6,9 173:21
174:22 175:3,9,10 181:4
181:10
managerial
46:7 145:5 176:13
managers
117:11 144:10 180:15
manager's
181:7
March

22:14,20 23:1 66:10
Marcie
89:19,22 95:17 96:5
109:1 146:6,13 147:21
150:4
Marcie's
93:16
mark
21:1 23:21 25:5 26:10
75:17 105:20 112:6
113:8 149:3 155:16
163:11
marked
21:4 23:19 25:3 26:13
75:14 105:23 112:4
113:6 143:12,16 146:19
149:6 155:18 163:15
169:5 182:13,15 186:5,8
189:10
marking
169:1
married
14:7 15:12 56:16 90:3
94:22 95:2 98:11
Marvin
134:11,13 172:18
matter
123:4
ma'am
130:21 163:13 164:5
McCrae
100:7,9
McDonald
32:7,11 43:2,4,14 44:23
62:23 70:3,16 73:10
142:20 144:16 153:14,23
154:15 164:18 165:6
175:6
McDonald's
46:21 67:19 139:19
143:10
McGhee
17:11,17,19 18:1 88:23
89:19,22 91:16 93:6,8
93:13,19,23 95:17 96:5
109:1 146:6,13,13,22
147:4,21 148:5 150:4
mean
9:21 14:12 18:5,8 22:16
23:3 31:11 32:9 33:20
35:22 36:1 37:14 38:16
39:7,17 49:5,8,13 51:4
51:9 52:6,11 59:4,14
73:21 77:4,7,22 79:22
80:11,17,18 83:12 90:12
90:19 91:4 92:2 95:9
97:8 105:2,13 107:4
109:14 115:21 116:2
117:10 121:19 125:10
130:15 142:13 161:19
163:3 165:20 171:9,19

175:17,22 176:1,7 184:4
185:2 191:10
meaning
187:6
means
116:3 121:10 176:1
meant
175:13,18 176:4,7
Meatway
63:7
medications
7:19 8:13,21 9:2,16,23
10:5,9,17 11:8
Medicine
169:9
meet
55:9,12
meeting
55:5 56:8 58:2,5 68:21
68:23 70:2,5,12 71:12
71:20 73:10,16,18 74:3
75:8 138:19 139:7
140:23 142:19 144:10
159:12,16 181:4,5,7,10
182:19 190:1
Melody
98:12,20
member
102:21
memory
91:22 101:14 102:9
mental
76:23 80:23 81:4,8,18
126:12,14
mention
43:12 73:19 128:11 188:13
mentioned
146:10
merit
104:21
merits
104:17
met
79:7 138:13,15
middle
1:2 183:2,2
Midway
34:10 61:11,11 63:11,12,13
63:15 64:17 124:20
134:14 172:18
milk
54:15 104:12 137:11
167:14 168:17 188:5,8
188:21
million
131:19
mind
185:3
minimum
33:4
minute

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

19:2  56:10

**minutes**
158:8,11

**mischaracterizes**
154:2

**misconduct**
165:13  167:18  168:21

**misrepresenting**
166:18

**missed**
163:4

**mistake**
16:10

**mistaken**
22:18

**MLK**
3:6  194:12

**mom**
15:3

**moment**
17:22  32:10  108:16  114:8
144:4

**moments**
129:10

**money**
13:2  37:16

**Montgomery**
6:12

**month**
156:23

**months**
18:10  30:2,3  66:6

**Morrison**
29:16  110:18  111:21
152:18  174:2

**mother**
11:21  16:17  80:4  86:10
89:15,16,17  93:20  96:12
106:12,15

**mother's**
14:17

**Mount**
103:2

**move**
105:18

**moved**
40:10

**Muhammad**
3:4  4:5,7  8:6  9:5  12:6
16:12  25:7  28:9  45:13
45:18  63:10  73:4  74:14
76:8,16,20  80:19  81:5
82:5  83:23  85:15  87:13
92:10,12  98:14  99:8
112:10  113:10  123:9
125:16,21  126:8  127:3
127:10,15,23  128:9,18
129:5,18  130:2  131:1,17
132:8,20  135:9  136:21
138:18  140:3  143:18
144:2,4  145:17  146:1,5

146:9,21  148:11,18
149:2,8  150:2,7,17,22
151:9,12,22  152:6  154:3
154:5  155:15,20  160:14
160:15  162:7,16  163:10
163:17,22,23  166:1,14,17
167:2,22  168:23  169:7
171:10,20  172:5  174:6
174:14,18  176:5,16
177:4,10,21  179:8  182:8
184:11  185:1,7  186:9
190:5,8  191:19  192:4
193:1  194:12

M-E-L-O-D-Y
98:21

_____

**N**

N
2:1  3:1

**name**
6:23  8:12  11:13  14:17
15:1  17:16  40:2,5  44:18
49:20  50:4,22  61:21,23
63:20  64:7,14  98:12
100:6  106:12  110:4
111:9  132:22  135:11
142:21

**named**
16:2,5  50:12  64:10  88:22
172:19

**names**
54:1  98:19

**Nash**
3:15

**necessary**
2:10

**need**
9:10  28:1  50:17  68:8
123:1,1,3  126:10

**needed**
20:2  34:19  41:5  60:18
142:22  144:17  163:5
190:20

**needs**
185:2

**neither**
155:14  195:16

**nephew**
90:21  91:9,13  92:13,20

**nephews**
91:5

**nervous**
9:22  171:6,19,19

**never**
68:17  75:2  77:3  88:18
89:2,6  109:12  111:4
120:5  121:19,22  160:18
163:2,4

**new**
121:10  171:23

**Nichols**
1:20  2:7  6:1

**niece**
18:2  46:21  47:1,4  67:20
68:3  88:22  89:10,13
90:11,12  91:8,20  92:19
93:6  123:5  139:19
143:10  145:4  146:12

**nieces**
91:4

**night**
52:9  108:1

**ninety-five**
120:22

**Nodding**
109:19  175:21

**nonresponsive**
74:21

**noon**
72:17,18

**North**
3:18

**Notary**
1:23  2:9  6:4  194:23

**notepad**
140:17

**notes**
140:16

**notice**
16:11  135:14  136:5,6

**noticed**
95:7

**November**
156:14  187:16,16

**number**
12:4,12  25:12  130:8  131:4
131:18  132:1  144:7,7,23
157:23  158:1  159:6,7
163:11

_____

**O**

O
2:1

**oath**
7:16  9:20  84:7  183:13
184:9

**object**
12:6,8  25:8,11  80:20
87:13  127:2,9,13,21
128:7,16  129:3,16
130:22  132:7,19  135:8
136:13  138:17  145:15,22
148:9  149:22  150:15
151:7  152:2  154:1
160:11  162:6,14  165:17
167:19  171:4  172:4
174:5,9,17  176:3,15,21
177:20  191:17

**objected**
166:23

**objecting**
165:22

**objection**
25:10  45:13  85:15  92:10
99:8  128:17  129:4,17
130:1  131:13  148:17
150:5  151:21  184:11
192:3

**objections**
2:11,14

**occasion**
144:9  155:1  162:17

**occasionally**
68:14

**occasions**
34:15  158:13

**occur**
77:13  180:20

**occurred**
126:20  144:8

**occurring**
161:11

**October**
1:18  6:13  66:10  156:13
157:1  159:19

**odd**
67:1

**offered**
2:16  131:23  137:8  166:4

**office**
132:16  157:21  158:13
194:19

**officer**
165:7,12

**offices**
6:11

**Off-the-record**
8:9  14:19  29:17  36:17
44:13  72:22  76:13,17
79:4  86:21  89:20  103:4
114:23  118:12,15,17
123:10  139:8  143:14
171:17

**Ogletree**
3:15  15:2  97:23  98:12,13

**Oh**
70:8,8  91:1  120:4  131:3
153:2,6,8  160:17  163:1
163:22  186:17

**okay**
7:9,21,23  9:1,13  10:4,15
11:15,19  12:1  15:3,6
19:9,12  20:11,23  22:4
23:8  25:14,18  26:1,9
27:6,14  28:3,10  29:6
30:4,17,23  32:2,19
33:18  34:16  35:23  36:5
36:9  46:15  50:5,23
51:6,18,19,23  52:5  54:3
56:11  58:7,11  59:6
67:22  68:6,21  71:11

72:19  73:6  76:18  79:11
89:8  91:11  98:10  99:18
99:20  101:8  105:17
108:5  109:22  110:12
111:13  113:17  114:14
115:11,15  116:12  118:6
120:16,19  121:3  123:13
123:18  124:8  126:17
131:6,10  136:21  138:18
142:8  148:2,22  154:8
165:12  169:23  170:7
175:10  176:10  180:12
181:21  186:3,21  188:10
191:15

**old**
15:18  20:18  82:23  83:3,9
83:16,17,20  84:12  87:3
100:15  102:17

**once**
34:12  58:10  68:13,13
124:5

**ones**
120:4

**online**
19:18

**Opelika**
11:17  20:15,17  27:8,15
28:12  29:23  31:18,20
34:17  61:8  108:6  127:6
134:2,7,8,13

**open**
36:14  37:1,2  181:8

**opening**
20:6

**operator**
118:5

**opinion**
147:21  148:1,3,13,15

**opportunity**
14:3  48:18  97:4  173:7
190:10

**oral**
6:15

**orders**
27:16,17  117:5,6,9,9

**ought**
123:6

**outcome**
12:20

**outgoing**
103:21

**outlines**
26:5

**outlining**
24:18

**outside**
20:8  41:4

**overall**
111:16

**overcoming**
104:1

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031     http://www.TylerEaton.com

overheard
142:20 161:16,17 180:13
overlooked
46:19 126:21 127:4 133:9
oversaw
116:10

**P**

P
2:1 3:1,1
pack
87:21 88:1
pad
140:22
page
4:3,12 5:3 112:21 115:7
144:6 149:10 157:3
183:2
pain
128:20 129:1
pajamas
54:12 104:11
paperwork
31:9,13 41:16 63:23
paragraph
24:15 166:2,20 183:3
186:22 189:10
parents
82:19 83:13 84:3,6,9
85:1,7,10,19,22 86:6
87:2 92:4 101:13 102:6
Parkway
34:13 134:8 172:18
part
14:4 25:17 59:11 167:18
168:21 192:11,18
participate
185:21
particular
81:9 92:13 138:14 157:4
parties
2:4,14 103:17 195:17
Pause
65:16
pay
32:16,19,21 33:10 37:15
52:5 121:1,3 127:18,19
128:3,5 131:5,7
paying
53:6 166:7 177:11,12
payroll
38:13
pecuniary
129:20
Pelia
103:2
people
17:10 29:3
Pepperell
34:13 134:8

percent
131:9,16
perform
175:15 176:8
performance
49:12 111:16 122:8,11
133:20 134:18 135:5
176:17 177:1
period
162:8
person
16:4,8 20:4 50:12 58:16
80:10,12,16 99:7,14
103:21 150:22 157:19
164:17,19 172:9
personal
56:14 71:16
personally
51:16 175:8
personnel
135:6
Phenix
139:7 144:9 181:3
Philpot
119:3
phone
62:7 156:7 188:11
phonebook
77:23
photographs
168:13
Place
3:17
Plaintiff
1:8 3:3
Plaintiff's
4:21,22,23 5:4,5,6 106:7
130:4,8 143:12,15
146:18 149:3,5 155:16
155:17,22 163:11,14
169:2,4 182:16 186:8
planning
180:16
plant
46:1,1 118:16 119:1,5
plan-o-grams
36:15 38:14
Plaza
34:11 61:11,12 63:8,11,12
63:13 64:17 124:20
134:14 172:18
please
7:13 98:18 130:3
plus
131:8,15,21
pocket
177:12
point
18:4 29:14 56:19 88:15
95:2 143:6 151:15
161:15 164:10 187:18

policies
24:18
Policy
26:3
poor
122:13
pop
188:12,12
position
22:2 23:6 27:7 28:12
31:5,15,23 37:16 40:20
40:21,23 41:7,12,18
42:11,17,20 43:6,22
44:6 45:2 46:12,23
48:9 61:8,13,16 62:4,5
62:5,9,12,16,19,22 63:7
64:3,6,9 65:1,10 68:1
116:16 123:16 124:12
125:9 126:21 127:5
133:12 139:15,17,20
144:14 145:3,9,13
148:23 151:23 162:10
173:23 175:16
positions
61:6
possibility
114:10
possible
28:2 53:19,22 55:22 56:3
101:16,19,20
Post
9:8
posted
20:7 40:23
posting
20:9 41:2,9,13
post-high
18:23 19:5
Post-traumatic
9:5
pots
119:12
practically
37:8
praise
49:5
premises
57:10 190:21
preparation
191:21
prepare
191:7
prepared
143:20 179:19 191:8,13
prescribe
11:7
presence
140:11
present
56:21 57:21 58:22 59:2
60:16,19,23 71:8 137:5

139:1 140:10 147:3
190:14
presented
147:7 189:12
pretty
33:10
previous
35:20 149:18 150:16
153:19
previously
35:15 88:14 182:15 186:5
prices
38:16
primary
151:13
prior
2:17 23:16 35:8 45:11
46:4,6 115:8 136:18
141:1 154:2 160:12
161:2,10 169:18 177:3
182:18 183:8 184:6
privy
85:5
pro
9:17,18,18 82:4
probably
15:15 33:3 34:12,12 50:15
50:18 52:11 53:17 54:2
58:9 63:2 68:13,19
70:9 72:16 78:11 87:21
116:18 134:20 174:7
problem
34:1,20 36:2,3 39:8 81:6
116:7 134:23
problems
77:1 91:23 101:14 102:9
104:1,2 106:21 132:12
procedure
6:8 26:7
procedures
24:18
proceedings
6:16
produce
114:6 135:4
produced
109:11 114:1
Production
113:18 114:7
Professional
1:22 2:8 6:3
promatic
9:3 10:19,20 11:1 81:21
82:2,4
promote
32:8,12 43:9 44:21 67:2
67:3
promoted
30:14 47:21 65:19,21
66:3 145:12 150:20
promoting

43:14
promotion
30:11,18 32:17 48:12
66:18,19,20 67:7,8
pronouncing
82:3
protection
48:13,15 166:10
provide
93:22 94:2,5,7
provided
6:7 21:17 26:19
provider
156:4
provisions
187:2
psychological
77:1 170:18
psychologist
77:9 169:11
public
1:23 2:9 6:4 12:8 25:10
25:17 194:23 195:22
punishment
13:13
punitive
128:12
purchases
117:4 166:8
pure
174:11
put
41:3,3,4,4 80:23 111:14
171:19
putting
12:9
P.C
3:16 169:9
p.m
73:2 185:14,14 193:3
P.O
3:7 194:13

**Q**

qualified
42:19,21,22 66:23 68:4
145:2
question
7:11,13 9:14 10:16 14:14
16:13,15 17:6 19:4
28:14,15 39:10 42:15
44:4 54:7,8 69:8,10
88:6,14 98:18 103:11
107:7 110:7 120:11
138:10 146:22 151:4
154:4 165:23 178:19
180:10 181:15 183:22
184:14,21,23 185:6,9
188:18,20
questioning

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

80:20 131:14 135:10
150:21 151:6 179:18
questions
2:12,13 10:7 56:15,20
57:3,20 58:21 59:8,12
60:8,14,20 71:3,7,22,23
72:4,8,12 73:15 79:13
79:13 99:19 106:10
109:20 114:17 123:12
126:10 136:4,23 137:4
167:1 178:12 182:12
186:4 190:13 191:6
195:9
quick
123:7

**R**

R
3:1 195:1
racial
173:15,18
raise
32:16
ran
38:4
rang
117:3
rate
32:19,21
read
16:15,16 24:19 166:12
185:15 189:11 194:4
reading
166:2
reads
144:7
ready
28:7 63:5 73:3 175:6,15
175:23 176:8
really
15:16 65:2 68:20 88:8
90:16 94:15 96:14
106:19 110:3 122:22
125:10 180:4
Realtime
1:21 2:7 6:2
reapplication
151:19 152:8
reason
22:15,21 32:13 43:19
46:8 47:12,19 51:1
58:14 59:13 67:23
69:23 81:13 90:9 93:21
102:11 121:14 125:5,14
126:3,12 143:21 145:18
146:23 154:9,14,17,20
160:6,13,18,22 161:2
162:11 165:9 166:19,21
167:4,6 173:10 182:21
189:15

reasonable
129:7,8,13,14
reasons
35:9,19 93:18
recall
11:5 15:16 17:22 24:5
32:9,10 34:7 41:15
42:3,6 47:14 48:17
49:9 55:5,8 68:20
77:18 79:7 83:5 86:8
86:18 87:8 96:17 99:16
101:17 107:14 108:16
121:21 134:4 144:8,23
165:5 170:11
recap
58:19
receive
13:14,16 19:15 32:16 44:5
66:18,19,20 67:8,9
122:13 133:19 134:2
135:14 136:6 152:13
received
13:2 24:16 27:3 30:11
31:23 45:2 48:9 67:7
153:13 166:3 169:15,18
receiving
46:12
reckon
49:9
recognize
21:8 26:16 106:3 112:14
149:13 150:3 155:21
recollection
33:2 41:14 42:8 48:8
49:23 82:7,10 83:13,21
85:11
recommend
153:1
recommended
152:19
record
16:16 25:10,11,17 27:20
76:15 93:4 106:6 132:3
140:7 185:15
recorder
73:20 140:10
recording
140:13
records
22:13,19 135:4
recount
28:18
redact
25:16
reduced
195:10
reemployed
158:18
REEXAMINATION
4:6,7 178:1 190:8
refer

78:18
referred
77:21,22 78:2
referring
34:3 78:3
reflect
106:7 132:4 170:4
refusal
192:11
refuse
71:1,15 160:8
refused
57:14 70:19 71:3,7,14,16
160:7,23 162:17 183:6
185:21
refusing
192:18
refute
105:6,12
regard
162:4 177:7 185:19
regarding
137:1 141:17 142:6 161:7
161:10 167:17
regardless
60:13
register
37:4
Registered
1:22 2:8 6:2
regularly
103:6
regurgitate
136:16
rehabilitate
136:16
reiterate
184:14
related
89:22
Relations
165:1 186:6,12
relationship
96:1,11 97:5 98:23
relative
100:2 103:10
relevance
80:21
reliable
20:3
relief
127:17
remember
15:18 22:4,22 23:10 24:6
34:22 35:3 36:6 40:4
42:15 43:8,21 44:9,17
45:1,4 47:6,17 48:10
49:15 50:6,19 51:5,11
52:8 53:15,17 54:1,2
56:12 61:22 63:16,19
64:13 71:12 77:8 82:12

83:6,17,19 84:1,4,5,8,10
84:11,14,16,23 85:4,20
86:7,9,19,23 87:3,9,14
87:17 92:4 101:3,4,12
101:21 102:1,5 139:3
183:19,20 184:1,2,17
187:12,13
remembered
101:9
remembering
92:6 101:6
remind
84:6
repeat
17:6
rephrase
7:14 17:5 19:3 35:12
42:14 44:4 99:11 105:8
report
52:22 53:4 78:1 80:14
83:2 87:23 95:7 99:13
117:15 165:16 166:4
reported
1:20 52:16 166:8
reporter
1:21,23 2:8,8 6:2,3 8:5
8:12,14 9:11 29:20 78:6
78:9 82:1 98:15,19
163:13
reporter's
76:12
reporting
26:7
represent
7:1 24:2 91:7
represents
195:12
reprimand
152:23 153:3 162:11
reprimands
152:13
request
113:18 114:7 135:3
requests
114:12
requirement
152:7
requisite
174:15
reset
38:14
respective
2:5
response
88:12 108:4 112:16 113:18
114:7 124:17 188:14
responses
118:19,23
responsive
114:11
rest

34:14
restaurant
116:10
result
32:17 128:21 171:2 195:18
results
147:16
return
16:21
returned
144:11
returns
16:6 17:18 18:1 89:5 91:6
92:8
rid
142:22 144:18 180:16
right
8:22 10:8 16:23 21:14,18
22:7 23:5 27:9 39:6
55:23 57:10 68:10
72:13 75:5 76:21 80:16
81:1 82:3 102:12 104:21
105:18 114:3 118:20
132:14 138:20 141:4
143:3 170:3 171:7
179:21 180:6,11 182:10
183:21 184:3 185:22
186:2,14,18 187:19,21
189:6,16 190:2,21
ring
27:17
Rita
146:7
rules
6:7 7:10 25:15
running
37:13 116:3
Ryan
3:13 6:23

**S**

S
2:1 3:1
SAITH
193:4
sake
190:6
sales
28:19 36:15 38:12
Salissa
98:1,7
satisfaction
158:17
saw
79:1 96:15,23 140:19
170:14
saying
35:13 44:2 68:17 69:9
75:11 102:1 107:18
124:9,10 126:13,23

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                    http://www.TylerEaton.com

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

| | | | |
|---|---|---|---|
| 128:4,13,23  129:12,21 | **set** | **sir** | **specifically** | **stock** |

**set**
28:18,22  36:14  37:3
191:4

**sets**
125:17

**setting**
38:13

**settled**
12:22,23

**Seven**
33:9  121:4

**sexually**
99:21

**shaking**
171:7

**Sharonda**
98:10

**Shealy**
95:17,19

**shelf**
38:15

**shelves**
29:1

**shift**
37:13  115:23  116:4,4,5

**short**
185:12

**shorthanded**
64:21

**show**
25:11  82:6  105:4,10,19
127:16  129:6  130:21
143:11

**showed**
22:19

**showing**
53:4  54:19  135:4

**shows**
131:3,4  145:19  149:10
157:23  158:3  189:12

**sic**
9:4  10:19,20  11:1  63:8
81:21  82:2,4,4  124:4
133:15

**sick**
100:18,21

**sign**
41:4

**signature**
21:11,15  24:8  25:21  75:20
76:1  112:22  149:16
191:9,10

**signatures**
149:20  150:3

**signed**
24:3  68:17  143:20  149:10
183:12  191:11

**signified**
113:2

**signing**
21:15  24:5,22  76:5  113:1

---

128:4,13,23  129:12,21
166:15  172:22  175:22
180:15  183:17  185:8
188:15,23  191:12

**says**
16:21  24:14,15  76:1  78:1
83:2  99:13  118:23
165:19  166:18  167:4
170:17  183:3  186:23
187:1  192:10

**scan**
28:17,21

**scanner**
119:7,9,11

**scared**
171:6,8,16

**schedule**
117:8,8

**school**
18:12,14  19:1,5,7  40:8,9
179:15

**seal**
194:18

**second**
20:15  76:15  141:6,6  158:9
166:2

**Security**
12:4,11  25:12

**see**
21:14  53:18  75:23  76:3
78:19,23  106:23  118:23
140:15  151:10  155:10
165:20  170:12,12  173:7
185:1  186:23

**seeing**
170:5  177:16

**seeking**
129:11

**seen**
39:7  77:8  113:14  135:2
150:10  169:12

**sentence**
166:20

**separate**
15:14

**separated**
15:15  82:20  83:15  85:10
85:19,23  86:3,16,20
87:2,4,7,11,12,16  92:4
96:13  102:6

**separately**
194:8

**separating**
83:14

**separation**
84:3,6,9  85:2  87:5
101:13

**September**
47:11,16

**sertraline**
8:8,18

---

**sir**
17:20

**sister**
97:21  98:2,5,6

**sisters**
97:17  99:1

**sister-in-law**
90:3

**situation**
75:10  90:6

**six**
18:10  47:20,23  48:4,5
120:22

**sixty-three**
102:19

**sixty-two**
102:19

**skills**
174:15  175:2

**slip**
12:17

**Smoak**
3:16

**smoke**
87:18,20  88:4,6,7

**smoked**
88:1

**snatched**
57:7  190:16

**social**
12:4,9,11  25:9,12  95:9

**soda**
188:12,12,16

**Sodexho**
114:22  115:3,16

**somebody**
149:23

**son**
93:16

**sorry**
9:7  15:9  16:14  17:12  18:7
22:22  56:23  90:23
95:18  98:21  105:20
119:8

**sought**
76:22

**sound**
42:4  63:13

**Source**
114:21  115:3,17

**South**
30:7  34:9  172:16

**Southern**
120:7,12,16

**speak**
90:23  93:4  95:18  100:8
157:20  171:7

**speaks**
145:15  166:11

**specific**
151:3

---

**specifically**
34:23  38:9  44:18  45:5
56:13  134:1

**Speculating**
176:4

**speculation**
45:14,16  167:20  174:12
191:18

**speed**
29:20

**spell**
8:19  11:12  14:21  17:14
98:14,18

**spellings**
98:16

**spoke**
133:4  157:14  158:12
166:9

**spoken**
159:19

**Sprint**
156:5,6

**stand**
151:3

**standards**
176:19

**start**
9:14  10:8  155:12

**started**
27:8  33:4  125:12  178:11

**starts**
179:12

**state**
6:4,11  57:16  59:15  195:4

**stated**
70:18  155:9  165:8

**statement**
57:7  74:15  139:12,12
169:8  170:16

**States**
1:1  6:8

**status**
56:16

**staying**
56:17  84:19

**stays**
15:8  119:14

**stealing**
165:11  168:3  189:4

**stenotypy**
195:9

**stepdaughter**
49:19  110:2,5  123:5

**Stevenson**
111:2,22

**Stewart**
3:16

**STIPULATED**
2:3

**stipulation**
6:9

---

**stock**
29:1

**stopped**
187:11,19

**store**
20:13,17  22:3  27:9,15
28:13,23  29:9,13,15
30:6,20  31:17,18,19,19
31:20,21  33:15,17  34:9
34:13,17,22  35:2,11,16
35:20  36:7,11,12,14
37:2,21  38:2,7,11,18,20
38:22  39:1,4,5,11,15,18
39:22,23  40:14,22  41:9
41:17  42:17  43:6,22
44:6,22  48:12,14,20,22
49:7,15  50:1  51:2  52:2
52:9,12  53:20  54:4,9
57:8  58:10  61:7,8,10,11
61:14  63:7,8,14  64:16
64:23  66:3  69:2,3,11,18
69:23  70:11  108:6
110:20  116:11,13,15,17,18
117:11,18  123:15,23
124:12,13,19,20  125:9
127:5  134:6,7,7  135:1
137:22  138:20  139:6
140:4  142:17,18  144:9
144:12  147:9,13  158:23
159:12  166:3  172:15,16
172:17  173:3,21  175:9
175:10  181:2,4,7,9
190:17

**stores**
30:8  34:14  152:12,16,20
163:6  172:12

**strange**
66:17  67:6,11,13

**Street**
30:7  172:16

**stress**
9:4,6  10:19,20  11:1  81:21
82:2,13,16  88:11  90:14
94:12,20

**stressed**
88:4,8

**stressful**
94:14

**strike**
39:9  74:20  104:8  124:6
126:18  154:4  159:21
161:7  188:19,20

**study**
19:12

**stuff**
23:14  28:20,22  33:21
35:4  37:4  71:20  139:11
139:15,17

**subjected**
128:20  173:15,17

**submit**

---

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                    http://www.TylerEaton.com

63:22  147:9
submitted
  21:20  109:10  168:12
subscribed
  194:16
subsequent
  169:15,16  171:15
sue
  126:12
sued
  12:14  13:5  125:19  178:5
suffer
  9:3,17
suffering
  128:20  129:1
suing
  122:16  123:14,17,22  124:1
    124:10,14,15,18,22  125:1
    126:3,14  179:20  180:5,7
suit
  12:16
Suite
  3:17
supervise
  38:21  39:2,11  121:5
supervised
  152:15
supervises
  39:19
supervision
  195:11
supervisor
  29:7  116:4  119:3  153:7
    161:9
supervisors
  133:21  134:17  152:15
support
  89:12  91:19  93:12,19
supported
  89:9  90:20  91:3,8,12
    92:7,18  93:5,10
supporting
  96:7
supposed
  10:3  59:15,16  137:15
sure
  22:12,17  28:9  32:5,23
    33:6  35:13  42:2,9
    43:11  47:13  48:3,6
    49:20  50:21,22  53:15
    61:18  62:17  66:8  68:15
    70:9,13  76:16,20  77:14
    83:1,8,11  84:19,22
    102:20  108:13  119:13
    123:9,13  134:19  135:1
    140:9  152:22  157:16
    184:20
suspended
  57:11,13  153:22  154:6,7,8
    155:6  157:12  183:4,5
    185:20  190:19,20  191:3

192:6,10
suspension
  154:10,15,18,21  155:3,11
    158:18  159:22  160:3,6
    160:16,19  182:22
sworn
  6:19  136:19  194:16
  S-A-L-I-S-S-A
    98:8
  S-E-R-T-R-A-L-I-N-E
    8:20
  S-O-D-E-X-H-O
    115:1

                 T
T
  2:1,1  195:1,1
table
  24:19
Taco
  115:18,19  116:9  117:23
Taffy
  44:12,19  50:3  70:17
    139:19
take
  8:5  9:11  15:11  19:20  24:1
    25:20  27:16,17,23
    37:15  44:5  51:19  52:1
    53:5  68:9  90:7,10,15
    96:5  106:2  112:9  117:5
    117:6,18  123:7  144:2
    148:14  149:21  168:13
    184:19,22  185:4,11
taken
  2:6  91:9  109:4  168:6
    186:16  195:8
talk
  20:11  36:9  41:23  42:10
    42:23  52:6  56:8  61:19
    62:22  73:23  74:4
    107:12,15  109:16,18
    141:11  142:11  155:2
    157:17
talked
  23:10  31:12  41:20  42:16
    62:21  63:17  81:2  104:5
    104:6  107:4  109:12
    111:11  120:3  132:21
    141:13  157:20  183:21
talking
  28:11  70:22  86:12  119:22
    134:22  141:23  144:15
    180:21
Tally
  44:15,16,19,21  45:1,7
    46:6,12,20  47:21  48:8
    54:4,6,8,11,14,20  67:19
    67:23  104:6,9  105:18
    111:7,23  112:1  136:5
    137:14  138:3  145:4

Tally's
  45:20  48:11
Tammy
  111:2,22
tape
  73:19
tax
  16:6,21  17:8  18:1  89:5
    91:6  92:8
taxes
  91:10
tea
  54:16  104:11  137:11
    167:14,15  168:16  188:5
    188:8,21
Tech
  19:10,16,21
teenager
  83:18  87:1,6
telephone
  156:1
tell
  7:13  27:14  28:16  33:13
    36:11  38:9  42:13  46:15
    49:22  51:18  52:4  65:5
    65:8,10  71:2  74:18
    79:20,23  80:3,6  83:12
    88:10  90:5  91:17  99:6
    138:19  140:12  142:20
    144:17  151:4  155:12
    175:7,8  176:18  178:20
    183:9,15  185:23  187:14
telling
  65:3,13  71:18  99:16
    139:13,21  142:14  161:3
ten
  56:18  96:18,20
terminate
  70:19
terminated
  108:18,21  124:23  153:16
    156:21  157:1  162:1
    164:2  165:9  171:11,12
    189:3,4,16  192:20,22
termination
  159:23  160:3,4,16,21
    161:4,10,11  166:19,22
    171:2  177:17  182:2
terms
  175:22  176:12
Terrell
  40:3,7
terrified
  69:5  107:23  171:8
terrify
  106:23
testified
  6:20  57:19  60:20  67:18
    86:23  88:14  89:9  99:10
    101:9,11  105:3  109:2
    127:14  132:9,21  134:5

136:14  144:5  146:10
    150:19  151:5  169:12
    170:10  176:10  187:21
testify
  9:19  10:1,10  88:21  111:15
    150:8,17  172:20
testifying
  127:18  141:1  184:8
testimony
  37:19  58:19  84:1,8  85:9
    89:1,5  92:3  127:4,11
    136:16,19  150:16  151:3
    154:2  160:12  165:5
    177:3,5  179:13  180:17
    181:17  182:19  184:7
    185:18  192:5  194:4
Thank
  177:22
theirs
  61:2
thereto
  2:17  195:10
thing
  38:5  68:2  81:2  122:23
    127:6  161:12  190:15
things
  29:21  38:10  74:9  88:11
    101:3,4,7  128:2  177:7
    178:4  183:20  184:3,18
think
  22:20  33:4  47:12  49:19
    50:20,21  55:12  56:19
    57:2  59:11  60:10  63:4
    63:10  65:17,20  66:1
    67:23  75:2  79:18  82:4
    83:7  84:18  87:14
    100:11,16  104:9,13
    105:3  109:1  112:12
    113:10  116:14  123:8
    125:16  156:16  160:7
    173:11  175:5,14  176:8
    177:4  184:14  186:7
    190:4
thinking
  114:9
third
  30:16  31:2,7,15,23  32:8
    32:13,17  33:8  36:12,13
    36:19,22  37:6,17,21
    38:2,10  39:15,19  43:10
    43:14  65:19,21  150:14
    150:20  151:14,23
thirty-five
  33:6
thought
  22:16  23:3  47:3  122:22
    147:22
thousand
  131:8,12,15
three
  30:1,3  97:21  162:15

176:23
throwed
  57:9  190:17
Tiffany
  20:12  21:23  22:1  23:9
    29:8  31:3,8,12  32:1
    33:13  43:12  95:20  96:1
    108:5  134:20  141:17,20
    142:8  143:7,20  145:18
    150:4  152:17  161:13,14
    180:13  181:1,21
tills
  36:15  37:3
Tim
  61:12,20  62:20  63:17
time
  2:15,16  10:16  13:16  27:21
    29:13,14  33:5  34:8
    36:10  39:23  41:12,13
    45:8  48:11  49:3  72:16
    79:1  83:10  88:16  89:14
    95:3  96:15,23,23  101:10
    116:22  126:6  137:14,21
    138:7,21  139:2  140:4
    141:6,6,8,16  142:4,5
    147:3  159:23  170:14
    171:6,12  188:1  192:16
timeline
  73:14
times
  35:6  78:21  162:15  176:23
    177:9
Tim's
  63:19
today
  7:3,15  9:20  10:2,7,11
    29:21  81:11  84:7,8  85:9
    85:21,22  114:3  136:1
    183:21  184:9
Todd
  55:6  56:9  58:1,4,8,15
    61:3  68:12,22  73:17
    74:8  110:13,16  137:2
    138:15  141:2,8  182:20
    189:20
told
  31:4,8,22  33:19  39:20
    40:19  42:18,22  46:17
    55:10  56:19  57:2,9,14
    58:20  59:9  62:20,22
    63:3  64:8  70:13,22
    78:15  82:19  83:7  91:20
    92:19,19  99:9,13  129:9
    133:7,16  137:3  138:22
    139:11  158:23  159:9
    161:13  175:1,9,11  178:5
    180:21  185:19  190:12,15
    190:18,19
Toomer
  11:17
top

94:9
topic
72:21
totes
28:22
track
119:14
train
68:5 121:11
trained
54:6 112:2 174:2,19
training
133:10 181:4,4,7
transcript
194:4 195:13
transfer
30:5,8 33:14,17 35:10,19
transferred
30:2,22 35:1,6,15 36:7
39:3 40:1
transferring
34:18
Trawick
48:19,21 49:2 55:6 56:9
56:13 58:20 59:7 60:7
60:10 68:22 71:9,17
72:4,8 73:16 137:2,21
138:14 140:6,23 141:19
142:2,16 144:11 154:7,9
154:12 155:5,6 180:14
181:12,17,20 182:20
185:19,23 190:1,9
treat
123:3
treated
46:18 107:1 123:6 125:2
125:13,14 132:13 133:8
133:14 139:22 143:4
treatment
76:23
trial
2:15
trouble
142:23 144:19
trucks
28:18
true
21:17 76:2 87:2 113:2,21
135:18,20 184:16 194:5
195:12
Trust
94:19
truth
180:4
truthful
79:15
truthfully
10:10
trying
23:1 50:20 60:11 81:11
94:15 136:15 177:2

191:3
turn
112:20
Tuskegee
3:8 115:6,6,16 194:13
twelve
131:9,16
twenty-five
33:9
twice
34:13 58:10 68:14 78:23
two
9:15 45:3 50:7,8 52:2,10
52:12 53:20,23 66:5
97:20 145:8 146:2
149:18 158:3,13 159:18
166:4
type
75:10 82:15
typed
191:13
typewriting
195:11
typical
117:2

**U**

U
2:1
Uh-huh
20:19 64:12 96:21 113:20
118:21 120:18 159:14
189:17
unauthorized
54:21
uncle
44:23 104:16
underneath
24:13
understand
7:13,15 53:11 57:18 70:21
90:18,20 94:19,21 105:7
125:23 152:23 178:16,19
187:5
understood
7:12 27:4 178:21
unemployment
164:1,4,7 165:3 186:12,14
186:20 187:2 188:1
189:2
unfairly
125:2,15 143:4
United
1:1 6:8
University
19:11 115:7,16 120:6,8,20
unknown
111:9
unload
28:18

unpack
28:21
unresponsive
39:10 124:6 188:19,20
untruthful
58:15
upset
95:1 97:3
use
73:19

**V**

verbal
153:21
visit
77:10,13 79:10 95:8,10,11
95:14 170:8
visited
78:22
visits
79:6 169:10 177:11
vs
1:9

**W**

wage
33:4,7
wait
19:2 47:22 48:1,4
waited
47:20
Wanda
111:9,10 132:22,22
want
10:8 20:14 25:10 32:22
56:2 59:1 73:23 74:3
75:17,19 81:23 90:12
94:22 102:18 123:13,19
124:6 127:19 128:13
129:13 130:7,19 132:3
137:4 148:4,15 156:16
159:5 163:18 185:5
187:15,17 190:13
wanted
20:10 31:1 40:21 41:5
52:5 55:10,13 59:9
73:19 128:2 130:13
warning
153:20
wasn't
33:23 38:5 54:7 60:8
61:4 68:4 74:18 80:13
80:17 89:15 90:8 93:14
99:7 130:15 133:8
139:22 176:19
Waverly
15:8,10,11 103:2
way
10:1 31:5 33:21 52:19,19
52:23 54:22 81:15

105:5,11 106:23 117:15
125:12,13 152:5
Webb
98:10
week
63:3 78:23
weeks
45:3 47:20,23 48:4,5
145:8
Wendy
132:23 133:1,2,5,6,7,16
154:21 157:14
went
18:13 27:2 31:3 40:9,18
75:8 121:1 160:2 170:11
weren't
59:17,21 60:13 66:2 72:11
129:11 151:16 154:22
West
3:6 194:12
white
143:8,9 145:4 174:7
189:20
Wilson
78:14
Winn-Dixie
12:17
withdraw
88:13 180:9
Withdrawn
85:16
witness
6:14 13:23 56:21,22 57:4
57:22,22 58:22 59:3,5
60:16,19,22 71:4,8 75:3
75:4,6,7 106:22 107:22
137:5 141:7 189:23
190:14 191:1 194:3,18
195:14
witnessed
85:6 107:5,20,23
woman
174:7
wonder
171:23
word
61:1
words
153:3
work
23:13,16 29:22 34:5 35:8
35:20 38:21 39:2,7,8,12
45:11,20 46:4 48:19,21
49:3,4,6,8,11 50:11 51:2
54:4,9 64:16,19 108:1
114:19 115:5,12,15
118:14 119:15 120:19
152:11 155:13 162:23
163:2 176:17,23
worked
30:1 33:20,22 34:8,9,12

34:14,16,23 35:4,14
45:21,22,23 50:9 58:9
66:9 68:11,18 114:21
115:13 118:2 120:5,6
134:6,10,12,16,21 152:12
153:9 172:13,23 173:4
181:12,16,19
worker
20:3 134:22
working
31:6 33:23 36:2,4 46:1
64:8 89:15 90:8 93:14
93:20 94:10 115:9
152:5 172:6
works
108:11
work-related
51:10
wouldn't
22:14 33:11 43:18 53:12
73:23 75:1 105:11,13
109:15,21 159:6 174:8
191:1
write
162:10
writing
140:19 153:20,21 184:9
written
8:6 121:22 122:2 133:20
134:3,17 152:7
wrong
22:21 47:12 83:4
wrote
109:14

**Y**

yeah
13:1 30:3 33:19 49:18
65:12 66:16 98:6
120:10 163:22 173:2
year
18:6,20 19:22 101:9
156:15,20
years
19:20 56:18 82:23 83:3
83:20 84:20 86:10
96:18,20
Yesterday
79:3
Young's
118:16 119:1,5,17

**Z**

Zoloft
8:2

**0**

03
18:22 100:12
05

KINERA LOVE
DOLLAR GENERAL CORPORATION, ET AL.

66:10,11
07
19:22

---
**1**
---

1
4:13 21:2,4 144:6
1.5
131:19,19
1:00
27:23 72:18
1:07
73:1
10
4:22 146:19
10th/22nd
157:7
10:31
6:13
10:57
28:5
1000
3:17
105
4:18
1096
3:7 194:13
11
4:23 149:4,6 182:14,16
11:02
28:5
11:46
73:1
112
4:19
113
4:20
12
5:4 155:16,18,22
12:00
27:22
126
4:5
13
5:5 163:12,15 186:8,9
14
5:6 169:3,5
143
4:21
146
4:22
149
4:23
15
20:14
1515
20:14
155
5:4
163

5:5
169
5:6
178
4:6
1819
3:18
19th
169:19 170:7
190
4:7
1998
118:10,11

---
**2**
---

2
4:14 23:19,22 27:2 144:7
2.0
158:8
2000
115:13,14
2005
22:14 26:20 42:4,7,7
   47:11,16 66:14 115:14
   156:17,18 157:1,7
   159:21
2007
1:18 6:13 77:19 169:19
   170:7 194:17
21
4:13
22nd
159:19
23
4:14
25
4:15
26
4:16

---
**3**
---

3
4:15 25:3,6,19 115:7
130:8 144:23 183:2
195:23
3rd
22:14 156:14
3-A
131:4
3-B
131:11
3-C
131:18
3/1/2005
24:11
3:06-CV-1147-MHT
1:5
3:07
185:14
3:10

185:14
3:17
193:3
30
1:18 6:13
30th
47:11,16
334.727.1997
3:9
35203
3:19
36087
3:8 194:13
36801
11:18
3805
3:6 194:12

---
**4**
---

4
4:16 26:11,13
4th
156:13
4:00
70:12
4:30
27:23
409-A
11:17
41
12:5
415
6:11

---
**5**
---

5
4:17 75:14,17
5th
3:18
51
34:11 134:10

---
**6**
---

6
4:4,18 105:21,23 112:21
   113:11,11 130:3 132:1
6715
12:13

---
**7**
---

7
4:19 112:4,7 157:3
75
4:17

---
**8**
---

8
4:20 113:6,9
800
158:1

---
**9**
---

9
4:21 143:13,16
9/26/1979
12:3

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                          http://www.TylerEaton.com

EXHIBIT 3



# SIGNATURE PAGE

`4 1 6 D 8 6 7 1 S`

Social Security Number

DEFENDANT'S
EXHIBIT
2
K.Love

## WAGE & HOUR ACKNOWLEDGEMENT

I understand that *working off the clock*, instructing someone to work off the clock, allowing friends and/or family to work in the store or accepting merchandise or cash for work is a serious violation of Company policy. I also understand that employees must be paid for all hours worked, including time spent making nightly deposits, within the week they were actually worked. Employees will be paid through the regular payroll system for all hours they work, no exceptions. Any violation may result in immediate termination of employment for the responsible employee, even for the first offense. I understand that it is my responsibility to contact the Employee Reponse Center at 1-888-237-4114 if I have not been paid for all hours worked.

## PAY POLICY ACKNOWLEDGEMENT

I understand that it is company policy and State and Federal Law that all employees must accurately record ACTUAL HOURS WORKED on their time sheet and employees are to be paid for all hours worked. I understand that Dollar General Company Policy requires that all employees be at least 18 years of age. I FURTHER UNDERSTAND THAT FAILURE TO FOLLOW EITHER POLICY WILL RESULT IN TERMINATION OF EMPLOYMENT OF THE EMPLOYEE WHO FALSIFIES THE TIME RECORD AS WELL AS FOR ANY MANAGEMENT EMPLOYEE WHO INSTRUCTS THE EMPLOYEE TO FALSIFY THE TIME RECORD.

## DRUG TESTING ACKNOWLEDGEMENT

I hereby certify that Dollar General has provided me with a copy of its Drug & Alcohol Policy; that I have read and understand the Policy; and that I agree to abide by the terms and conditions of the Policy. I understand that, where permitted by law, I am subject to drug and/or alcohol testing, including pre-employment (post-offer), random, post-accident and reasonable suspicion testing. I hereby give my consent to be tested in accordance with the Policy.

**I acknowledge that I have read ALL the above policies and agree to fully adhere to these Company policies. I further acknowledge that I should contact the Employee Response Center at 1-888-237-4114 to report any violations of these policies.**

Employee Signature: X _Kureia Sine_     Date: _03/01/05_

## EMPLOYMENT ACKNOWLEDGEMENT

I acknowledge that I have received a copy of the Dollar General Employee Handbook outlining the policies and procedures of Dollar General. I have read the Table of Contents, and I know what kind of information I can find in the Handbook. I acknowledge that it is my responsibility to read and understand the information contained in this Handbook. I am aware that the Company may revise, add to or delete any policies, procedures, or benefits without notice as deemed necessary for the efficient operation of the Company. If I have any questions, I understand that I should contact my immediate supervisor or Human Resources.

AS A CONDITION OF MY CONTINUED EMPLOYMENT, I AGREE TO FOLLOW THE RULES AND REGULATIONS OF THE COMPANY. I ALSO UNDERSTAND THAT NOTHING CONTAINED IN THE HANDBOOK IS INTENDED TO CREATE AN EMPLOYMENT CONTRACT BETWEEN THE COMPANY AND ME FOR EITHER EMPLOYMENT DURATION OR FOR THE PROVIDING OF ANY BENEFIT. IT IS THE POLICY AND INTENT OF DOLLAR GENERAL AND THE UNDERSIGNED THAT THE EMPLOYMENT RELATIONSHIP IS ONE CREATED AND GOVERNED BY THE WILL OF BOTH PARTIES AND MAY BE TERMINATED AT ANY TIME WITH OR WITHOUT CAUSE BY EITHER PARTY.

I understand if I steal from Dollar General, I will be terminated and prosecuted.

I further understand that no supervisor, manager or representative of the Company, other than the Chairman, has any authority to enter into any agreement for employment for any specified period of time or make any agreement contrary to the foregoing.

Employee Signature: X _Kureia Sine_     Date: _03/01/05_

EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| KINERA LOVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO.: |
| | ) | |
| DOLLAR GENERAL | ) | 3:06-CV-1147-MHT |
| CORPORATION, | ) | |
| d/b/a DOLGENCORP, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF CHARLES MCDONALD

1.     My name is Charles McDonald.  I am over the age of 21 years, and I am suffering from no legal disability.

2.     I am currently a District Manager for Dolgencorp, Inc. ("Dolgencorp").

3.     This declaration is based upon personal knowledge and my review and inspection of certain business records of Dolgencorp.  Those records were created and maintained in the regular course of business.

4.     By virtue of my position, I have access to personnel files and payroll records for employees both past and present.

5.     During Plaintiff Kinera Love's ("Love") employment, I was the District Manager over Store No. 6519 located in Opelika, Alabama, and Store No. 8665 located in Auburn, Alabama.

6.     I approved Jeff Jennings' recommendation to promote Love from Clerk to Lead Clerk, also known as "Third Key."

7.    I approved Jeff Jennings' recommendation to promote Donna Tally ("Ms. Tally") to Assistant Store Manager instead of Love because Ms. Tally had prior retail management experience.

8.    Candice Harrison ("Ms. Harrison), who was a Clerk at Store No. 8665 located in Auburn, Alabama, during Love's employment, reported that Love had tried to convince her to steal a candy bar. *See* Statement from Ms. Harrison, Attachment "1."

9.    Specifically, Ms. Harrison reported that Plaintiff had told her that she could take a candy bar without paying for it because "it was just the two of them" in the store. *See* Attachment "1."

10.    Donna Tally ("Ms. Tally"), who was Assistant Store Manager at Store No. 8665 located in Auburn, Alabama, during Love's employment, reported that on August 14, 2005, and on September 10, 2005, Love asked for unauthorized discounts on store merchandise. *See* Statement from Ms. Tally, Attachment "2."

11.    Specifically, Ms. Tally reported that Plaintiff had asked for discounts on pajamas, iced tea, and milk, and for Ms. Tally to "cut her a deal." *See* Attachment "2."

12.    As a result of the reports from Ms. Harrison and Ms. Tally, Dolgencorp initiated an investigation.

13.    Jack Trawick ("Mr. Trawick"), an Asset Protection Supervisor, was in charge of the investigation.

14.    As part of the investigation, Mr. Trawick, along with Johnnie Todd ("Ms. Todd"), held a meeting with Love on October 14, 2005.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of December, 2007.

Charles McDonald

ATTACHMENT 1

12/05/2005  16:51    8555868
Milton C. McDonald    FIELD EMP RELATIONS          PAGE  05
                                 (334) 745-6708              P. 2

I, Candice Harrison, am a cashier at store #08663.  On a night when Kinera was the mananger on duty I believe she tried to coerce me into stealing a candy bar, I was on my break and wanted to purchase a candy bar and she told me it was ok if I just took it. I said that I wanted to pay for it. She said it was ok because it was just the two of us in the store. I said that I still wanted to pay for it. She asked me why and I said that I had a conscience and could not do that.  She said, "Oh – I bet you thought I was trying the test you to just take it.  I meant that I would pay for it."  I then acted like I didn't suspect anything but I knew what she was trying to get me do.

Candice Harrison
10/4/05

ATTN: Bueleg Nelson
DISTRICT 307

ATTACHMENT 2

JAN-05-2007 FRI 03:20 PM                    FAX NO.                         P. 14/20
     12/05/2005  16:51     8555860                                      PAGE  06
                           Milton C. McDonald    FIELD EMP RELATIONS    p.1
                                                 (334) 745-8708

10-14-05

I Donna Tally was approached by Kim's store on two different occasions to mark down merchandise for her. The first time was around Aug. the 14th we had closed the store and she wanted me to mark down a lot of lingerie half price. The second time was around Sept. 10th I rung up a gallon of milk and a gallon of tea and she told me that she thought that I was going to cut her a deal. I didn't feel comfortable about this so I reported it to my Dm.

"Donna M. Tally
418.27-4421
Store # 8665

Attn: Barley Nelson

District 307

EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

COPY

KINERA LOVE,                        )
     Plaintiff,                      )
                                 )
v.                                  )   CASE NO.: 03-06cv1147-MHT-SRW
                                 )
DOLLAR GENERAL CORPORATION, )
   d/b/a DOLGENCORP, INC.,          )
      Defendant.                     )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S INTERROGATORIES

The Plaintiff offers the following responses:

1. The Plaintiff objects to this interrogatory, in part, regarding the request for her to state her social security number. With this objection, the Plaintiff cites the Privacy Act. Without waiving said objection, the Plaintiff states the following:

Name: Kinera La'Shun Love;

Date and place of birth:  September 26, 1979, Lee County Hospital (now East Alabama Medical Center), Opelika, Alabama;

Social Security Number: XXX-XX-6715

Telephone number: 334-737-0800;

Present home address: 409-A Toomer Circle, Opelika, Alabama 36801, same address on the dates of the occurrences made the basis of this suit;

Driver's license state and number: Alabama, 7185224;

2. Each person identified in the Plaintiff's Complaint has knowledge of the relevant facts concerning the issues, claims and defenses in this lawsuit. Additional witnesses whom the Plaintiff can presently identify are: Jean Love, Post Office Box 236, Loachapoka, Alabama

36865; Tiffany Cross, 186 Lee Road, Opelika, Alabama 36804, 334-750-0206; Marcie McGhee, 454 South Tenth Street, Opelika, Alabama 36801, 334-660-6902; Jo Ann S. Holder, administrative hearing officer, Alabama Department of Industrial Relations; Jean Walker, federal investigator, Equal Employment Opportunity Commission, Birmingham, Alabama, 205-212-2100; present and/or former employees of Dollar General, namely, Jamie Jennings, Johnnie, Julie Morrison, Tammy Stevenson and Donna Taffy.  Contact information for each employee is unknown at this time;

3.   The Plaintiff identifies the following persons: Jean Love, Tiffany Cross, Marcie McGhee, Marcus Ware. The Plaintiff does not presently recall the details of each discussion.  If and when she is able to do so, this answer will be supplemented.

4.  The Plaintiff was a party in a lawsuit against Winn-Dixie. It was a slip and fall action, styled Kinera Love v. Winn-Dixie. The case was filed in the Lee County Circuit Court.

5.   The Plaintiff objects to this interrogatory in that it requests documents that are privileged and a part of the attorney work product. Without waiving said objection, the Plaintiff answers that she has affidavits that support her claims and a copy of each is attached here. This answer will be supplemented should any additional documents which are not considered privileged become known.

6.  The Plaintiff answers that the charge of discrimination filed against Dolgencorp on 16 March 2006 is the only complaint she has filed with the Equal Employment Opportunity Commission.

7. The Plaintiff answers that, in the last ten years, she has worked at the following;

    a.  Burger King; cashier; 1997-1998; $5.15-$5.35; not enough hours; does not recall name of supervisor; no supervisory capacity;

2

$5.45; lack of transportation; Greg Philpot, supervisor; no supervisory capacity;

   c.  Health Data, Inc.; data input operator; filed auto accident reports; July 1998-December 1998; $5.75-$6.00; relocated; Jody, supervisor; no supervisory capacity;

   d.  Taco Bell; lead cashier; April 1999-May 2000; $5.25-$6.05; relocated; Fred Owens; supervised other cashiers;

   e.  Tuskegee University (OneSource and Sodexho); custodian; July 2000-February 2005; $5.15-$6.35; medical reasons regarding my Mother; Ms. Butler, supervisor; no supervisory capacity;

   f.  Dollar General Store; cashier; April 2005-October 2005; $5.25-$7.25

   g.  Southern Management; custodian/crew leader; October 2006-Present; $6.95; Brad Campbell and Marcus Ware, supervisors; supervisory capacity;

8.  The Plaintiff answered this Interrogatory in Item #5 above;

9.  This answer will be supplemented upon receipt of documents;

10.  The Plaintiff has not identified any expert whom she expects to be called at the trial. This answer will be supplemented if and when any such expert is identified;

11.  Neither the Plaintiff nor her attorney or any other person acting on the Plaintiff's behalf has contacted any employee of Dolgencorp.  The Plaintiff has contacted former employee Tiffany Cross for her current contact information as shown in Item #2 above;

12.  The Plaintiff complained and reported to Wendy, human resource director at ERC with Dolgencorp business office in Columbus, Georgia;

13. The Plaintiff maintained an assignment notebook in the store during her employment at Dolgencorp. At the point of separation, she requested it or a copy and management refused to give either;

14. The Plaintiff recalls the first incident was when management overlooked the Plaintiff when the assistant manager's position given to his niece, Donna Taffy. To add insult to injury, she recalls that management required her to train Donna Taffy in various management duties that she did not know but the Plaintiff did. The Plaintiff recalls the second incident occurred when management refused to consider her for the assistant manager's position at another store where an opening occurred. The Plaintiff recalls the third incident was on her birthday, September 26, 2005, when management came into the store and began verbally attacking her and threatening to replace her for no apparent reason. The Plaintiff recalls the next incident occurred when she was suspended by management from her position without any reason given. The Plaintiff recalls the next incident occurred when she was terminated from the position without any reason given. Each incident was reported to ERC with no results;

15. The Plaintiff recalls being retaliated against by management because she filed a complaint with ERC for unfair and discriminatory practices in the workplace. The Plaintiff recalls Tiffany Cross was one of the witnesses to the incident. The Plaintiff recalls that on October 11, 2005, Jack Traywick ("Traywick) came into Dollar General Store where she worked and told her he wanted to talk with her. The Plaintiff recalls going into the back of the store with Traywick, along with another store manager, a female named Johnnie. The Plaintiff recalls inquiring about Traywick's need to talk with her and that he told her he wanted to get to know her better. The Plaintiff further recalls Traywick asking her various personal questions. As he

continued to interrogate her, the Plaintiff recalls informing him that she did not feel comfortable with his inquiries and wanted to have a witness or an attorney present. The Plaintiff recalls that at that point, Traywick snatched her keys from her hand, took the store keys from the keychain, and threw the remaining key to her. The Plaintiff recalls that Traywick then ordered her to leave the premises. The Plaintiff recalls asking what had she done to deserve such treatment and Traywick threatened to call the police. The Plaintiff recalls leaving the store in tears and feeling extremely hurt and disrespected;

16. The Plaintiff does not have any ownership interest in real estate;

17. The Plaintiff has answered this interrogatory in a separate document. See Plaintiff's Initial Disclosures;

18. The Plaintiff identifies her current employer, Southern Management in Opelika, Alabama. She applied in October 2006;

19. The Plaintiff states that she inquired about employment opportunities with various entities; no applications submitted because none were hiring;

20. The Plaintiff states that she applied for unemployment compensation shortly after her termination at Dolgencorp, Inc. She was awarded compensation. She received a total of $607.00 from the Alabama Department of Industrial Relations between November 2005 and February 2006. The additional income that the Plaintiff has received is from her employment at Southern Management Company. She serves as a Crew Leader with duties to train and evaluate the completed work orders of those she supervises. The Plaintiff's total income ranges between $5,550.00 and $6,000.00. She was hired on or about October 15, 2006. The address of her employer is 1510 2nd Avenue, Opelika, Alabama 36801, 334-745-3822;

21. See Item #20 above;

22. The Plaintiff states that she has never been arrested or convicted of any crime;

23. The Plaintiff states that she has never filed bankruptcy;

24. The Plaintiff objects to this question on the basis of relevance. Without waiving said objection, the Plaintiffs states that she only consulted with her present attorney of record; and,

25. The Plaintiff identifies the following relatives who are over 18 and live in the Middle District of Alabama:

a. Jean Love, Mother, Post Office Box 236, Loachapoka, Alabama 36865, retired

b. John Ogletree, Father, address unknown, retired

c. Lonnie Love, Brother, 2860 Dogwood Street, Opelika, Alabama 36801, Interior Transformation;

d. Alvin Ogletree, Brother, 500 Crawford, Lot #700, Opelika, Alabama 36801, truck driver;

e. Salissa Love, Sister, address unknown, Fairfax Mill;

f. Barbara Love, Aunt, 1375 County Road 12, Waverly, Alabama, Valley Mill;

g. Lela Andrews, Aunt, 624 Westview Drive, Auburn, Alabama 36830, retired.

Respectfully submitted,

_Kinera Love_
Kinera Love

SWORN TO AND SUBSCRIBED BEFORE ME this _01_ day of _Nov_, 2007.

_Laleejah Muhammad_
Notary Public

My Commission expires: 12/03/08

Seal

6

_Lateefah Muhammad_

Lateefah Muhammad (*Ala. Code* MUH001)
ATTORNEY FOR PLAINTIFF

Lateefah Muhammad, Attorney At Law, P.C.
Post Office Box 1096
Tuskegee, Alabama 36087
(334) 727-1997 telephone and facsimile
lateefahmuhammad@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiff's Responses to Defendant's Interrogatories to Ryan M. Aday, Esquire, attorney for Defendant, by sending it to OGLETREE DEAKINS, P.C., One Federal Place, Suite 1000, 1819 Fifth Avenue North, Birmingham, Alabama 35203, in the United States Mail, postage prepaid, on this 2nd day of May, 2007.

_Lateefah Muhammad_

Lateefah Muhammad

EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

KINERA LOVE,                        )
                                    )
        Plaintiff,                  )
                                    )
vs.                                 )        CIVIL ACTION NO.:
                                    )
DOLLAR GENERAL                      )        3:06-CV-1147-MHT
CORPORATION,                        )
d/b/a DOLGENCORP, INC.              )
                                    )
        Defendant.                  )
                                    )

## DECLARATION OF JOHNNIE D. TODD

1.      I am currently employed with Dollar General as the Store Manager for Store No. 9240 located in Opelika, Alabama. I am over the age of 18. I have personal knowledge of the matters set forth in this declaration.

2.      On October 12, 2005, Charles McDonald ("Mr. McDonald"), who was Dollar General's District Manager over Store No. 8665 at that time, requested my assistance in connection with an asset protection investigation being conducted by Jack Trawick ("Mr. Trawick"), an Asset Protection Supervisor.

3.      As part of that investigation, I and Mr. Trawick interviewed Kinera Love ("Love") on October 14, 2005.

3.      During the interview, Love stated that she needed her tape recorder, and that her lawyer "wouldn't want me to talk."

4.      Love stated that she was not going to talk without her lawyer present.

5.      Mr. Trawick  informed Love that she was being placed on suspension for

failing to cooperate in an internal investigation, and asked Love for her store keys.

6.    Mr. Trawick was polite to Love throughout the interview, and did not "snatch" Love's keys from her hand.


I declare under penalty of perjury that the foregoing is true and correct. Executed on this the ⎯⎯ day of ⎯⎯October⎯⎯⎯⎯⎯⎯⎯⎯, 2007.

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Johnnie D. Todd

2

EXHIBIT 7

STATE OF ALABAMA    )
                            )

MACON COUNTY      )



PLAINTIFF'S EXHIBIT
K. Love

## AFFIDAVIT

I, the undersigned Affiant, hereby acknowledge the following:

1.  My name is Kinera Love.  I was employed by Dollar General of Auburn-Opelika, Alabama from April 2005 to October 17, 2005.  After I had worked for three months as a cashier at the store, Mrs. Julie Morrison, an assistant manager, trained Ms. Tammy Stephens and me for about three weeks prior to transferring me from Opelika store to the Auburn store. The first day that I was transferred to Auburn, I became a third-key manager, in two weeks after the then assistant manager, left.  So when Terrell left, I approached Mr. Jeff Jenning and reminded him that I was interested in the position and that I was qualified.  Jeff informed me that he would have to talk it over with Mr. Charles McDonald first and that he would get back with me.  Jeff was fully aware of my training under Julie Morrison and that I was cross-trained. He also commented that he thought I would make a good assistant manager.

Charles offered the assistant manager's position to Mrs. Donna Taffy, even though she told me she thought that I would get the position because she knew that I was more qualified than she, particularly since I had been there longer and was more capable than she.  A couple of days later, I approached Jeff again and inquired about my request to be considered for the position of assistant manager.  Jeff informed me that Charles assigned Donna to the position.

I was required to train Donna on the various management duties.

I became aware of another assistant manager position at another store.  I called that store manager and asked him to consider me for the position.  He informed me that he would have to talk it over with Charles and that he would get back with me. I called the store

Affidavit of Kinera Love
Page 2

manager back instead and he told me that Charles said I was not ready yet.

I reported the situation to ERC by filing a complaint against Charles, claiming that Charles had discriminated against me by not assigning me to the position of assistant manager. ERC sent Mr. Jack Traywick to investigate my complaint a couple of days later. Jack Traywick came into the store and asked me what was the problem. I told him that Charles was not being fair to me by overlooking me for the position of assistant manager. I told Jack that I was qualified for the position and was not hired for it. That instead Charles hired his niece, Donna, and that I trained her for the position.

After the investigation, Jack allegedly told Jeff and Charles that they needed to get rid of me because I could cause problems, according to Ms. Tiffany Cross.

About a week later, on Monday, September 26, 2005, my birthday, Charles told me he sat in the parking lot of the store for an hour-and-a-half, watching me. Then he came into the store and began fussing at me for no apparent reason. I had a composition booklet in the store in which I kept all of my assignments. I went into the back and brought the booklet out and showed it to Charles. The booklet detailed every assignment that I had completed that night. I walked with him through my work areas. He continued to fuss at me and to threaten me about my job and how he would replace me. I asked him did he have something against me because I was doing my job. He never answered me.

By October 11, 2005, Jack Traywick came back into the store. He said he wanted to talk with me when we went into the back of the store. He, along with another store manager,

Affidavit of Kinera Love
Page 3

a female named Johnnie (I had never worked with her before), and I were together. I asked

him what did he need to talk to me about and he said "I just want to get to know you better."

He asked me if I were married, how many children did I have, what are my plans for ten years

from now. I responded that I hope to own a beauty salon. With all of the questions, I

informed him that I did not feel comfortable answering his questions without having a witness

or an attorney present. At that point, Jack snatched the keys out of my hand and took the

store keys off of my key chain and then throw my keys back to me. Then he ordered me to

leave the premises. When I asked him why, he said "You're being suspended." I asked him

why was I being suspended and he said because I refused the investigation. I told him that I

did not refuse the investigation; but instead I did not want to discuss my personal affairs with

him. That he never asked me anything about Dollar General. At that point, Jack repeatedly

yelled at me, in front of customers, "You need to leave this store right now before I call the

officers to have you removed!" I left the store crying.

I called ERC and complained about the incident. I was told that ERC had no

knowledge of my suspension. When I inquired about returning to work, I was told that the

manager should be able to tell me when I am to return to work.

On October 17, 2005, Jeff called me at my home and told me that Charles wanted to

have a meeting with me at 4 p.m. Charles asked me to clock in and come into Jeff's office. I

clocked in and went into the back to Jeff's office. Charles told me "Kinera, we have to let you

go because you refused to participate in the investigation." I objected to his assessment of the

Affidavit of Kinera Love
Page 4

situation, and told him that I did not refuse to participate in the investigation. I told him that

Jack only asked me about my personal business; nothing about Dollar General. I also told him

that when Jack snatched my keys from me, that stopped the conversation. However, he had

already written the termination slip and asked that I sign it. I asked if I could get a copy and

was told I had to sign it first. I signed it, but I was never given a copy. My signing the

termination slip did not mean that I accept that my termination should occur nor for the reason

Charles gave.

I believe I have been discriminated against because of my race. I believe my

termination is based upon the fact that I filed a complaint against Charles for unfair and

discriminatory treatment in the workplace and he retaliated against me. I believe that I was

discriminated against in being denied the position of assistant manager because of my race.

The Affiant further saith not.

_____
Kinera Love, Affiant

**SWORN AND SUBSCRIBED BEFORE ME** this _____16th_____ day
of March, 2006.

_____
Notary Public

My Commission expires: _12/03/08_

SEAL

EXHIBIT 8

*(See reverse side for complete instructions.)*

# Dollar General Personnel Action Form
*PLEASE PRINT IN BLACK INK, AND ONLY COMPLETE SECTIONS THAT ARE CHANGING.*




DEFENDANT'S
EXHIBIT
3
K. Love

**Social Security Number:** 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
*(required for processing)*

**Employee Name:** Kinera Love

**Effective Date of Change:** 10/24/05

**Store Stamp/ Dept. Name:**
Dollar General Store # 8685
1655 S College St
Auburn, AL 36832-6538

---

## ❑ Personal Changes    **New Marital Status:** ❑ Married    ❑ Single

**Name Change:** *(must attach a copy of Social Security Card showing the new legal name – required for processing)*
Previous Name: _____    New Name: _____
**New Address:** Street Address: _____    City: _____
State: _____    Zip: _____    New Home Phone Number: (___ ___ ___) ___ ___ ___ - ___ ___ ___ ___

---

## ❑ Job Changes    ❑ Promotion    ❑ Demotion    ❑ Lateral Transfer    ❑ Pay Increase

**Dept./Store/Cost Center:** From: _____ To: _____    **Rate of Pay:** From: _____ To: _____
                                                                         *Per hour or annual salary*    *Per hour or annual salary*
**Job Code:** From: _____ To: _____    **Shift Code:** From: _____ To: _____
*(Must change if promotion or demotion occurred)*
**Position/Title:** From: _____    **Supervisor:** _____
                    To: _____    **Supervisor:** _____

**Job Status:** ❑ Full Time    ❑ Part Time    ❑ DG Temporary

---

## Reason for Separation or Leave of Absence

**Termination Date:** 10/24/05    **Leave Begin Date:** ___ / ___ / ___
**Last Day Worked:** 10/14/05    **Leave End Date:** ___ / ___ / ___

| Resign | Discharge |
|---|---|
| ( ) 01 Dissatisfied with employment | *(See instructions on reverse side prior to discharge.)* |
| ( ) 70 Failed to return to work from leave | ( ) 14 Excessive tardiness or absenteeism |
| ( ) 06 Health reasons | ( ) 40 Failure to meet hiring/employment criteria *(comments required below)* |
| ( ) 04 Moved from area | ( ) 41 Falsifying records |
| ( ) 05 Personal reasons | (X) 42 Inappropriate conduct *(comments required below)* |
| ( ) 02 Pursue another job | ( ) 13 Insubordination *(comments required below)* |
| ( ) 71 Resigned during investigation | ( ) 43 Mishandling or failure to protect company funds or |
| ( ) 03 Return to school | assets (cash shortages, borrowing money from Company, etc.) |
| ( ) 08A Without notice – 3 consecutive work days, no call–no show | ( ) 10 Not meeting performance standards |
| ( ) 08B Without notice – walked off job during scheduled work hours | ( ) 44 Unauthorized removal or use of company property |
| ( ) 08 Without notification *(comments required below)* | (X) 46 Violation of company policy/procedure *(comments required below)* |
| | ( ) 47 Violation of safety rules |

| Leave of Absence | Miscellaneous |
|---|---|
| *NOTIFY HR/HRIS FOR LEAVE APPROVAL.* | ( ) 15 Death |
| ( ) 27 Extended Medical Leave | ( ) 16 Elimination of position |
| ( ) 24 Family Medical Leave (FMLA) | ( ) 50 Hired but never worked |
| ( ) 20 Medical Leave (not FMLA eligible) | ( ) 19 Lack of work |
| ( ) 22 Military Leave | ( ) 18A Store closing – natural disaster (tornado, fire, etc.) |
| ( ) 28 Pending investigation | ( ) 18 Store closing – other |
| ( ) 21 Personal Leave | ( ) 17 Other *(comments required below)* |
| *NOTIFY RISK MANAGEMENT FOR W/C LEAVE APPROVAL.* | |
| ( ) 23 Workers' Compensation | |

**Comments:** Failed to Re Interviewed in a Store Infrass
(investigation. Refused to speak with the Asset Protection)
Supervisor, on the Issues that were in Question.

*I certify that all the information above is correct.*
X Kinera Love _____
Employee Signature            Date

*I certify that all the information above is correct.*
X _Charles W. Greer_ 10/24/05
Manager/Supervisor Signature        Date

EXHIBIT 9

DEFENDANT'S
EXHIBIT
4
K love

# Dollar General
# Retail
# Employee Handbook
### Effective February 5, 2005



# 2005

## 2005 Dollar General Employee Handbook

## Welcome to Dollar General

You have joined one of the fastest growing retailers in the country, and we are glad to have you as part of our team. Since our company's beginning in 1939, the desire to serve others has been the driving force behind our growth and our strategy. In fact, Serving Others is our mission.

At Dollar General, we have a deep respect and appreciation for our customers. We strive to serve their needs for consumable basic merchandise each day in our more than 7,000 stores. Only through our 60,000-plus employees and the support of our mission can we do that.

From our store support center to our eight distribution centers and the employees throughout 30 states and growing, every individual plays a role in helping ensure Dollar General's success. Thank you for being part of our team. Working together Dollar General will continue to grow as a place in which we are proud to work and our customers are proud to shop.





## 2005 Dollar General Employee Handbook

# Acknowledgement of
# Receipt of Dollar General Employee Handbook

I acknowledge that I have received a copy of the Dollar General Employee Handbook outlining the policies and procedures of Dollar General. I have read the Table of Contents, and I know what kind of information I can find in the handbook. I acknowledge that it is my responsibility to read and understand the information contained in this handbook. If I have any questions, I understand that I should contact my supervisor or the Employee Response Center.

AS A CONDITION OF MY EMPLOYMENT AND CONTINUED EMPLOYMENT AT DOLLAR GENERAL, I AGREE TO FOLLOW THE POLICIES AND PROCEDURES OF THE COMPANY. I UNDERSTAND THAT, UNLESS OTHERWISE AGREED IN WRITING SIGNED BY AN OFFICER OF THE COMPANY AND SUBJECT TO ANY APPLICABLE LAW, ALL DOLLAR GENERAL EMPLOYEES ARE EMPLOYED ON AN AT-WILL BASIS. THIS MEANS THAT EMPLOYMENT IS NOT GUARANTEED FOR ANY SPECIFIC DURATION OF TIME, AND DOLLAR GENERAL RETAINS THE RIGHT TO TERMINATE AN INDIVIDUAL'S EMPLOYMENT AT ANY TIME, WITH OR WITHOUT CAUSE. NO ORAL REPRESENTATIONS MADE BY A DOLLAR GENERAL EMPLOYEE WITH RESPECT TO CONTINUED EMPLOYMENT CAN ALTER THIS RELATIONSHIP.

I am aware that Dollar General can revise, add or delete any policies, procedures or benefits as deemed necessary for the efficient operation of the Company.

**Note to Employees:**
As of its issue date, this handbook replaces all previously distributed editions. Any policy contained in any previous handbook which does not appear in this edition, or is different from the information provided in this edition, is invalid.

This handbook is the property of Dollar General. All information contained within this handbook is for Dollar General and its employees only.

### *Please print clearly in black ink only.*

_____     _____     _____
Your Name                    Your Signature                             Date

Social Security Number: ☐☐☐ – ☐☐ – ☐☐☐☐
*(use block lettering – numbers should not touch sides of boxes)*

_____
Supervisor Signature

## EMPLOYEES MUST SIGN AND RETURN THIS PAGE TO THEIR
## SUPERVISOR OR TO THE HRIS DEPARTMENT.

## 2005 Dollar General Employee Handbook

# Acknowledgement of
# Receipt of Dollar General Employee Handbook

*THIS COPY OF THE EMPLOYEE ACKNOWLEDGEMENT IS FOR YOUR RECORDS.*

I acknowledge that I have received a copy of the Dollar General Employee Handbook outlining the policies and procedures of Dollar General. I have read the Table of Contents, and I know what kind of information I can find in the handbook. I acknowledge that it is my responsibility to read and understand the information contained in this handbook. If I have any questions, I understand that I should contact my supervisor or Human Resources.

AS A CONDITION OF MY EMPLOYMENT AND CONTINUED EMPLOYMENT AT DOLLAR GENERAL, I AGREE TO FOLLOW THE POLICIES AND PROCEDURES OF THE COMPANY. I UNDERSTAND THAT, UNLESS OTHERWISE AGREED IN WRITING SIGNED BY AN OFFICER OF THE COMPANY AND SUBJECT TO ANY APPLICABLE LAW, ALL DOLLAR GENERAL EMPLOYEES ARE EMPLOYED ON AN AT-WILL BASIS. THIS MEANS THAT EMPLOYMENT IS NOT GUARANTEED FOR ANY SPECIFIC DURATION OF TIME, AND DOLLAR GENERAL RETAINS THE RIGHT TO TERMINATE AN INDIVIDUAL'S EMPLOYMENT AT ANY TIME, WITH OR WITHOUT CAUSE. NO ORAL REPRESENTATIONS MADE BY A DOLLAR GENERAL EMPLOYEE WITH RESPECT TO CONTINUED EMPLOYMENT CAN ALTER THIS RELATIONSHIP.

I am aware that Dollar General can revise, add or delete any policies, procedures or benefits as deemed necessary for the efficient operation of the Company.

## Note to Employees:

As of its issue date, this handbook replaces all previously distributed editions. Any policy contained in any previous handbook which does not appear in this edition, or is different from the information provided in this edition, is invalid.

This handbook is the property of Dollar General. All information contained within this handbook is for Dollar General and its employees only.

*Dollar General is an equal opportunity employer. It is the Company's policy to grant equal employment opportunity (EEO) to all qualified persons without regard to race, sex (including pregnancy, childbirth and related conditions), religion, color, age, national origin, disability, citizenship or any other characteristic protected by law. The Company provides equal opportunities in employment, promotions, wages, benefits, and all other privileges, terms and conditions of employment.*

# 2005 Dollar General Employee Handbook

## Table of Contents

Accident and Injury Prevention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Alternative Dispute Resolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Anniversary Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Anti-Discrimination and Harassment Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Attendance and Tardiness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Background Checks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Bulletin Board Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Child Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Clear Desk and Clear Screen Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Company Newsletter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Computer Data Center Access Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Computer Usage Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Direct Deposit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Direct Stock Purchase Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Diversity in the Workplace . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Dollar General's Leave Policies at a Glance . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Drug and Alcohol Policy (Summary) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Eating and Drinking in Unauthorized Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Emergency Evacuations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Employee and Customer Injuries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Employee Check Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Employee Purchase Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Employment of Relatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Ethical Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Family & Medical Leave Act (FMLA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Food Handling Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Funeral Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## 2005 Dollar General Employee Handbook

GED Assistance Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Getting Started . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

High Level Security Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

HIPAA (Health Insurance Portability and Accountability Act of 1996). . . . 16

Holidays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Jury Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Meal Breaks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Medical Absence Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Military Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Minimum Age . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Need for Policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Open Door Policy – Solving Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

OSHA "Right to Know" Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Other Employment or Business Activities. . . . . . . . . . . . . . . . . . . . . . . . 12

Pay for Time Not Worked and Overtime. . . . . . . . . . . . . . . . . . . . . . . . 28

Pay Rate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Pay Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Personal Appearance and Dress Code Policy. . . . . . . . . . . . . . . . . . . . . . 6

Personal Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Personal Phone Calls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Personal Relationship Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Personal Visits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Personnel File . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Progressive Counseling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Promotions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Proprietary and/or Confidential Information . . . . . . . . . . . . . . . . . . . . . 12

Protection of Company Assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Protective Orders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Reasons for Counseling and/or Termination. . . . . . . . . . . . . . . . . . . . . 44

# 2005 Dollar General Employee Handbook

Response to Media. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Rest Breaks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Running and Horseplay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Searches. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Service Bridging. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Smoking/Tobacco Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Solicitation and Distribution Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Status Change . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Tele-Commuting Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Telephone and Voicemail Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

The Employee Response Center (ERC) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

The Work Number . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Tracking Work Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Transfer Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Types of Employment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Unions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Use and Care of Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Vacation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Voting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Wage & Hour Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

When an Accident Occurs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Wireless Network Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Work Hours and Overtime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Work Safety. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Working Minors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Working Off the Clock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Workplace Violence Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## 2005 Dollar General Employee Handbook

## Getting Started

As you begin your new job, you will be busy learning your job responsibilities and meeting other employees. You are encouraged to take every opportunity to discuss job expectations and goals, any job-related difficulties, questions and concerns with your supervisor so that you may learn the job and feel comfortable with it.

## Need for Policies

The policies stated in this handbook are guidelines to:

- Maintain high safety standards for all employees
- Inform employees of the Company's expectations and what they can expect in return from the Company.
- Minimize misunderstandings about how to deal with problems
- Provide consistent treatment of employees
- Comply with the law

It is impractical to have a policy to cover every situation and not all Dollar General policies are stated in this handbook. Where state or local law imposes requirements contrary to the policies set forth herein, Dollar General will comply with those policies.

## Unions

We believe our union-free status is one reason we continue to grow and provide employment while many unionized companies have declined. Our employees have enjoyed competitive wages, benefits and steady employment without paying dues to unions, and have never missed a paycheck because of a strike. We provide job security by continuing to build a sound, growing and profitable business.

The Company is built on the principle of dealing directly with employees rather than through third parties. Like any organization, we may have problems from time to time. However, we believe that interference by a third party would harm our employees. Our employees are individuals, and Dollar General is committed to resolving employee issues and concerns in an equitable and open manner.

If a union organizer or business agent asks you to join a union or to sign any kind of union card (whether it is to join the union, get more information about the union, or for some other purpose) you have the right to refuse. Signing a union card is like signing a blank check – like giving up your rights. It means that you, as an individual, are no longer interested in dealing directly with management and would rather someone else do your talking for you.

## 2005 Dollar General Employee Handbook

We believe that Dollar General employees want to think, speak and act for themselves. If you ever have any questions about our commitment to you, or if you have any personal problems or questions, we urge you to speak to your supervisor, manager or the **Employee Response Center (ERC) at 1-888-237-4114**.

# Open Door Policy – Solving Problems

The Company is committed to an open door policy to answer any work-related question, problem or concern you may have. If you have a concern you would like to bring to management's attention, follow these steps:

• Talk it over with your immediate supervisor.

• If you and your supervisor cannot resolve the issue to your satisfaction, or your supervisor is part of the problem, discuss your concerns with the next level of supervision.

• If you are not satisfied with the response given by your supervisors or if you do not feel comfortable in bringing your concerns to the attention of your supervisors, contact the Employee Response Center (ERC) at 1-888-237-4114. Guidance will be provided as to alternative ways that such issues may be resolved.

# Alternative Dispute Resolution

Alternative Dispute Resolution (ADR) is designed to offer Dollar General employees alternative methods to resolving specific workplace disputes which include: termination, final counseling, demotion, harassment and discrimination.

When you are looking for a solution to a workplace conflict, your supervisor or your supervisor's manager is often the place to start. If a solution cannot be reached, contact the **Employee Response Center (ERC) at 1-888-237-4114**.

In those unique situations when your conflict still has not been resolved, call the ADR team.

**Call 1-800-297-5527**
**Monday - Friday, 8 a.m. - 5 p.m. Central Time**

## 2005 Dollar General Employee Handbook

# The Employee Response Center (ERC)

The Employee Response Center is a dedicated team of representatives available to provide resolution to questions you may have regarding your store registers, scanners, printers and processes, as well as questions regarding Company policies. The ERC is also one of the many avenues provided by the Company for reporting inappropriate conduct, including discrimination and harassment. If you are ever unsure who to call, the ERC is here to assist and will make sure you are directed to the proper department for resolution. The ERC is open from 7a.m. until 9 p.m. CST, Monday through Saturday and from 8 a.m. until 8 p.m. on Sunday. The ERC is also open on all holidays except for Easter and Christmas.

# Diversity in the Workplace

Dollar General recognizes that diversity is a business imperative. The Company demonstrates its commitment to inclusion through:

- Recruitment, hiring and development of employees;
- Selection of suppliers and vendors;
- Serving the needs of our customers; and
- The Company's mission and business strategy

Employees looking for career opportunities should visit the Company web site at www.dollargeneral.com and click on the careers button located on the left side. From there, you may select retail positions, store support center positions or DC positions.

# Solicitation and Distribution Policy

In order to avoid interruption of your work and to protect you from unnecessary annoyance, soliciting memberships or contributions, distributing printed material, or conducting personal business on Company property is limited by the following rules:

- Employees must not solicit and/or distribute literature to fellow co-workers during work or while in working areas.
- Soliciting an employee or distributing literature to an employee by a non-employee is prohibited at all times on Company property.
- Soliciting and/or distributing non-company literature to customers is strictly prohibited.
- Only Company sponsored documents are allowed to be posted on Company property by an authorized manager.

## 2005 Dollar General Employee Handbook

## Bulletin Board Policy

We communicate important information about work and your job on bulletin boards. Please review them frequently to keep up with current activities and information. The bulletin boards are for Company information only. Please do not post or remove any material from them. Only Company sponsored documents are allowed to be posted on bulletin boards by authorized managers.

## Ethical Standards

Dollar General's values dictate conduct of the highest moral, ethical and legal standards in pursuing our business interests. We expect all employees to comply with the Company's Code of Business Conduct and Ethics, which has been designed to promote those standards. If you have questions regarding the Code of Ethics or the appropriate course of conduct in a particular situation, you should first consult your supervisor who knows your job and circumstances the best. In situations where your supervisor cannot provide the answer or where you do not believe that your supervisor is the appropriate person to consult, you should usually consult the next higher level of management or the **Employee Response Center (ERC) at (888) 237-4114**, either of which can direct you to the appropriate person or department in Dollar General. We also have noted in various sections of the Code of Ethics the appropriate persons to consult regarding interpretations of certain subjects.

We also have established a hotline that you can use to report violations of the Code of Ethics anonymously. The hotline can be reached at 1-800-334-9338. All complaints and concerns submitted through this hotline will be received and processed by a third party provider. Their operators will take your report over the phone and forward to designated Dollar General representatives. All matters reported via the hotline will be treated confidentially, subject to applicable law, regulation or legal proceeding.

Dollar General intends to consistently enforce the policies and standards in the Code of Ethics through appropriate disciplinary mechanisms. Conduct that violates the Code of Ethics or any applicable law, rule or regulation may subject the persons involved to prosecution, imprisonment or fines. Dollar General also may be subject to prosecution, fines and other penalties for the improper conduct of our employees.

Any violation of the Code of Ethics or any applicable laws, rules or regulations, including the failure to report a violation, is cause for disciplinary action up to and including termination of employment. The appropriate form of discipline will be case-specific and fairly applied.

## 2005 Dollar General Employee Handbook

## Minimum Age

Persons working for Dollar General must be at least 18 years old, unless otherwise determined by Human Resources.

## Types of Employment

Dollar General hires employees in two categories:

### Regular, on a full-time or part-time basis:

- It is the employee's responsibility to work with his or her supervisor to monitor his/her employee status.
- A Personnel Action Form must be processed to change an employee's status from part-time to full-time or vice versa.

### Temporary, on a full-time or part-time basis:

- A temporary employee should be given specific start and end dates upon being hired.
- The supervisor must complete a Personnel Action Form to change a temporary employee to regular part-time or full-time status.

## Personnel File

The Company has adopted the following guidelines to assist in avoiding the unnecessary disclosure of confidential employment information:

- The Company will request, use and retain only personal information about employees that is required for business or legal reasons.
- The Company will take reasonable measures to protect and preserve the confidential personal information in its records and files.
- The Company will limit the internal availability of personal information to those Company officials with a "need to know" purpose.
- The Company will refuse, except in specific circumstances, to release information to outside sources without the employee's written approval. Exceptions are limited to simple employment verification and to comply with legal requirements.

**NOTE:** *Personnel files are Company property and, therefore, typically will not be copied or released unless required by law, necessary to defend the Company in litigation or other proceedings or in compliance with a lawfully issued subpoena or court order.*

## 2005 Dollar General Employee Handbook

# Personal Appearance and Dress Code Policy

This policy is intended to establish clear guidelines and expectations for the personal appearance of employees in order to convey a positive and professional image to our customers, vendors and general public while at work. Employees are expected to maintain a neat, clean and well-groomed appearance while at work.

Employees violating this policy will be subject to disciplinary action and will be asked to return home and change in order to meet the Personal Appearance and Dress Code Policy requirements. The Manager on duty at the time who allows an employee to violate the Personal Appearance and Dress Code Policy will also be subject to disciplinary action. Violation of the Personal Appearance and Dress Code Policy may result in progressive counseling up to and including termination, even for the first offense.

## Personal Appearance

- Employees may not work with unnatural hair colors, e.g., blue, green or pink hair.
- Hair, including facial hair, must be neatly groomed and trimmed.
- Good hygiene must be practiced, including bathing, deodorant use, etc.
- Clean hands and fingernails should be maintained.
- No head coverings of any kind should be worn.
- No open-toe or open-heel shoes are allowed.
- All visible body piercing is limited to the ear only.
- Visible tattoos must not be in violation of any Dollar General policies.

## Dress Code

- Plain black polo-style short-sleeve or long-sleeve collared shirt, without any logos other than the Dollar General logo
- Shirt must be tucked in pants/skirt where possible; if not, a smock must be worn. The shirt must cover the midriff.
- Khaki or tan-colored pants (capris are not allowed) or khaki or tan-colored skirt (knee length or longer); no sweatpants are allowed
- A belt must be worn with pants having loops where possible; if not, a smock must be worn
- Clean shoes (No open-toe or open-heel shoes or sandals are permitted)
- Socks or hose must be worn
- Name badge must be worn on the left collar

## 2005 Dollar General Employee Handbook

- Smocks with the Dollar General logo are permitted where available. The smock must be worn with khaki or tan colored pants/skirt and black polo-style shirt.
- Clothing should be in good condition. Torn or sheer clothing is not permitted.
- No jeans are allowed to be worn during store hours.
- During cold weather, employees may wear similarly colored long-sleeve clothing underneath the polo-style shirt, or a similarly colored jacket/sweater may be worn over the polo-style shirt.

**NOTE:** *Religious and/or disability-related exemptions may be permitted depending on the circumstances. Partner with the district manager for direction.*

## Anti-Discrimination and Harassment Policy

All Dollar General employees have the right to work in an environment free from all forms of discrimination and conduct which can be considered harassing, coercive or disruptive. Dollar General values and respects the rights and dignity of each person and will not tolerate discrimination or harassment based on race, color, religion, sex (including pregnancy, child birth and related conditions), national origin, age, disability, citizenship or any other characteristic protected by law. All employees should, therefore, be aware of the following:

### Discrimination

- Discrimination on the basis of race, color, religion, sex (including pregnancy, child birth and related conditions), national origin, age, disability, citizenship status or any other characteristic protected by law is strictly prohibited. This includes, but is not limited to the following: hiring, placement, upgrading, transfer, demotion or promotion, treatment during employment, rates of pay or other forms of compensation, benefits, layoff or discharge, the provision of reasonable accommodation, recruitment or solicitation of employment and all other terms and conditions of employment.
- Harassment on the basis of any protected characteristic is also strictly prohibited. Under this policy, harassment is speaking to or treating an employee in a way that is degrading or in a way that exhibits dislike for, hostility or hatred toward, an individual (or that of his/her relatives, friends or associates) because of race, color, religion, sex (including pregnancy, child birth and related conditions), national origin, age, disability, citizenship or any other characteristic protected by law.

## 2005 Dollar General Employee Handbook

### Sexual Harassment

- Sexual harassment in any situation is strictly prohibited. This includes sexual harassment by managers, supervisors, co-workers, or third parties such as vendors or customers. It is particularly damaging when it exploits the interdependence and trust between employees or between supervisors and their employees.

- An individual found to be guilty of sexual harassment, creating a hostile work environment or any other form of discrimination is subject to disciplinary action for violations of this policy, up to and including termination from the Company. Accordingly, it is the Company's intention that this policy go beyond the legal requirements and includes conduct we otherwise believe to be inappropriate.

### Non-employees of Dollar General

Dollar General applies its Anti-Discrimination and Harassment Policy to its vendors and customers. Dollar General will not tolerate unlawful discrimination by or against non-employees of Dollar General. Dollar General will provide reasonable accommodation for its disabled customers as required by law (e.g., allowing disabled customers to shop with service animals).

### Retaliation

Dollar General prohibits retaliation against an employee who has made a report of alleged discrimination or harassment or who has participated in certain investigations or administrative proceedings.

### Examples of conduct prohibited by the Anti-Discrimination and Harassment Policy include, but are not limited to:

- Offering or implying an employment related reward (such as a promotion or raise) in exchange for sexual favors or submission to sexual conduct

- Threatening or taking of a negative employment action (such as termination, demotion, or denial of a leave of absence) if sexual conduct is rejected

- Unwelcome sexual advances or repeated flirtations

- Unwelcome intentional touching of another person or other unwanted intentional physical contact (including patting, pinching, or brushing against another person's body)

- Unwelcome whistling, staring or leering at another person

- Asking unwelcome questions or making unwelcome comments about other person's sexual activities, dating, personal or intimate relationships, or appearance

- Unwelcome sexually suggestive or flirtatious gifts, letters, notes, e-mail or voicemail

## 2005 Dollar General Employee Handbook

- Conduct or remarks that are sexually suggestive or that demean or show hostility to a person because of a protected characteristic (including jokes, pranks, teasing, obscenities, obscene or rude gestures or noises, slurs, epithets, taunts, negative stereotyping, threats, blocking of physical movement)

- Displaying or circulating pictures, objects or written materials (including graffiti, cartoons, photographs, pinups, calendars, magazines, figurines or novelty items) that are sexually suggestive or that demean or show hostility to a person because of a protected characteristic

*These guidelines also apply to other forms of unlawful harassment, including conduct based on race, color, religion, sex (including pregnancy, child birth and related conditions), national origin, age, disability, citizenship or any other characteristic protected by law.*

### Zero Tolerance

An individual who is believed by the Company to have engaged in conduct that violates this policy is subject to disciplinary action up to and including termination from the Company. Accordingly, it is the Company's intention that this policy go beyond the legal requirements and includes conduct we otherwise believe to be inappropriate.

### Reporting Harassment and Discrimination

- Any employee who believes that he/she has been the subject of any form of harassment or discrimination by anyone at Dollar General or by any person who does business with Dollar General or who has witnessed harassment, discrimination or retaliation should immediately report the matter to the Employee Response Center (ERC), at 1-888-237-4114.

- In all cases, an investigation will be conducted. The investigation will be conducted on a confidential basis; sensitive information will be disclosed on a need-to-know basis. There will be no retaliation against any employee who reports such conduct or participates in the investigation in good faith. Any attempt to interfere with an investigation or retaliate against an employee for reporting conduct or participation in an investigation will result in immediate termination.

## Workplace Violence Policy

Dollar General can best perform its mission when all employees coexist in a climate that supports a free exchange of ideas and utilizes constructive methods of conflict resolution. Dollar General is committed to create and maintain an environment free from disruptive, threatening and violent behavior.

## 2005 Dollar General Employee Handbook

Dollar General will not ignore, condone or tolerate disruptive, threatening, or violent behavior by any Dollar General employee, contract service provider, visitor or customer. Employees engaged in such behavior will be subject to disciplinary action, up to and including termination. Some disruptive, threatening, or violent behavior is prohibited under criminal or civil law. When appropriate, Dollar General may initiate civil action or criminal prosecution.

### Definitions

- **Workplace Violence:** Any physical assault, threatening behavior, verbal abuse or intimidation occurring in or affecting the work environment.
- **Disruptive Behavior:** Disturbs, interferes with, or prevents normal work functions or activities.
- **Threatening Behavior:** Includes any physical actions short of actual contact (e.g., moving closer aggressively or blocking a person's movement), general oral or written threats to people or property.
- **Violent Behavior:** Includes any physical assault with or without weapons; behavior that a reasonable person would interpret as being violent (e.g., throwing things, pounding on furniture, slamming doors, destroying property); and specific threats to inflict physical harm (e.g., a threat to harm a named victim).

### Examples of Prohibited Conduct:  (not all inclusive)

- Yelling, shouting, using profanity or other verbal abuse
- Waving arms, shaking fists or other inappropriate gestures
- Aggressive posturing or movement, inappropriate invasion of someone's personal space
- Preventing the free movement of another person, preventing them from leaving a room
- Any direct or indirect threats toward a person or property
- Throwing objects, slamming doors or telephones, pounding desks; any destruction of property
- Aggressive physical contact, grabbing, touching, holding, shoving or hitting
- Possession of a firearm or other weapon on the premises
- Threatening or implying possession or access to a firearm or other weapon on the premises
- Threatening to return with a weapon at a later date or time

## 2005 Dollar General Employee Handbook

**Reporting**

All managers and supervisors are responsible for the implementation of this policy. Employees can report such behavior by utilizing the Company's Open Door policy by contacting your immediate supervisor or by calling the **Employee Response Center (ERC) at 1-888-237-4114**.

## Protective Orders

Employees of Dollar General who have obtained a protective order and wish not to be contacted by a non-employee should supply a copy to the manager. Other parties may be informed when deemed necessary for safety reasons; however, disclosure will be limited to those individuals who have a legitimate need to know the information. Also supply a copy of the protective order to your district manager and local Police Department.

## Background Checks

A criminal background check is required for all persons who accept a conditional employment offer for a full time, part time, or temporary position. Dollar General reserves the right to obtain background information for as long as you are employed by the Company. The purpose of the background check is to provide a safe place for our employees and customers. Receiving a favorable result on the background check, as set forth in Dollar General hiring criteria, is a condition of employment.

## Searches

To enforce Company policy, Dollar General may conduct unannounced searches in Company facilities, on Company property (which includes but is not limited to, property owned or leased by the Company) or during Company-sponsored events. Dollar general reserves the right to search with or without the employee's consent. Employees are expected to cooperate in the conduct of any searches.

These searches may include, but are not limited to, desks, lockers, closets and personal items such as vehicles, parcels, purses, coats, backpacks and briefcases.

Consent to a search is required as a condition of employment with Dollar General, and the refusal to consent may result in disciplinary action, including termination from the Company, even for a first refusal.

## 2005 Dollar General Employee Handbook

## Drug and Alcohol Policy (Summary)

It is Dollar General's intent to maintain a safe and healthful working environment for our employees, to protect and preserve our property and that of others, and to provide safe and efficient operations for our customers. Dollar General takes very seriously its responsibility to ensure that substance abuse by its employees does not impact Company operations or the safety of our employees and customers.

All employees are expected to comply with Dollar General's Drug and Alcohol Policy, a copy of which has been provided to you. The Policy outlines Dollar General's policy and procedures regarding: (i) the use, sale, possession, transfer, or other misconduct involving illegal drugs; (ii) the use and misuse of legal drugs; (iii) alcohol use and misuse; and (iv) Company policy and procedures relating to drug and alcohol testing. Where permitted by law, Dollar General has the right to require drug and/or alcohol testing, including pre-employment, random/suspicionless, post-accident and reasonable suspicion testing. The district manager must be contacted for approval prior to any drug testing. It is important that you read and understand this Policy and the consequences of violating it. If you have any questions regarding the Policy, or would like to request another copy, please contact Human Resources.

## Proprietary and/or Confidential Information

Much of the Company's information is proprietary and/or confidential. As an employee of the Company, you are responsible for protecting that information. If anyone asks you for information that you believe may be proprietary and/or confidential or if you have questions regarding what constitutes proprietary and/or confidential information, refer to your supervisor.

## Other Employment or Business Activities

Dollar General full-time employees may not have any outside employment or any outside business activity **if** it: (a) involves the use of Company property or facilities; or (b) materially diverts the employee's time, attention or energy away from the performance of the employee's duties. While the Company does not seek to intrude on employees' personal lives, other employment or business activity potentially impacts an employee's ability to perform the duties required of his or her position at Dollar General.

Outside employment or business activities may be permitted when an employee can continue to satisfactorily perform his or her normal work duties within the scheduled workweek. Work assignments and schedules will not be changed for a Dollar General employee to perform work for another company or business.

## 2005 Dollar General Employee Handbook

If circumstances require that an employee must work a second job, the employee must discuss the situation first with his or her supervisor. Working for a competitor or Dollar General vendor or having a material financial interest in or relationship with a competitor or Dollar General vendor is not permitted except in specific pre-approved circumstances.

# Wage & Hour Policy

Working off the clock, instructing or allowing someone to work off the clock, allowing friends and/or family to work in the store or accepting merchandise, cash, or compensatory time for work is a violation of Company policy. Employees must be paid for all hours worked within the week they actually worked and employee hours may not be "rolled" from one work week to another. Additionally, employees must clock in and out for all hours worked. Managers are prohibited from making payroll modifications which adversely impact an employee's pay. Modifications of payroll records are subject to audit at any time.

**Employees will be paid through the regular payroll system for all hours they work, no exceptions.** Any violation may result in immediate termination of employment for the responsible employee, even for the first offense. It is the employee's responsibility to contact the **Employee Response Center (ERC) at 1-888-237-4114** if he/she has not been paid for all hours worked.

| DO: | DO NOT: |
|---|---|
| • Pay all employees through the regular payroll system. | • DO NOT work off the clock |
| • Pay all employees during the week the work was actually done (in other words do not move hours to the next week). | • DO NOT allow anyone to work (including unloading trucks, taking out trash, etc.) unless the person is an employee and paid for all hours worked |
| • Ensure employees are paid for making bank deposits and other work performed, as well as work performed outside normal business hours. | • DO NOT allow close relatives to work in the store (this means allowing them to perform any work—for example, unloading trucks, stocking shelves, taking out the trash, etc.) – NO EXCEPTIONS! |
| • Clock in prior to starting work, clock in and out before and after meal periods and clock out at the end of your work day –everyday– no exceptions! | • DO NOT accept or give merchandise or cash for work |
| • Call the Employee Response Center (ERC) at 1-888-237-4114 if you have not been paid for all hours worked or to report a violation of our Wage & Hour policy. | • DO NOT allow another employee to sign in or out for you. |
| • Review your paycheck carefully each week to ensure you've been paid for all hours worked. | • DO NOT allow employees in the store before or after store hours without being paid. |
| | • DO NOT perform work of any kind during an unpaid lunch or meal break |
| | • DO NOT work overtime without it first being approved by your manager |

## 2005 Dollar General Employee Handbook

## Tracking Work Time

Compensation for hourly employees is determined by the pay rate and number of hours the employee works each week. By using the electronic clock-in/out on the register, an accurate account of the hours you work will be recorded.

- Hourly employees must record all hours they work by clocking in/out at the register.

- Employees are required to clock-in when they start to work each day, clock-out and in before and after any break of 30 or more minutes, and clock-out at the end of their work day.

- Under no circumstances may an employee have another employee clock-in or clock-out for him/her, nor may he/she clock-in or clock-out for someone else.

- End of week payroll modifications by the manager should be very few, if any at all. The manager should never clock in or out for an employee or enter modifications to an employee's clock in/out times that could adversely impact an employee's pay. The only exceptions are corrections to error(s) that an employee made to his/her time record or technical problems that occurred.

- Hourly management employees may not make payroll modifications to their own time records. .

- Working off the clock may result in immediate termination from the Company. See the Wage and Hour Policy for more details.

**NOTE:** *Failure to properly track work time as listed above may result in progressive counseling up to and including termination, even for the first offense.*

## Work Hours and Overtime

As an employee, your work schedule may vary from week to week. No employee of Dollar General is guaranteed to work a specific number of hours, at specific times, during any work week. The store manager or assistant store manager will post your work schedule. These schedules will always be based upon customer, rather than employee, needs. Work schedules may be subject to change due to arrival of trucks or other needs as they arise.

## Company Policies:

- No vendors or contractor are allowed in the store before or after store hours without a business purpose and authorization from the district manager.

## 2005 Dollar General Employee Handbook

- No Dollar General employee is allowed in the store before or after store hours without the district manager's authorization and unless scheduled to work and paid for all hours.
- No one other than Dollar General employees may work in the store.
- Performing any work prior to clocking in or after clocking out may result in immediate termination from the Company, even for the first offense.
- Allowing new employees to begin work prior to receiving confirmation from HRIS through the register receipt that all hiring criteria has been met is a violation of Company policy and may result in disciplinary action up to and including termination from the Company.

**NOTE:** *No employee has the authority to ask another employee to work off the clock. Report all violations or requests for violations of this policy to the district manager or the ERC.*

## Working Minors

Dollar General is committed to protecting the health and welfare of minors in the workplace and to safeguard their education. The Company allows the hiring of 16 and 17 year old employees in specific states identified by Human Resources as part of the Hiring Minors Program. Contact your supervisor or the ERC for questions regarding Dollar General's Hiring Minors Program. Policy violations regarding the employment of minors will result in disciplinary action, which may include termination even for the first offense.

## Tele-Commuting Policy

Unless otherwise required by law, Dollar General generally does not support the practice of tele-commuting or working from remote locations (including but not limited to an employee's home).

If Dollar General identifies a business need for an employee to work from a remote location, it may grant an exception to this policy. Such exceptions require the approval of the Executive Vice-President (EVP) responsible for the department requesting the exception and the Vice-President (VP) of Human Resources.

## 2005 Dollar General Employee Handbook

## GED Assistance Program

Dollar General proudly supports and encourages its employees who are working toward their General Education Diploma (GED). Full-time employees who take and pass the GED test are eligible for testing fee reimbursement. For more information, contact the **Employee Response Center (ERC) at 1-888-237-4114** or your supervisor. To be reimbursed for the cost of the GED testing, please mail the receipt for the test fee and a copy of the GED Certificate to:

**Dollar General**
**ATTN: Tuition Reimbursement**
**100 Mission Ridge**
**Goodlettsville, TN 37072**

## Benefits

For information on your Dollar General benefits, refer to your Summary Plan Documents. For questions, call the Benefits Service Center:

**1-877-885-5735**
**1-700-200-1234 ext. 5440**

## HIPAA (Health Insurance Portability and Accountability Act of 1996)

Dollar General Corporation sponsors the Dollar General Health Plan (the "Plan") for the benefit of its employees. As a function of Dollar General's role to administer the Plan, some employees of Dollar General may have access to the individually identifiable health information of plan participants on behalf of the Plan or Dollar General Corporation. HIPAA and its implementing regulations provide specific restrictions on the employer's ability to use and disclose protected health information.

### "Individually Identifiable Information" Defined

Health information, including demographic information, that is:

1. Created or received by a health care provider, health plan, or employer; and

2. Relates to the past, present or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual.

## 2005 Dollar General Employee Handbook

### "PHI" Defined
Protected health information (PHI) is individually identifiable health information (see above definition) that is transmitted or maintained electronically, orally, or in written form by the Plan.

### Use and Disclosure
PHI is used when it is shared, utilized, applied, or analyzed within Dollar General. A disclosure of PHI is made when it is released, transferred, given access to, or otherwise communicated to any person or entity outside of the Plan.

### Permitted Uses and Disclosures
An employer may use and disclose PHI without consent or authorization, or without allowing the individual to object or agree to the use or disclosure if:

1. Use or disclosure was made to the individual who is the subject of the PHI;

2. The use or disclosure is for the treatment, payment or health care operations;

3. The use or disclosure is incidental to a permitted use or disclosure, and reasonable safeguards are in place;

4. An employee authorization was obtained before the use or disclosure.

PHI is not to be disclosed for the purpose of payment of operations of "non-health" benefits, such as Workers' Compensation, disability, or FMLA, unless an individual authorization has been obtained or the disclosure is required by applicable state law and particular requirements under HIPAA are met.

### Minimum Necessary Standard
In the event that PHI is used or disclosed, the Health Plan will make reasonable efforts not to use, disclose or request more than the least amount of PHI necessary to accomplish the intended purpose of use, disclosure, or request.

The minimum necessary standard does not apply in the following disclosures:

1. PHI that is disclosed to the individual who is the subject of the PHI;

2. When a valid authorization has been obtained;

3. When required by law;

4. When required to comply with HIPAA.

## 2005 Dollar General Employee Handbook

### Safeguarding PHI

Employees must take the following steps to safeguard protected health information in their area to ensure that PHI is protected and kept confidential:

1. An automatic log-off should be placed on your computer when you are away from your workstation for 10 minutes or more;

2. All computers are to be turned off at the end of the day;

3. All paper documents concerning PHI should be locked in a drawer or cabinet;

4. Protected health information is not to be left on voice mail messages;

5. Any other reasonable step necessary to physically secure PHI in your area.

### Complaints

An individual has the right to file a complaint against the Plan for violation of HIPAA privacy regulations. A complaint can be filed with the Plan by calling the Privacy Hotline at 1-800-334-9338. A participant also has the right to file a written complaint with the U.S. Department of Health and Human Services.

### Sanctions for Violations of Privacy Policy

A violation of the HIPAA Privacy Policy by any member of the workforce may lead up to, and include, termination of employment. The appropriate sanction will be determined upon the nature of the violation, its severity, and the intent of the violation.

Sanctions will not be imposed upon an employee who lodges a complaint with the Privacy Official or with the U.S. Department of Health and Human Services, or who refuses to follow a policy or procedure they believe in good faith to be a violation of the Privacy Rule.

Further, no employee may intimidate, threaten, coerce, discriminate against or take other retaliatory action against an individual for exercising their privacy rights, filing a complaint, participating in an investigation, or opposing any improper practice under HIPAA. No individual shall be required to waive his or her privacy rights under HIPAA as a condition of treatment, payment, enrollment, or eligibility.

### Individual Rights

HIPAA's privacy rules give individuals, or personal representatives, certain rights regarding their PHI. These rights include:

## 2005 Dollar General Employee Handbook

1. Right to access and amend the PHI maintained by the Plan;

2. Right to an accounting of disclosures made of his or her PHI;

3. Right to request a restriction on the use and disclosure of PHI;

4. Right for PHI to be communicated by alternative means or to an alternative location to protect the individual from endangerment.

**Overview**
This is a policy overview. A copy of the full HIPAA Privacy Policy may be requested by calling the Benefits Service Center at 1-877-885-5735.

# The Work Number

The Work Number is an automated service that provides instant employment and income verification. The service is used when employees are applying for a mortgage or loan, reference checking, leasing an apartment, applying for government assistance or any other instance where proof of employment or income is needed. Employees benefit from having control of the process and being able to authorize others access to his/her information.

Employees need to give the verifier the contact information below and a salary key authorization number (if verification of wages is needed). A salary key may be obtained via the internet or by calling The Work Number. Verifiers absorb the cost of this service.

Verifiers may contact The Work Number on the internet at www.theworknumber.com or by calling 1-800-367-5690 to obtain verifications. For more information, employees may refer to the wallet card that was distributed during the initial roll-out of the program and that is included with the new hire paperwork.

Employees should provide **only** The Work Number when contacted for a reference for another employee. Failure to do so can result in disciplinary action up to and including termination even for the first offense.

# Personal Phone Calls

Make or receive personal calls only when necessary. If it is necessary to place a personal call, you should make it during approved breaks.

• No personal cell phones (including camera phones) or personal pagers may be used or carried while employees are on the sales floor. Personal cell phones and pagers may only be used while employees are on break in the back room.

## 2005 Dollar General Employee Handbook

- Unauthorized long distance calls may result in immediate termination from the Company.

## Personal Visits

Personal visits from friends and relatives are acceptable during your meal break. They should occur outside the workplace. "Workplace" means any area within a Dollar General store including but not limited to the sales floor, any store office, restroom, break room or stock room. It is a violation of Company policy to allow a non-employee in the store during non-business hours, unless the non-employee is a contractor or vendor there for business purposes and the visit is pre-approved by the district manager.

## Child Care

Under no circumstances should a child be brought to the work place. Any child care conflicts should be resolved before reporting to work.

## Employee Purchase Policy

While we encourage employees to shop in our stores, the following procedures must be followed:

- A member of management must ring up all employee purchases. Employees (including the store manager and assistant store manager) are not allowed to ring up their own purchases.

- Employees should not make purchases during their work hours, unless it is a small food item for immediate consumption during a rest or meal break. All other purchases must be made when the employee is off duty and the store is open for business.

- Merchandise must be paid for before it is used or consumed.

- The receipt for the purchase must be given to the employee. The employee must be able to present the receipt for the purchase, at any time, when requested by a member of management.

- No employees, including management, are to hold merchandise for purchase at a later time.

- All merchandise must be paid for before it leaves the store. Failure to ring up all merchandise could result in immediate termination for all involved employees.

- Employees are not allowed to ring up members of their household and/or close relatives as defined in the handbook.

## 2005 Dollar General Employee Handbook

- If the employee has a refund, the refund must be transacted when the employee is off duty, the store is open for business and conducted by store management.
- Employees (including the store manager and assistant store manager) are not allowed to complete their own refund, nor are they allowed to complete refunds for members of their household and/or close relatives.
- All refunds must be verified by an employee other than the one who completed the refund transaction.

Violation of these procedures may result in progressive counseling up to and including termination, even for the first offense.

## Employee Check Policy

Employees may write checks for the amount of purchase only. The employee may not write personal checks for cash or cash other checks through the register, deposit or safe fund. The store manager must write the word "Employee" at the top of any checks written by a Dollar General employee. Employees who write bad checks or commit any other violation of this policy may be subject to counseling up to and including termination. Please refer to the SOP for further information.

## Smoking/Tobacco Policy

Dollar General is committed to creating and maintaining a safe and healthful environment for its employees and customers. Therefore, the use of tobacco products is strictly prohibited in the workplace at Dollar General. "Workplace" means any area within a Dollar General Store, including, but not limited to, the sales floor, any store office, restroom, break room or stock room.

Employees may use tobacco products during approved rest breaks and meal periods. All tobacco products should be disposed of properly. However, even during these approved periods, employees may not use tobacco products within 20 feet of the store entrance. Tobacco products may not be used while unloading trucks, retrieving carts from the parking lot or during other work-related tasks that may take an employee away from the sales floor.

Violation of the Smoking/Tobacco Policy may result in progressive counseling up to and including termination, even for the first offense. If you have any questions regarding this Policy, please discuss them with your immediate supervisor.

## 2005 Dollar General Employee Handbook

# Direct Stock Purchase Plan

Dollar General offers its employees the opportunity to deduct a portion of their pay to purchase Dollar General stock. To enroll, employees must complete a Direct Stock Purchase Plan Enrollment/Change Form that can be obtained from Human Resources or Stock Services.

## Plan Information

- You decide how much you wish to deduct each pay period.
- Your deductions are totaled at the end of the month, a purchase is made during the following month, and the shares are deposited into your account.
- To receive an enrollment package for the Direct Stock Purchase Plan, call 1-700-200-1234, extension 5193.

# Direct Deposit

Direct deposit is a benefit that Dollar General provides to help the employee eliminate the hassle of handling and depositing a paper paycheck. Signing up for direct deposit authorizes Dollar General to automatically deposit an employee's pay into his/her account at any financial institution chosen (credit unions included).

Employees are given the option of directing the deposit of their earnings into a maximum of four different accounts. For example, you can deposit 80% of your paycheck into your checking account, 10% into a savings account and the remaining 10% into yet another savings account.

An employee's money will be in his/her account, ready for use, at the close of business of each pay day even if the account is in another city. Dollar General will provide the employee, on his/her normal scheduled pay date, with a deposit advice detailing the bank accounts credited along with the employee's normal payroll information. All full-time and part-time employees hired on a regular basis are eligible for direct deposit. Temporary and seasonal employees are not eligible to enroll.

To enroll in direct deposit, you must complete an authorization form. Additional direct deposit forms can be requested by calling the Payroll Department. When signing up for Direct Deposit into checking accounts, include a voided check. (Deposit slips for checking accounts will NOT be accepted.) When using Direct Deposit with a savings account, include a deposit slip. **After submitting the forms, allow 3 – 4 weeks for your payroll check to be automatically deposited.**

## Anniversary Date

An employee's anniversary date is the date that an employee was **originally** hired (unless rehired- see the Service Bridging section). This includes employees who were originally hired as part-time or temporary employees (those hired through the Company, not a temporary agency) and who have now become full-time employees. The anniversary date is used, in conjunction with other employment criteria, to determine service with the Company which impacts several leave policies and benefit programs.

## Service Bridging

Anniversary date will be defined as the original hire date unless the employee was rehired after a break in service of more than 30 days. If rehired after being separated from the Company more than 30 days, the anniversary date will be changed to reflect the rehire date. If an employee leaves the Company and is rehired within 30 days of the termination date, the original hire date remains the same and should not be changed during the re-hire process. The original hire date will remain the same for purposes of vacation, counseling, benefits and service. This is called service bridging.

## Pay Schedule

Dollar General pays its retail store employees on a weekly basis. The pay week begins on Saturday and ends the following Friday. Payroll checks may **never** be distributed to employees prior to the date of the check. Distributing payroll checks prior to the check date is a violation of Company policy.

Checks are distributed to employees by their manager in their store each week. The check received is for the previous work week. Any questions concerning an employee's compensation should be directed to the Payroll Department.

**NOTE:** *Employees may not accept merchandise, cash, compensatory time off or any type of gift in lieu of payment for time worked. This may result in progressive counseling up to and including termination, even for the first offense.*

## 2005 Dollar General Employee Handbook

## Meal Breaks

It is our policy to provide unpaid meal breaks during the course of each workday for full-time employees. Store managers or assistant managers determine the time of the meal break. *Where state law differs from Dollar General policy, Dollar General will follow the specific state law.*

- Full-time employees are given a minimum 30-minute uninterrupted meal break usually near the middle of their workday.

- Supervisors are responsible for balancing work loads and scheduling meal breaks and should take into consideration the work load and the nature of the job performed.

- Hourly (non-exempt) employees must clock out when the meal break begins and clock back in when the break is over, as it is unpaid time.

- Employees are expected to be punctual in starting and ending their meal breaks.

- Employees who work part-time should discuss unpaid meal periods with their supervisor.

## Eating and Drinking in Unauthorized Areas

Eating and drinking should be limited to the designated break or lunch area during specified times. Failure to comply with this policy will result in disciplinary action.

## Rest Breaks

It is our policy to provide rest breaks during the course of each workday for full-time employees. Store managers or assistant managers determine the break schedules for part-time employees. *Where state law differs from Dollar General policy, Dollar General will follow the specific state law.*

- Full-time employees may receive up to two 15-minute paid rest breaks per day depending on the duration of the employee's scheduled work hours. Peak store hours or store projects may make it necessary to delay, shorten, or cancel the break.

- Break periods will be scheduled by the store manager or assistant store manager according to business needs.

- Employees do not clock out for the 15-minute break period, as it is paid time.

- Rest breaks should be taken on company premises.

- Employees are expected to be punctual in starting and ending their breaks.

## 2005 Dollar General Employee Handbook

- Employees who choose not to take a rest break are not entitled to leave before the normal quitting time and will not receive extra pay for the time worked.
- Breaks required by state law may not be waived.

# Pay Rate

It is the intent of Dollar General to pay employees in a manner that it considers to be fair based upon their job duties and their performance. The Company also strives to provide pay rates that are competitive with other companies in our business and in our market areas. All employees will be paid at least the current government mandated minimum wage per hour. No form of payment other than payroll check is allowed. You should not accept merchandise, cash, compensatory time-off or any type of gift in lieu of payment for time worked.

## Store Management

**Performance Review:** All store managers and assistant store managers who are employed as of January 1 will receive an annual performance review. Store managers and assistant store managers are reviewed on annually assigned performance goals. Reviews are completed as soon as possible after fiscal year end (January 31).

**Pay Rate Adjustments:** Adjustments for store managers and assistant store managers are considered annually (usually April) for those who meet the current eligibility guidelines.

**Amount of the Pay Adjustment:** The amount of the pay adjustment may be based upon the following items (this is not a complete list):

- Current rate of pay or placement within the range
- Current performance rating
- Company's ability to pay

## Store Clerks

All newly hired regular full-time and part-time Store Clerks and Lead Clerks will receive a pay increase after six months of employment and a pay increase each annual anniversary thereafter. Store Clerks and Lead Clerks at or above the maximum pay range may not be eligible for an incremental pay increase.

## 2005 Dollar General Employee Handbook

### Holidays

Paid holidays include Easter Sunday, Thanksgiving Day and Christmas Day. However, Thanksgiving Day is a working holiday. All full-time regular employees are granted holiday pay if they have received pay the week of the holiday (Saturday to Friday), excluding Workers' Compensation pay. Employees should still work their scheduled day before and scheduled day after the holiday. Exceptions may be made where required by law (e.g., the FMLA).

**NOTE:** *Part-time and temporary employees are* **not** *eligible for paid holidays. However, part-time employees may receive additional compensation for Thanksgiving* **only if** *they work on Thanksgiving Day.*

### Vacation

• All full-time, regular employees are eligible for vacation after six months of service. This includes employees who were originally hired as part-time or temporary employees (those hired through the Company and not a temporary agency) and who have now become full-time employees.

• Vacation is granted to all full-time, regular employees based on completed years of service, unless there is a break in service from the Company of more than 30 days. Vacation must be taken before the next anniversary of the employee's original hire date, no exceptions.

• Dollar General temporary employees and part-time employees are not eligible for vacation.

• Employees whose status voluntarily changes from full-time to part-time lose their entitlement to any vacation (including any unused vacation) while in a part-time status.

• If an employee's status changes from part-time to full-time without a break in service of more than 30 days, service time in the part-time position counts towards vacation available if the employee's status changes to full-time.

• Unused vacation time cannot be used in place of working out a notice.

• The Company encourages everyone to take this time off each year for rest and recreation; therefore, the Company does not provide pay in place of vacation. Additionally, vacation time is not carried over to the next year if unused by an employee's anniversary date.

• Since vacation is "granted," not "earned," the time not taken when an employee leaves the Company will be forfeited. Employees will not be paid for unused or forfeited vacation.

## 2005 Dollar General Employee Handbook

### Scheduling Vacation

- All vacation time should be taken between January 1 and November 15.
- Vacations should be scheduled with your manager 30 days prior to the requested time. Exceptions may be permitted with district manager approval.
- Employees must wait one week from their anniversary date before taking vacation.
- Your store manager reserves the right to decline vacation requests during peak work load periods.
- Priority for vacation will be given according to length of service and position.

**NOTE:** *Where state law differs from the vacation policy, Dollar General will follow the specific state law.*

### Hours Paid for Store Managers
*(Refer to the SOP for procedures on recording vacation time)*

- At the completion of six-months consecutive service, store managers are eligible for one week (20 hours paid) of vacation.
- At the completion of one year consecutive service, store managers are eligible for one week (40 hours paid) of vacation.
- Effective April 1, 2005, store managers who have two years of consecutive service are eligible for a total of 80 hours paid vacation per anniversary year.
- Effective April 1, 2005, store managers who have 15 or more years of consecutive service are eligible for a total of 160 hours paid vacation per anniversary year.

### Hours Paid for Full-Time Store Managers

| Consecutive Service | Vacation Available |
|---|---|
| 6 months | 1 week (20 hours paid) |
| 1 year | 1 week (40 hours paid) |
| 2 years | 2 weeks (80 hours paid) |
| 7 years | 3 weeks (120 hours paid) |
| 15 years | 4 weeks (160 hours paid) |

## 2005 Dollar General Employee Handbook

### Hours Paid for Full-Time Hourly Employees

| Consecutive Service | Vacation Available |
|---|---|
| 6 months | 1 week (20 hours paid) |
| 1 year | 1 week (40 hours paid) |
| 3 years | 2 weeks (80 hours paid) |
| 7 years | 3 weeks (120 hours paid) |

### Hours Paid for Full-Time Hourly Employees
*(Refer to the SOP for procedures on recording vacation time)*

- At the completion of six-months consecutive service, full-time hourly employees are eligible for 20 hours paid vacation.
- At the completion of one year consecutive service, full-time hourly employees are eligible for 40 hours paid vacation.

## Pay for Time Not Worked and Overtime

The following examples are representative of "non-work" hours in which the employee may still be eligible for pay: vacation, holidays, jury duty and funeral leave. (This is not a complete list of "non-work" examples.)

When determining eligibility for overtime, only actual "worked" hours are taken into consideration for non-exempt employees. Therefore, "non-work" hours, such as those noted above, are not considered in the government mandated overtime calculations. Overtime pay is always determined by the number of hours actually worked during the work week, in accordance with government guidelines.

## Working Off the Clock

"Working off the clock" means working, but not reporting on the electronic clock-in on the register the hours you worked. Working off the clock, or allowing or instructing someone to work off the clock, is a violation of Company policy and can lead to immediate termination from the Company even for the first offense.

Employees must be paid for all hours worked. In addition, you must be paid for all hours worked within the week the hours were actually worked. Hours cannot be intentionally held over to another week for payment. No employee in the Company, including your store manager, your district manager or your Region Manager has the authority to require you to work off the clock or falsely report hours as having been worked in a week other than when they were actually worked.

## 2005 Dollar General Employee Handbook

You should immediately report any employee who asks you to work off the clock to your district manager or the **Employee Response Center (ERC) at 1-888-237-4114**.

## Voting

Some states have laws that address granting employees time off to vote. Our experience tells us that most employees vote before or after work since the polls are usually open at these times. If you have difficulty voting before or after your work schedule, check with your supervisor for specific information about your location's policy regarding time off to vote.

## Dollar General's Leave Policies at a Glance

The following section outlines Dollar General's leave policies. Please partner with your supervisor if you have any questions regarding this section. Where permitted by law, the Company reserves the right to require appropriate documentation to verify an employee's need for leave.

FMLA, Medical Absence Leave and Personal Leave are calculated using a 12-month rolling period measured backward from the date on which a leave of absence is to begin. For these types of leaves, employees may not exceed the total maximum amount of time allowed in a 12-month rolling period. The maximum amount of time allowed is determined by law and/or based on years of service with Dollar General.

Full-time employees with less than one year service may be eligible for up to a maximum of four work weeks of total combined leave (including personal and medical leave) in a 12-month rolling period, excluding military, funeral or workers' compensation leave.

Full-time employees with more than one year service may be eligible for up to a maximum of 16 work weeks of total combined leave (including FMLA, personal and medical leave) in a 12-month rolling period, excluding military, funeral or workers' compensation leave.

Part-time employees who are ineligible for FMLA may be eligible for up to a maximum of two work weeks of total combined medical and/or personal leave in a 12-month rolling period, excluding military, funeral or workers' compensation leave.

## 2005 Dollar General Employee Handbook

An employee's failure to provide required documentation supporting the need for leave in the required timeframe may result in delay or denial of the leave. In addition, for the time missed, the employee may be subject to disciplinary action as outlined in the attendance policy, depending on the circumstances.

The Company's leave policies, including its FMLA leave policy, are outlined in this handbook. You should refer to these policies and their eligibility requirements, and ensure that you have met those requirements if you wish to take a leave of absence under those policies.

If an employee is eligible for FMLA and a medical certification is not returned as outlined, FMLA leave can be delayed or denied. Failure to provide a medical certification will require the employee to take a medical or a personal leave, both of which are shorter in duration, are not job protected and may affect all benefits.

**NOTE:** *Where additional leave is required by federal or state law or regulation (for example, the ADA), or where federal or state law or regulation gives employees greater rights than Company policy, the Company will comply with such law or regulation.*

## 2005 Dollar General Employee Handbook

## Family & Medical Leave Act (FMLA)

| | |
|---|---|
| **Eligibility** | 12 months employment (need not be consecutive) and 1,250 actual hours worked in 12 months prior to leave (does not include non-work time such as vacation or leaves) |
| **Criteria for Leave** | Personal serious health condition; serious health condition of employee's parent, spouse or child; birth or adoption of child or placement of foster child. Contact the Leave Department toll-free at 1-866-DGS-FMLA. |
| **Period of Leave** | 12 weeks per rolling 12-month period (Counting backward from date on which most recent requested leave is to begin) |
| **Pay Continuation Status** | Unpaid leave, but may use vacation. |
| **Benefit Status** | Medical and welfare benefits will continue for 12 weeks through payroll deductions or remitting premiums timely. Use of your Health Care and or Dependent Care Flexible Spending Account will be suspended, unless receiving pay through payroll. At the end of 12 weeks, if employee does not return to work, benefits may be terminated. COBRA may apply. Employee and employer contributions to the retirement plan will cease if not receiving pay through payroll. |
| | If benefits terminate, benefits will be reinstated if employee contacts the Benefits Department in writing within 31 days of returning to work. |
| **Reinstatement** | Employee will be returned to previous position or substantially equivalent position (except in limited, specific circumstances). |
| **Teamshare Status** | Pro-rated (for all leave amount increments including intermittent, reduced and full-time leave) |

## 2005 Dollar General Employee Handbook

# Family and Medical Leave Act Policy (FMLA)

## Eligibility

To be eligible for leave under the FMLA, an employee must have been employed by the Company for a total of at least 12 months and must have worked at least 1,250 hours (not including non-work time such as vacation or leaves) during the 12-month period immediately preceding the date the requested FMLA leave is to begin.

Where practicable, eligibility for leave should be determined prior to the date the leave is to commence. Employees should immediately contact the **Leave Representative at 1-866-DGS-FMLA** (1-866-347-3652) to initiate an FMLA leave request and notify his/her district manager. An employee on FMLA leave is required to report periodically on his or her status and intent to return to work. Upon return from leave, the Company will return the employee to his/her original position or a substantially equivalent position.

**NOTE:** *It is a violation of Company policy to deny or discourage an employee from exercising his/her rights or retaliate against an employee who has exercised his or her rights under the FMLA.*

## Eligibility

Under the FMLA, eligible employees are entitled to up to 12 workweeks of unpaid leave within any 12-month rolling period (measured backward from the date the employee's leave begins) for the following reasons:

- The birth or adoption of a child or the placement of a foster child with the employee

- To care for a family member (parent, child or spouse) with a serious health condition

- The employee's own serious health condition that prevents the employee from performing his or her job

*The phrase "serious health condition" means an illness, injury, impairment or physical or mental condition that involves:*

- inpatient care in a hospital, hospice, or residential medical care facility and period of recovery there

- "continuing treatment" by a health care provider

- pregnancy or prenatal care. A visit to the health care provider is not necessary for each absence.

## 2005 Dollar General Employee Handbook

- a chronic serious health condition which continues over an extended period of time, requires periodic visits to a health care provider, and may involve occasional episodes of incapacity (e.g. asthma, diabetes). A visit to a health care provider is not necessary for each absence.

- a permanent or long-term condition for which treatment may not be effective (e.g. Alzheimer's, a severe stroke, terminal cancer). Only supervision by a health care provider is required, rather than active treatment.

- any absences to receive multiple treatments for restorative surgery or for a condition which would likely result in a period of incapacity of more than three days if not treated (e.g. chemotherapy or radiation treatments for cancer).

### Continuing Treatment

"Continuing treatment by a health care provider" includes any period of incapacity due to a health condition (including treatment therefor, or recovery therefrom) lasting more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also includes:

1. treatment two or more times by or under the supervision of a health care provider; or

2. one treatment by a health care provider with a continuing regimen of treatment

### FMLA Counting Method

Dollar General calculates leave eligibility based on a 12-month rolling period measured backward from the day the leave is to begin. An employee is not required to use granted vacation (if available) during FMLA leave. An employee can elect to use available paid leave concurrently with unpaid leave

Leave for the birth of a child or the placement of a child for adoption or foster care must conclude within twelve months of the birth of the child or placement of the child into the employee's care. Holidays which occur while an employee is on FMLA leave will be counted towards the employee's FMLA entitlement.

## 2005 Dollar General Employee Handbook

### Leave Requirements: Employee Notice

- Where the need for leave is foreseeable, an employee should provide the Company with 30 days advance written notice of a request for leave. However, if 30 days advance notice is not practical or possible (e.g., an emergency), then the employee must give notice as soon as possible (i.e., at least verbal notification within two business days of when the need for leave becomes known to the employee).

- Unauthorized work for personal gain while on leave is prohibited. Violations may result in termination. See the Moonlighting Policy for more details regarding when an employee may hold a second job.

- If the employee can return to work sooner than anticipated, the employee must give the Company at least two business days notice of the changed circumstances.

- If an employee does not return to work after the expiration of 12 workweeks of FMLA leave, the Company may terminate the employee (unless additional leave is required by federal or state law or regulation). In that case, the employee may be eligible for COBRA health/insurance coverage. If an employee is unable to return to work by the end FMLA leave because of a physical or mental condition (including continuation of a serious health condition), he/she should contact his/her supervisor or district manager to discuss possible alternatives and/or accommodations, such as an additional leave. If an additional leave is granted, the employee may be required to pay the COBRA coverage continuation premium rate to continue health/dental coverage.

### Medical Certification

Employees taking FMLA leave to care for a parent, child or spouse with a serious health condition or for the employee's own serious health condition will be required to provide medical certification in support of their requests. The medical certification form must be obtained from and returned to Human Resources by the employee within 15 days from the date that he/she was notified of the medical certification form completion requirement. Failure by the employee to provide this form can result in a delay or denial of the employee's request for leave.

## 2005 Dollar General Employee Handbook

### Return to Work Release

An employee returning to work from FMLA leave (or any other leave) due to the employee's own serious health condition will be required to submit a release to return to work ("Fitness for Duty") certificate from the employee's health care provider. Failure to return to work at the end of the designated leave may result in progressive counseling up to and including termination, unless additional leave is necessary to comply with federal or state law.

### Key Employees

Under limited circumstances, where restoration to employment will cause substantial and grievous economic injury to its operations, an employer may refuse to reinstate certain highly paid "key" employees after using FMLA leave during which health coverage was maintained. A "key" employee is a salaried "eligible" employee who is among the highest paid ten percent of employees within 75 miles of the work site. In order to do so, the employer must:

• notify the employee of his/her status as a "key" employee in response to the employee's notice of intent to take FMLA leave;

• notify the employee as soon as the employer decides it will deny job restoration, and explain the reasons for this decision;

• offer the employee a reasonable opportunity to return to work from FMLA leave after giving this notice; and

• make a final determination as to whether reinstatement will be denied at the end of the leave period if the employee then requests restoration.

### Spouses

When eligible spouses are both employed by the Company, the spouses are entitled to a combined total of 12 workweeks of FMLA leave if the leave is taken for:

• The birth of a child or the placement of a child for adoption or foster care

• To care for a sick parent

• Eligible spouses are not limited to a combined total of 12 workweeks if the leave is for the serious health condition of the employee or the employee's spouse or child

## 2005 Dollar General Employee Handbook

### Reduced Schedule Leave or Intermittent Leave

Reduced schedule leave or intermittent leave can be taken to care for the health condition of a parent, child or spouse or for the employee's own serious health condition if such leave is medically necessary. If an employee needs intermittent or reduced schedule leave:

• The employee must make a reasonable effort to schedule planned medical treatment so as not to unduly disrupt the operations of the Company.

• For a reduced schedule or intermittent leave due to medical treatment, the employee must submit a medical certification form stating the reasons that the leave is necessary, the dates the treatment will be given and the duration of the treatment. (The employee may obtain the certification form by contacting the Leave Representative.)

• The Company may require the employee to transfer temporarily to an available alternative position which can better accommodate the modified leave than the employee's current position (but only for the period during which leave is being taken), assuming the employee is qualified to perform the alternative position. This position must have equivalent pay and benefits.

If an employee takes intermittent or reduced schedule leave, only the amount of leave actually taken will be counted toward the 12 weeks of leave to which an employee is entitled. The Company tracks such leave in quarter-hour increments.

## 2005 Dollar General Employee Handbook

## Medical Absence Leave

| | |
|---|---|
| **Definition** | This leave is designed for employee's own "serious health condition" where employee is ineligible under FMLA or after FMLA is exhausted, if necessary. |
| **Eligibility** | No waiting period for regular full-time and part-time employees. |
| **Criteria for Leave** | 1. Partner with your manager<br>2. Contact the Leave Department toll-free at 1-866-DGS-FMLA<br>3. Meet the FMLA definition of a "serious health condition", or as required to comply with other federal or state law or regulation<br>4. Provide medical certification from physician and fitness for duty prior to returning to work<br>5. Leave must be taken in at least one work-day increments |
| **Period of Leave** | Up to 4 work weeks combined leave for full-time employees and up to two work weeks combined leave for part-time employees in a rolling 12-month period (counted same as FMLA). Employment may be terminated at the end of the leave if the employee does not return to work, unless further accommodation is required under federal or state law. |
| **Pay Continuation Status** | Unpaid. Vacation time may be used. |
| **Benefit Status** | Medical and welfare benefits will continue during length of leave through payroll deduction or remitting premiums timely. Use of your Health Care and or Dependent Care Flexible Spending Account will be suspended, unless receiving pay through payroll. Employees enrolled in Starbridge should contact the Benefits Service Center immediately at 1-877-885-5735. All benefits will terminate at the end of the leave period. COBRA may apply. Benefits will be reinstated if the employee contacts the Benefits Department in writing within 31 days of returning to work. Employee and employer contributions to the retirement plan will cease if not receiving pay through payroll. |
| **Reinstatement** | Employees generally are not entitled to return to their previous position following a medical leave, except where required by law. |
| **Teamshare Status** | Pro-rated (for all leave amount increments including intermittent, reduced and full-time leave) |

37

## 2005 Dollar General Employee Handbook

## Personal Leave

| | |
|---|---|
| **Definition** | This leave is designed for employees in the event they require a non-medical leave of absence. |
| **Eligibility** | No waiting period for full-time and part-time employees. |
| **Criteria for Leave** | All personal leaves are at the discretion of the district manager and are generally only approved in emergency situations. Leave must be taken in at least one-day increments. Contact the Leave Department toll-free at 1-866-DGS-FMLA. |
| **Period of Leave** | Up to 4 work weeks combined leave for full-time employees and up to two work weeks combined leave for part-time employees in a rolling 12-month period (counted same as FMLA). Employment may be terminated at the end of the leave if the employee does not return to work, unless further accommodation is required under federal or state law. |
| **Pay Continuation Status** | Unpaid. Vacation time may be used. |
| **Benefit Status** | Rewrite of Benefit Status: All medical and welfare benefits will terminate, and COBRA will apply if applicable. Use of your Health Care and or Dependent Care Flexible Spending Account will be suspended, unless receiving pay through payroll. Employees enrolled in Starbridge must contact the Benefits Service Center at 1-877-885-5735 immediately. Employee and employer contributions to the retirement plan will cease if not receiving pay through payroll. <br><br> Benefits will be reinstated if employee contacts the Benefits Department in writing within 31 days of returning to work. |
| **Reinstatement** | Employees generally are not entitled to return to their previous position following a personal leave. |
| **Teamshare Status** | Pro-rated (for all leave amount increments including intermittent, reduced and full-time leave) |

## 2005 Dollar General Employee Handbook

## Military Leave

| | |
|---|---|
| **Definition** | This leave is designed for employees (full-time and part-time) who serve (through active duty or called-up to active duty) in any branch of the Armed Forces, National Guard or Reserve training. |
| **Eligibility** | No waiting period |
| **Criteria for Leave** | Employee must provide advanced written or verbal notification to his/her supervisor, including a copy of the military orders where possible. |
| **Period of Leave** | Up to five years (or more in certain circumstances). |
| **Pay Continuation Status** | 0 to 26 weeks of supplemental pay based on length of service. Supplemental pay is the difference between the employee's military pay and regular pay at Dollar General. |
| **Benefit Status** | Benefits are continued at the same employee contribution level as if working during supplemental pay period. Afterward, benefits continue pursuant to USERRA or other applicable law. If not eligible for supplemental pay, benefits continue for 30 days. (COBRA may apply if benefits terminate.) Life and disability will continue to the same extent these benefits continue for other types of leave and credit for periods of military service will be given for retirement purposes. <br><br> Benefits will be reinstated if employee contacts the Benefits Department in writing within 31 days of returning to work. |
| **Reinstatement** | When possible, for military service of up to five years if certain requirements are met including release, proof of status and return date within specified period. |
| **Teamshare Status** | Pro-rated |

## 2005 Dollar General Employee Handbook

## Funeral Leave

| | |
|---|---|
| **Definition** | This leave is provided to all full-time and part-time employees in the event of the death of a relative, as defined below. |
| **Eligibility** | No waiting period. |
| **Criteria for Leave** | Death of spouse, brother, sister, child, parent, grandparent, grandchild, great-grandparent, great-grandchild, parent-in-law, son-in-law, daughter-in-law, grandparent-in-law, brother-in-law, sister-in-law, step-parent, step-child, step-brother, step-sister, step-grandparent, step-grandchild and dependent member of household. |
| **Period of Leave** | Up to three days of paid leave limited to the day before the funeral, day of the funeral and day after the funeral provided the employee is already scheduled to work any of these three days. Otherwise it is unpaid. |
| **Pay Continuation Status** | Full pay at regular rate of pay. |
| **Benefit Status** | Not applicable. |
| **Reinstatement** | Employees generally will return to their previous position following funeral leave. |

## 2005 Dollar General Employee Handbook

### Jury Duty

| | |
|---|---|
| **Definition** | This leave is designed for full-time and part-time employees who are called to serve jury duty. |
| **Eligibility** | No waiting period. |
| **Criteria for Leave** | Employees required to serve jury duty should give their supervisor a copy of the written court order request. |
| **Period of Leave** | For the entire period required by the court. |
| **Pay Continuation Status** | Full pay (Dollar General will provide the employee's regular pay amount less jury pay). See the SOP for specific instructions. |
| **Benefit Status** | Not applicable. |
| **Reinstatement** | Employees generally will be reinstated to previous position upon completion of jury duty. |

## 2005 Dollar General Employee Handbook

### Status Change

To administer our pay and benefit programs properly, it is extremely important that the Company has up-to-date information on your status. It is your responsibility to keep HRIS updated.

Complete a **Personnel Action Form (PAF)** for any of the following status changes and submit to HRIS using the envelopes addressed to the Store Support Center:

* Name
* Marital Status
* Address
* Telephone Number

Other changes on your PAF (such as job code, department, job status, etc.) will be completed by your supervisor. Please contact your supervisor for Personnel Action Forms or call the Forms Hotline at 1-700-200-1234, extension 4175.

**NOTE:** *If you have a name change, you must attach to the PAF a copy of the Social Security Card with your new legal name.*

### Promotions

Dollar General is always interested in promoting from within the Company. We are constantly searching for qualified or trainable people who are interested in advancement. Generally, promotions are based on an employee's:

* performance, conduct and attendance in current and previous jobs
* ability to learn the skills required for the new job
* willingness to assume additional responsibility
* willingness to relocate if required

To learn more about current career opportunities at Dollar General, employees should visit the Company web site at www.dollargeneral.com and click on the careers button located on the left side. From there select retail, store support center or distribution center positions.

If you are interested in being promoted, you should discuss this with your supervisor. Dollar General's management will help provide you with a good working climate and training to improve your skills. The rest is up to you!

## 2005 Dollar General Employee Handbook

## Transfer Policy

Dollar General reserves the right to transfer employees from one store to another as business needs dictate. Employees on written or final counseling may not be able to transfer to another position until 90 days or the end of the plan, whichever is greater. Please contact the district or region manager if there are extenuating circumstances. Transfers require approval of both the district manager in the employee's current district and in the district the employee will transfer to.

## Attendance and Tardiness

Excessive absenteeism and tardiness have a negative effect on our productivity and quality of service. For this reason, Dollar General expects its employees to be present for work when scheduled and to call their supervisor if for any reason they cannot be at work at the scheduled time.

Employees are expected and required to report to their designated work locations at the time their work activity is to begin. Tardiness, unexcused absence or failure to report to work as required may result in progressive counseling. In the event an employee cannot report to work as scheduled, the employee must notify his/her supervisor at least one hour prior to the scheduled reporting time or be prepared to provide evidence of extenuating circumstances.

In the event that the manager responsible for opening or closing the store has an emergency, the manager must make contact and discuss the situation with his/her immediate manager as soon as possible. If the manager cannot be reached "live" then the next level of management should be contacted and the situation discussed with him/her. The store manager is ultimately responsible for making sure the store is operating during all business hours.

The employee is responsible for communicating with his or her supervisor as needed. In all cases of an employee's absence or tardiness, the employee should provide his or her supervisor with a reason for the absence and, if applicable, the probable duration of the absence. This will enable the workload to be distributed, if necessary, so that service to our customers will not be affected.

Excessive absenteeism, regardless of the reason(s), will be evaluated on a case-by-case basis to determine the need for progressive counseling up to and including termination from the Company. Managers are encouraged to partner with their district manager to determine the appropriate action. An employee who is absent without notice or authorization from his/her supervisor for three or more consecutive scheduled workdays will be considered to have abandoned his/her job and will be automatically removed from the payroll, unless the employee can provide verifiable evidence of extenuating circumstances. Please contact your supervisor for guidance.

## 2005 Dollar General Employee Handbook

An employee who walks off the job or leaves the work area during scheduled work hours without authorization from a manager will be considered to have abandoned his/her job. The employee will be automatically terminated unless the employee can provide verifiable evidence of extenuating circumstances. The employee may be asked to provide verifiable evidence of extenuating circumstances (doctor's excuse, funeral obituaries, etc.).

**NOTE:** *Qualified absences for eligible employees related to FMLA and/or other leaves of absence taken in accordance with Company policy or pursuant to applicable law will not lead to Progressive Counseling.*

## Progressive Counseling

Progressive counseling is used to document unacceptable performance, conduct or attendance issues and to positively reinforce performance improvement. The performance, conduct and attendance standards contribute to the ability to perform effectively and create a positive, equitable and values-driven environment. The appropriate level of progressive counseling is determined by the severity of the attendance, conduct or performance issue.

The purpose of the progressive counseling is to communicate unacceptable performance, conduct or attendance issues and develop an action plan which results in standard or above standard performance, conduct or attendance. However, these procedures are guidelines only and the Company specifically reserves the right to terminate any employee at any time when the Company determines it to be appropriate under the circumstances.

## Reasons for Counseling and/or Termination

The disciplinary action that will be taken in a particular case will depend on the circumstances involved, including the severity of the offense, the employee's past record and other relevant factors. The following are some **examples** of violations (NOT all-inclusive) for which even the first offense may lead to progressive counseling and/or termination from the Company:

1. Violation of the Code of Business Conduct and Ethics
2. Smoking Policy violations
3. Excessive absences or tardiness
4. Unapproved absence from work
5. Taking unauthorized and/or extended breaks
6. Walking off the job or leaving your work area during scheduled work hours without authorization
7. Working overtime without authorization

## 2005 Dollar General Employee Handbook

8. Working hours for which you did not clock in or out (working off the clock) or instructing someone to work off the clock

9. Allowing a minor to perform work for the Company (except in those states approved by the Company as part of the Hiring Minors program)

10. Accepting merchandise for time worked

11. Allowing friends, family or any other individuals who are not employees to work

12. Personal use of Company credit card

13. Substandard performance or conduct

14. Parking in unauthorized areas

15. Eating and drinking in unauthorized areas

16. Violation of Personal Appearance and Dress Code Policy

17. Unauthorized personal use of Company telephones

18. Solicitation, distribution or loitering on Company property

19. Gambling on Company property or at Company sponsored events

20. Sexual harassment or any other form of harassment, discrimination or inappropriate conduct

21. Conviction of a felony or other crime which may be detrimental to the interests of the Company

22. Immoral or indecent conduct on Company property or at Company sponsored events

23. Use of profane or abusive language in the workplace, including use of racial, gender, ethnic or religious slurs

24. Willful destruction or theft of your co-worker's, Dollar General's, customer's, vendor's or contractor's property

25. Unauthorized use or removal of Company property, equipment or information

26. Falsifying Company documents, including time records

27. Fighting on Company property or inciting a fight

28. Failure to immediately report an accident involving yourself or any vehicle or equipment you may be operating

29. Violation of Drug and Alcohol Policy

30. Insubordination, including, but not limited to, failure to follow the reasonable instruction of your supervisor, the failure to submit to testing as required by the Company's Drug and Alcohol Policy or failure or refusal to participate in an internal investigation

## 2005 Dollar General Employee Handbook

31. Failure to control inventory
32. Failure to protect Company assets
33. Release of proprietary/confidential information
34. Failure to submit, follow-up or meet Dollar General hiring criteria related to pre-employment background checks, drug testing, etc.
35. Possession of a weapon (examples include: gun, knife, stun gun, mace, pepper-spray and other weapons) on Company-owned or leased property or at Company-sponsored events
36. Mishandling of Company property or assets (including, but not limited to: borrowing money from the Company, cash shortages, giving keys to unauthorized personnel, deposit shortages, late deposits, etc.)
37. Sleeping or loafing on the job
38. Creating a hostile work environment
39. Failure to properly ring and/or record all sales through the register
40. Unauthorized personal use of cellular phones and/or pagers during work hours
41. Willfully and deliberately clocking in or out for another employee
42. Driving on behalf of the Company without a valid driver's license
43. Having in your possession or being under the influence of alcohol or illegal drugs in the workplace
44. Violation of the Personal Relationship Policy
45. Posting proprietary information or making derogatory comments regarding Dollar General on message boards or other public sites
46. Failure to cooperate with a police investigation involving the Company or failure to cooperate in any Dollar General Company investigation
47. Solicitation when either the employee soliciting or being solicited is supposed to be working (work time)
48. Distribution of any non-Company literature or written material in a work area or during work time
49. Providing or agreeing to provide false or misleading information pursuant to a Company investigation or inquiry
50. Stealing merchandise or money from the Company, employee, customer, vendor or contractor (Dollar General prosecutes employees caught stealing from the Company)
51. Violation of the Employee Check Policy
52. Allowing non-Dollar General employees in the store before or after store hours

## 2005 Dollar General Employee Handbook

53. Failure to open the store on time or closing the store early

54. Using Dollar General's name for personal use, e.g. credit card, phone

55. Any unlawful activity on Dollar General property

56. Failure to report knowledge of another employee's theft

57. Policy violations relating to computers and voicemail

58. Removing customer's lost items from the store and taking them home

59. Violation of any policies outlined in the Employee Handbook

60. Accepting product previously or otherwise for sale by Dollar General vendors

61. Providing employment references on former or current employees to other organizations

62. Participating in or allowing horseplay on Company property

63. Making change for a customer without a transaction (i.e., when they have not made a purchase)

64. Recording conversations in person and/or over the phone without the prior consent of all involved parties

## Employment of Relatives

Working with "close relatives" may lead to a number of awkward situations that work to the disadvantage of both the employee and the Company. Therefore, Dollar General has established the following policy:

- No employee may work under the immediate supervision of a close relative.

- Two or more employees who are close relatives may not be assigned to work in the same store.

- Managers who knowingly allow violations of the Employment of Relatives Policy may be subject to disciplinary action up to and including termination from the Company.

- Dollar General prohibits hiring a close relative of a Company officer (VP and above) or Board member

- Should two employees become relatives through marriage, the employees have the option of deciding who will resign or ask for a transfer, if available. If that option is not exercised within 30 days, Dollar General may select which employee will resign or transfer (depending upon the availability of positions).

- Cohabitation: People sharing the same address and/or home are not allowed to work together in the same store. Such a relationship may create a conflict of interest for the Company.

## 2005 Dollar General Employee Handbook

### Who are close relatives?

- Husband, wife
- Brother, sister
- Parent, child
- Grandparent, grandchild
- In-laws (such as parent-in-law, grandparent-in-law, son-in-law, daughter-in-law, grandson-in-law, granddaughter-in-law, brother-in-law, and sister-in-law)
- Step-relatives (such as step-parent, step-child, step-brother, step-sister, step-grandparent, step-grandchild)
- Aunts, uncles, nieces, nephews and first cousins

**NOTE:** *This policy became effective 5-1-90. All persons involved in a working relationship with a close relative prior to the effective date of this policy will not be affected in their current working relationship unless problems arise out of that relationship. Employees violating this policy are subject to termination from the Company.*

## Personal Relationship Policy

The Company prohibits supervisors from dating employees whom they supervise, whether directly or indirectly. When a manager makes an advance to a subordinate, the employee is placed in an uncomfortable position. While we do not want to interfere with the personal lives of our employees, we recognize that this type of relationship has a high risk of creating an adverse effect on the job. Thus, the Company strictly prohibits supervisors from dating or otherwise making advances toward their employees, even if it is believed the advance is welcomed. Violation of this policy could lead to disciplinary action up to and including termination.

## Protection of Company Assets

Dollar General employees are responsible for protecting the Company's assets. Success in business is measured in large part by profits. Dishonesty and theft reduce a company's profits. Each employee has a responsibility to be productive and help make Dollar General successful. Included in that responsibility is the obligation to be honest, work hard and report unlawful acts or violations of Company policy. If you suspect or know of someone who is stealing, you should report his/her name to your supervisor or the Company Shrink Tip Hotline. Refer to the SOP for details on the STARS Program (Store Teams Actively Reducing Shrink).

## 2005 Dollar General Employee Handbook

Dollar General will make every reasonable effort to ensure you will remain anonymous, and you will have the satisfaction of knowing that your efforts will help make Dollar General a more successful Company.

Consent to a search is required as a condition of employment with Dollar General, and the refusal to consent may result in disciplinary action, including termination from the Company, even for a first refusal. Failure to report unlawful acts may result in termination from the Company. **Dollar General will prosecute any employee caught stealing from the Company.**

Dollar General purchases equipment, tools and supplies for the specific purpose of conducting Dollar General business. Unauthorized removal of Dollar General property from Dollar General's facilities is a violation of Dollar General policy and may be a violation of the law. Dollar General equipment generally should not be used for non-Dollar General business. Any improper use of Dollar General's assets, whether for personal or business purposes, including the misapplication or improper use of corporate or customer funds or property or the unauthorized use or publication of intellectual property, is prohibited and may be unlawful.

**Shrink Tip Hotline**
**1-800-334-9338**

## Work Safety

Dollar General is committed to providing a safe working environment for our employees. Every Dollar General employee is expected to support the safety effort and take action to prevent accidents.

Employees who work in positions which require driving on behalf of the Company must have a valid driver's license. It is expected that you make your supervisor aware of your lack of a valid driver's license, if asked to drive for business. Failure to do so may result in disciplinary action, up to and including termination even for the first offense.

Never put yourself or others in the store in danger. Only the store manager, assistant store manager and certain authorized persons have the authority to question and apprehend shoplifters. You must have approval from the Asset Protection Department before prosecuting a shoplifter. Please reference the Standard Operating Procedures Manual for more details on the proper procedure for handling shoplifters.

## 2005 Dollar General Employee Handbook

If you have any safety concerns or suggestions, discuss them with your supervisor, district manager or Risk Management. Immediately report any unsafe conditions. Dollar General forbids retaliation against employees who make good faith complaints about safety issues.

**NOTE:** *Employees who commit acts which endanger the safety of themselves or others are subject to disciplinary action up to and including termination from the Company even for a first offense. As previously noted, weapons are not allowed at the workplace or on Company property. Disciplinary action up to and including termination may result for this offense.*

## Use and Care of Equipment

No one under the age of 18 is allowed to operate or use the electric pallet jack, electric lift truck/walkie stacker, floor buffer, floor scrubber, and baler. All equipment is to be operated by authorized personnel only after daily operation checklists have been completed. Use the equipment for stated use only. At no time is an employee allowed to ride on the equipment or be lifted.

Policy violations regarding the safe and correct use of power equipment will result in disciplinary action, which may include termination even for the first offense.

## Running and Horseplay

Be considerate of your co-workers and provide a safe and pleasant working environment for everyone. Running, horseplay or throwing objects on the job may result in serious injury and are prohibited. Policy violations will result in disciplinary action, which may include termination even for the first offense.

## Accident and Injury Prevention

It is extremely important for every Dollar General employee to look for opportunities to prevent accidents.

### Lifting Boxes, Cartons or Heavy Objects

• Size up the load, determine the weight, get help if needed.

• Use your legs, keep your back straight, avoid bending and twisting at the waist.

• Keep the load close to your body.

• Whenever possible, push – do not pull.

## 2005 Dollar General Employee Handbook

### Ladder Use

- Check the ladder to make certain it is in good condition and that the steps are clean and free of debris.
- Never use a ladder on uneven surfaces and always make certain the ladder is on a clean, even and stable surface.
- Use the hand-off method – always have someone on the ground to hand items to/from the person on the ladder.
- Do not climb to the top or next to the top step of a ladder.
- Always have a co-worker hold the ladder steady.

### Stocking Merchandise

- Always remove cardboard and other packaging debris and place it on a cart, in a trash can or in another box to keep it off the floor and out of the path of customers and co-workers.
- When discarding trash, employees must never enter the dumpster. Items should be removed from the aisles as quickly as possible.
- Try to avoid staging merchandise in the aisles. If it is necessary, pay attention to customer traffic and make certain any items placed in the aisle are clearly visible to your co-workers and customers.
- When stocking, remember to avoid blocking a customer's access to merchandise and do your very best to offer assistance.

### Truck Day (for non-rolltainer stores)

The activities associated with Truck Day present a number of safety challenges. Please consider the following:

- Before the truck arrives, plan the activities and make certain the stockroom is arranged to eliminate any obstacles and to maximize available space.
- Check your equipment. Make certain the rollers are stable, all u-boats have the handles secure and two-wheelers are in good shape.
- When the truck arrives, stay inside the building. If someone must assist the driver in backing-up, he/she should always be in clear sight of the driver and always avoid blind spots.
- Stay clear when opening the trailer doors.
- Prepare your muscles and joints by stretching and warming up.
- Use teamwork on heavy and odd-shaped items.
- As you take merchandise to the sales floor, pay attention and watch out for customers.
- On warmer days, drink plenty of water or other fluids to help control fatigue.

## 2005 Dollar General Employee Handbook

### Flooring Surfaces

- Clean-up spills and remove foreign objects from the floor as soon as possible.
- If there are any uneven edges or seams on the tile or carpet, notify your supervisor immediately and warn others in the area of the hazard.
- Watch out for worn entry mats and make certain they are flat on the floor.

### Electrical Equipment

- Watch out for tripping hazards such as electrical cords and computer lines. Extension cords are for temporary use; warn others if an extension cord is on the floor.
- Use caution plugging and unplugging electrical cords and watch for frayed wires.
- Keep electrical panels clear and accessible.

### Personal Security

- If arriving before sunlight, or leaving after dark, always park in an area with good lighting.
- Before parking, drive around the parking lot and look for anything unusual.
- If you notice a person who could be viewed as a threat, leave the property and call your supervisor and advise them of the situation as soon as possible.
- Keep purses or valuable articles in a locked cabinet or drawer.
- Always remember, safety comes in larger numbers, so ask others to join you when leaving after normal hours.
- When taking bank deposits, be especially cautious and pay close attention to your surroundings.

**Do not give information regarding the security system including access codes to non-management employees or non-Dollar General employees. The violation of this policy may result in progressive counseling up to and including termination.**

### Fires/Emergency Evacuations

- Employees are **never** expected to fight a fire.
- Safe evacuation is your first and most important responsibility.
- When evacuating, make certain you assist any visitors who may be unaware of the evacuation routes.

## 2005 Dollar General Employee Handbook

- After evacuating the building, take immediate action to call the fire department.
- Cooperate with the fire department.
- Contact your supervisor as soon as possible.
- If you or any of your co-workers are disabled and may need assistance during an emergency evacuation, please notify your supervisor and/or the person(s) responsible for emergency response planning.
- The door must have an operable panic bar to prevent entry from the outside, but it must allow exit from the inside without a key.
- **Never block an exit or place any objects or merchandise in an aisle or path leading to an exit.**

## When an Accident Occurs

If an accident occurs, it is extremely important that it is reported **immediately** to your supervisor. It is equally important to report near-miss accidents to avoid future situations that could result in injuries or property damage.

Promptly reporting accidents allows Dollar General the opportunity to respond to your medical needs and to take action to prevent similar injuries or property damage.

The supervisor must complete an incident report and send the report to Risk Management. In addition, the supervisor must call the toll-free accident reporting hotline at 1-800-456-9446, ext. 5140. All serious injuries (requiring hospitalization) should be reported to Risk Management immediately.

## Emergency Evacuations

- Stay calm and evaluate the situation. In some situations, especially during severe weather, stay in the store rather than evacuate. The safety of employees and customers is the highest priority.
- Call the Police/Fire/Emergency Medical Services or appropriate authorities to report the situation.
- If an evacuation is necessary, look for the safest route from the store and verify the exit is not blocked or locked
- Evacuate the customers first. Ask them to leave any unpaid merchandise in the store.
- Provide assistance to disabled customers or employees.

## 2005 Dollar General Employee Handbook

- Secure the store
  - Check restrooms and other hidden areas to confirm the building is empty
  - Remove all money from the registers and place in the store safe - be sure to lock the safe
  - Lock the store, unless the fire department or other authorities may need access to respond to the emergency situation

If the evacuation is due to a fire, employees are never expected or required to fight a fire.

## Employee and Customer Injuries

See the SOP for specific procedures for handling employee and customer injuries.

## OSHA "Right to Know" Requirements

As a general rule, OSHA requires every employer to inform its employees about hazardous chemicals in the workplace by means of labels and material safety data sheets. Please read all labels of materials that you may not be familiar with and follow the directions to avoid injury.

Customers and employees may contact the **Material Safety Data Sheets (MSDS) Program at 1-877-855-8797** for information regarding the hazards of our products or for more detailed information than appears on the label.

## Food Handling Safety

Dollar General sells perishable foods (milk, bread, frozen food, etc.) where coolers are installed. Always follow safe food handling procedures as outlined in the Standard Operating Procedure Manual. Certain states and county health departments require that a store have one or more Certified Food Handlers on staff. Contact your supervisor regarding the need for a Certified Food Manager in your store.

Failure to follow safe food handling procedures could result in a food borne illness, fines, and prohibition to sell food. Policy violations regarding the safe handling of food will result in disciplinary action, which may include termination even for the first offense.

## 2005 Dollar General Employee Handbook

## Company Newsletter

Our Company's newsletter, *The Dollar General Story*, is published monthly for all employees of Dollar General and their families. It is one of the primary media through which we communicate announcements, news and employee features. It is published for your benefit, so you are encouraged to provide feedback. You may send suggestions via e-mail to: dgstorysuggestions@dollargeneral.com.

## Response to Media

To maintain consistent communication with the news media, only designated management employees have the authority to respond to media inquiries and requests. As an employee of Dollar General you are responsible for helping to maintain our Company's image and the integrity of information released to the media. No employees should respond to or initiate contact with the media. Doing so may result in disciplinary action up to and including termination for the employee. All media calls should be directed to the Media Relations Manager at the Store Support Center at (615) 855-5209.

## Clear Desk and Clear Screen Policy

### 1.0 General Overview

#### 1.1 Purpose of this Policy

This document defines Dollar General's policy for properly securing desktop computers and confidential paperwork.

#### 1.2 Audience

Employees of Dollar General's Store Support Center, Hong Kong, and Distribution Center locations are members of the intended audience for this document.

### 2.0 Policy

#### 2.1 General Requirements

Dollar General's employees shall act diligently to maintain the confidentiality and integrity of the company's information. All Store Support Center and Distribution Center employees shall adhere to the following requirements.

• Paperwork containing confidential information shall not be left unattended. It is to be secured in a secure/locked location (e.g., locked cabinet).

## 2005 Dollar General Employee Handbook

- Desktop computers shall not be left in a "logged in" state when they are unattended. They are to be locked (using "Control-Alt-Delete") or "logged off" when they are unattended. (Being outside of the immediate vicinity of the desktop computer or confidential paperwork for two or more hours shall be considered unattended.)

- Confidential information should be removed from printers and fax machines immediately.

## Computer Usage Policy

### 1. 0 General Overview

#### 1.1 Purpose of this Document

This document defines Dollar General's policy for using the company's computing systems.

#### 1.2 Audience

All users of Dollar General's computing systems are members of the intended audience for this document.

### 2.0 Policy

#### 2.1 General Requirements

Users of Dollar General's computing systems shall act diligently to maintain the confidentiality and integrity of the company's information. All Store Support Center and Distribution Center employees shall adhere to the requirements defined in this policy.

Users of Dollar General's computing systems are prohibited from using the company's computing systems to conduct any activity that is illegal under local, state, federal, or international law.

Users of Dollar General's computing systems are prohibited from using the company's computing systems to create, transmit, or store information or data that may be considered disruptive, defamatory, or offensive (e.g., offensive information or data concerning gender, disabilities, sexual orientation, pornography, religious beliefs or practices, national origin, political beliefs, threatening statements or content, etc.).

All data and information on Dollar General's computing system are subject to the company's Corporate Records Retention Policy.

## 2005 Dollar General Employee Handbook

### 2.2 Privacy and Confidentiality

Users of Dollar General's computing systems shall have no expectation of personal privacy with regard to any information that is created, transmitted, received, or stored on the company's computing systems. All information on Dollar General's computing systems is the sole property of the company.

Dollar General reserves the right to monitor equipment, systems, network traffic, and all information created, transmitted, received, and stored on the company's computing systems.

Users of Dollar General's computing systems are prohibited from disclosing any and all of the company's proprietary and/or confidential information to any third-party, except where expressly permitted in writing.

Users are required to maintain the highest professional and ethical standards, as outlined in Dollar General's Code of Business Conduct and Ethics, while using the company's computing systems.

### 2.3 Password Policy

Users of Dollar General's computing systems shall adhere to the following Password Policy.

- Do not share Dollar General passwords with anyone for any reason
- Change passwords every 90 days at a minimum
- New passwords should be different than the previous five passwords used
- Always use strong passwords
- Use the following rules to create strong passwords
  - Use a minimum of seven characters
  - Use a combination of letters and numbers
  - Use both upper and lower case characters (e.g., a-z, A-Z)
  - Special characters may also be used (e.g., *@!)
  - Do not use:
    - Words that can be found in the dictionary (English or foreign)
    - Slang words
    - Names or titles
    - Personal information (e.g., birthdays, social security numbers)
    - Word or number patterns (e.g., aaabbb1, 123abc1)
- Do not use the "Remember Password" feature of applications (e.g., Outlook, Eudora, web sites)
- Example of a strong password – lk5Lm25i

## 2005 Dollar General Employee Handbook

### 2.4 Internet Usage Policy

Dollar General permits some of its computer users to access the Internet. Dollar General's Systems Administration and IT Security departments monitor the use of Internet access. Users who access the Internet shall adhere to the following requirements.

- The use of company-provided Internet access is intended exclusively for management-approved activities

- Intentionally accessing Internet sites with pornographic content is prohibited

- Users are prohibited from using the Internet to create, transmit, receive, or store the company's confidential information, except where expressly permitted in writing by an authorized Dollar General Employee (e.g., a System Design Document that has been authorized and signed by an IT Director)

- Users of Dollar General's computing systems are prohibited from using the company's computing systems to create, transmit, or store information or data that may be considered disruptive, defamatory, or offensive (e.g., offensive information or data concerning gender, disabilities, sexual orientation, pornography, religious beliefs or practices, national origin, political beliefs, threatening statements or content, etc.).

- Users are required to maintain the highest professional and ethical standards, as outlined in Dollar General's Code of Business Conduct and Ethics, while using the company's computing systems

### 2.5 Email Usage Policy

Users of Dollar General's email systems shall have no expectation of personal privacy with regard to any information that is created, transmitted, received, or stored on the company's email systems. All information on Dollar General's email systems is the sole property of the company.

Dollar General reserves the right to monitor equipment, systems, network traffic, and all information created, transmitted, received, and stored on the company's email systems.

Users are required to maintain the highest professional and ethical standards, as outlined in Dollar General's Code of Business Conduct and Ethics, while using the company's email systems.

Users of Dollar General's email systems shall adhere to the following requirements.

## 2005 Dollar General Employee Handbook

- Do not open email attachments of any kind from an unknown sender.
- Viruses are commonly transmitted through emails; therefore, Dollar General requires that users of the email system take special precautions with regards to email messages that appear to be suspicious – users are to DELETE (without opening) email messages that appear to be suspicious.
- SPAM email messages are email messages that originate outside of Dollar General's network. They are normally advertisements or "chain emails." SPAM messages use a great deal of email space and overload the company's email systems. Furthermore, SPAM messages are frequently harmful, and they may contain viruses. Dollar General requires that users of the email system take special precautions with regards to SPAM email messages – users are to DELETE (without opening) email messages that appear to be SPAM.
- Users of Dollar General's email systems are prohibited from using the company's email systems to create, transmit, or store information or data that may be considered disruptive, defamatory, or offensive (e.g., offensive information or data concerning gender, disabilities, sexual orientation, pornography, religious beliefs or practices, national origin, political beliefs, threatening statements or content, etc.).
- Users are prohibited from using the email systems to create, transmit, receive, or store the company's confidential information, except where expressly permitted in writing by an authorized Dollar General Employee (e.g., a System Design Document that has been authorized by an IT Director).
- Email messages and files are intended to be short-lived. As company-owned records, they are subject to Dollar General's Records Retention Policy. They should be purged on a regular and timely basis. Email messages and files that require long-term storage should be removed from the email system and retained in an alternate storage area.
- All persons are prohibited from accessing email mailboxes without being formally authorized to do so. This authorization may be in the form of an information-access form, a production change form, or other formal, documented approval form. Systems Administrators are prohibited from accessing email mailboxes, except when there is a legitimate business need for such activity.

## 2005 Dollar General Employee Handbook

### 2.6 Computer Equipment and Software Policy

#### 2.6.1 General Requirements

Dollar General's computing systems are intended to be used for business purposes. As such, users are not permitted to modify the configurations of the company-owned computers without formal approval from an Information Systems representative. Users shall adhere to the following requirements.

- Do not modify, tamper with, or add hardware to company-owned computers
- Do not modify or tamper with software on company-owned computers
- Do not modify the operating systems of company-owned computers
- Do not install unauthorized software on company-owned computers
- Do not use wireless technology on company-owned computers

#### 2.6.2 Privacy and Confidentiality

Users of Dollar General's computing systems shall have no expectation of personal privacy with regard to any information that is created, transmitted, received, or stored on the company's computing systems. All information on Dollar General's computing systems is the sole property of the company.

Dollar General reserves the right to monitor equipment, systems, network traffic, and all information created, transmitted, received, and stored on the company's computing systems.

#### 2.6.3 Exceptions

Members of Dollar General's Technical Services department are responsible for testing, installing, and supporting new and existing applications and operating systems. Members of this department are permitted to deviate from the requirements defined in Section 2.6.1 when there is a business reason for doing so.

### 2.7 Remote Access Policy

Dollar General provides some users with the ability to connect to the company's network from locations outside of the company-owned locations using "Remote Access Services."

## 2005 Dollar General Employee Handbook

### 2.7.1 General Requirements
Users of the company's Remote Access Services shall adhere to the following requirements.

- User are prohibited from simultaneously connect to Dollar General's network and any other network.
- Users are to ensure that the anti-virus software on their computers is actively running and up-to-date
- Users are prohibited from configuring connections for "split-tunneling" or "dual-homing"
- All computers that connect to the company's networking using Remote Access Services must meet the following minimum requirements:
  - Microsoft Windows 2000 or XP operating system
  - Microsoft Internet Explorer ("IE") version 5.5 with Service Pack 1 or higher
  - Active and up-to-date anti-virus protection
- Users shall not install Dollar General's software on any computer (personal or Dollar General–provided) without proper authorization from a member of the Technical Services department

Organizations or individuals who wish to implement non-standard remote access solutions to the Dollar General network must obtain formal approval from the Sr. Director of Technical Services or the Vice President of Information Systems.

### 2.7.2 Exceptions
Members of Dollar General's PCNS, Network Administration and IT Security groups are responsible for testing, installing, and supporting new and existing remote access systems. Members of these groups are permitted to deviate from the defined policy when there is a business reason for doing so.

### 2.7.3 Definitions
Cable Modem – Cable companies such as Comcast provide Internet access over Cable TV coaxial cable. A cable modem accepts this coaxial cable and can receive data from the Internet.

Dial-in Modem – A device that connects computers to each other for sending communications via the telephone lines.

Dual Homing – Having a connection to more than one network at the same time.

## 2005 Dollar General Employee Handbook

DSL – Digital Subscriber Line (DSL) is a form of high-speed Internet access that works over standard phone lines.

Frame Relay – A form of high-speed access normally used to connect different companies together.

ISDN – Integrated Services Digital Network is an older version of high-speed dialup. Unlike DSL and cable modems, ISDN still requires a phone call like a Dial-in Modem.

Remote Access – Any access to Dollar General's corporate network from a remote location.

Split-tunneling – Simultaneous direct access to a non-Dollar General network (such as the Internet, or a home network) while connected into Dollar General's corporate network via a VPN tunnel.

VPN – Virtual Private Network (VPN) is a method for accessing a remote network via "tunneling" through the Internet.

### 2.8 Laptop Computer Policy

#### 2.8.1 General Requirements

Dollar General provides some users with laptop computers. In addition to the requirements defined in the company's Computer Usage Policy, Laptop users must also adhere to the following requirements.

- Laptop computers can easily be stolen or damaged. Laptop users are to protect the company's Laptop computers from theft and damage by securing them in a locked location when they are not in use.
- Laptop computers are to be transported in a protective case (e.g., a Laptop bag)
- Laptop users are to adhere to the following guidelines for proper Laptop care
  - Maintain direct supervision of the Laptop at all times
  - Do not check the Laptop as "luggage" at the airport
  - Do not place drinks or food in close proximity to the Laptop
  - When the Laptop is turned on, it must be on a flat, solid surface to enable proper airflow. The Laptop will overheat without proper airflow.
  - The Laptop user's hands should be clean to avoid damaging the keyboard
  - Laptop users should backup important data on a CD, floppy disk, or network drive to avoid data loss

## 2005 Dollar General Employee Handbook

- Laptop users are not permitted to connect company-owned laptops to broadband internet services in offsite locations
  - Connecting to a hotel's broadband internet service, for example, forces the user's laptop to join the hotel's insecure network, thereby compromising the security of the laptop and the data stored on it
- Laptop users are not permitted to connect company-owned laptops to wireless internet services in offsite locations

### 2.8.2 Exceptions
Members of the Technical Services department's systems administration and security teams are permitted to make connections to offsite broadband and wireless internet services due to their specialized technical functions.

## 2.9 Computer Equipment Sign-Out Policy

### 2.9.1 General Requirements
All persons are required to obtain formal approval before removing a computer or computer-related equipment from a Dollar General facility. The following process is to be used to obtain the approval.

- The Requestor is to complete a Computer Equipment Sign-Out Form (this form is available on DGNet under Security Policies, All Employees)
- The Requestor is to specify the length of time he or she expects to have the equipment checked out
  - Periods of more than two weeks require approval from the Sr. Director of Technical Services
- This form is to be emailed to the "Helpdesk" email mailbox.
- If approved, the Helpdesk will send the Requestor an email stating that the request has been approved.
- The Helpdesk is to retain a copy of the request form for auditing purposes.
- Equipment is only to be check-out during normal business hours (Monday through Friday, 8AM – 5PM)

### 2.9.2 Exceptions
Laptop users are not required to check out their Laptop computers.

## 2005 Dollar General Employee Handbook

Members of the Technical Services department provide support for the company's computing systems. Providing this support often makes it necessary for these persons to perform their duties outside of normal business hours. Members of this department may check out computer equipment outside of normal business hours when there is a business reason for doing so. These persons are required to complete a "Computer Equipment Sign-Out Form" and have a member of the Technical Services Management Team sign the form.

### 2.10 Web-based Remote Control Policy

No person is to allow an external party to initiate or conduct a web-based remote control session with a computer on Dollar General's network without first obtaining formal authorization from the Network Administration and IT Security departments. A web-based remote control session is one in which someone uses a computer outside of Dollar General's network to take control of a computer that is on Dollar General's network.

Formal authorization should be granted using the Web-based Remote Control Authorization form, which is located on DGNet under the Security Policies link. The following list provides examples of products that provide web-enabled remote control functionality: WebEx, GoToMyPC, PCAnywhere, and Timbuktu.

### 2.11 Instant Messaging Policy

No person is permitted to use Instant Messaging from a Dollar General-owned network without first obtaining formal authorization from the IT Security department. Formal authorization should be granted using the Instant Messaging Authorization form, which is located on DGNet under the Security Policies link. The following list provides examples of products that provide Instant Messaging functionality: ICQ, AOL Instant Messenger, Microsoft Netmeeting, MSN Messenger, Yahoo Messenger, Odigo, eShare, PeopleLink, Pager, PAL, PowWow, IMICI, and PHT.

### 3.0 Enforcement

Any person found to have violated this policy is subject to disciplinary action, up to and including termination of employment.

## Wireless Network Policy

### 1. 0 General Overview

### 1.1 Purpose of this Document

This document defines Dollar General's policy regarding wireless networks, such as 802.11, Bluetooth, and handheld devices, that connect to the company's network.

## 2005 Dollar General Employee Handbook

### 1.2 Audience
Dollar General's employees, partners, and other affiliates are members of the intended audience for this document.

## 2.0 Policy

### 2.1 Company Locations
Dollar General prohibits the unauthorized use or installation of wireless technology in any location hosting one of the company's wired or wireless networks. This restriction applies to production, test, and development networks that connect to the company's network. Explicit authorization for wireless networks must be obtained through the Senior Director of Technical Services and/or the IT Security Manager.

Wireless networks enable multiple computers to communicate through airwaves instead of through a physical medium, such as an Ethernet cable. Since wireless networks communicate via airwaves, they effectively present the logical equivalent of an Ethernet network port to other wireless-capable devices within their "range" of communication.

Much of the wireless communication technology that is currently available fails to provide adequate protection from security standpoint. Very few vendors offer wireless technologies that are secure enough to be used in an environment hosting sensitive information. Furthermore, even when the appropriate vendors and technologies are utilized, an improper configuration will result in an insecure wireless network.

### 2.2 Offsite Locations
Much of the wireless communication technology that is currently available fails to provide adequate protection from security standpoint. Dollar General prohibits the unauthorized use of wireless technology on any device that makes a connection to a Dollar General network.

Examples of prohibited use of wireless technology are listed below.

- Users of company-provided laptops and other computing devices are not to add a wireless network card or other wireless device to those laptops or other computing devices. Further, devices that are approved for installation are to be installed by Dollar General-approved installers.
- The built-in wireless network cards in company-provided computers are to be disabled at all times.

- Users are to disable the wireless networks cards in the non-Dollar General owned computers that are used to connect to the company's remote access services when connecting to those services.
- Users who have obtained proper authorization for using wireless communication devices are to disable those devices when they are not actively in use.

## 3.0 Enforcement

Any person found to have violated this policy is subject to disciplinary action, up to and including termination of employment.

Dollar General's employees and affiliates shall report any known violations of this policy to the IT Security Department or the Vice President of Information Systems immediately.

# Computer Data Center Access Policy

## 1.0 General Overview

### 1.1 Purpose of this Policy

This policy defines Dollar General's requirement for controlling access to Dollar General's Data Centers in the Store Support Center, Distribution Centers, and Hong Kong offices.

### 1.2 Audience

Dollar General's employees and affiliates are members of the intended audience for this document.

## 2.0 Policy

### 2.1 Authorization

Dollar General's Data Centers house the company's computer and telecommunications equipment. The company's Data Centers are protected by electronic card systems and physical locks.

### 2.1.1 Store Support Center

In order to access the Data Center, a person must be formally granted access to the Data Center (access granted via the electronic card system's access list or a physical key), or the person must be escorted into the Data Center by an authorized person.

## 2005 Dollar General Employee Handbook

Only the Vice President of Information Systems and the Sr. Director of Technical Services are permitted to approve electronic card or key access to the Data Center.

Vendors, contractors, consultants, and other third-parties are to be escorted into the Data Center by an authorized Dollar General Employee. Third-parties are not to be left unattended in the Data Center.

### 2.1.2 Distribution Centers
In order to access a Data Center in a Distribution Center, a person must be formally granted access to the Data Center (access granted via the electronic card system's access list or a physical key), or the person must be escorted into the Data Center by an authorized person.

Only the Distribution Center Managers are permitted to approve electronic card or key access to the Data Center in the Distribution Centers.
Vendors, contractors, consultants, and other third-parties are to be escorted into the Data Center by an authorized Dollar General Employee. Third-parties are not to be left unattended in the Data Center.

### 2.1.3 Hong Kong Office
In order to access the Data Center, a person must be formally granted access to the Data Center (access granted via the electronic card system's access list or a physical key), or the person must be escorted into the Data Center by an authorized person.

Only a Director and the Sr. Hong Kong MIS Analyst are permitted to approve electronic card or key access to the Data Center.

Vendors, contractors, consultants, and other third-parties are to be escorted into the Data Center by an authorized Dollar General Employee. Third-parties are not to be left unattended in the Data Center.

## 2.2 General Requirements
The doors to the company's Data Centers are not to be kept open or unlocked.

Vendors, contractors, consultants, and other third-parties are to be escorted into the Data Centers by an authorized Dollar General Employee. Third-parties are not to be left unattended in a Data Center.

## 2005 Dollar General Employee Handbook

Authorized Information Systems personnel and members of Dollar General's Executive Management Team are permitted to give tours of the Data Centers to third-parties, provided that the third-parties are not left unattended in a Data Center.

### 3.0 Enforcement

Any person found to have violated this policy is subject to disciplinary action, up to and including termination of employment.

# Telephone and Voicemail Policy
## 1.0 General Overview

### 1.1 Purpose of this Policy

This policy defines Dollar General's requirement for telephone and voicemail usage.

### 1.2 Audience

Dollar General's employees and affiliates are members of the intended audience for this document.

### 2.0 Policy

Users of Dollar General's telephone and voicemail systems are required to maintain the highest professional and ethical standards, as outlined in Dollar General's Code of Business Conduct and Ethics, while using the company's computing systems

### 2.1 Telephone Usage Policy

The following standards apply to all Telephone users:

- Unless otherwise authorized, users of Dollar General's telephone systems are prohibited from recording communication, including in person and telephonic communication, with other Dollar General employees without the prior knowledge and consent of all parties to the communication.

- The Company's telephones are intended to be used for Company business. However, incidental and occasional use may occur if it does not generate a direct cost to the Company. Placing a long-distance telephone call does create a direct cost because the Company pays a charge for the call. Employees needing to make personal long distance calls should use their personal credit card or other personal, long distance billing methods as may be appropriate.

## 2005 Dollar General Employee Handbook

- Employees are prohibited from changing telephone service or carriers, long-distance service, or adding features such as caller ID.
- Any communications by employees via the Voicemail system that may constitute verbal abuse, slander or defamation or that may be considered offensive, harassing, vulgar, obscene, or threatening is strictly prohibited. Offensive content would include, but not be limited to sexual comments or images, racial slurs, gender-specific comments, or any comments or language that would offend someone on the basis of his or her age, race, color, religion, sex (including pregnancy, child birth and related conditions), national origin, disability, citizenship status or any other characteristic protected by law.

### 2.2 Voicemail Usage Policy

The following standards apply to all Voicemail users:

- Do not share Dollar General passwords with anyone for any reason
- Messages should be retrieved two times a day (at a minimum), preferably at the start and end of each day
- When sending a group message, state at the beginning of the message which groups are included in the distribution list
- All users should record an "out of office" message when they are away from the office for one or more days
- Utilize distribution lists to schedule meetings
- Any communications by employees via the Voicemail system that may constitute verbal abuse, slander or defamation or that may be considered offensive, harassing, vulgar, obscene, or threatening is strictly prohibited. Offensive content would include, but not be limited to sexual comments or images, racial slurs, gender-specific comments, or any comments or language that would offend someone on the basis of his or her age, race, color, religion, sex (including pregnancy, child birth and related conditions), national origin, disability, citizenship status or any other characteristic protected by law.
- To facilitate the Company's business, an officer of the Company may allow a customer or vendor limited access to the appropriate Voicemail system, provided the user agrees to be bound by this policy.
- Employees are reminded that they should have no expectation of personal privacy with regard to any information or messages created, transmitted, received or stored on the Voicemail system. Employees using the Voicemail system for personal purposes do so at their own risk, with no expectation of privacy.

## 2005 Dollar General Employee Handbook

- Information and messages on the Company Voicemail system are to be available only to authorized employees. Employees are not permitted to use pass codes not issued to the individual employee or not known to the Company system administrator. Employees are not permitted to use another employee's code or retrieve information stored on the system unless authorized to do so as part of their jobs.

- Approval of an officer of the Company is required to establish Voicemail group broadcast boxes.

- It is a violation of Company policy for any employee, including a system administrator or supervisor, to access the Voicemail mailboxes of other employees without legitimate business purpose and specific authorization from an officer of the Company.

- Any employee who fails to comply with any provision of this voice communications policy is subject to immediate disciplinary action up to and including termination, even for a first offense.

### 3.0 Enforcement

Any person found to have violated this policy is subject to disciplinary action, up to and including termination of employment.

## High Level Security Policy
### 1.0 General Overview

#### 1.1 Purpose of this Policy

This policy defines Dollar General's High Level Security Policy.

#### 1.2 High Level Security Policy Defined

Dollar General's High Level Security Policy (HLSP) describes the company's general organizational principles and requirements as they relate to the security and protection of the company's information assets. The HLSP is also intended to demonstrate Executive Management's commitment to supporting and enforcing information security.

Dollar General publishes detailed security policies in addition to the HLSP. Detailed security policies provide support for the HLSP, and are written to address specific issues, practices, and technologies.

#### 1.3 Scope

All of Dollar General's employees are required to comply with the High Level Security Policy and all other security policies, standards, and procedures.

## 2005 Dollar General Employee Handbook

### 2.0 Policy

### 2.1 Responsibilities and Expectations

#### 2.1.1 All Employees of Dollar General
Dollar General recognizes that securing the company's information assets is the responsibility of all of the company's employees, and that the effectiveness of security controls is dependent upon people. As such, Dollar General requires its employees to comply with the company's security policies, standards, and procedures.

Moreover, Dollar General requires that its employees help ensure that others are acting in compliance with security policies, standards, and procedures, and to report any known or suspected security violations to the VP of Information Systems or the IT Security Manager immediately.

Dollar General's employees must act diligently to prevent security breaches. Employees of Dollar General shall not participate in any activity that has the potential of compromising the security of the company's information assets.

Threats to the security of computers are pervasive. Computer viruses and other forms of malicious software are very serious threats to the security of Dollar General's information assets.

Users of Dollar General's computing systems must take care to prevent computer viruses and other forms of malicious software from entering the computing network by following all applicable security policies and procedures, including, but not limited to, policies for the appropriate use of email, remote access connections, and the company's internet access.

#### 2.1.2 Executive Management
Dollar General's Executive Management team supports the company's information security initiatives and requires that the company's employees comply with all applicable security policies, standards, and procedures. Furthermore, the Executive Management team will enforce the disciplinary process when security violations occur.

#### 2.1.3 IT Security
Dollar General's IT Security (ITS) department is responsible for ensuring that the company's security objectives are met. ITS shall investigate reported security violations and report the resulting information to the Executive Management team.

## 2005 Dollar General Employee Handbook

### 2.1.4 System and Application Administrators
*Appropriate Use of Advanced Permissions*
Dollar General's systems and applications administrators have advanced permissions to access the company's information assets. These administrators are highly trusted employees of the company and, as such, they are required to take special care to ensure that information assets remain secure.

Systems and applications administrators are not to abuse or misuse their advanced privileges. For example, an administrator's advanced "technical" privileges may enable him or her to access the company's confidential information (e.g., Human Resources data); this does not imply that the administrator has the authority or right to access that information. Rather, the administrators are prohibited from accessing this confidential information for any purposes that are not directly related to their job functions.

Any employee or affiliate of the company knowing of or suspecting a violation of this policy must report such information to the VP of Information Systems or the IT Security Manager immediately. Any suspected violations of this policy will be investigated by the IT Security department and reported to Executive Management.

*General Requirements*
Dollar General's systems and applications administrators shall strive to protect the company's information assets from harm and inappropriate disclosure. Administrators shall strive to implement secure, stable systems and applications. Administrators shall not grant any person access to confidential information unless that person has the express permission to do so. Administrators shall take care to prevent the company's information systems and applications (including firewalls and network devices) from being exploited by malicious activity, including viruses and other malicious software.

### 2.2 Legislative, Regulatory, and Contractual Compliance
Dollar General is committed to meeting all prescribed security requirements that result from applicable laws, regulations, and contractual agreements. All of the company's employees shall strive to comply with all such security requirements.

### 2.3 Confidential Information
All employees of Dollar General shall strive to ensure that the company's business information is not compromised or released without proper authorization. The proper policies and procedures for accessing and releasing information must be followed.

## OUR VALUES

Building our Company with persons:

- who are committed to integrity;
- whose maturity is evident in:
  -- self-assessment;
  -- sense of humor;
  -- enthusiastic pursuit of mission;
- who demonstrate respect for the dignity, diversity and potential of others;
- who extend themselves for the DG family while crediting others for success.

Promoting leadership that results in team creativity, prompt, effective decision-making, and tough expense management.

Emphasizing strengths and learning from our mistakes.

Rewarding the results of hard work and striving to make it safe, simple, smart and fun.

Seeking true success that involves mutual gain.



**DOLLAR GENERAL CORPORATION**

*OUR MISSION*

# Serving Others

For Customers...A Better Life
For Shareholders...A Superior Return
For Employees...Respect and Opportunity

*OUR STRATEGY*

A customer-driven distributor of consumable basics.

*OUR NICHE*

Profitable small stores delivering convenience and value

**Dollar General Retail Employee Handbook**

DG-HR-5003R    04/05



DEFENDANT'S
EXHIBIT
5
K. Love

# Dollar General Personnel Action Form

*(See reverse side for complete instructions.)*

PLEASE PRINT IN BLACK INK, AND ONLY COMPLETE SECTIONS THAT ARE CHANGING.

Social Security Number: 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
*(required for processing)*

Employee Name: Kinera Love

Effective Date of Change: 10/24/05

Store Stamp/ Dept. Name:
Dollar General Store # 8665
1655 S College St
Auburn, AL 36832-6698

## ☐ Personal Changes

New Marital Status: ☐ Married    ☐ Single

Name Change: *(must attach a copy of Social Security Card showing the new legal name – required for processing)*
Previous Name: _____    New Name: _____

New Address: Street Address: _____    City: _____
State: _____    Zip: _____    New Home Phone Number: (___ ___) ___ ___ ___ – ___ ___ ___ ___

## ☐ Job Changes    ☐ Promotion    ☐ Demotion    ☐ Lateral Transfer    ☐ Pay Increase

Dept./Store/Cost Center: From: _____ To: _____    Rate of Pay: From: _____ To: _____
*Per hour or annual salary    Per hour or annual salary*

Job Code: From: _____ To: _____    Shift Code: From: _____ To: _____
*(Must change if promotion or demotion occurred)*

Position/Title: From: _____
To: _____    Supervisor: _____
Supervisor: _____

Job Status: ☐ Full Time    ☐ Part Time    ☐ DG Temporary

## Reason for Separation or Leave of Absence

Termination Date: 10/24/05    Leave Begin Date: __/__/__
Last Day Worked: 10/14/05    Leave End Date: __/__/__

### Resign
( ) 01    Dissatisfied with employment
( ) 70    Failed to return to work from leave
( ) 06    Health reasons
( ) 04    Moved from area
( ) 05    Personal reasons
( ) 02    Pursue another job
( ) 71    Resigned during investigation
( ) 07    Retirement *(see instructions on reverse side for explanation)*
( ) 03    Return to school
( ) 08A   Without notice – 3 consecutive work days, no call–no show
( ) 08B   Without notice – walked off job during scheduled work hours
( ) 08    Without notification *(comments required below)*

### Discharge
*(See instructions on reverse side prior to discharge.)*
( ) 14    Excessive tardiness or absenteeism
( ) 40    Failure to meet hiring/employment criteria *(comments required below)*
( ) 41    Falsifying records
(X) 42    Inappropriate conduct *(comments required below)*
( ) 13    Insubordination *(comments required below)*
( ) 43    Mishandling or failure to protect company funds or assets (cash shortages, borrowing money from Company, etc.)
( ) 10    Not meeting performance standards
( ) 44    Unauthorized removal or use of company property
(X) 46    Violation of company policy/procedure *(comments required below)*
( ) 47    Violation of safety rules

### Leave of Absence
*NOTIFY HR/HRIS FOR LEAVE APPROVAL.*
( ) 27    Extended Medical Leave
( ) 24    Family Medical Leave (FMLA)
( ) 20    Medical Leave (not FMLA eligible)
( ) 22    Military Leave
( ) 28    Pending Investigation
( ) 21    Personal Leave
*NOTIFY RISK MANAGEMENT FOR W/C LEAVE APPROVAL.*
( ) 23    Workers' Compensation

### Miscellaneous
( ) 15    Death
( ) 16    Elimination of position
( ) 60    Hired but never worked
( ) 19    Lack of work
( ) 18A   Store closing – natural disaster (tornado, fire, etc.)
( ) 18    Store closing – other
( ) 17    Other *(comments required below)*

Comments: failed to Re Interviewed in a Store interess investigation. Refused to Speak with the Asset Protection Supervisor, on the Issues that were in Question

I certify that all the information above is correct.
X _Kinera Love_
Employee Signature    Date

I certify that all the information above is correct.
X _____  10/24/05
Manager/Supervisor Signature    Date

DGP-P-14  0702

Store changes send to: HRIS at Mission Ridge    DCs send to: DC Human Resources Dept.
Corporate and Field Management send to: Compensation Dept. at Mission Ridge