IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

RECEIVED
2008 FEB -3  P 10: 31

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA.

| | | |
|---|---|---|
| KINERA LOVE, | ) | |
|     Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: |
| v. | ) | 03-06cv1147-MHT-SRW |
| | ) | |
| DOLLAR GENERAL CORPORATION, | ) | |
|   d/b/a DOLGENCORP, | ) | |
|     Defendant. | ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## WITH EVIDENTIARY MATERIALS

Lateefah Muhammad (*Ala. Code* MUH001)
ATTORNEY FOR PLAINTIFF

Lateefah Muhammad, Attorney At Law, P.C.
Post Office Box 1096
Tuskegee, Alabama 36087
(334) 727-1997 telephone and facsimile
lateefahmuhammad@aol.com

TABLE OF CONTENTS

I.   *INTRODUCTION*     .     .     .     .     .     .     .     .     *1*

II.  *PLAINTIFF'S OPPOSING STATEMENT TO DEFENDANT'S*     *2*
     *UNDISPUTED  FACTS*

III. *ARGUMENT* .     .     .     .     .     .     .     .     .     8

     A. Summary Judgment Standard     .     .     .     .     .     8

     B.  Defendant's Claim that Plaintiff's Failure to .     11
         Promote Claim Fails as a Matter of Law

         1.  Prima Facie Case     .     .     .     .     .     11

         2.  Pretext for Discrimination     .     .     .     13

     C.  Defendant's Claim of Entitlement to Summary     .     19
         Judgment on the Plaintiff's Title VII Retaliatory
         Discharge Claim

         1.  Protected Activity     .     .     .     .     .     20

         2.  Suffered Adverse Employment Action     .     .     23

         3.  Causal Link Between the Protected Activity     26
             And the Adverse Employment Action

IV.  CONCLUSION     .     .     .     .     .     .     .     .     30

## TABLE OF CASES

### - A -

*Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 662 (9th Cir. 2002), p. 11.

### - B -

*Bass v. Board of County Commr's*, 242 F.3d 996 (11th Cir. 2001), pp. 14, 16, 23.

*Belour v. Adapt of Illinois, Inc.*, 460 F.Supp.2d 867, 873 (N.D. Ill. 2006), p. 9.

### - C -

*Carter v. Three Springs Residential Treatment*, 132 F.3d 635 (11th Cir. 1998), pp. 10, 11, 18, 19.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548 (1986), p. 10.

*Chapman v. AI Transport*, 229 F.2d 1012 (11th Cir. 2000), p. 14.

*Conneen v. MBNA America Bank, N.A.*, 334 F.3d 318, 325 fn. 9 (3d Cir. 2003), p. 9.

### - F -

*Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322 (11th Cir. 1999), p. 20.

### - G -

*Goldsmith v. City of Atmore*, 996 F.2d 1155 (11th Cir. 1993), p. 27.

*Gupta v. Florida Bd. Of Regents*, 212 F.3d 571 (11th Cir. 2000), pp. 20, 26, 27, 28.

### - H -

*Harbison v. Prestige Group, Inc.*, 2001 WL 395786 *6 (S. D. Ind. 2001), p. 8.

- L -

*Little v. United Technologies*, 103 F.3d 956 (11th Cir. 1997), p. 20.

- M -

*Mayfield v. Patterson Pump Co.*, 101 F.3d 1371 (11th Cir 1996), p. 10.

*Miles v. M.N.C. Corp.*, 750 F.2d 867 (11th Cir. 1985), p. 15.

*Morrison v. Booth*, 763 F.2d 1366 (11th Cir. 1985), p. 17.

- R -

*Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192 (11th Cir. 1997), 27.

*Reeves v. Sanderson Plumbing Products, Inc.*, 197 F.3d 688, 693 (5th Cir. 1999), pp. 8, 15.

*Robinson v. PPG Indus. Inc.*, 23 F.3d 1159, 1162 (7th Cir. 1994), p. 9.

- S -

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993), p. 8

*Sun v. Bd. of Trs. of Univ. of Illinois,* 473 F.3d 799, 812 (7th Cir. 2007), p. 17.

- W -

*Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1119 (8th Cir. 2006), p. 9.

*Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994), p. 11.

*Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir. 1998), p. 26.

*Williams v. City of New York*, 2006 WL 2668211 (E.D. N.Y. 2006), p. 10.

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

RECEIVED

2008 FEB -4  P 12: 01

KINERA LOVE,                          )
    Plaintiff,                        )
                                      )  CIVIL ACTION NO.:
v.                                    )  03-06cv1147-MHT-SRW
                                      )
DOLLAR GENERAL CORPORATION,           )
   d/b/a DOLGENCORP,                  )
    Defendant.                        )

## PLAINTIFF'S BRIEF IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## WITH EVIDENTIARY MATERIALS

The Plaintiff, by and through her attorney of record, files this Brief in Opposition to the Defendant's Motion for Summary Judgment **(Doc. #14)**, and requests that this Honorable Court deny the Defendant's Motion.  Included with this Opposition Brief are Plaintiff's Objections to Defendant's Evidence, shown attached as **Exhibit N**.  The Plaintiff submits the following for the Court's consideration:

## I. INTRODUCTION

The Plaintiff, Kinera Love ("Love"), an African American female, disagrees with the Defendant, Dolgencorp, Inc., when it states that this case should not have been filed.  In fact, it had to be filed in order for the Plaintiff to get the just consideration by this Court that she should have been given by her former employer, Dolgencorp, Inc., the Defendant ("Dolgencorp").  The Plaintiff accepts the Defendant's name correction without any contention.

The Plaintiff filed this action under Title VII of the Civil Rights Act of 1964, as amended, alleging racial discrimination as well as a retaliatory charge.    She claims that she was not promoted because of her race and was subsequently terminated in retaliation for exercising her civil rights by filing a complaint against her employer for discriminating against her when she was not promoted to the position that she was in line to receive.    It will be a travesty against the American system of justice for the Defendant's Motion for Summary Judgment to be granted.    The Plaintiff contends that there are material facts, evidence and issues in dispute that negate the success of the Defendant's motion.

## II. PLAINTIFF'S OPPOSING STATEMENT TO DEFENDANT'S UNDISPUTED FACTS

1.    The Plaintiff admits and concurs with the Defendant's Statement of Undisputed Facts up to a point.    Particularly, she agrees with Numbers 1 through 7 as shown.    In Number 8, however, the Plaintiff shows the Court that the facts are disputed as to who promoted Donna Tally ("Tally"), a White female.    Accordingly, Charles McDonald ("McDonald"), a White male, is known to be the district manager at the time this promotion occurred, and is known to be the one who promoted Tally.    *See* Love Depo. at 44; *see also* **Exhibit A – Affidavit and Testimony of Plaintiff Kinera Love, p. 1, ¶3 and p. 2, ¶10; and, Exhibit B – Affidavit and Testimony of Tiffany Cross, p. 3, ¶4.4.**

2

2. There is also contention for what retail management experience Tally had prior to her promotion as assistant manager of the Auburn store. *Id*. **at Exh. B, pp. 2-3, ¶4.2-4.** In addition, even after Tally was promoted, Love was required by Jeff Jennings, store manager, to train her. *Id*. **at Exhibit A, p. 3, ¶13** and *Id*. **at Exh. B, p. 3, ¶4.2-4.** If, as Love states, Tally was more qualified than she, why did Jeff have Love to train Tally to be the assistant manager? *See* **Exh. A, p. 3, ¶13.**

3. It is an undisputed fact that the Plaintiff had previous retail management experience prior to her hire at Dolgencorp, Inc. She worked as a lead cashier at Taco Bell who supervised other cashiers (*see* **Love Depo. pp. 115-117** and **Doc. #16-3, p. 14. d.),** and she trained for more than two months at Dolgencorp prior to her request to be considered for the assistant manager's position. She was also in line for the position when she transferred from the Opelika store to the Auburn store in accord with established practices. **Exh. A, p. 3, ¶13** and *see* **Exh. B, p. 3, ¶4.4.** The facts show that employees of Dolgencorp are trained for advancement, if they desire it, as soon as they become employed. That they advance from cashier to third key clerk or manager to assistant manager to manager. **Exh. B, p. 1, ¶2** and **Defendant's Evidentiary Submission number 9 – Employee Handbook, p. 42 (Doc #16).**

3

4.    Love does admit that Tally received the promotion because she is McDonald's niece; however, she also admits that Tally received the promotion because of her race. **Exh. A, p. 2, ¶10.**

5.    Love denies that she knows Candice Harrison ("Harrison"), a White female, only had conversations with her regarding work-related matters and never told her it was okay for her to take a candy bar without paying for it. **Love Depo. p. 50, lines 11-23, p. 51, lines 6-23, p. 52, lines 1-7.**

6.    Love disputes that she has ever asked anyone at Dolgencorp for any unauthorized discounts, particularly Tally. **Love Depo. p. 54, lines 11-23.** While she cannot dispute whether Harrison or Tally made some report about her to Dolgencorp management, she disputes that what they claim she committed ever occurred. **Exh. A, p. 2, ¶4, Love Depo. p. 53, lines 8-9 and p. 54, lines 11-23.**

7.    Love disputes that she was ever told anything about an investigation regarding statements made by Harrison and Tally. **Love Depo. p. 55, line 4.**

8.    Love admits that she met with Jack Traywick ("Traywick"), a White male, and Johnnie Todd ("Todd"), an African American female; however, she maintains that Traywick said nothing about an investigation to her. **Love Depo. p. 55, lines 15-17 and p. 57, lines 15-17.**

4

9.    Love admits requesting a witness or an attorney to be present during the meeting with Traywick and Todd.    She denies being told, during that meeting, that she was suspended because she refused to participate in an investigation.    **Love Depo. p. 57, lines 3-5.    See also Exh. A, p. 4, ¶21.**    Love was told by Traywick to give him the store keys and when she did not readily give them to him, he snatched them from her hand, took the store keys from the ring and threw her keys back at her.    He then told her to "leave the premises right now."    **Love Depo. p. 57, lines 7-11.**

10.    Love admits that she was terminated on 24 October 2005 and to signing the personnel action form as shown in Defendant's Exhibit 8 to Document 16; however, she denies that she agrees with the reason for her termination.    The Plaintiff disputes that she was aware of the reason she was being terminated.    That she did not know until the date she was terminated.    She contends that she did not refuse to participate in a store investigation because she did not know a store investigation was underway until she was terminated.    She stated that she refused to discuss her personal business with Traywick without having a witness or an attorney present.    She contends that the only "issues that were in question" were matters regarding her personal life that had nothing to do with Dollar General.    **Love Depo. p. 71, lines 13-17.**

5

11.    An undated, handwritten, signed statement by Johnnie
Todd, produced on 30 January 2008, by Dolgencorp in response to
the Plaintiff's Request for Production, indicates a recount of
what Todd said happened on 12 October 2005 and on 15 October
2005.   Her statement of what occurred on 15 October 2005 concurs
with what Love stated regarding the personal business discussion.
Todd's statement does not show an investigation was discussed
with Love.  And, there is no reference in Todd's statement about
the reason Love was suspended during that meeting between
Traywick, Todd and Love. **See Exh. C – Statement of Johnnie D.
Todd, Bates No. 0072-0073.**

12.    It is disputed that the statement of Todd referred to
here in paragraph 11 is in agreement with the declaration she
gave on 17 October 2007 and shown as Exhibit 6 with the
Defendant's Evidentiary Submission in Support of Defendant's
Motion for Summary Judgment **(Doc. #16-3, pp. 19-20).**  She did not
indicate in the undated statement that Traywick gave a reason for
Love's suspension. **See Exh. C, Bates No. 0073.**

13.    It is further disputed that Love only registered her
telephone complaint with Dolgencorp's Employee Response Center
("ERC") about being overlooked for a position that was given to
McDonald's niece.   Love contends that she reported both her
discrimination complaint to ERC at the same time she registered
her complaint that she was overlooked for the position of
assistant manager and that McDonald's niece was given the

6

promotion instead. In addition, despite the fact that the Incident Details produced by Dolgencorp in response to Plaintiff's Request for Production **(Exh. D – Incident Details, Bates No. 0015)** shows Love was told she would receive a response within five business days from the making of the complaints, it is disputed that Love ever received a response. **Exh. A, p. 2, ¶9.** Love also disputes that "ASTARKS," shown to be the Owner Rep, took her complaint when she registered it. **Exh. A, p. 5, ¶23.**

14.   The Plaintiff disputes that an email copy, which was produced by the Defendant in response to Plaintiff's Request for Production, of three emails sent between McDonald to Burley Nelson ("Nelson") on Monday, 17 October 2005 between 7:30 a.m. and 8:18 a.m., indicates any reason for her suspended status. **Exh. E, Bates No. 0067** and **Exh. F, Bates No. 0068.**   She also disputes that another Incident Details, produced by Dolgencorp in response to Plaintiff's Request for Production, shows any reason for her suspended status. **Exh. G, Bates No. 0016.**   She further disputes that each Incident Details report produced in response to Plaintiff's Request for Production because she called ERC on 14 October 2005 to inquire about her suspension and the representative with whom she spoke could not tell her anything about the suspension. **Exhibit A, p. 4, ¶20.**

15.   The Plaintiff contends that she has suffered tremendously as a result of being terminated from Dolgencorp. She did not work for over a year, thus the loss in income affected

7

her.   She also disputes that her health has suffered as well.
That she has been diagnosed with two mental conditions for which
she is receiving treatment and medication. **Exhibit A, p. 6-7, ¶29
and Exhibits H, I, J and K.**

## III. ARGUMENT

A.   Summary Judgment Standard

The Defendant has set out the basic standard in favor of a
ruling for its Motion for Summary Judgment; however, there are
some key components the Defendant left unstated.   The Plaintiff
is moved to present additional approaches from various courts on
this critical area of the practice of law.

The United States Supreme Court has expressly stated that
any favoritism toward employment discrimination cases should be
abandoned. ***Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S.
133, 148, 120 S.Ct. 2097, 2109 (2000),** in holding "[w]e have
reiterated that trial courts should not 'treat discrimination
differently from other ultimate questions of fact.'," *quoting St.
Mary's Honor Center v. Hicks*, **509 U.S. 502, 524, 113 S.Ct. 2742,
(1993).** The courts have gradually fallen in line. ***See, e.g.*,
*Harbison v. Prestige Group, Inc.*, 2001 WL 395786 *6 (S. D. Ind.
2001),** which held "[a]lthough intent and credibility are critical
issues in employment discrimination cases, there is no special
rule of civil procedure that applies only to them."

Notwithstanding the above cases and points of law, many
courts correctly continue to view summary judgment cautiously in

employment discrimination cases because such cases rest almost
entirely on judgments about motive, intent and credibility—
inherently factual issues. For example, in *Conneen v. MBNA Am.
Bank, N.A.*, **334 F.3d 318, 325 fn. 9 (3d Cir. 2003)**, the court
ruled "[i]n employment discrimination cases, the summary judgment
standard is 'applied with added rigor' because 'intent and
credibility are crucial issues.'," quoting *Robinson v. PPG Indus.
Inc.*, **23 F.3d 1159, 1162 (7th Cir. 1994)**.

In *Wallace v. DTG Operations, Inc.*, **442 F.3d 1112, 1117-18
(8th Cir. 2006)**, the Eighth Circuit stated: "We have stated that
summary judgment should be used sparingly in the context of
employment discrimination and/or retaliation cases where direct
evidence of intent is often difficult or impossible to obtain.
[A]lthough Rule 56 contains only one standard, we must exercise
particular caution when examining the factual question of intent
to ensure that we dutifully extend all justifiable inferences in
favor of the non-moving party." (citations omitted).

In *Belour v. Adapt of Ill., Inc.*, **460 F.Supp.2d 867, 873
(N.D. Ill. 2006)**, the court cited "[w]eighing evidence and making
credibility decisions are **jury** functions, and it is not
appropriate for a judge to assume those functions when deciding a
summary judgment motion. Accordingly, we apply the summary
judgment standard with special scrutiny to employment
discrimination cases, where issues of intent and credibility
often are paramount.") **(citation omitted)(emphasis added)**.

In addition, "[t]he Second Circuit has cautioned that the standard for summary judgment in employment discrimination cases must be applied with 'added rigor' and 'sparingly' because intent and credibility are often at issue. In addition, the burden of proof in such cases is often described as *de minimis*. Since there are frequently questions of fact as to whether the reasons proffered by employers for actions taken against employees are credible or merely pretexts for discrimination, summary judgment is often inappropriate in employment discrimination cases.") **(citations omitted).** *Williams v. City of New York,* **2006 WL 2668211 (E.D. N.Y. 2006).**

**In the Eleventh Circuit, the Court** reviews "the granting of a motion for summary judgment *de novo,* using the same legal standard as the district court." **citing** *Mayfield v. Patterson Pump Co.,* **101 F.3d 1371, 1374 (11th Cir. 1996) in** *Carter v. Three Springs Res. Treatment*, **132 F.3d 635, 641 (11th Cir. 1998).** "Summary judgment is proper if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* **477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986) (quoting Fed.R.Civ.P. 56(c)).** In reviewing the record, we are mindful that the evidence must be viewed in the light most favorable to the nonmoving party." (citations omitted) *Id.*

## B. Defendant's claim that Plaintiff's failure to promote claim fails as a matter of law

The Defendant puts forth this argument with two basic points: 1) that the Plaintiff does not have a *prima facie* case of discrimination; and, 2) that the Plaintiff has no evidence that the Defendant's actions to retaliate against and terminate her were not pretexual.

### 1. *Prima Facie* Case

There is evidence to show that the Plaintiff does have a *prima facie* case of discrimination. Since the Defendant concedes that the first and third *prima facie* elements have been met, the Plaintiff will focus on the two elements that the Defendant claims cannot be satisfied.

In *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994), the court ruled that "[t]he requisite degree of proof necessary to establish a *prima facie* case for Title VII […] claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." The court in *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 659-60 (9th Cir. 2002) emphasized the low threshold for a *prima facie* case and holding that even an employee's self-assessment is relevant evidence (emphasis added).

The Eleventh Circuit has said the first step in showing a *prima facie* case is to determine the minimum qualifications for the job of [assistant manager]. *See Carter, supra,* at 643.

According to a draft Dollar General job description, dated June 2005, produced by Dolgencorp in response to the Plaintiff's Request for Production, the minimum qualifications for the assistant manager's position are "high school diploma or equivalent, one to two years experience within a grocery store operation or equivalent, and six months supervisory experience preferred and attainment of required local and state food handling management certifications." **Exh. L., Bates No. 0013-0014.**

The Plaintiff contends that she met the minimum qualifications in that she received a high school diploma or equivalent and had over a year of experience as a lead cashier at Taco Bell during which she supervised other cashiers. **See Doc. #16-3, p. 14, d.**

In addition, to the minimum qualifications, the Plaintiff was well-trained by a Dolgencorp store manager, Julie Morrison, for the third key manager position.  Such training is what put her in line for the promotion to the assistant manager position. **See Exh. A, p. 3, ¶12 and Exh. B, p. 2, ¶4.4.**

Unlike the Plaintiff, Tally did not meet the minimum qualifications because she did not have the requisite one to two years experience within a grocery store operation or equivalent or the six months of supervisory experience.  The Defendant produced nothing to show that Tally had any retail management

experience as is claimed in McDonald's Declaration.   ***See instead***
**Exh. B, p. 2-3, ¶4.**

In addition, the Plaintiff was obviously more qualified for
the position because she was required to train Tally when Tally
was promoted. ***Id.*** and ***See* Exh. A, p. 3, ¶12-13.**   Because the
Plaintiff was more qualified than Tally, and because Tally is a
non-minority who was less qualified and promoted to the position
of assistant manager over the Plaintiff, the Plaintiff satisfies
the second and fourth elements of the *prima facie* requirement to
show a case of discriminatory failure to promote, thus satisfying
all of the requirements.

## 2.   Pretext for Discrimination

Having met the burden of the *prima facie* requirements, the
Plaintiff contends that the evidence shows that the Defendant's
so-called legitimate, nondiscriminatory reason for not promoting
the Plaintiff to the assistant manager's position was a pretext
to discriminate against her.   ***Carter, supra,* at 644.**   The
Plaintiff has shown by the evidence that a Dolgencorp employee is
promoted according to their success in training. ***See* Exh. A, p.
3, ¶12 and Exh. B, p. 2, ¶4.4.**

When the Plaintiff, an African American female, was
initially hired, she was trained as a cashier. **Love Depo. p. 27,
lines 11-13.**   Then, with further training, she was promoted to
the position of third key manager. **Love Depo. p. 30, lines 14-**

13

**16.** The evidence shows that an employee at Dolgencorp can get promoted to the position of assistant manager through the established practices of the company by being successfully promoted from cashier to third key manager to assistant manager. **Exh. B, p. 1, ¶2.** and **Defendant's Evidentiary Submission number 9 – Employee Handbook, p. 42 (Doc #16).**

In **Bass v. Board of County Com'rs, 242 F.3d 996 (11th Cir. 2001),** the Eleventh Circuit Court cited that it reaffirmed that a subjective reason for an employer's action … can be as legitimate as any other reason. **See Chapman v. AI Transport, 229 F.3d 1012, 1033 (11th Cir. 2000) (en banc).** **"However,"** it stated, "in order for a subjective reason to constitute a legally sufficient, legitimate, nondiscriminatory reason, the defendant must articulate 'a clear and reasonably specific factual basis upon which it based its subjective opinion.' **Id. at 1006. (emphasis added).**

The initial proffered reason Dolgencorp gave to the Plaintiff for not promoting her to the position of assistant manager was that "you're not ready." The Plaintiff contends that no clear and reasonably specific factual basis upon which Dolgencorp based its subjective opinion was given. While there is nothing inherently wrong with allowing decision makers to base decisions on subjective criteria, the Eleventh Circuit has found that "subjective evaluations involving white supervisors provide

14

a ready mechanism for racial discrimination." **See Miles v. M.N.C. Corp., 750 F.2d 867 (11th Cir. 1985).**

Then, the next proffered reason Dolgencorp gave to the Plaintiff for not promoting her to the position of assistant manager was its statement that Tally had prior retail managerial experience, therefore, she was promoted to the assistant manager's position. Again, the Plaintiff contends that no clear and reasonably specific factual basis upon which Dolgencorp based its subjective opinion was given. Matter of fact, in a statement by one of Tally's relatives who knows about her work history, a declarant indicates that Tally has never worked as a manager in a video store, as claimed by McDonald. **Exh. B, p. 2, ¶4.2.** The Courts have found that "the factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." **Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097 (2000).**

In addition, Dolgencorp did not produce one scienter of proof of the alleged "prior retail managerial" experience of Tally in its response to the Plaintiff's request for production when asked. **See** Doc. #21, attach. #2, p. 4, **Request for Production No. 3 and Response.** Neither did it produce a copy of

Tally's personnel file as requested, nor was any statement clarifying what was meant when the Plaintiff was told "you're not ready."

The Plaintiff contends that evidence requested of Dolgencorp would have provided a clear and reasonably specific factual basis for the subjective opinion given by the Defendant. **Doc #21, attach #2 at p. 1.; *see also* Exh. A, p. 5, ¶24.** However, the Defendant failed to produce it, which leads a rational thinking mind to accept that no such basis exists.

Because Dolgencorp did not offer a specific factual basis upon which it based its subjective opinion or did not produce the requested evidence that would substantiate its actions, it failed to meet its burden of showing that it had a nondiscriminatory reason for not promoting the Plaintiff to the assistant manager's position. For that reason alone, this Court must deny the Defendant's motion. **See *Bass* at 1006.**

In the instance the Court rules that Dolgencorp has met its burden of showing a legally sufficient, legitimate, nondiscriminatory reason for taking the action it did, then the Plaintiff must show sufficient evidence to create a genuine issue of fact that Dolgencorp's nondiscriminatory reason was a pretext for discrimination.

It is indisputable that the Plaintiff was required to train Tally once Tally was promoted to the assistant manager's position. It is also indisputable that Tally's promotion was

16

outside of the normal and established course of business at Dolgencorp. **Exh. B, p. 1, ¶2** and **Defendant's Evidentiary Submission number 9 - Employee Handbook, p. 42 (Doc #16)**.

The Plaintiff contends that established practices of promoting employees at Dolgencorp were not followed when the promotion of Tally to the assistant manager's position occurred.

The Plaintiff further contends that no Dolgencorp employee had skipped from being a cashier to an assistant manager prior to Tally, and especially not without having been trained as a third key manager first. The evidence shows that it takes at least two months of training to become an assistant manager. **Exh. B, p. 3, ¶4.** The Plaintiff contends that she had the requisite training and the skills to perform the work because she was doing the work of the assistant manager without having the position while she was serving as third key manager. **Love Depo, p. 37, lines 6-18.** The Eleventh Circuit has held that it is suspicious circumstantial evidence of discrimination where it is alleged that established rules were bent or broken to give a non-minority applicant an edge in the hiring process. **See Morrison v. Booth, 763 F.2d 1366, 1373-74 (11th Cir. 1985).**

In addition, "evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." **Sun v. Bd. of Trs. of Univ. of Illinois, 473 F.3d 799, 812 (7th Cir. 2007).**

17

Additional pretextual evidence includes other discriminating incidents by McDonald involving other persons in the protected group. According to a former Dolgencorp manager, Tiffany Cross:

> **"Besides this occasion of discriminating against Kinera, Charles has shown me he is prejudice against Blacks on other occasions. On one occasion in spring of 2005, a Black lady came into the Opelika store on the Marvin Parkway where I was working and asked Charles if we were hiring. He told her "No." That afternoon of the same day, he hired two white females, one of whom was a white girl named Amy.**
>
> **On another occasion, in the summer of 2005, Charles made a comment to me about another employee of Dolgencorp when were working at the Opelika store on Second Avenue, Wendy Whitlock, a white female. He said that she would not make it any further in Dollar General because she is married to a 'F_____g N_____r.' Wendy had been hired to work at Dolgencorp before I was, but could not get a promotion because of her Black husband. She was stuck in the position of third key clerk until I made a complaint to the Home Office to Jeff Weaver within days after my husband and I heard his (Charles') racist comment. The outcome was that Wendy finally got her well-deserved promotion to assistant manager by Charles, about two or three months later, and transferred to the Midway Plaza store. Later, she was transferred to the Marvin Parkway store as manager."**

### Exh. B, pp. 3-4, ¶5.

The Eleventh Circuit has ruled that instances of alleged disparate treatment could be relevant to a trier of fact in evaluating [an employer's] motives when considering issues of pretext. *See Carter* at 645.

The Plaintiff avers that her work performance on the job was very good. Further, she did not take leave days except when she was scheduled to be off. The Plaintiff was often called in

to work even on her off days whenever she was needed at the store. Tally, on the other hand, was on leave at least once every week. **Exh. A, p. 3, ¶11.** Considering the Plaintiff's superior qualifications over Tally's, **n**o reasonable person, in the exercise of impartial judgment, could have chosen Tally over the Plaintiff for the position in question.

Based upon the circumstantial evidence surrounding this issue, the Court should conclude that the alleged legitimate, nondiscriminatory reason for promoting Tally to the assistant manager's position was a pretext to discrimination against the Plaintiff. Given the foregoing, the Plaintiff contends that she has produced evidence that, if believed, could be found to cast doubt on the credibility of the reasons stated by Dolgencorp for promoting Tally instead of the Plaintiff. **See Carter** at 645.

## C.    Defendant's claim of entitlement to summary judgment on the Plaintiff's Title VII retaliatory discharge claim

In addition to prohibiting employers from discriminating on the basis of race, Title VII makes it unlawful:

> for an employer to discriminate against any of his employees or applicants for employment, . . . because he has opposed any practice made an unlawful employment practice by this subchapter [of Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [of Title VII].

42 U.S.C. § 2000e-3(a).

19

In order to establish a *prima facie* case of retaliation, the plaintiff must show: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal link between her protected activity and the adverse employment action. ***See Gupta v. Florida Bd. Of Regents,*** **212 F.3d 571, 587 (11th Cir. 2000);** ***Farley v. Nationwide Mut. Ins.,*** **197 F.3d 1322, 1336 (11th Cir. 1999);** ***Little v. United Technologies,*** **103 F.3d 956, 959 (11th Cir. 1997).**

### 1.  Protected Activity

The Plaintiff contends that she engaged in protected activity when she registered her complaint of racial discrimination with Dolgencorp's ERC regarding Charles overlooking her for the position of assistant manager of the Auburn store.   She also complained about the fact that he promoted his niece, Tally, into the assistant manager's position. The Plaintiff contends that she called the toll-free telephone number which is located in the employee handbook and on her paycheck stub. **Exh. A, p. 1, ¶3.    See Defendant's Evidentiary Submission number 9 - Employee Handbook, p. 9 (Doc #16).**

The Defendant opposes the contention that the Plaintiff complained of racial discrimination.   However, the Plaintiff takes the position that it only stands to reason that her report included race because ERC followed up with an investigation as it states it will do on in the employee's handbook, after an employee makes a report, and also because there was no

20

requirement to report the hiring of a relative as there is to report "any harassment or discrimination by anyone at Dollar General…" **See Defendant's Evidentiary Submission number 9 – Employee Handbook, pp. 7-9, 47-48 (Doc #16).** The Plaintiff was just following the requirements with the hope that something would be done about her complaint.

Despite the fact that the Plaintiff contends she made the complaint, Dolgencorp has not produced any document that shows the racial discrimination claim was made.  The Defendant has produced a document that indicates the Plaintiff made a call to ERC on 30 September 2005, complaining about being overlooked for a position by Charles McDonald and that he gave it to his niece. **Exh. D – Incident Details, dated 30 September 2005.** The Plaintiff does not remember the date she called; however, she does remember speaking with an employee by the name of "Wendy" who was in the ERC office.  Contrary to that name, the Incident Details form shows an owner representative named "ASTARKS" on the Plaintiff's report. *Id.* Whoever took the complaint obviously acted upon it to initiate an investigation of "harassment or discrimination by anyone at Dollar General," because an investigation did occur on or about 4 October 2005.

According to the Plaintiff, Traywick came to the Auburn store to investigate the complaint.  She does not remember the date but she recalls "it was right after I called ERC the first time." **Love Depo. p. 138, lines 13-21.** The Plaintiff testified

that Traywick asked her why did she call ERC, he told her that he was there to do an investigation and that he was going to ask her some questions to get her statement. **Id. at 139, lines 9-12.**

The Plaintiff's testimony continued:

So I was telling him how they looked over me and everything for the position and stuff. And then he asked me who got – who – is the position still available and stuff like that. I am like, "No, Charles McDonald's niece, Donna Taffy got the position." And I was just telling him that I wasn't being treated fairly and it was just discrimination – they were doing discrimination towards me. And that is why I called ERC and made a complaint.

**Q: (BY MS. MUHAMMAD) Who else was in the store with you at the time?**

**A: No one but me and Jack, Jack Traywick.**

**Q: Did he record that conversation that you all had?**

**A: I'm not for sure. He had a recorder with him, but he didn't present it in my presence.**

**Q: He didn't tell you that he was recording it?**

**A: Huh-uh.**

**Q: Did you see him making any notes?**

**A: He did have a notepad with him.**

**Q: And you saw him writing down—**

**A: Yes.**

**Q: -- on the pad? Was this meeting with Jack Traywick that you are testifying about now prior to the one where he and Johnnie Todd came to you?**

**A: Came back?**

**Q: Right.**

**A: It was before – before they came the second time. The second time, that is when he brought the witness – Johnnie Todd with him. The first time he came by himself.**

**Q: During that conversation, did he talk about any complaints being made against you?**

**A: No. He just talked – he asked me about the complaint that I made when I called ERC.**

**Id. at 139, lines 13-23, 140, lines 1-23, 141, lines 1-15.**

Despite the fact that Dolgencorp did investigate the Plaintiff's complaint, no report of the investigation was ever produced of it to the Plaintiff as she was told there would be. No production was sent to the Plaintiff's lawyer in response to a request for production. It appears the discrimination report just disappeared into thin air! The filing of a racial discrimination complaint over the telephone may be in dispute; however, it is clearly indisputable evidence that a subsequent complaint of discrimination was made during the investigation by Traywick at the store when he interviewed Love. **Id.** It is equally indisputable that a record of that investigation was made. **Id.** Thus, the first prong is satisfied. **See Bass at 1014.**

### 2. Suffered Adverse Employment Action

With respect to the second prong, Love alleges that she suffered at least three adverse employment actions: she was suspended from her employment on 14 October 2005; she was terminated from her employment on 24 October 2005; and, she was falsely accused of misconduct on 6 December 2005 at a hearing for

23

unemployment compensation. An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." **Gupta, 212 F.3d at 587.**

After her termination, the Plaintiff was without income or compensation for over a year. **Exh. A, p. 6, ¶29.** The Plaintiff was without income after the Defendant won the unemployment compensation decision appeal that had awarded her funds. **Id.** There was never a hearing regarding the alleged misconduct at which she could have faced her accusers. The Plaintiff contends that her alleged misconduct was a pretext for Dolgencorp's retaliatory conduct towards her.    There were no complaints against her during the investigation of her racial discrimination complaint on 4 October 2005; however, the same date of her investigative interview with Jack Traywick, 4 October 2005, is the date that one of the alleged complaints by a Dolgencorp employee is dated, accusing the Plaintiff of some misconduct she was supposed to have committed one unknown night before the complaint was filed, and by an employee whom the Plaintiff hardly knew. **Love Depo, p. 51, lines 15-16.** On that same date, 4 October 2005, while attending a manager's meeting in Phenix City, Alabama, which Traywick joined after he had completed investigating the Plaintiff's discrimination complaint, another

24

Dolgencorp employee heard Traywick tell Jeff Jennings and Charles McDonald "they need to get rid of Kinera because she could cause them some trouble." **Exh. B, p. 2, ¶3.**

Then, on 14 October 2005, the same date of the meeting between the Plaintiff, Traywick and Todd, during which the Plaintiff asked to have a witness or an attorney present, the second complaint is dated by another Dolgencorp employee alleging misconduct that allegedly took place two months earlier in one instance and a month earlier in another instance. Each alleged incident supposedly involved only the accused and the accuser in each instance. However, the Plaintiff contends that neither accusation was made known to her until after she was terminated. The Plaintiff was never informed that she was being investigated for any alleged misconduct and that she was never allowed the opportunity to defend her good name and character. She categorically denies that either incident occurred and that each incident only came forward after her **racial** discrimination complaint was made. **Exh. A, p. 2, ¶4-7.** The Plaintiff contends that prior to her discrimination complaint to ERC, she had not experienced any problems on her job; she worked hard to help the company by working even on her off days, when she was needed.

In addition, the Plaintiff argues that the adverse employment actions have even affected her health conditions. She is now under the care of a mental health specialist as a direct result of the trauma she experienced at Dolgencorp the weeks

25

before and during her termination process. **See Exh. A, p. 6, ¶29, Exhibits H, I, J and K.**

The Eleventh Circuit has ruled that when [these] actions are considered collectively, the total weight of them constitutes an adverse employment action. **See Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998)** ("It is enough to conclude, as we do, that the actions about which Wideman complains considered collectively are sufficient to constitute prohibited discrimination. We need not and do not decide whether anything less than the totality of the alleged reprisals would be sufficient."). The Plaintiff argues that she has met the burden of proof of the second prong, having suffered the effects of the foregoing adverse employment actions.

### 3. Causal Link Between the Protected Activity and the Adverse Employment Actions

The last prong brings us to the question of whether there is enough evidence to create a genuine issue of material fact as to the causal connection between Love's participation in a protected activity and the adverse employment actions. "To establish a causal connection, a plaintiff must show that the decision makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." **Gupta, 212 F.3d at 590 (citation and internal marks omitted).** It is not enough for the plaintiff to show that someone in the organization knew of the protected expression;

26

instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression. **Raney v. Vinson Guard Service, Inc.,** 120 F.3d 1192, 1197 (11th Cir. 1997). This awareness, however, may be established by circumstantial evidence. **See Goldsmith v. City of Atmore,** 996 F.2d 1155, 1163 (11th Cir. 1993). Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated. **See Gupta,** 212 F.3d at 590.

The Plaintiff argues that the two were **wholly** related in her case. She filed her discrimination complaint on 30 September 2005. Four days later, on 4 October 2005, an investigation ensues. On 4 October 2005, false accusations surface against her. On 4 October 2005, the Plaintiff learns of a conversation in which Charles McDonald, the person who terminated her, is heard discussing "getting rid of her." On 12 October 2005, another investigation ensues, this time **against** the Plaintiff without her knowledge. During the period between 4 October 2005 and 12 October 2005, the Plaintiff has no contact from ERC to report its findings to her. On 14 October 2005, an alleged investigation is taking place with the Plaintiff without her knowledge. She is called into a meeting in which only personal matters are being discussed with her. She requests to have a witness or an attorney present. On 14 October 2005, Jack Traywick suspends the Plaintiff from her employment for unknown reasons. On 21 October 2005, the Plaintiff calls Jeff Jennings about the reason for

suspension and he does not know.   On 22 October 2005, the Plaintiff calls ERC about the reason for suspension and no one there knows; the Plaintiff is referred back to her store manager. On 24 October 2005, Jennings called the Plaintiff to the store, asked her to clock in and come into the back office to see McDonald.   On 24 October 2005, Charles McDonald, who knew about the protected activity and the adverse employment actions from the beginning, terminated the Plaintiff from her employment with Dolgencorp, giving some lame-duck reason that would not hold water even in an old-fashioned tin tub!

The close temporal proximity between filing of the ERC complaint and the adverse actions is sufficient in this case to satisfy the third prong of the prima facie case of retaliation. *See generally Gupta*, **212 F.3d 590**. Thus, Love established a prima facie case of discrimination.

The burden now shifts to the Defendant to set forth a legitimate, non-retaliatory reason for its actions. Dolgencorp's only reason for suspending and terminating Love is because she allegedly refused to participate in an internal investigation, an investigation that was based upon false accusations made by two Dolgencorp employees, whose motives and credibility should have been questioned, and based upon a myriad of circumstances.

First, Traywick and Todd called Love into the office to confer with her. Secondly, they never told her the purpose of the conference. Thirdly, they only discussed her personal matters and

28

nothing about Dolgencorp, particularly, nothing about any misconduct on her part. Love later learned that the initial alleged misconduct was supposed to be about drinks and chips. Next, she was told it was about stealing candy bars, then next, it was about discounts on pajamas, iced tea **("… I don't even drink tea. Love Depo. p. 167, line 15.)** and milk.

The Plaintiff argues that she did not refuse to participate in an investigation because she was never told that an investigation was underway. Love merely asked for a witness or an attorney to be present in the meeting because of the questions that were being asked about her personal affairs. Despite the fact that McDonald told the state agent at the unemployment compensation hearing that Traywick gave Love seven days to get an attorney to be present in another meeting with them, the Plaintiff argues that no such directive was ever given her before she was **told**, not asked, to leave the store, after having her keys snatched from her and then thrown back to her. **See Exh. L, p. 1, ¶2 under Findings.**

Based upon the weight of the totality of these circumstances and the evidence presented, the Plaintiff can show that her retaliatory charge is a valid claim, and that it also serves as the basis for this Court to deny the Defendant's Motion for Summary Judgment to allow a jury of her peers to weigh in on resolving this dispute.

## IV. CONCLUSION

The Plaintiff can show the trier of fact that there are genuine issues of material facts in dispute in this case as shown throughout this Plaintiff's Brief in Opposition to the Defendant's Motion for Summary Judgment. And, when the totality of the circumstances is considered, the Plaintiff prays that this Honorable Court will find that the Defendant's Motion for Summary Judgment is due to be denied.

Respectfully submitted,

Lateefah Muhammad (*Ala. Code* MUH001)
ATTORNEY FOR PLAINTIFF

Lateefah Muhammad, Attorney At Law, P.C.
Post Office Box 1096
Tuskegee, Alabama 36087
(334) 727-1997 telephone and facsimile
lateefahmuhammad@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiff's Brief in Opposition to the Defendant's Motion for Summary to Ryan Aday, Esquire, attorney for Defendant, by sending it to OGLETREE DEAKINS, P.C., One Federal Place, Suite 1000, 1819 Fifth Avenue North, Birmingham, Alabama 35203, in the United States Mail, postage prepaid and by facsimile on this 3rd day of February, 2008.

Lateefah Muhammad

30

EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| **KINERA LOVE,** | ) |
| **Plaintiff,** | ) |
| | )     **CASE NO.:** |
| **v.** | )   **03-06cv1147-MHT-SRW** |
| | ) |
| **DOLLAR GENERAL CORPORATION,** | ) |
| **d/b/a DOLGENCORP, INC.,** | ) |
| **Defendant.** | ) |

| | |
|---|---|
| **STATE OF ALABAMA** | ) |
| | ) |
| **MACON COUNTY** | ) |

### AFFIDAVIT AND TESTIMONY PLAINTIFF OF KINERA LOVE

The Affiant declares the following:

1. I am the Plaintiff in the above case. The facts stated in this affidavit are known to me of my own personal knowledge or, if stated on information and belief, I believe them to be true. If called upon to testify to the matters in this affidavit, I could and would competently do so;

2. I am an African American female who was employed by Dolgencorp, Inc. on March 3, 2005, until I was terminated on October 24, 2005. I was the only African American employed in the Auburn store of Dolgencorp, Inc. at the time of my employment;

3. I was terminated in retaliation of my complaint against Charles McDonald, a white male, for racially discriminating against me. I called ERC and reported that he had overlooked me and discriminated against me to promote his niece, Donna Tally, a white female, to the position of assistant manager in the Auburn Dolgencorp store. I felt Charles discriminated against me because

I am Black. I called the toll-free number that was on my paycheck stub and in the employee handbook to report my complaint;

4. I never was involved in any criminal and/or illegal activity on the job at Dolgencorp, Inc. on any date. There was never anything said to me of any criminal and/or illegal activity on my part by any store personnel until after I was terminated and during the examiner's hearing for unemployment compensation;

5. I was suspended on October 14, 2005, without knowing why I was being suspended;

6. I was never given the opportunity to face my accusers to defend my good name and character while I was employed at Dolgencorp, Inc. or since my termination;

7. Several inconsistent statements have been made regarding the alleged activities by various persons employed by Dolgencorp, Inc. The allegations only came forward **after** I made my complaint of discrimination regarding Charles failure to promote me to the assistant manager position;

8. I know the allegations are without any bases in truth, and believe they were used by Dolgencorp only to justify my termination;

9. I met with Jack Traywick on or about 4 October 2005, and gave him a detailed, verbal statement I was never given a report of findings regarding my complaint of discrimination, and about three weeks after my discrimination complaint, I was terminated;

10. Charles promoted Donna Tally and not Jeff Jennings, also a white male. Charles did so because Donna is White and because

2

she is his niece, despite the company policy against close relatives working in the same store and against a close relative working under the direct supervision of a close relative;

11. Charles knew that Donna was less qualified than I was, especially since she had only been on the job for about two weeks when she received the promotion. In addition, he knew my work performance was very good. I never took off other than when I was scheduled. I came to work whenever I was needed to help out at the store, and especially since I was in line to receive the promotion;

12. To become an assistant manager requires at least two months of training. I was trained for over two months by Dolgencorp manager, Julie Morrison;

13. If Donna were more qualified than I was, why did Jeff have me to train her to be assistant manager? Donna did not have any of the experience that I had for the position of assistant manager;

14. I have reviewed some documents that Dolgencorp provided to my attorney. In one of the documents, Jeff stated that I told him that I "was fine with (Donna being promoted) as long as it was good for the store." I never made that statement. I would not have complained about being overlooked and discriminated against if I had made a statement such as that;

15. Jeff never sat down to talk with me about why I did not get the promotion. There was no discussion after the decision to promote Donna; he simply told me that Charles said I was not

3

ready, despite the fact that I had trained under Julie Morrison and was doing the work of the assistant manager from the day I began working in the Auburn store;

16.    Further, Jeff did not participate in training Donna; I was the only person who trained Donna after she was promoted;

17.    The actual duties and responsibilities of the third key clerk are very much the same as those of the assistant manager. The primary difference is the pay; the assistant manager position pays more;

18.    In another document produced by Dolgencorp to my attorney, I read a statement made by Johnnie Todd, in which she stated that Jack Trawick was polite to me during the interview. When the interview began, he was polite.  However, the moment I told him I needed a witness or an attorney present, his politeness changed to hostility;

19.    Charles stated to the examiner in my unemployment compensation hearing that I had been given seven days to get an attorney, but no such directive was given to me by Jack Trawick or Johnnie Todd before Jack ordered me suspended and to leave the premises before he called the law to remove me;

20.    Jack did not tell me why I was being suspended; that is why I called ERC on 21 October 2005, in an attempt to find out why, and no one there could tell me a reason;

21.    I did not find out why I was suspended from my job at Dolgencorp until the day I was terminated.

22.    I signed the Dollar General Personnel Action Form on the

4

date of my termination under duress.  Charles told me I had to sign it even though I told him I did not agree with the reason given for terminating me;

23.  In two other documents, called "Incident Details," they show the "owner rep" who took my complaint was "ASTARKS".  The person to whom I spoke identified herself as "Wendy" when I called to register my discrimination complaint;

24.  In reviewing the discovery documents that Dolgencorp provided to my lawyer, I saw no record of many of the requests she made.  Particularly, there is no record of  Donna's application for employment which would show her qualifications and experience, there is no record of training by Julie Morrison, who was the store manager of the Opelika store at the time, there is no report of findings regarding the discrimination complaint, (i.e., a copy of my statement as given to during the investigation to Jack Trawick), there is  no  evidence     of  any  surveillance  tape, videotape and/or audio tape from the monitoring system in the store where I worked, especially on the dates during the alleged illegal activity, during the investigation of the discrimination complaint and during the investigation that preceded my alleged misconduct, there is no evidence of the small tablet I used to keep notes of various events (I wasn't allow to take with me when I was suspended. and there is no record of a statement made by Charles   as   district   manager   regarding   the   discrimination complaint;

25.  Dolgencorp, Inc. failed to provide documents and other

5

evidence that I know exists or did at one time;

26. The statements and emails that my lawyer showed me which were apparently generated by Dolgencorp employees were all new to me; I had never seen them before;

27. There were some documents that Dolgencorp provided to my attorney regarding my previous employers. Several of the documents shows my name to be "Kimberly Love." I had used that name from birth until 1999, the year I acquired a copy of my birth certificate. I discovered that my name is recorded with the State of Alabama Vital Statistics Bureau as "Kinera Love." I asked my mother why was my name shown as "Kinera Love" and she had no explanation because she told me she gave me the name of "Kimberly Love" when I was born. I have used the name on my birth certificate ever since;

28. I have never been terminated from a job before Dolgencorp terminated me. I have never been racially discriminated against before this incident that is the basis of my lawsuit. I have never sued anyone for discrimination before I was treated the way I have been treated at Dolgencorp. This has been a very frightening and troubling experience for me.

29. I have suffered tremendously as a result of being terminated from Dolgencorp. I did not work for a whole year after being terminated until I got my present job which began in November 2006. After a few months of unemployment income, it stopped because of Dolgencorp. After complaining about how I was feeling most of the time since I was terminated by Dolgencorp, my

godmother and my attorney gave me names of psychologists in the Lee County area and referred me to get help with my problems. I went through the telephone book and got the telephone numbers of the doctors and called for an appointment. I chose Dr. John Gam, Ph.D. because he had the earliest appointment I could get. I began treatment with him in July 2007, for what he has diagnosed "post traumatic stress disorder" and "depression." Dr. Gam has stated that these conditions resulted from the trauma I experienced as a result of the termination from Dolgencorp, and from other experiences leading up to the termination. I am still in treatment for the mental disorders and am taking medication to help correct them.

   I declare under penalty of perjury that the foregoing is true and correct.
   Done this _____1st_____ day of February, 2008.

_Kinera Love_
Kinera Love

7

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| KINERA LOVE, ) | |
|     Plaintiff, ) | |
| ) | CASE NO.: |
| v. ) | 03-06cv1147-MHT-SRW |
| ) | |
| DOLLAR GENERAL CORPORATION, ) | |
|     d/b/a DOLGENCORP, INC., ) | |
|     Defendant. ) | |

STATE OF ALABAMA    )
                  )
LEE COUNTY         )

### AFFIDAVIT AND TESTIMONY OF TIFFANY CROSS

The Affiant, being first duly sworn, says and affirms the following:

1. My name is Tiffany Cross. The facts stated in this affidavit are known to me of my own personal knowledge and, if called upon to testify to the matters in this affidavit, I could and would competently do so;

2. I am a former store manager of Dollar General, Opelika, Alabama store at 1515 Second Avenue. I was initially hired as a cashier in April of 2004 at the Marvin Parkway store. I was promoted to third key clerk, then to assistant manager at the Marvin Parkway store. I was promoted after that to manager of the Auburn and then transferred to the Second Avenue store. Employees who are successfully trained are generally promoted this way. I worked in three Dollar General stores between April 2004 and November 13, 2005. I am a White female;

3. I recall an incident that occurred in the Phenix City

store on an occasion when there was a managers' meeting. I attended the meeting. It was on or about the 4th day of October, 2005. Jack Trawick had just arrived from the Auburn store where he investigated a complaint that Kinera Love, a Black female, made to ERC because she did not get the position of assistant manager. Jack was talking to Charles McDonald and Jeff Jennings, and I heard him tell Jeff and Charles that they needed to get rid of Kinera because "she could cause them some trouble."

4. I know that instead of them hiring Kinera, whom I know was capable and qualified, for the assistant manager's position, they hired a White female, Donna Tally, Charles' niece. Donna and I are also relatives. I know that Donna Tally had no managerial experience when they hired her because the majority of her working life has been in assembly line jobs. She has worked at Master Brand, a cabinet-making plant in Auburn in the late 1990's, Master Lock, a lock-making plant in Auburn in the early 1990's, Capitol Vale, an M&M candy packaging plant in Auburn in the middle 1990's and MDT, a batteries plant in Auburn in 2005, a company from which she quit when she got married that year because of the company policy that prohibited husbands and wives from working there at the same time.

Donna has never worked as a manager in a video store. She did work in a video warehouse business, owned by Charles McDonald and Jeff Jennings, when she was a high school student during the after-school hours in 1989-90, when she was about 16-years-old but she was not the manager.

2

In addition, Donna worked at the Opelika Wal-Mart for about two weeks as a jewelry clerk in 1998 or 1999. She has never held one job for a long period of time. When Dolgencorp, Inc. hired her, she was between jobs after having quit at the MDT plant in Auburn.

Donna had been on the job at Dolgencorp for only two weeks before she was promoted to assistant manager. It takes at least two months to train to become an assistant manager. Kinera was in line for the promotion when she was transferred to the Auburn store from the Opelika store, having been trained for the two months as third key clerk by Julie Morrison. As third key clerk, Kinera practically ran the Auburn store. When Charles promoted Donna, Kinera was required to train her;

5. Besides this occasion of discriminating against Kinera, Charles has shown he is prejudice against Blacks on other occasions. On one occasion in spring of 2005, a Black lady came into the Opelika store on the Marvin Parkway where I was working and asked Charles if we were hiring. He told her "no." That afternoon of the same day, he hired two white females, one of whom was a white girl named Amy.

On another occasion, in the summer of 2005, Charles made a comment to me about another employee of Dolgencorp when we were working at the Opelika store on Second Avenue, Wendy Whitlock, a white female. He said that she would not make it any further in Dollar General because she is married to a "F____g N_____r." Wendy had been hired to work at Dolgencorp before I was, but

3

could not get a promotion because of her Black husband.  She was stuck in the position of a third key clerk until I made a complaint to the Home Office to Jeff Weaver within days after my husband and I heard his racist comment.  The outcome was that Wendy finally got her well-deserved promotion to assistant manager by Charles, about two or three months later, and transferred to the Midway Plaza store.  Later, she was transferred to the Marvin Parkway store as manager.

**6.**    I know what Charles and Jeff did to Kinera is not right.  I know they will try to discredit me by saying I was terminated from Dolgencorp, Inc. for a bouncing check; however, I gave proof that it was a bank error to Charles and he failed to give the bank information to upper management to show the error.  I know I could have fought it but I choice not to because I knew it was best for me to move on.  I am presently working as a manager in another store.

I declare under penalty of perjury that the foregoing is true and correct.
DONE this _____1st_____ day of February, 2008.

2-1-08

Tiffany Qhoss

4

# EXHIBIT L

AT-169



## STATE OF ALABAMA
## DEPARTMENT OF INDUSTRIAL RELATIONS
## HEARINGS AND APPEALS DIVISION
## MONTGOMERY, ALABAMA   36130

### DECISION ON UNEMPLOYMENT COMPENSATION CLAIM

**CLAIMANT**

KINERA L LOVE
409 A TOOMER CIRCLE
OPELIKA AL 36801-7090

**EMPLOYER**

DOLGENCORP
CTM
PO BOX 34150
LOUISVILLE KY 40232

| | |
|---|---|
| **APPELLANT** : EMPLOYER | **DATE MAILED** : 12/14/05 |
| **LOCATION** : MONTGOMERY (TELEPHONE) | **CASE  NO.** : 13980-AT-05 |
| | **S. S. NO.** : XXX-XX-6715 |
| **OC  NO.** : 00-74 | **HEARING DATE** : 12/6/05 |

**APPEARANCES AT THE HEARING:** Employer representative

**ISSUE(S):** Discharge from most recent bona fide work for misconduct committed in connection with work.  Section 25-4-78(3)(c) Code of Alabama 1975

**FINDINGS:** This employer, with whom the claimant had most recent bona fide work, appealed an Examiner's determination on a claim for unemployment benefits.

The claimant worked for the listed employer from April 2005, until mid July 2005.  The store manager received a report that the claimant offered two employees, one of whom was the assistant manager drinks and chips at no charge.  They both insisted on paying for their purchases.  After they reported this, the manager spoke with the asset protection representative.  He interviewed the claimant initially asking general questions, however, the questions he asked were of a personal nature.  She informed him that she would refuse to answer personal questions and wish to have an attorney.  At that point, the representative had not informed her of the reason for their meeting.  He asked for her keys and then instructed her to leave as he was placing her on suspension.  The representative gave her seven days to have an attorney contact the employer representative.  When there had been no contact, the manager called her asking her to come in for a meeting.  After she clocked in, he presented the letter of termination informing her that because she failed to cooperate with an internal investigation, he was discharging her.

**CONCLUSIONS:** Section 25-4-78(3)(c) of the Law provides that an individual shall be disqualified from receiving unemployment benefits if she was discharged from her most recent bona fide work for misconduct committed in connection with work.  "Misconduct" is defined as conduct evincing a deliberate, willful, or wanton disregard of an employer interests or of the standards of behavior which the employer has a right to expect of his employees.  The evidence presented shows the claimant was discharged from her employment for failure to comply with an investigation.  The employer gave her a reasonable opportunity to obtain an attorney in order to continue with the investigation, however, she failed to cooperate.  Therefore, she would be subject to a disqualification under this section of the Law.

**DECISION:** The Examiner's determination is reversed.  The claimant is disqualified under the provisions of Section 25-4-78(3)(c) of the Unemployment Compensation Law for a period of four

weeks beginning July 17, 2005. The maximum amount of benefits to which the claimant may become entitled after this period of disqualification is reduced by four times the weekly benefit amount.

Benefits paid the claimant if any, contrary to this decision, constitute an overpayment which the claimant is required to repay as provided by Section 25-4-91(d)(1)(a) of the Law.

**APPEAL RIGHTS:** This decision becomes final unless an application for leave to appeal to the Board of Appeals is received in writing at the Department address above or by fax at 334-242-0539 on or before the **FINAL DATE OF December 29, 2005**.

Jo Ann S. Holder
Administrative Hearing Officer

JSH/mp

# EXHIBIT M

 **DOLLAR GENERAL JOB DESCRIPTION**

# DRAFT

FLSA: Non-exempt
Date: June-2005

**JOB TITLE:** Assistant Store Manager-DG Market

**DEPARTMENT:** Store Operations

**REPORTS TO:** Store Manager

**SUPERVISES:** Clerks, Lead Clerks

## GENERAL SUMMARY:

Supervise store employees. Assist with efficient management of inventory and effective presentation of merchandise. Ensure a safe working environment while providing for the protection of company assets.

## DUTIES and ESSENTIAL JOB FUNCTIONS:

1. Open the store a minimum of two days per week; close the store a minimum of two days per week.
2. Authorize and sign for refunds and overrides; count register; deposit money in bank.
3. Assist in ensuring the financial integrity of the store through strict cashier accountability, key control, and adherence to company security practices and cash control procedures.
4. Manage store in store manager and co-manager's absence.
5. Assist store manager, and co-manager as directed, in providing adequate training for employees.
6. Discuss and review operating statements with store manager to identify business trends (including sales, profitability, and turn), expense control opportunities, potential shrink, and errors.
7. Order drop-shipments and other areas of store as designated by store manager.
8. Follow prescribed ordering practices to ensure the meeting or exceeding of in-stock targets; review ordering plan, seasonal direction and inventory management issues on a weekly basis.
9. Markdown damaged and overstocked merchandise.
10. Minimize damages and markdowns, ensure accurate scanning and paperwork, and follow inventory control procedures to maintain accurate inventory levels.
11. Assist with the efficient staging, stocking and storage of merchandise; unload trucks.
12. Ensure that merchandise is presented according to established practices and store manager direction; utilize merchandise fixtures properly including presentation, product pricing and signage.
13. Assist in plan-o-gram implementation and maintenance.
14. Assist in maintaining accurate inventory levels by controlling damages, markdowns, scanning, paperwork, and facility controls.
15. Conduct safety meetings; help to maintain a clean, well-organized store and facilitate a safe and secure working and shopping environment.
16. Provide superior customer service leadership.
17. Follow company policies and procedures as outlined in the Standard Operating Procedures manual, Employee Handbook, and company communications. Assist store manager and co-manager in ensuring employee compliance.
18. Complete all paperwork and documentation according to guidelines and deadlines.

Love v. Dolgencorp

Def. Docs. Prod.    0013

*(Assistant Store Manager continued)*

## KNOWLEDGE and SKILLS:

- Ability to read and interpret documents such as diagrams, safety rules, operating and maintenance instructions, and procedures manuals.
- Ability to operate electrical pallet lifts and floor cleaning equipement
- Ability to perform mathematical calculations such as addition, subtraction, multiplication, division, and percentages.
- Knowledge of cash handling procedures including cashier accountability and deposit control.
- Ability to learn and perform IBM cash register functions to generate reports.
- Knowledge of inventory management and merchandising practices.
- Effective oral and written communication skills.
- Effective interpersonal skills.
- Knowledge of cash, facility and safety control policies and practices (deposits, store keys, SAFE program, etc.)
- Good organization skills with attention to detail.
- Ability to solve problems and deal with a variety of situations where limited standardization exists.
- Ability to obtain the required local and state food handling management certifications.

## MINIMUM WORK EXPERIENCE and/or EDUCATION

- High school diploma or equivalent
- One to two years experience within a grocery store operation or equivalent, and six months supervisory experience preferred.
- Attainment of required local and state food handling management certifications.

## COMPETENCIES:

- Aligns motives, values and beliefs with Dollar General values.
- Supports ownership by tapping into the potential of others.
- Acts as a liaison between the corporate office and store employees.
- Fosters cooperation and collaboration.
- Interacts with staff tactfully yet directly and maintains an open forum of exchange.
- Demonstrates responsiveness and sensitivity to customer needs.
- Applies basic principles of retail (i.e., ordering cycles, peak inventories, merchandise flow, etc.)
- Provides continuous attention to development of staff.
- Recruits, hires and trains qualified applicants to fulfill a store need.
- Ensures store compliance to federal labor laws and company policies and procedures.

## WORKING CONDITIONS and PHYSICAL REQUIREMENTS:

- Frequent walking and standing.
- Frequent bending, stooping and kneeling to run check out station, stock merchandise and unload trucks.
- Frequent handling of merchandise and equipment such as hand-held scanners pricing guns, box cutters, merchandise containers, two-wheel dollies, and U-boats (six-wheel carts).
- Frequent and proper lifting of up to 40 pounds; occasional lifting of up to 55 pounds.
- Occasional climbing (using ladder).
- Occasional driving/providing own transportation to make bank deposits, attend management meetings and to other Dollar General stores.
- Fast-paced environment; moderate noise level.
- Occasionally exposed to outside weather conditions.

*This job description represents an overview of the responsibilities for the above referenced position and is not intended to represent a comprehensive list of responsibilities. An employee should perform all duties as assigned by his/her supervisor.*

Love v. Dolgencorp
Def. Docs. Prod.     0014

# EXHIBIT N

*Love v. Dollar General Corporation,* 03:06cv1147-MHT

## Plaintiff's Objections to Defendant's Evidence

| Defendant's Evidence | Objections to Defendant's Evidence |
|---|---|
| 1. The Plaintiff's Deposition in which all evidence of confidential information that comes under the Consent Protective Order, particularly, references to and the Plaintiff's social security number, medical records and medical conditions, p. 9, lines 3, 5; p. 10, line 19, 20; p. 11, line 1; p. 81, line 21; p. 82, lines 2,4 | Consent Protective Order filed in this case restricts confidential information from being published. |
| 2. The Plaintiff's Deposition | Irrelevant. Fed.R.Evid. 402.<br><br>Except for those specific citations as offered by the Defendant on relevant issues in his Motion for Summary Judgment and Brief in Support. |
| 3. The entire "Statement of Candice Harrison," exhibit 4, attachment 1 | Lack of oath or affirmation. Fed.R.Evid. 603. The entire "Statement of Candice Harrison" is inadmissible because it has not been signed under penalty of perjury.<br><br>Hearsay. Fed.R.Evid. 802. |
| 4. The entire "Statement of Donna Tally," exhibit 4, attachment 2 | Lack of oath or affirmation. Fed.R.Evid. 603. The entire "Statement of Candice Harrison" is inadmissible because it has not been signed under penalty of perjury.<br><br>Hearsay. Fed.R.Evid. 802. |
| 5. Declaration of Charles McDonald, p. 2, ¶¶ 8, 9, 10, 11 | Lack of personal knowledge. Fed.R.Evid. 602.<br><br>Hearsay. Fed.R.Evid. 802.<br><br>Statements were made by others and not by him. |
| | |