IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| KINERA LOVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO.: |
| | ) | |
| DOLLAR GENERAL | ) | 3:06-CV-1147-MHT |
| CORPORATION, | ) | |
| d/b/a DOLGENCORP, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SUBSTITUTED REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Christopher W. Deering, Esq.
Ryan M. Aday, Esq.
**Ogletree, Deakins, Nash,
Smoak & Stewart, P.C.**
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone:  (205) 328-1900
Facsimile:  (205) 328-6000
E-mail: christopher.deering@odnss.com
E-mail: ryan.aday@odnss.com

*Attorneys for Defendant
Dolgencorp, Inc.*

## TABLE OF CONTENTS

I.  INTRODUCTION: .......................................................................................1

II. ARGUMENT: .........................................................................................1

   A.  Plaintiff's failure to promote claim fails as a matter of law. ...................1

      1.  Plaintiff cannot establish a *prima facie* case of failure to promote because she cannot show that she was qualified for the Assistant Store Manager position. ...............................................................................2

      2.  Plaintiff cannot show that any non-minority who was equally or less qualified was promoted to the Assistant Store Manager position and, therefore, she cannot sustain her *prima facie* case. .......................7

   B.  Even if Plaintiff can somehow satisfy a *prima facie* case of discriminatory failure to promote, she has no evidence to show that Dolgencorp's legitimate, nondiscriminatory reason for promoting Ms. Tally to the Assistant Store Manager position is pretextual. .........................................................7

      1.  Dolgencorp has met its burden of proffering a legitimate, nondiscriminatory reason for promoting Ms. Tally instead of Plaintiff to Assistant Store Manager. ..............................................7

      2.  Dolgencorp has produced all discovery documents referenced in its discovery responses. .....................................................................8

      3.  Plaintiff cannot prove pretext because she cannot show that she was better qualified than Ms. Tally. ..........................................9

      4.  Evidence of nepotism cannot be used to show pretext. ..............11

      5.  Plaintiff cannot use "stray remarks" or statements which show no racial bias as evidence of pretext. ...............................................13

   C.  Dolgencorp is entitled to summary judgment on Plaintiff's Title VII retaliatory discharge claim. ..................................................................16

      1.  Plaintiff did not engage in any statutorily protected conduct or expression because she never complained of race discrimination or engaged in any other type of protected activity prior to her termination. .16

2. Plaintiff cannot show any "nexus or causal connection" between her complaint to ERC and her eventual termination because the undisputed evidence shows that she was terminated for refusing to participate in an internal investigation. ....................................................18

3. Even if Plaintiff could establish a *prima facie* case of retaliatory discharge, Plaintiff cannot show that Dolgencorp's legitimate, non-retaliatory reason for her termination was pretextual. ................................19

III. CONCLUSION ....................................................................................20

## I. INTRODUCTION:

On December 21, 2007, Dolgencorp timely filed its Motion for Summary Judgment, along with a Brief in Support and an Evidentiary Submission (collectively referred to as the "Summary Judgment Motion"). After two extensions of time, Plaintiff filed her Brief in Opposition to Dolgencorp's Motion for Summary Judgment (the "Opposition Brief"). Plaintiff attempts to engineer disputes of material fact through inadmissible declaration testimony which lacks foundation, contains conclusory allegations, contradicts prior deposition testimony, and is due to be stricken.

On February 15, 2008, Dolgencorp filed its Reply to Plaintiff's Opposition Brief. (the "Initial Reply Brief"). As mentioned in the Initial Reply Brief, the deposition of Tiffany Cross ("Ms. Cross"), who provided a sworn affidavit in connection with Plaintiff's Opposition Brief, was deposed on February 14, 2008. Pursuant to the Court's Order of February 20, 2008, Dolgencorp submits this Substituted Reply Brief to supplement the record with Ms. Cross' deposition testimony, and is intended to completely replace Dolgencorp's Initial Reply Brief. **During her deposition, Ms. Cross admitted that certain of the material testimony contained in her Affidavit was incorrect, inaccurate and/or false, resulting in arguable perjury**. Simultaneous with the filing of this Substituted Reply Brief, Dolgencorp has filed a Substituted Notice of Objection. As discussed in the Summary Judgment Motion, in this Substituted Reply Brief, and in the Substituted Notice of Objection, Dolgencorp is entitled to summary judgment on all counts.

## II. ARGUMENT:

### A. Plaintiff's failure to promote claim fails as a matter of law.

1.    **Plaintiff cannot establish a *prima facie* case of failure to promote because she cannot show that she was qualified for the Assistant Store Manager position.**

In her Opposition Brief, Plaintiff attempts to engineer disputed issues of fact with respect to comparator Donna Tally's ("Ms. Tally") qualifications for the Assistant Store Manager position, arguing that Ms. Tally was less qualified than Plaintiff.  *See* Opposition Brief at 3, 11-18.   Plaintiff attempts to support this assertion with self-serving appraisals of her own performance, as well as through the incompetent and admittedly false affidavit testimony of Tiffany Cross ("Ms. Cross"), a former Dolgencorp Store Manager who completely lacks foundation to testify as to Ms. Tally's work history and qualifications.   Much of Plaintiff's and Ms. Cross' affidavit testimony is due to be stricken from the record.   *See* Substituted Notice of Objection and Motion to Strike, which has been filed simultaneously herewith.   During her deposition, Ms. Cross admitted that certain of the material testimony contained in her recently filed Affidavit was incorrect, inaccurate and/or false, resulting in arguable perjury.   Moreover, her deposition testimony further informed of the evidentiary incompetence of certain testimony offered via her previously filed affidavit.

In her affidavit, Ms. Cross states that because she is "related" somehow to Ms. Tally that she has knowledge of her entire work history.   As made clear by her deposition testimony, however, Ms. Cross does not have first-hand knowledge of Ms. Tally's prior job duties and responsibilities.   In her deposition on February 14, 2008, Ms. Cross contradicted her affidavit testimony by admitting that she did not have first-hand knowledge of Ms. Tally's prior job duties and responsibilities in her prior jobs.   *See* Ms. Cross Depo. at 93-101, attached hereto as Exhibit "1."   Ms. Cross admitted not only that

2

she had <u>never personally observed</u> Ms. Tally working at Video City Rentals, but that she had <u>never even visited</u> Video City Rentals. *See* Ms. Cross' Depo. at 95. Ms. Cross admitted that she did not have any personal knowledge as to when Ms. Tally's employment with Video City Rentals began, ended, or the length of time Ms. Tally worked for Video City Rentals. *See* Ms. Cross Depo. at 96. Additionally, contrary to her sworn Affidavit, Ms. Cross admitted that she does not dispute that Ms. Tally, while working as a manager at Video City Rentals: (1) provided direct supervision of other employees; (2) supervised all aspects of the store's operations in Mr. McDonald's absence; (3) trained and developed new store employees; (4) was responsible for maintaining financial control of the store; and (5) engaged in transactions with vendors and other third parties on behalf of Video City Rentals. *See* Ms. Cross' Depo. at 99-100. As Ms. Cross has admitted to having no personal knowledge of Ms. Tally's prior work experience at Video City Rentals, it is impossible for Plaintiff to use Ms. Cross' contradictory and false affidavit testimony to create a genuine issue of material fact as to Ms. Tally's qualifications.

The undisputed fact remains that Charles McDonald ("Mr. McDonald") has first-hand knowledge of Ms. Tally's prior retail management experience because he hired her previously to manage Video City Rentals, Inc., a video rental store that Mr. McDonald previously owned. *See* Supplemental Declaration of Mr. McDonald at ¶¶ 3-4, attached hereto as Exhibit "2". Ms. Tally provided direct supervision of other employees and supervised all aspects of the store's operations. In her job at Video City Rentals, Tally's job duties included, but were not limited to, training and developing store employees; maintaining financial controls for the store including shrink, labor and operating

expenses; developing rapport and good will with the store's customers to drive business; ensuring the store's compliance with all state and federal laws; coaching and counseling store employees; and engaging in various transactions with vendors and other third parties on behalf of the store.[1] *See* Supplemental Declaration of Mr. McDonald at ¶¶ 5-6. Accordingly, Ms. Tally more than met the qualifications for the Assistant Store Manager position and, moreover, was more qualified and experienced than Plaintiff.

Plaintiff, on the other hand, had no such experience prior to her employment with Dolgencorp, and therefore, was not qualified for the position. In her Affidavit, Plaintiff mischaracterizes her prior deposition testimony concerning her employment with Taco Bell. Unlike Ms. Tally, who was in charge of the overall day-to-day operations for Video City Rentals when Mr. McDonald was not present, Plaintiff was merely the "lead cashier" at Taco Bell, and reported to the Store Manager, who, according to Plaintiff, "oversaw the whole restaurant." *See* Plaintiff's Depo. at 116. Plaintiff testified that her job responsibilities as "lead cashier" included taking orders, preparing invoices, and receiving calls from other cashiers if one was going to be late to work. *See* Plaintiff's Depo. at 117. In addition to being less qualified for the Assistant Store Manager position than Ms. Tally, there is no evidence that Mr. McDonald or Mr. Jennings knew of Ms. Love's work as a "lead cashier" at a Taco Bell store and, furthermore, Plaintiff's Application for Employment with Dolgencorp does not indicate her work at Taco Bell.

Plaintiff also attempts to show that she was qualified for the Assistant Store Manager position through her own self-serving and conclusory appraisals of her own

---

[1] As mentioned previously, in her deposition and contrary to her filed affidavit, Ms. Cross testified that she does not dispute that Ms. Tally performed all such job duties while employed at Video City Rentals.

work performance and the unspecified "training" she received during her time at Dolgencorp. As explained in the Summary Judgment Motion, a plaintiff cannot show that she was qualified for a position, or equally or more qualified for a position than someone else, through self-serving appraisals of her own performance. *See Curtis, et al. v. TeleTech Customer Care Management (Telecommunications), Inc.*, 208 F.Supp.2d 1231, 1246 (N.D. Ala. 2002). In her affidavit, Plaintiff makes numerous self-serving appraisals such as "he [Mr. McDonald] knew my work performance was very good. I never took off another [*sic*] than when I was scheduled. I came to work whenever I was needed to help out in the store, and especially since I was in line to receive the promotion." Plaintiff's Affidavit at ¶11. Such conclusory and self-serving statements cannot be used to prove qualifications. Moreover, coming to work is a basic job expectation, not a promotion qualification. Plaintiff also makes the baseless assertion that "to become an assistant manager requires at least two months of training." Nowhere in the Assistant Store Manager job description does it state that two months of "training" is a prerequisite for consideration for the position. [2] In fact, Ms. Cross admitted in her deposition that this purported "two month" training requirement is nothing more than personal opinion. *See* Ms. Cross Depo. at 103-04.

Finally, Plaintiff attempts to show her qualifications through the affidavit testimony of Ms. Cross, a former Dolgencorp Store Manager. The plaintiff does not dispute that Mr. McDonald and Mr. Jennings were the ones who made the decision to

---

[2]    As mentioned previously, much of Plaintiff's Affidavit is due to be stricken from the record. *See* Substituted Notice of Objection and Motion to Strike. Additional grounds include Ms. Cross' admission in her February 14, 2008 deposition that she did not have any personal knowledge as to Ms. Tally's work experience at Video City Rentals, and her acknowledgment that she cannot dispute that Ms. Tally performed the job duties that Mr. McDonald outlines in his supplemental declaration. *See* Ms. Cross Depo. at 93-101.

promote Ms. Tally, not Ms. Cross, and that Ms. Cross did not have any input into this decision. Therefore, Ms. Cross' subjective opinions of Plaintiff's work performance and training is irrelevant. *See* Substituted Notice of Objection and Motion to Strike filed simultaneously herewith. In her affidavit, Ms. Cross makes the conclusory statement "I know that instead of hiring Kinera, whom I know was capable and qualified, for the assistant manager position, they hired a White female, Donna Tally, Charles' niece." Such a statement is conclusory and based only on personal opinion. Additionally, the statement is irrelevant as Ms. Cross was not the decision-maker.

Similarly, Ms. Cross, in her Affidavit, initially purported to be able to testify as to Ms. Tally's prior work history and qualifications, but, as discussed above, has completely contradicted her Affidavit with her deposition testimony. *See* Ms. Cross Depo. at 93-101. Mr. McDonald was aware of Ms. Tally's prior retail management experience first-hand as he hired her to run his Video City Rentals business several years earlier. Ms. Cross' assertion that "Donna never worked as a manager in a video store" lacks foundation as Ms. Cross does not have personal knowledge of Ms. Tally's job duties or work experience at Video City Rentals, which she admitted in her February 14, 2008 deposition. *See* Ms. Cross Depo. at 93-101; Substituted Notice of Objection and Motion to Strike. Mr. McDonald, the decision-maker, has such first-hand knowledge. Accordingly, Plaintiff's attempt to show her qualifications through Ms. Cross' misrepresentations and conclusions, and certainly cannot be used to create a genuine issue of material fact on the promotion claim. Therefore, it remains abundantly clear that Plaintiff cannot show that she was qualified for the Assistant Store Manager position. As a result, Plaintiff cannot sustain a *prima facie* showing of failure to promote,

and therefore, her claim fails as a matter of law.

> **2.      Plaintiff cannot show that any non-minority who was equally or less qualified was promoted to the Assistant Store Manager position and, therefore, she cannot sustain her *prima facie* case.**

Plaintiff cannot show that she was qualified for the Assistant Store Manger position, and her *prima facie* case of discriminatory failure to promote fails for that reason alone.  Because Plaintiff cannot show that she was qualified for the position, she certainly cannot show that Ms. Tally was equally or less qualified for the position than Plaintiff.  As discussed above, Ms. Tally had prior retail management experience at Video City Rentals.  Ms. Cross completely contradicted her sworn affidavit by testifying in her deposition that she had no personal knowledge of Ms. Tally's work experience at Video City Rentals.  Because of this prior work experience, not only was Ms. Tally at least equally qualified for the position, she was better qualified than Plaintiff.  Plaintiff cannot refute Ms. Tally's qualifications with Ms. Cross' misrepresentations and false statements concerning Ms. Tally's work history.  Accordingly, Plaintiff cannot sustain a *prima facie* case of discriminatory failure to promote.  Dolgencorp remains entitled to summary judgment on this claim.

> **B.      Even if Plaintiff can somehow satisfy a *prima facie* case of discriminatory failure to promote, she has no evidence to show that Dolgencorp's legitimate, nondiscriminatory reason for promoting Ms. Tally to the Assistant Store Manager position is pretextual.**

> **1.      Dolgencorp has met its burden of proffering a legitimate, nondiscriminatory reason for promoting Ms. Tally instead of Plaintiff to Assistant Store Manager.**

Even if Plaintiff could somehow make a *prima facie* showing of discriminatory failure to promote, Plaintiff has utterly failed to come forth with evidence to show that

Dolgencorp's legitimate, nondiscriminatory reason for not promoting her to Assistant Store Manager is pretext for race discrimination.  In her Opposition Brief, Plaintiff erroneously argues that Dolgencorp has not met its burden of proffering a legitimate, nondiscriminatory reason and that, according to Plaintiff, the "first" legitimate, nondiscriminatory reason offered by Dolgencorp was "you're not ready."  *See* Opposition Brief at 14.  Plaintiff provides no evidentiary support for this baseless assertion.  Likewise, Plaintiff makes the misplaced argument that Dolgencorp has not supported its "second" legitimate, nondiscriminatory reason, that Ms. Tally had prior retail management experience, and Plaintiff did not.  *See* Opposition Brief at 15.  Such an argument is groundless in light of the substantial evidence presented that Ms. Tally had prior retail management experience at the Video City Rentals retail business.  *See* Declaration and Supplemental Declaration of Charles McDonald.  The burden on an employer of proffering a legitimate, nondiscriminatory reason for the employment action is "exceedingly light."'  *Bevill v. UAB Walker College,* 62 F. Supp. 2d 1259, 1277 (N.D. Ala. 1999) (quoting *Meeks v. Computer Assocs., Int'l,* 15 F.3d 1013, 1019 (11th Cir. 1994)). Dolgencorp "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."  *Burdine,* 450 U.S. at 257.  Accordingly, Dolgencorp has met its burden of proffering a legitimate, nondiscriminatory reason for promoting Ms. Tally instead of Plaintiff.

## 2. Dolgencorp has produced all discovery documents referenced in its discovery responses.

Plaintiff's misguided arguments and assertions to this Court continue in her Opposition Brief by accusing Dolgencorp of not producing documents requested in

Plaintiff's request for production. Plaintiff alleges that the lack of production of certain documents, which Dolgencorp never agreed to produce, and which Plaintiff did not challenge, somehow supports Plaintiff's argument that Dolgencorp's decision was pretextual. *See* Plaintiff's Opposition Brief at 15-16. Dolgencorp produced all documents indicated in its Responses to Plaintiff's "eleventh hour" discovery requests, which were served on December 14, 2007. During the telephone hearing held on January 25, 2008, the undersigned counsel and Plaintiff's counsel agreed that Dolgencorp would produce copies of the documents indicated in Dolgencorp's discovery responses – <u>and they were</u> so produced. If Plaintiff wished to challenge Dolgencorp's discovery responses, which Dolgencorp believes were more than sufficient, Plaintiff should have done so during the discovery phase of this litigation – yet <u>she did not</u>. Plaintiff now makes this blanket and unsupported assertion without any explanation as to how any additional documents may make a difference in deciding the issues in this lawsuit. For Plaintiff to now assert that Dolgencorp's allegedly deficient discovery responses somehow constitute pretext is misguided, and the Court should disregard this argument.

    **3.**    **Plaintiff cannot prove pretext because she cannot show that she was better qualified than Ms. Tally.**

In a failure to promote case, a plaintiff cannot prove pretext by simply arguing or even by showing that she was better qualified than the individual who received the promotion. *See Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1339 (11th Cir. 2000). "A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race." *Id.* The Eleventh Circuit has explained that "'a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons. . .'" *Id.* (citing *Combs*, 106

F.3d at 1542); *see also Damon v. Flemming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)(emphasizing that courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged decision.").

In a weak attempt to show evidence of Pretext, Plaintiff tries to show that she was better qualified than Ms. Tally because she allegedly "trained" Ms. Tally. While a Title VII plaintiff may show pretext by presenting evidence that he/she was better qualified for the position, the evidence of superior qualifications must show a disparity such that no reasonable person, in the exercise of impartial judgment, could have chosen the individual selected over the plaintiff for the position in question. *See Cooper v. Southern Co.*, 390 F.3d 723 (11th Cir. 2004). Based on the evidence presented, it is clear that Plaintiff has failed to meet this standard.

Plaintiff erroneously asserts that training is somehow a requirement for promotion to Assistant Store Manager, and cites page 42 of Dolgencorp's Employee Handbook and Ms. Cross' affidavit in an attempt to support that assertion, and makes the erroneous argument that Ms. Tally's promotion was "outside of the normal and established course of business at Dolgencorp". *See* Opposition Brief at 16-17. Nowhere in Dolgencorp's Employee Handbook, or in the Assistant Store Manager job description, does it say that training is a prerequisite for obtaining the Assistant Store Manager position. *See also* Supplemental Declaration of Mr. McDonald at ¶ 8 ("Training is not a prerequisite for obtaining the Assistant Store Manager position."). Additionally, Ms. Cross, a former Store Manager, is hardly in a position to testify as to what is a "normal and established course of business" at Dolgencorp, and her testimony is nothing more

than an erroneous opinion. In fact, Ms. Cross testified in her deposition that, in her own subjective opinion, Plaintiff was qualified for the Assistant Store Manager position because she knew how to fill out Dollar General paperwork and because "she had been with the company longer [than Ms. Tally]." *See* Ms. Cross Depo. at 88-89. However, Ms. Cross also admitted that she was "not quite sure" how long Ms. Tally had been with the company at the time of her promotion. *See id.* at 89. Accordingly, Plaintiff's "training" argument is unsupported, irrelevant, and cannot be used to show pretext.

### 4.    Evidence of nepotism cannot be used to show pretext.

Tellingly, during her deposition when questioned as to why she believed Ms. Tally received the Assistant Store Manager position, Plaintiff said that Ms. Tally received the promotion because she is Mr. McDonald's niece, and for no other reason. *See* Plaintiff's Depo. at 46-47, 67-68. When Plaintiff called ERC (the Employee Response Center, toll-free line) to complain about not receiving the Assistant Store Manager position, Plaintiff testified during her deposition that she told ERC that Mr. McDonald "was going to look over me and give it to his niece." *See* Plaintiff's Depo. at 46-47. Furthermore, Plaintiff testified that, in her opinion, the fact that Ms. Tally is Mr. McDonald's niece was the reason Ms. Tally received the promotion. *See* Plaintiff's Depo. at 67-68. Based on her own testimony, Plaintiff <u>never once mentioned race as being a factor in Dolgencorp's decision to promote Ms. Tally</u>, only that, in her opinion, nepotism played a role in the decision. Plaintiff's deposition testimony is substantiated by the ERC notes that Plaintiff has submitted in support of her Opposition Brief. *See* Exhibit "D" to Plaintiff's Opposition Brief ("Kinera said she would like to register a complaint. She indicated the district manager isn't being fair to her. According to Kinera, the district manager

11

overlooked her for a position and gave it to his niece.").  As explained *infra*, nepotism does not equate to race discrimination.

Plaintiff, through her newly-filed Affidavit, now attempts to change her deposition testimony to include race discrimination as being part of her complaint to ERC. *See* Plaintiff's Affidavit at ¶ 3 ("I called ERC and reported that he [McDonald] had overlooked me and discriminated against me to promote his niece, Donna Tally, a white female, to the position of assistant manager . . ." "I felt Charles discriminated against me because I am black.").  Plaintiff cannot purport to change her clear and unambiguous deposition testimony after the fact with an affidavit in an effort to engineer issues of disputed fact. *See Van T. Junkin & Assoc., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656 (11th Cir. 1984)(finding that affidavit contradicting prior deposition testimony a sham when the party merely contradicts prior testimony without any valid explanation); *see also* Notice of Objection and Motion to Strike.

As this Court is aware, <u>nepotism is not race discrimination</u>.  *See, e.g., Holder v. City of Raleigh*, 867 F.2d 823, 825-26 (4th Cir. 1989) (rejecting "nepotism" as an impermissible hidden motive equivalent to discrimination for employer's refusal to hire more qualified black applicant); *cf, Brant v. Shop'n Save Warehouse Foods, Inc.*, 108 F.3d 935, 938 (8th Cir. 1997) ("[I]t is not intentional sex discrimination . . . to hire an unemployed old friend who happens to be a male, without considering an applicant who is neither unemployed nor an old friend and happens to be female."); *Foster v. Dalton*, 71 F.3d 52, 54, 56 (1st Cir. 1995) (upholding, against Title VII challenge, supervisor's decision to alter job description to favor his "fishing buddy" over generally more qualified female applicant, because "Title VII does not outlaw cronyism"); *Bickerstaff v. Nordstrom, Inc.*, 48 F.Supp.2d

790, 800 (N.D. Ill. 1999) (hiring decision based on nepotism does not give rise to an inference of racial discrimination); *U.S. Equal Employ. Com'n v. Foster Wheeler Constructors, Inc.*, 1999 WL 528196 *6 n.4 (N.D. Ill. 1999)("Nepotism might not be a good means for making employment decisions; however, the discrimination laws are not aimed at stopping employers from using "bad" motivations, but only at stopping employers from using discriminatory employment motivations."). Therefore, because Plaintiff testified that nepotism, not race, was the reason for Ms. Tally's promotion, Plaintiff cannot possibly show any evidence of pretext, and as a result, her failure to promote claim fails as a matter of law.

**5.     Plaintiff cannot use "stray remarks" or statements which show no racial bias as evidence of pretext.**

Ms. Cross testified in her Affidavit that she heard Asset Protection Supervisor Jack Traywick ("Mr. Traywick") tell Mr. McDonald and Mr. Jennings that they needed to get rid of Kinera because "she could cause them some trouble." *See* Ms. Cross' Affidavit at ¶3. This alleged comment is not evidence of pretext because:  (1) Mr. Traywick is a non-decision-maker; and (2) the alleged comment does not show any racial bias.

In the Eleventh Circuit, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age" [or here on the basis of race] will constitute direct evidence of discrimination. *Damon*, 196 F. 3d at 1359 (quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990). Evidence that merely "suggests discrimination ... or that is subject to more than one interpretation ... does not constitute direct evidence." *Merrit*, 120 F. 3d at 1189 (internal citations omitted). Stray remarks, statements by non-decisionmakers, and statements by decisionmakers unrelated to the decisional process itself, do not constitute direct evidence of

13

discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring); *EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir. 1990) (quoting *Price Waterhouse*, 490 U.S. 228, 277 (1989)); *Mauter v. Hardy Corp.*, 825 F.3d 1554, 1558 (11th Cir. 1987) (statements by non-decisionmaker).

It is undisputed that Mr. McDonald, not Mr. Traywick, was the decision-maker with respect to the Assistant Store Manager position in question. Therefore, any comment attributed to Mr. Traywick cannot constitute evidence of pretext. More importantly though, the alleged comment does not even suggest race discrimination, and for that reason alone it does not meet the threshold for being a "stray remark", let alone a statement sufficient to show discriminatory intent.[3]

In further efforts to create evidence of pretext, Ms. Cross in her affidavit makes the vague and unsupported allegation that, "On one occasion in spring of 2005, a black lady came into the Opelika store where I was working and asked Charles if we were hiring. He told her "no." That afternoon of the same day, he hired two white females, one of whom was a white girl named Amy." *See* Ms. Cross Affidavit at ¶ 5. This allegation is groundless, is not based on Ms. Cross' first-hand knowledge, and does not provide any detail as to the position sought by the unidentified black female or whether the individuals purportedly hired were seeking the same position as the black female. In her deposition, Ms. Cross admits that she does not recall the time frame of this alleged incident. *See* Ms. Cross Depo. at 106. Additionally, Ms. Cross testified that that there may have been "one or two [individuals] hired" before the nameless "black lady"

---

[3] Ms. Cross testified during her deposition that while she allegedly heard Mr. Traywick say "she could cause some trouble" she did not offer any opinion as to what Mr. Traywick meant by that statement. *See* Ms. Cross Depo. at 82.

allegedly came into the Opelika store. *See* Ms. Cross. Depo. at 110. Furthermore, Ms. Cross admitted that during her employment there were occasions when Mr. McDonald may have interviewed prospective employees or talked with prospective employees which Mr. McDonald did not discuss with Ms. Cross. *See* Ms. Cross Depo. at 111. Clearly, Ms Cross does not know whether any decision to hire the two white females was already made prior to the unnamed "black lady" inquiring as to any position. As discussed in Dolgencorp's Notice of Objection and Motion to Strike, this testimony is due to be stricken from the record. Furthermore, a review of Dolgencorp's Store Records for 2005 shows that no individual named "Amy" ever worked at the Opelika store. *See* Supplemental Declaration of Mr. McDonald at ¶ 7. Such baseless and contradicted affidavit testimony is due to be stricken and should not be considered as evidence of pretext. Furthermore, race discrimination cannot be inferred from this alleged comment as the comments were not made in connection with the decision-making process to promote Ms. Tally to the Assistant Store Manager position. Therefore, this alleged incident, at most, constitutes nothing more than a "stray remark". Accordingly, Plaintiff cannot rely on this affidavit testimony as evidence of pretext.

Ms. Cross' final allegation against Mr. McDonald is that he allegedly said that Wendy Whitlock "would not make it any further in Dollar General because she is married to a 'F_____g N_____r.'" *See* Ms. Cross Affidavit at ¶ 5. Again, even when taking this allegation as true for purposes of summary judgment (which it is not, *see* Supplemental Declaration of Mr. McDonald at ¶10), the alleged single, isolated comment constitutes a "stray remark" which is insufficient to show pretext as a matter of law. In addition to being a single, isolated comment, it is <u>unconnected with the decision to</u>

promote Ms. Tally to the Assistant Store Manager position.    Therefore, Ms. Cross'

alleged comment, even if true, should be disregarded as a "stray remark" and not

considered evidenced of pretext.

### C.    Dolgencorp is entitled to summary judgment on Plaintiff's Title VII retaliatory discharge claim.

#### 1.    Plaintiff did not engage in any statutorily protected conduct or expression because she never complained of race discrimination or engaged in any other type of protected activity prior to her termination.

Plaintiff cannot satisfy the first required *prima facie* element of her retaliatory

discharge claim because she never engaged in any statutorily protected activity or

expression.  While Plaintiff testified in her deposition that she complained to ERC after

Ms. Tally was promoted to Assistant Store Manager, Plaintiff did not mention race

discrimination, or any other impermissible factor, as having played a role in Dolgencorp's

decision not to promote her.  In fact, when asked what she told ERC, Plaintiff testified

that she only told ERC that Dolgencorp had "overlooked her", that "Donna Tally is

Charles McDonald's niece" and that Mr. McDonald was "going to overlook me and give

it [the Assistant Store Manager position] to his niece."  *See* Plaintiff's Depo. at 46-47.

Plaintiff never mentioned race discrimination in her complaint to ERC, and only made

general allegations of unfairness.  Furthermore, the ERC notes submitted by Plaintiff

further substantiate the fact that Plaintiff never mentioned race in her complaint to ERC.

The ERC notes (Exhibit "D" to Plaintiff's Opposition Brief) states as follows: "Kinera

said she would like to register a complaint.  She indicated the district manager isn't being

fair to her.  According to Kinera, the district manager overlooked her for a position and

gave it to his niece."  It is clear that the documentary evidence submitted by Plaintiff

herself supports the conclusion that Plaintiff did not mention race discrimination in her complaint to ERC.

As pointed out above, in an apparent realization that her deposition testimony and the ERC notes on this issue doom her retaliatory discharge claim because she failed to engaged in statutorily required protected activity, Plaintiff attempts to change her testimony to reflect that she did complain to ERC about race being a factor in the decision not to promote her to Assistant Store Manager. *See* Plaintiff's Affidavit at ¶ 3 ("I called ERC and reported that he [McDonald] had overlooked me and discriminated against me to promote his niece, Donna Tally, a white female, to the position of assistant manager . . ." "I felt Charles discriminated against me because I am black."). There is also no evidence of any inaccuracy with respect to the ERC notes. Plaintiff cannot purport to change her clear and unambiguous deposition testimony after the fact with an affidavit in an effort to engineer issues of disputed fact. *See Van T. Junkin & Assoc., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656 (11th Cir. 1984)(finding that affidavit contradicting prior deposition testimony a sham when the party merely contradicts prior testimony without any valid explanation). Therefore, as a matter of law, Plaintiff did not engage in any protected activity, which is fatal to her retaliation claim.

Plaintiff also makes the unsupported allegation and argument that she had a meeting with Mr. Traywick, an Asset Protection Supervisor, at the Auburn store to investigate her ERC complaint, and that this somehow constitutes protected activity. *See* Opposition Brief at 21-22. This second attempt by Plaintiff to show that she engaged in protected activity again fails as Plaintiff, yet again, fails to mention race as being the reason for her alleged discriminatory treatment. *See id.* Furthermore, any internal

investigation performed in response to a complaint of discrimination by an employee against a District Manager would have been conducted by the Regional Manager, not an Asset Protection Supervisor, such as Mr. Traywick.  *See* Supplemental Declaration of Mr. McDonald at ¶11.  Accordingly, Plaintiff cannot show that she ever engaged in any protected activity because she never mentioned race as being a factor in the decision not to promote her, and therefore, her retaliatory discharge claim cannot stand.

> **2.    Plaintiff cannot show any "nexus or causal connection" between her complaint to ERC and her eventual termination because the undisputed evidence shows that she was terminated for refusing to participate in an internal investigation.**

Even if Plaintiff could somehow show that she engaged in protected activity, Plaintiff cannot show any causal connection between her complaint and her eventual termination and, therefore, cannot satisfy a *prima facie* case of retaliation under Title VII. In an attempt to create an issue of material fact with respect to the "nexus or causal connection" element of the *prima facie* case, Plaintiff sets forth unsupported, conclusory assertions based on her own subjective opinion.  *See* Opposition Brief at 26-27.  Plaintiff claims that she did not refuse to participate in an investigation, because, according to her, she did not know an investigation was taking place.  Regardless of whether Plaintiff was aware of an investigation or not, Plaintiff does not and cannot dispute that Candice Harrison ("Ms. Harrison") and Ms. Tally each submitted complaints to Dolgencorp management that Plaintiff had asked for unauthorized discounts on merchandise.  *See* Plaintiff's Depo. at 54-55.  Additionally, Plaintiff cannot and does not dispute the fact that she refused to answer questions from Mr. Traywick, Dolgencorp's Asset Protection Supervisor, without a witness or an attorney present.  *See* Plaintiff's Depo. at 56-58, 60,

72. Plaintiff's assertion that she would not to speak with Mr. Traywick without a witness or an attorney present flies in the face of her contention that she did not know an investigation was occurring. Additionally, Plaintiff does not dispute that it is Dolgencorp policy that an employee can be terminated for failing or refusing to participate in an internal investigation. *See* Employee Handbook at 44-45.

Furthermore, Plaintiff acknowledged that the reason for her termination is true on her Termination Form. *See* Exhibit "8" to Dolgencorp's Evidentiary Submission. She admitted to doing so in her deposition. *See* Plaintiff's Depo. at 75-76. Now, in her new Affidavit, Plaintiff claims that she "signed the Dollar General Personnel Action Form on the date of my termination under duress." *See* Plaintiff's Affidavit at ¶22. This boldfaced change of testimony characterizes the lengths Plaintiff is willing to go in an effort to create a factual dispute. Such a blatant change in testimony cannot be used to create a factual dispute in light of documentary evidence and deposition testimony to the contrary. As a result, Plaintiff cannot show any causal connection between her purported protected activity and her termination because she has admitted to engaging in the conduct for which she was terminated. Therefore, Dolgencorp remains entitled to summary judgment on her retaliatory termination claim.

> **3.    Even if Plaintiff could establish a *prima facie* case of retaliatory discharge, Plaintiff cannot show that Dolgencorp's legitimate, non-retaliatory reason for her termination was pretextual.**

It is undisputed, despite Plaintiff's baseless contentions to the contrary, that she did not engage in any statutorily protected conduct, and that Dolgencorp terminated Plaintiff's employment for refusing to participate in an internal investigation. These facts are undisputed, regardless of Plaintiff's efforts to contradict her prior sworn testimony

and the documentary record evidence. Plaintiff's only argument with respect to this issue is that she was unaware an investigation was occurring when she asked for a witness or an attorney to be present, and that Ms. Harrison's and Ms. Tally's allegations were "false", in her opinion. *See* Opposition Brief at 28-29. It is irrelevant whether Ms. Harrison's or Ms. Tally's complaints were "true" or not – Plaintiff never gave Dolgencorp an opportunity to fully investigate those complaints, in violation of company policy. The existence of the complaints, to which Plaintiff admits, more than justifies the asset protection investigation that ensued. Additionally, Plaintiff's argument that she did not refuse to participate in an investigation because she did not know an investigation was occurring is illogical and meritless in light of the fact that she admits she wanted a witness or an attorney present. Furthermore, there has been no evidence presented that Plaintiff had any right to have known that she was being investigated. No evidence has been presented because none exists. Regardless, the fact remains that based on her own deposition testimony, as well as on the Termination Form which she signed, Plaintiff has admitted to engaging in the conduct for which she was terminated. As a result, Plaintiff cannot show that Dolgencorp's legitimate, non-retaliatory reason for her termination was pretextual and, as a result, Dolgencorp is entitled to summary judgment.

## III.    CONCLUSION

Plaintiff cannot sustain a *prima facie* case of discriminatory failure to promote because she cannot show that she was qualified for the Assistant Store Manager position, nor can she show that non-protected employees with equal or lesser qualifications were promoted to Assistant Store Manager. The evidence shows that Ms. Tally's prior experience in retail management made her more qualified for the Assistant Store

Manager position than Plaintiff.  Additionally, even if Plaintiff could sustain a *prima facie* case, Plaintiff has no evidence which would tend to show that Dolgencorp's legitimate, non-discriminatory reason for promoting Ms. Tally instead of Plaintiff[4] is a pretext for discrimination.

Likewise, Plaintiff's retaliatory discharge claim fails as a matter of law.  Plaintiff cannot sustain a *prima facie* of retaliatory discharge because she cannot show any nexus or causal connection between her complaint to ERC regarding the Assistant Store Manager position and her termination.  Plaintiff has admitted that her employment was terminated for refusing to participate in an internal investigation in accordance with Dolgencorp policy.  Even if Plaintiff could sustain a *prima facie* showing of retaliatory discharge, she has no evidence that Dolgencorp's legitimate, nondiscriminatory reasons for her termination are pretext for retaliatory animus.  As a result, Dolgencorp is entitled to summary judgment on all claims asserted in Plaintiff's Complaint.

WHEREFORE, PREMISES CONSIDERED, Dolgencorp respectfully requests that this Court enter an Order granting it summary judgment with respect to all claims asserted in Plaintiff's Complaint.

---

[4] Or even Plaintiff's belief that it was because Ms. Tally was Mr. McDonald's niece.

Respectfully submitted,

s/Christopher W. Deering
Bar No.:  ASB-5555-I71C

s/Ryan M. Aday
Bar No.:  ASB-3789-A54A

Christopher W. Deering, Esq.
Ryan M. Aday, Esq.
**Ogletree, Deakins, Nash,**
**    Smoak & Stewart, P.C.**
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone:  (205) 328-1900
Facsimile:  (205) 328-6000
E-mail: christopher.deering@odnss.com
E-mail: ryan.aday@odnss.com

*Attorneys for Defendant*
*Dolgencorp, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 22nd 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Lateefah Muhammad – lateefahmuhammad@aol.com

s/Ryan M. Aday
Ryan M. Aday
Bar Number:  ASB-3789-A54A
Attorney for Defendant,
Dolgencorp, Inc.

5509802.2

5509802.2

EXHIBIT 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF ALABAMA

 3                     SOUTHERN DIVISION

 4    KINERA LOVE,             )

 5           Plaintiff,   )

 6    VS.                      )   CIVIL ACTION NO:

 7    DOLLAR GENERAL           )

 8    CORPORATION,       )   CV 1147-MHT

 9                       )  DEPOSITION OF:

10           Defendant.  )   TIFFANY CROSS

11

12          S T I P U L A T I O N S

13

14      IT IS STIPULATED AND AGREED, by and

15    between the parties through their respective

16    counsel, that the deposition of:

17               TIFFANY CROSS,

18    may be taken before Cathy A. DeBardeleben,

19    Commissioner and Notary Public, State at

20    Large, at The Hampton Inn, 3000 Capps Way,

21    Opelika, Alabama, on the 14th day of

22    February, 2008, commencing at approximately

23    9:00 a.m.
```

Page 2

1    IT IS FURTHER STIPULATED AND AGREED
2    that the signature to and reading of the
3    deposition by the witness is not waived, the
4    deposition to have the same force and effect
5    as if full compliance had been had with all
6    laws and rules of Court relating to the
7    taking of depositions.
8
9    IT IS FURTHER STIPULATED AND AGREED
10   that it shall not be necessary for any
11   objections to be made by counsel to any
12   questions, except as to form or leading
13   questions, and that counsel for the parties
14   may make objections and assign grounds at the
15   time of the trial, or at the time said
16   deposition is offered in evidence, or prior
17   thereto.
18                    ***
19
20
21
22
23

Page 3

1         A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFF:
4    LATEEFAH MUHAMMAD
5    Attorney at Law
6    3805 West MLK Highway
7    Tuskeegee, Alabama  36083
8
9    ON BEHALF OF THE DEFENDANT:
10   CHRISTOPHER DEERING
11   Attorney at Law
12   Ogletree, Deakins, Nash,
13   Smoak & Stewart, P.C.
14   One Federal Place
15   Suite 100
16   1819 5th Avenue North
17   Birmingham, Alabama 35203
18
19   ALSO PRESENT:
20   CHARLES MCDONALD
21   KINERA LOVE
22
23

Page 4

1
2              I N D E X
3
4    MR. DEERING: 5-140, 146-151
5    MS. MUHAMMAD:  141-146
6
7         E X H I B I T  L I S T
8
9    Defendant's Exhibit No. 1 -  44
10   Defendant's Exhibit No. 2 -  45
11   Defendant's Exhibit No. 3 -  45
12   Defendant's Exhibit No. 4 - 105
13   Defendant's Exhibit No. 5 - 137
14
15
16
17
18
19
20
21
22
23

Page 5

1         I, Cathy A. DeBardeleben, a Court
2    Reporter of Birmingham, Alabama, and a Notary
3    Public for the State of Alabama at Large,
4    acting as Commissioner, certify that on this
5    date, pursuant to Rule 30 of the Alabama
6    Rules of Civil Procedure and the foregoing
7    stipulation of counsel, there came before me
8    on the 14th day of February, 2008, at The
9    Hampton Inn, 3000 Capps Way, Opelika,
10   Alabama, commencing at approximately
11   9:00 a.m., TIFFANY CROSS, witness in the
12   above cause, for oral examination, whereupon
13   the following proceedings were had:
14              TIFFANY CROSS,
15   being first duly sworn, was examined and
16   testified as follows:
17   EXAMINATION BY MR. DEERING:
18   Q    Please state your full name for the
19   record?
20   A    Tiffany Lee Cross Wilson.
21   Q    Lee, L-E-E?
22   A    Yes, sir.
23   Q    Cross Wilson.  Okay.  Ms. Cross, my

Page 6

1  name is Chris Deering. I'm an attorney for
2  Dollar General Corporation. And I am here
3  simply to ask you a few questions about this
4  lawsuit that Ms. Love has brought against the
5  company. And I understand that Ms. Love, the
6  plaintiff in this case, is present in this
7  room. And also, I guess for the record,
8  Ms. Lateefah Muhammad, who I understand is
9  counsel for Ms. Love is here as well.
10  Charles McDonald, who is a district manager
11  for Dollar General Corporation is also
12  present today.
13      Ms. Cross, I've got to get some
14  background information. What's your date of
15  birth?
16  A   3/21/80.
17  Q   And where were you born?
18  A   Tuscaloosa.
19  Q   Where were you raised? Most of your
20  upbringing, where did that take place?
21  A   Half and half, Tuscaloosa and then
22  Auburn.
23  Q   You said Auburn?

Page 7

1  A   Uh-huh.
2  Q   All right.
3  A   Well, Opelika. I'm sorry. Opelika.
4  Q   Okay. And I guess that makes you 27
5  years old?
6  A   Uh-huh, yes, sir.
7  Q   Okay. Now, you understand you are
8  under oath today, correct?
9  A   Yes, sir.
10  Q   And you understand that you are to
11  tell the truth?
12  A   Yes, sir.
13  Q   Okay. Do you take any prescription
14  medications?
15  A   No, sir.
16  Q   How about non-prescription
17  medications?
18  A   No, sir.
19  Q   And you're not suffering from any
20  condition that would affect your ability to
21  testify truthfully and accurately today?
22  A   No, sir.
23  Q   Again, these are just some background

Page 8

1  questions I have to ask. Do you understand
2  that?
3  A   Yes, sir.
4  Q   Okay. Have you ever given a
5  deposition before?
6  A   No, sir.
7  Q   Okay. It's important for the court
8  reporter's purposes that we try not to talk
9  over one another. So, when I'm asking a
10  question, if you'll wait -- at least wait
11  until I'm done speaking to respond, and I'll
12  try to do the same thing. I'll try to wait
13  until you have given your response before I
14  start talking. Is that fair?
15  A   Yes, sir.
16  Q   Do you currently have a valid Alabama
17  driver's license?
18  A   Yes, sir.
19  Q   Have you ever held a driver's license
20  in another state?
21  A   No, sir.
22  Q   Okay. Not in Georgia?
23  A   No, sir.

Page 9

1  Q   Have you ever had your Alabama
2  driver's license suspended or revoked?
3  A   Yes, sir.
4  Q   When did that happen?
5  A   Back in -- I'm not real sure. 2000.
6  Q   Was it a suspension or a revocation
7  or both?
8  A   Suspension.
9  Q   It's your testimony that your license
10  was never revoked?
11  A   No, sir, they wasn't revoked.
12  Suspended.
13  Q   Okay. What's your current address?
14  A   186 Lee Road 420, Opelika, Alabama
15  36804.
16  Q   Okay. Is this a single family
17  dwelling house? In other words, is it -- I
18  mean, it's not an apartment?
19  A   No, sir, it's a mobile home.
20  Q   Okay. How long have you lived there?
21  A   Going on two years will be in June.
22  Q   Okay. And who lives in the house
23  with you?

4

Page 10

1   A      Me, my husband, and three kids.
2   Q      **Okay. And what's your husband's**
3   **name?**
4   A      Kevin Wilson.
5   Q      **And you said three children?**
6   A      Yes, sir.
7   Q      **All right. Can you please give me**
8   **their names?**
9   A      Breanna Cross, Cierra Cross and
10  Ansley Wilson.
11         MS. MUHAMMAD: For the record, could
12  you spell those so the court reporter can
13  have them?
14  A      Breanna is B-R-E-A-N-N-A; Cierra is
15  C-I-E-R-R-A; and Ansley is A-N-S-L-E-Y.
16  Q      **And how old is Breanna?**
17  A      10.
18  Q      **Cierra?**
19  A      Six and four.
20  Q      **Okay. Ansley is four?**
21  A      Four.
22  Q      **All right. Those are the only**
23  **children that you have?**

Page 11

1   A      Yes, sir.
2   Q      **Breanna Cross and Cierra Cross, did**
3   **they have a different father from Kevin**
4   **Wilson?**
5   A      Breanna has a different father.
6   Q      **Okay. Who is her father?**
7   A      John Cross.
8   Q      **And how about Cierra?**
9   A      We're doing an adoption on her.
10  Kevin is going to adopt her, but John is
11  originally her father.
12  Q      **John Cross is?**
13  A      Yes, sir.
14  Q      **All right. Have you ever lived in**
15  **another state?**
16  A      No, sir.
17  Q      **Okay.**
18  A      Well, when I was little -- I'm
19  sorry. When I was little I did.
20  Q      **Where did you live?**
21  A      Louisiana.
22  Q      **About how old were you?**
23  A      10, 11.

Page 12

1   Q      **Ever live in Moundville, Alabama?**
2   A      Yeah, that's where I was raised at.
3   Tuscaloosa, Moundville.
4   Q      **All right. Were you previously**
5   **married to John Cross?**
6   A      Yes, sir.
7   Q      **And other than John Cross and Kevin**
8   **Wilson, have you had any other marriages?**
9   A      No, sir.
10  Q      **Is that John Timothy Cross?**
11  A      Yes, sir.
12  Q      **Is he still living in Phenix City?**
13  A      No, sir.
14  Q      **Do you know where he is now?**
15  A      Louisiana.
16  Q      **What city?**
17  A      I have no clue.
18  Q      **All right. And how long have you**
19  **been married to Kevin Wilson?**
20  A      Two years March the 17th.
21  Q      **And where did you get married?**
22  A      Courthouse.
23  Q      **Lee County?**

Page 13

1   A      Yes, sir.
2   Q      **All right. Does Mr. Wilson work?**
3   A      Yes, sir.
4   Q      **Where does he work?**
5   A      He's a painter. He works for Bob
6   Fisher.
7   Q      **And where is Bob Fisher based out**
8   **of?**
9   A      His house.
10  Q      **Where is that?**
11  A      In Auburn somewhere.
12  Q      **Okay.**
13  A      I'm not real sure.
14  Q      **How long were you married to John**
15  **Cross?**
16  A      Four years.
17  Q      **Okay. And when were you divorced?**
18  A      In 2002.
19  Q      **Ever serve in the military?**
20  A      No, sir.
21  Q      **Now, with respect to the divorce of**
22  **John Cross, who filed for divorce, you or**
23  **him?**

(Pages 14 to 17)                                                                    5

Page 14

1    A    We both did.
2    Q    And other than that divorce case,
3    have you ever filed a lawsuit?
4    A    No, sir.
5    Q    Did you ever file a case for
6    protection from abuse against John Cross?
7    A    Like a restraining order?
8    Q    Yeah.
9    A    Yeah, we had a restraining order.
10   Q    Okay.  Ever been sued by someone
11   else?
12   A    Yes, sir.
13   Q    Tell me about any of those lawsuits.
14   A    I had a wreck and didn't have
15   insurance and he sued me.
16   Q    And who sued you?
17   A    I have no idea no more.
18   Q    Okay.  Where did that lawsuit get
19   filed?
20   A    Lee County.
21   Q    Was that Morris Baker and Matilda
22   Richardson that sued you?
23   A    Yes.

Page 15

1    Q    And that was the lawsuit you were
2    talking about?
3    A    Yes.
4    Q    All right.  Any other lawsuits that
5    have been filed against you?
6    A    That's it that I know of.
7    Q    Are you aware of a lawsuit filed by
8    Cash Loans against you?
9    A    Yes.  They started a garnishment on
10   my wages.  I forgot about that one, too.
11   Q    All right.  Ever testified in court
12   before?
13   A    No, sir.
14   Q    And I think I asked this, and I
15   apologize if I did.  Have you ever given a
16   deposition before?
17   A    No, sir.
18   Q    This is the first time?
19   A    Yes, sir.
20   Q    Okay.  Ever been convicted of a
21   crime?
22   A    No.
23   Q    You've never pled guilty to any

Page 16

1    crime?
2    A    Not that I know of.  I pled guilty to
3    that with Matilda, you know, where I was at
4    fault.
5    Q    Okay.  Do you recall pleading guilty
6    in January of 2001 for driving with a
7    suspended driver's license?
8    A    Yeah, I didn't know that was
9    considered.  Ticket violations.
10   Q    Well, did you also plead guilty to
11   another crime in December of 2001 to
12   driving when your driver's license was
13   revoked?
14   A    Oh, they was revoked?  Yeah, then I
15   guess.
16   Q    Did you plead guilty to that?
17   A    Yes, sir.
18   Q    Okay.  And that was back in 2001?
19   A    Yes, sir.
20   Q    All right.  And do you recall being
21   sentenced to 30 days in jail?
22   A    No, I didn't do 30 days.
23   Q    Did you receive a sentence of 30 days

Page 17

1    in jail?
2    A    Yeah.  But it was suspended, yeah.
3    Q    Okay.  And do you know that there is
4    currently a warrant out for your arrest in
5    Hale County?
6    A    Really?
7    Q    I'm just asking if you're aware of
8    that.
9    A    No, I'm not aware of that.
10   Q    Ever filed for bankruptcy?
11   A    Yes, sir, I did.
12   Q    How many times?
13   A    Once.
14   Q    And where did you file?
15   A    Lee County.
16   Q    Okay.  Middle district of Alabama in
17   Montgomery probably.  It's a bankruptcy
18   proceeding or federal proceeding?  You just
19   don't recall?
20   A    I went through Legal Services.  They
21   helped me do it.
22   Q    All right.  At some point in the
23   past, have you ever owed the Internal Revenue

Page 18

1  Service back taxes?
2  A    I owed them -- state $61.  But that's
3  it.
4  Q    What about the federal government?
5  A    Not that I know of.
6  Q    Okay.  So sitting here today, it's
7  your testimony that as far as you know you
8  don't owe the IRS any back taxes?
9  A    No, sir.  I just filed my taxes.
10 Q    Have you ever had any mental,
11 emotional or physical problems?
12 A    No.
13 Q    What did you do to prepare for this
14 deposition today?
15 A    Nothing.  I mean, just come in and be
16 honest with you.
17 Q    Did you review any documents?
18 A    No, sir, I sure didn't.
19 Q    All right.  Have you spoken with
20 anyone about the circumstances of this case?
21 A    Just what I've went over with her,
22 but that's it.
23 Q    With Ms. Muhammad?

Page 19

1  A    Yes, ma'am -- I mean, yes, sir.
2  Q    When did you go over things with her
3  about this case?
4  A    Actually through the whole time of
5  this, before this.  I mean, ever since it
6  started.
7  Q    Okay.  Like when was the first time
8  that you spoke with Ms. Muhammad about it?
9  A    Oh, gosh.
10 Q    More than a year ago?
11 A    Yes, sir.
12 Q    More than two years ago?
13 A    I'm not -- I'm not sure.
14 Q    Okay.  And where did these
15 conversations typically take place?
16 A    In her office.
17 Q    How many times have you been to Ms.
18 Muhammad's office?
19 A    I'm not sure.
20 Q    More than 20?
21 A    No, no.  I don't get out that much,
22 no.
23 Q    More than 10 times?

Page 20

1  A    No, probably not.
2  Q    Well, sitting here today, what's your
3  best judgment as to the number of times you
4  actually went to her office?
5  A    No more than five I know.  Two or
6  three, somewhere in there.
7  Q    How about telephone conversations
8  with Ms. Muhammad?
9  A    Yes, I've talked to her on the phone
10 once or twice, somewhere.
11 Q    So, your best judgment is only once
12 or twice?
13 A    Yeah, that I can --
14 Q    Okay.  What were some of the things
15 that y'all talked about?
16     MS. MUHAMMAD: I'm going to object to
17 that in terms of client privilege.  I believe
18 we may have discussed matters regarding
19 conversations I had with my client.  And so
20 to have her testify about those things could
21 divulge those privileges.
22     MR. DEERING: Is Ms. Cross a client
23 of yours sitting here today?

Page 21

1      MS. MUHAMMAD: She's not a client of
2  mine, but the substances of the conversations
3  that we've had had to do with conversations
4  that I had with my client.
5      MR. DEERING: I understand.  But if
6  she's not a client of yours and if you have
7  disclosed communications with your client to
8  Ms. Cross, it's clearly a breach of that
9  privilege.  So I am entitled to ask her
10 questions about conversations she had with
11 you.  Unless you're sitting here today and
12 telling me that Ms. Cross is a client of
13 yours, then the privilege would apply, then
14 I'm going to ask her questions over your
15 objection.
16     MS. MUHAMMAD: It was with the
17 permission of my client to talk with her
18 about those things is how we had the
19 conversation.  She didn't give the permission
20 for her to be able to disclose those to
21 anyone.
22     MR. DEERING: Well, I understand
23 that.  But the bottom line is that she's

Page 22

1   under subpoena. She has a court order
2   sitting here today to testify truthfully.
3   And unless you tell me and you represent to
4   the Court that she is a client of yours, then
5   any disclosures that you may have made to
6   her -- any privilege does not apply.
7       MS. MUHAMMAD: I still make my
8   objection for the record.
9       MR. DEERING: I'm not going to get
10  into all of the details.
11  **Q    I generally want to know the subject**
12  **matter that was discussed between you and**
13  **Ms. Love's lawyer. She is not representing**
14  **to the Court today that you're her client.**
15  **And as a result, I am going to continue to**
16  **ask you some questions. I'm not going to**
17  **belabor the issue. But I do want to ask some**
18  **general questions.**
19  **    Ms. Cross, what prompted you to talk**
20  **to Ms. Love? I'm sorry. Ms. Love's lawyer**
21  **about this case? Did they contact you or did**
22  **you contact them?**
23  A    Kinera contacted me.

Page 23

1   **Q    And when did that occur?**
2   A    Right after it all happened, right
3   after.
4   **Q    When you say "all happened," what are**
5   **you talking about?**
6   A    After she had gotten terminated and
7   all that.
8   **Q    Was this while you were still**
9   **employed by Dollar General?**
10  A    Yes, sir.
11  **Q    Okay. So, Ms. Love contacts you.**
12  **What did she say?**
13  A    Just asked me if I would speak with
14  her lawyer.
15  **Q    Okay.**
16  A    And tell her what I told her.
17  **Q    Okay. And you willingly went to her**
18  **lawyer, correct?**
19  A    Yes, sir.
20  **Q    And what did you tell her lawyer?**
21      MS. MUHAMMAD: I'm going to object
22  again.
23  **Q    You can answer.**

Page 24

1   A    Exactly what was said and what
2   happened.
3   **Q    Okay. And is that some of the stuff**
4   **that's contained in the affidavit that you**
5   **filed in this case?**
6   A    Yes, sir.
7   **Q    Is there anything else that you said**
8   **to Ms. Muhammad in that first conversation**
9   **that is not contained in that affidavit?**
10  A    Explain.
11  **Q    Well, you just testified, I believe,**
12  **correct me if I'm wrong, that when you had**
13  **this first conversation with Ms. Muhammad**
14  **that you spoke with her about things**
15  **contained in the affidavit that you filed in**
16  **this case, correct?**
17  A    Yes, sir.
18  **Q    Is there anything else that you**
19  **discussed with Ms. Muhammad at that time that**
20  **is not contained in the affidavit?**
21  A    No, not that I can remember.
22  **Q    And in this first conversation you**
23  **had with Ms. Muhammad, was this by telephone**

Page 25

1   **or did you go to her office?**
2   A    I went to her office.
3   **Q    In Tuskeegee?**
4   A    Yes, sir.
5   **Q    And how far of a drive from Tuskeegee**
6   **to your home is that?**
7   A    A good 20 minutes, 20 or 30 minutes.
8   **Q    One way?**
9   A    Yes, sir.
10  **Q    Okay. And you made that trip, I**
11  **think you said, about five times; is that**
12  **right?**
13  A    Yeah, uh-huh.
14  **Q    Is that a "yes"?**
15  A    Yes, sir.
16  **Q    Okay. Tell me a little bit about**
17  **your education. Are you a high school**
18  **graduate?**
19  A    No, sir.
20  **Q    Did you go to high school anywhere?**
21  A    Yes, sir, I did.
22  **Q    Where did you go?**
23  A    Beauregard.

Page 26

| | | |
|---|---|---|
| 1 | Q | **Where?** |
| 2 | A | Beauregard. |
| 3 | Q | **How do you spell that?** |
| 4 | A | Your guess is as good as mine.  I'm |
| 5 | | sorry.  I don't know.  B-E-A-U-R-G-A-R-D, |
| 6 | | something. |
| 7 | Q | **That's a high school?** |
| 8 | A | Yes, sir. |
| 9 | Q | **Where?** |
| 10 | A | Out in Beauregard, Beauregard High |
| 11 | | School.  It's still considered Opelika. |
| 12 | Q | **All right.  Do you presently work?** |
| 13 | A | Yes, sir. |
| 14 | Q | **Where are you working?** |
| 15 | A | Piggly Wiggly. |
| 16 | Q | **And which location?** |
| 17 | A | Right here in Opelika on 2nd Avenue. |
| 18 | Q | **How long have you been there?** |
| 19 | A | Since the doors opened.  So I think |
| 20 | | it's about eight months is what I'm thinking. |
| 21 | Q | **What's your position there?** |
| 22 | A | The dairy manager. |
| 23 | Q | **Are you a salary or hourly employee?** |

Page 27

| | | |
|---|---|---|
| 1 | A | Hourly. |
| 2 | Q | **Do you supervise any employees?** |
| 3 | A | Me, that's it. |
| 4 | Q | **Okay.  So, is that a "no"?** |
| 5 | A | No. |
| 6 | Q | **You don't supervise other employees?** |
| 7 | A | Unh-unh, no, sir. |
| 8 | Q | **Okay.  Where did you work just prior** |
| 9 | | **to Piggly Wiggly in Opelika?** |
| 10 | A | Target.  I worked at Target while I |
| 11 | | worked at Piggly Wiggly. |
| 12 | Q | **Is that the new Target store in** |
| 13 | | **Auburn?** |
| 14 | A | Yes, sir. |
| 15 | Q | **Or is that Opelika?** |
| 16 | A | Yes, sir, right here in Tiger Town. |
| 17 | Q | **Okay.  What did you do there at** |
| 18 | | **Target?** |
| 19 | A | Cashier. |
| 20 | Q | **How long?** |
| 21 | A | A month. |
| 22 | Q | **Why did you leave?** |
| 23 | A | It was too much. |

Page 28

| | | |
|---|---|---|
| 1 | Q | **What was too much?** |
| 2 | A | Getting off at 11:00 at night, being |
| 3 | | back to work at 7:00. |
| 4 | Q | **Okay.  Was it a full-time job?** |
| 5 | A | A part-time. |
| 6 | Q | **And the Piggly Wiggly dairy manager** |
| 7 | | **job that you have, is that full-time?** |
| 8 | A | Yes, sir. |
| 9 | Q | **Did you receive any discipline or** |
| 10 | | **counseling at Target?** |
| 11 | A | No, sir. |
| 12 | Q | **Okay.  How about at Piggly Wiggly,** |
| 13 | | **have you received any discipline?** |
| 14 | A | No, sir. |
| 15 | Q | **All right.  Where did you work prior** |
| 16 | | **to working at Piggly Wiggly and Target?** |
| 17 | A | I worked at Wal-Mart. |
| 18 | Q | **The one in Auburn?** |
| 19 | A | Yes, sir. |
| 20 | Q | **Okay.  What did you do there, what** |
| 21 | | **was your position?** |
| 22 | A | Unloader. |
| 23 | Q | **Is that night shift?** |

Page 29

| | | |
|---|---|---|
| 1 | A | Second shift, 2:00 to 11:00. |
| 2 | Q | **Did you have any supervisory** |
| 3 | | **responsibilities in that job?** |
| 4 | A | No, sir. |
| 5 | Q | **Why did you leave Wal-Mart?** |
| 6 | A | I had a conflict with someone. |
| 7 | Q | **Who was that?** |
| 8 | A | Howard.  I don't know his last name. |
| 9 | Q | **Manager?** |
| 10 | A | No, he was not a manager. |
| 11 | Q | **What was the conflict?  What was the** |
| 12 | | **nature of it?** |
| 13 | A | He wanted me to tell him when I was |
| 14 | | going to the bathroom. |
| 15 | Q | **Okay.  Did you ever tell him?** |
| 16 | A | No, sir. |
| 17 | Q | **Why not?** |
| 18 | A | Well, really it's no one's business |
| 19 | | when I've got to go to the bathroom.  When |
| 20 | | I've got to go, I've got to go. |
| 21 | Q | **This was a co-worker of yours?** |
| 22 | A | Yes.  He was the same title as I was, |
| 23 | | an employee. |

**Page 30**

1  Q    Did you ever report Howard to anybody
2  at Wal-Mart?
3  A    Yes, I did, several times.
4  Q    And did Wal-Mart take any action?
5  A    No, they didn't.
6  Q    Did they investigate?
7  A    No, they didn't.
8  Q    Who did you report to?
9  A    Oh, what was his name?  Well, I
10  reported it once to Austin, which he's no
11  longer at that store.  He's at the Opelika
12  store now.  I think his name was Gary.  I
13  want to say his name was Gary.
14  Q    Was Howard sexually harassing you?
15  A    No.
16  Q    Well, I mean he wanted to --
17  A    Honestly, he didn't believe a woman
18  should be back there in the back unloading
19  the truck.  Honestly.
20  Q    All right.  Prior to Wal-Mart, where
21  did you work?
22  A    Dollar General.
23  Q    So, you went from Dollar General to

**Page 31**

1  Wal-Mart?
2  A    No, I took care of a lady after that
3  but that was just something I was doing to be
4  doing it.
5  Q    Did you get paid?
6  A    Yes, sir.
7  Q    And who were you taking care of?
8  A    Tommie Rhodes.
9  Q    Where does she live?
10  A    Well, she's dead now.
11  Q    So, you were a caretaker for her?
12  A    Yes, sir.
13  Q    How long did you work for her?
14  A    From the time I left Dollar General
15  up until -- so, November the 16th of '05 to
16  March of last year.
17  Q    All right.  Well, let's talk a little
18  bit about your employment with Dollar
19  General.  Do you recall when it was that you
20  were hired?
21  A    No, I don't.  I know it was in
22  April.  I remember it being in April.
23  Q    If I told you that Dollar General's

**Page 32**

1  records show that you were hired on May 28th
2  2004 --
3  A    Okay.
4  Q    -- would you have any reason to
5  dispute that?
6  A    No.
7  Q    Okay.  How did you come to be hired
8  by Dollar General?
9  A    I talked to Charles about a job.  I
10  went in and asked him for a job.
11  Q    Okay.  When you say "Charles," you
12  are referring to Mr. McDonald?
13  A    Charles McDonald, yes, sir.
14  Q    Who is sitting here today?
15  A    Uh-huh.
16  Q    It that a "yes"?
17  A    Yes, sir.
18  Q    It has to be clear for the court
19  reporter.
20  A    I know.  I keep forgetting.  I'm
21  sorry.
22  Q    That's fine.  So Mr. McDonald hired
23  you?

**Page 33**

1  A    Yes, sir.
2  Q    What was Mr. McDonald's position at
3  that time?
4  A    He was the manager.
5  Q    Of which store?
6  A    9600.
7  Q    Where was 9600 located?
8  A    Marvin Parkway.
9  Q    Do you know how long Mr. McDonald has
10  been employed by Dollar General?
11  A    No, I don't.
12  Q    Do you know what positions he has
13  held within the company?
14  A    Yes, I do.
15  Q    And what are those?
16  A    Manager, district manager.
17  Q    Any others that you're aware of?
18  A    That's all I know of.
19  Q    Okay.  And you don't know how long
20  he's been with the company?
21  A    No, sir.
22  Q    Are you related to Mr. McDonald in
23  any way?

Page 34

1   A     Yes, by marriage.
2   Q     **Describe that for me. How exactly**
3   **are you related to Mr. McDonald?**
4   A     Through my stepdad.
5   Q     **And what's his name?**
6   A     My grandmother and his wife are
7   sisters.
8   Q     **Okay.**
9   A     Mr. McDonald's wife and my
10  grandmother are sisters.
11  Q     **Okay. When you say your grandmother,**
12  **you're referring to --**
13  A     Really my step-grandmother, but,
14  yeah.
15  Q     **All right. And what's her name, your**
16  **grandmother?**
17  A     Dorothy Tally.
18  Q     **And what's your stepfather's name?**
19  A     Donnie Tally.
20  Q     **Okay. And do you know who Donna**
21  **Tally is?**
22  A     Yes, sir, that's his sister.
23  Q     **Donnie Tally's sister.**

Page 35

1   A     Yes, sir. Donnie Tally is his
2   sister -- her brother. Sorry.
3   Q     **So, that will make -- correct me if**
4   **I'm wrong on this. But that would make Donna**
5   **Tally your aunt by marriage?**
6   A     Yes, sir.
7   Q     **All right. Now, what's your mom's**
8   **name?**
9   A     LeeAnn Tally.
10  Q     **Okay. Do you get along with Donna**
11  **Tally okay?**
12  A     Yes, sir.
13  Q     **Ever had any disagreements with**
14  **Donna?**
15  A     No.
16  Q     **How about your mom, has she ever had**
17  **any disagreements with Donna?**
18  A     Yes.
19  Q     **Tell me some that come to mind, some**
20  **disagreements that she's had with Donna?**
21  A     Well, she sold Donna her trailer and
22  Donna won't pay the payment on it. So,
23  that's really the only big disagreement

Page 36

1   they've ever had.
2   Q     **When you say "trailer," are you**
3   **talking about a mobile home?**
4   A     Yes, sir.
5   Q     **So, how much money does Donna**
6   **supposedly owe your mom?**
7         MS. MUHAMMAD: I'm going to object
8   unless she knows for certain. That is
9   probably something --
10        MR. DEERING: That's a fair
11  objection. Let me back up.
12  Q     **Do you have any knowledge as to**
13  **roughly how much Donna Tally owes your**
14  **mom?**
15  A     I know she owes another 10 years of I
16  think $400 and something -- a little over
17  $400 and something a month on the trailer
18  payment and 10 years old.
19  Q     **I'm sorry. 10 years of what?**
20  A     It's $400 and something a month for
21  the trailer payment. And that's what she
22  owes her.
23  Q     **Okay. And she hasn't been paying it?**

Page 37

1   A     Well, they pay it, but it just takes
2   them a while to get it out of them. So, they
3   don't like their bills to be late. It's
4   still in their name right now.
5   Q     **Still in your mom's name?**
6   A     My mom and stepdad's name.
7   Q     **I got you.**
8   A     So, it's their big fall down right
9   now. So they don't speak.
10  Q     **Okay. What about your stepdad, does**
11  **he speak with Donna?**
12  A     Oh, yes.
13  Q     **They get along okay?**
14  A     Yes, sir.
15  Q     **Okay. In talking about your**
16  **stepfather, Don, do you know how he gets**
17  **along with Mr. McDonald?**
18  A     Fine.
19  Q     **Do you know if there was ever a**
20  **period of time when Don didn't talk to**
21  **Mr. McDonald?**
22  A     Not that I know of.
23  Q     **Do you know anything about Mr.**

Page 38

1   McDonald firing Don from a job previously?
2   A    Donnie? No.
3   Q    You don't have any knowledge of that?
4   A    Unh-unh, no, sir.
5   Q    How long has your mom, LeeAnn, been
6   with Don Tally in a relationship?
7   A    I was 14. So, it's been some years.
8   Q    All right. But you were 14 when they
9   started seeing each other?
10  A    Yes, sir.
11  Q    Okay. Was your mom, LeeAnn, married
12  previously?
13  A    Yes, sir.
14  Q    Okay. And was that your father?
15  A    No, sir.
16  Q    Okay.
17  A    Stepfather, too.
18  Q    All right. Who is your father?
19  A    Joe Harris.
20  Q    Is he alive?
21  A    Yes.
22  Q    Where does he live?
23  A    Moundville, Hale County, whichever

Page 39

1   you want to call it.
2   Q    But your mom never married him?
3   A    Yeah, they was married, too.
4   Q    Okay. When did they get a divorce?
5   A    Gosh, I have no clue.
6   Q    Do you remember how old you were
7   roughly?
8   A    I was 10. They signed their papers
9   in September. The 25th they signed their
10  papers.
11  Q    Okay. And then she married another
12  gentleman, correct?
13  A    (Witness nods head.)
14  Q    What was his name?
15  A    Jim Williston.
16  Q    Williston?
17  A    W-I-L-L-I-S-T-O-N.
18  Q    And about how long was she married to
19  Mr. Williston?
20  A    They was only married -- well, they
21  was married longer, but they was only
22  together for a little over a year.
23  Q    Did she marry Mr. Williston

Page 40

1   immediately after her divorce from
2   Mr. Harris?
3   A    Yes.
4        MS. MUHAMMAD:  I'm going to object to
5   this line of questioning. I don't see the
6   relevance to this lawsuit.
7        MR. DEERING:  Well, I'm trying to
8   establish a time line.
9        MS. MUHAMMAD:  Who she was married to
10  and how long, what's the relevance?
11       MR. DEERING:  Well, the problem is
12  that your witness here, Ms. Cross, is related
13  to Mr. McDonald by marriage. She's also
14  related to Donna Tally by marriage. Both of
15  these individuals are key witnesses in this
16  lawsuit.
17       It's very important for the record,
18  for the Court, and for the jury in this case
19  to fully appreciate and understand the family
20  history of Tiffany Cross. And I'm not
21  belaboring these issues, but we have to get
22  some background as to Tiffany Cross's marital
23  and family relationships so the jury can

Page 41

1   understand the dynamics for which she is
2   testifying in this case.
3   Q    After Mr. Williston, did your mother
4   then enter into a relationship with Mr. Tally
5   or was there someone else she was involved
6   with?
7   A    It was straight to Donnie.
8   Q    Okay. And, again, you were
9   approximately 14 years old when Donnie came
10  in the picture?
11  A    Yes, sir.
12  Q    And did you know Donnie prior to the
13  age of 14?
14  A    No, sir.
15  Q    Never saw him before?
16  A    No, sir.
17  Q    Have you ever been to Mr. McDonald's
18  house?
19  A    Yes, sir.
20  Q    How many times?
21  A    Five or 10 maybe, in between five and
22  10.
23  Q    Okay. What were the occasions in

Page 42

1  which you were there?
2  A    Christmas, Thanksgiving, 4th of July.
3  Q    When was the last time you were at
4  Mr. McDonald's house?
5  A    The 4th of July before I left Dollar
6  General.
7  Q    And when did you leave Dollar
8  General?
9  A    '05 I'm wanting to say it is. I'm
10  thinking.
11  Q    Okay. If I told you November 13,
12  2005 was your last day --
13  A    Yeah, that's it.
14  Q    Does that sound right?
15  A    That's it.
16  Q    All right. On the occasions that you
17  would go over to Mr. McDonald's house, did
18  your mom typically go as well?
19  A    Yes, sir. Sometimes she did. Not
20  all the time.
21  Q    Okay. Did your mom get along with
22  Mr. McDonald?
23  A    Yeah.

Page 43

1  Q    Did they ever have any disagreements
2  with one another?
3  A    Not that I know of. She's a hard
4  person to get along with, so I don't know.
5  Not that I know of.
6  Q    Do you get along with your mom all
7  right?
8  A    Yeah.
9  Q    How about Mr. McDonald's wife, do you
10  know what her name is?
11  A    Barbara.
12  Q    Do you get along with her okay?
13  A    Yes, sir.
14  Q    All right. Did you send her a
15  Christmas card this year?
16  A    No, sir. I don't send them.
17  Q    Okay. Did you fill out a job
18  application when you applied for Dollar
19  General employment?
20  A    Yes, I filled out the paperwork and
21  all that, yes.
22  Q    Let me show you, Ms. Cross, what I am
23  marking as Defendant's Exhibit 1. If you'll

Page 44

1  take a look at that multi-page exhibit and
2  let me know if you recognize those as being
3  some of those employment forms that you
4  filled out when you applied with Dollar
5  General back in May of 2004.
6           (Defendant's Exhibit
7              No. 1 was marked for
8              identification).
9  A    Uh-huh.
10  Q    Is that a "yes"?
11  A    Yes, sir. I'm sorry.
12  Q    And those are your signatures at the
13  bottom of those three pages of Defendant's
14  Exhibit 1?
15  A    Yes, sir.
16  Q    While I'm at it, let me mark
17  Defendant's Exhibit 2 for you. If you will
18  take a look at that and let me know if you
19  recognize that as being the subpoena that was
20  served on you back on February 6, 2008.
21           (Defendant's Exhibit
22              No. 2 was marked for
23              identification.)

Page 45

1  A    Yes, sir.
2  Q    And that's to appear for this
3  deposition today, correct?
4  A    Yes, sir.
5  Q    Let me show you what I am marking as
6  Defendant's Exhibit 3. If you will take a
7  look at that multi-page exhibit and let me
8  know if you recognize those as being some
9  signed acknowledgments that you signed back
10  in May of 2004 at the time of your employment
11  with Dollar General?
12           (Defendant's Exhibit
13              No. 3 was marked for
14              identification).
15  A    Yes, sir.
16  Q    I'm sorry?
17  A    Yes, sir.
18      MS. MUHAMMAD: I'm going to object to
19  the last page of that exhibit in that it
20  shows her Social. I think that -- I notice
21  it was blackened out on --
22      MR. DEERING: Yeah, it should have
23  been blackened out. In fact, we'll do that

Page 46

1  right now while we're sitting here. We'll
2  blacken the first five digits or of that
3  Social number so that there can be no
4  question that this exhibit protects your
5  information.
6    Q    And, Ms. Cross, if you will take a
7  look at that last page of Defendant's Exhibit
8  3. Is that your signature on that document?
9    A    Yes, sir.
10   Q    Okay. And you dated that July 4 '05;
11 is that correct?
12   A    Yes, sir.
13   Q    And just for the record so we are all
14 clear, you saw me as I marked through the
15 first five digits of your Social Security on
16 that document, correct?
17   A    Yes, sir.
18   Q    And that's the only alteration that
19 we made to that document.
20   A    Okay.
21   Q    Let me ask you, Ms. Cross, let's go
22 through your time at Dollar General. When
23 you were hired by Mr. McDonald at 9600, what

Page 47

1  position were you hired into?
2    A    As a stock clerk. But he informed me
3  that I would be moving up.
4    Q    Okay. When did he inform you that
5  you would be moving up?
6    A    Right after I started.
7    Q    Okay. And, again, this was back in
8  May of 2004?
9    A    Yes, sir.
10   Q    Okay. And at some point, did you get
11 promoted to another position?
12   A    Yes, sir.
13   Q    And what position was that?
14   A    Third key.
15   Q    All right. Do you remember when it
16 was? Roughly how long you had been with the
17 company when you were promoted to third key?
18   A    A month -- about a month, somewhere
19 in there.
20   Q    Okay. And prior to working at Dollar
21 General, beginning in May of 2004, you had
22 never worked for Dollar General previously?
23   A    No, sir.

Page 48

1    Q    Is that correct?
2    A    Yes, sir, that's correct.
3    Q    All right. And when you were working
4  as third key at 9600, was Mr. McDonald your
5  supervisor at that time?
6    A    Yes, sir, he was.
7    Q    And at some time thereafter, did you
8  receive another promotion?
9    A    Yes, sir.
10   Q    And what were you promoted to?
11   A    To assistant manager.
12   Q    Do you recall when it was that you
13 were promoted to assistant manager?
14   A    I don't remember.
15   Q    If I told you that Dollar General's
16 records show that you were promoted September
17 18, 2004, does that sound about right?
18   A    Yes.
19   Q    Okay. And that was at 9600 when you
20 got that promotion?
21   A    Yes, sir.
22   Q    And then shortly thereafter, did you
23 transfer to another store?

Page 49

1    A    Yes, sir.
2    Q    Which store was that?
3    A    Auburn store.
4    Q    8665?
5    A    Yes, sir.
6    Q    And that's the Auburn Dollar General
7  store that's located at the Tiger Crossing?
8    A    By Winn-Dixie.
9    Q    And did that transfer take place in
10 the latter part of October 2004 to the best
11 of your judgment sitting here today?
12   A    Yes, sir.
13   Q    All right. And you were in that
14 position as assistant manager at 8665 for
15 approximately how long until you received
16 your next promotion?
17   A    Oh, gosh. It was the beginning -- I
18 think it was the beginning. It was right
19 there before Christmas I went to 6519.
20   Q    And 6519, that's the Parkway Village
21 store over on 2nd Avenue?
22   A    Yes, sir, 2nd Avenue.
23   Q    And that's in Opelika, correct?

Page 50

1  A    Yes, sir.
2  Q    All right.  And what was your
3  promotion?
4  A    To management.
5  Q    Store manager?
6  A    Yes, sir.
7  Q    Okay.  And, again, you said it was
8  before Christmas?
9  A    I'm thinking it was right before
10 Christmas.
11 Q    Of 2004?
12 A    Yes, sir.
13 Q    Okay.  And at any time did you ever
14 go to any of Dollar General's training
15 schools or training stores?
16 A    Later on I did.
17 Q    Okay.  Tell me about that.
18 A    I went July the 4th.  I remember July
19 4th week or something right there in that
20 week.  I went to the manager training school
21 in Jacksonville, Florida.
22 Q    How long were you there?
23 A    Two weeks.  Yeah, two weeks.

Page 51

1  Q    All right.  And, again, would this
2  have been in July of 2005?
3  A    Yes, sir.
4  Q    Okay.  And at the conclusion of that
5  training that you received, did you receive
6  any kind of certificate, any kind of document
7  showing that you had completed it?
8  A    Yes, sir, yes, sir.
9  Q    Did you receive a raise in pay after
10 going through the training school?
11 A    No, sir.
12 Q    All right.  Any other promotions that
13 you had at Dollar General prior to --
14 A    That was it.
15 Q    Okay.  And we've already established,
16 I think, for the record that your employment
17 ended on November 13, 2005, correct?
18 A    Yes, sir.
19 Q    During the time that you worked at
20 Dollar General, were you ever -- did you ever
21 receive any kind of discipline or counseling?
22 A    Not that I can remember.
23 Q    Okay.  Do you recall being counseled

Page 52

1  would when you worked as a store manager
2  because you had left store clerks at the
3  store by themselves and had given your keys
4  to the store to them?
5  A    No, I don't recall that.
6  Q    It is your testimony you were never
7  counseled with respect to that?
8  A    No, sir, because I never done that.
9  Q    Okay.  Do you remember one of your
10 store clerks at the 2nd Avenue store by the
11 name of -- it's either Chris or Thomas
12 Jacques?
13 A    Yes, I remember him.
14 Q    Did you ever leave him in the store
15 by himself?
16 A    No.
17 Q    That never happened?
18 A    No, sir.
19 Q    And you never left a store clerk by
20 himself in a store to go clean houses for
21 extra money?
22 A    No, sir.
23 Q    During the time you served as a store

Page 53

1  manager, did you ever borrow money from the
2  store safe for personal use?
3  A    No, sir.
4  Q    Because that would have been a
5  violation of company policy?
6  A    Yes, sir.
7  Q    And you understood that then,
8  correct?
9  A    Yes, sir.
10 Q    In April of 2005, did you borrow
11 money from the store safe for personal use?
12 A    No, sir.
13 Q    Were you ever counseled about leaving
14 during the day to work your second job
15 cleaning houses?
16 A    No, sir.
17 Q    You did make money cleaning houses
18 during the time you worked for Dollar
19 General --
20 A    I done it on my day off.
21 Q    And what was your day off back then?
22 A    I normally done it on Thursdays.
23 Q    All right.  And what houses were you

Page 54

1  cleaning?
2  A      Tommie Rhodes and Avery.  And that's
3  it.
4  Q      What's Avery?
5  A      Mr. Avery.
6  Q      That's his last name?
7  A      Yes, sir.
8  Q      What's his first name?
9  A      I'm not sure.  I always called him
10  Mr. Avery.
11  Q      Where does he live?
12  A      On north cutoff in Auburn.
13  Q      I'm sorry?
14  A      Off of North Hatch or something in
15  Auburn.
16  Q      North Hatch Road?
17  A      I think so.  Something like that.
18  Q      Okay.  And it's your testimony that
19  you only did this on Thursdays --
20  A      Yes, sir.
21  Q      -- while you were working at Dollar
22  General; is that correct?
23  A      Yes, sir.

Page 55

1  Q      How much money would you typically
2  make cleaning these houses?
3  A      Just $100.
4  Q      Per house?
5  A      No, $50 per house.
6  Q      And did you ever report any of that
7  income on your tax returns?
8  A      Yes, I do.
9  Q      Well, back in 2005, did you?
10  A      Now, in 2005, I'm not sure.  I know
11  last year I did.  And because I didn't make
12  enough in cleaning she said or something.  I
13  don't know.
14  Q      Okay.
15  A      But last year and this year I've
16  claimed it.
17  Q      All right.  Now, who was the district
18  manager when you were first hired in at 9600?
19  A      Dennis Long.
20  Q      And he was Mr. McDonald's boss, I
21  guess?
22  A      Yes, sir.
23  Q      And at some point in time, did you

Page 56

1  get a new district manager?
2  A      Yes, sir.
3  Q      Who was that?
4  A      Charles stepped up.
5  Q      Charles McDonald?
6  A      Charles McDonald, yes, sir.
7  Q      What happened to Mr. Long, if you
8  know?
9  A      I think he was going to get the Easy
10  Store started and get all of that worked in.
11  I believe that's what he was doing.
12  Q      Okay.  At some point did he come
13  back?
14  A      Yes, sir.
15  Q      As the district manager?
16  A      Yes, sir.
17  Q      Okay.  Do you recall when it was that
18  he came back?
19  A      I think the day he fired me.
20  Q      Okay.  And, again, that would have
21  been November 13, 2005?
22  A      Yes, sir.
23  Q      So, his first order of business was

Page 57

1  essentially to fire you?
2  A      Yes, sir.
3  Q      Have you had any -- other than Donna
4  Tally and Mr. McDonald, any other relatives
5  work for Dollar General that you know of?
6  A      No, not that I know of.
7  Q      How about any close friends of yours,
8  any friends you grew up with that have ever
9  worked for Dollar General?
10  A      No.
11  Q      Okay.  Who is Wendy Whitlock?
12  A      She used to work for Dollar General.
13  Q      Which store, if you remember?
14  A      She started at Charles' store, 9600.
15  Q      Okay.  Did you manage her or were you
16  the store manager when she was working there?
17  A      Charles was our store manager to
18  start with.
19  Q      Okay.  But you were assistant manager
20  at that time, correct, when Wendy was working
21  there?
22  A      No, she started before me.
23  Q      Okay.  And what was Wendy's position

Page 58

1  there?
2  A    A stock clerk, too.
3  Q    Did she ever get any promotions?
4  A    Yeah, later on.
5  Q    Let me back up. Do you know who
6  hired Ms. Whitlock?
7  A    I think -- I'm not sure. I think
8  Charles did, but I'm not sure. I come after
9  her so I don't know.
10 Q    And tell me again, do you know
11 whether she ever received any promotions?
12 A    Yes, she did.
13 Q    Okay. What promotions did she
14 receive?
15 A    She got promoted up to third key.
16 Q    Okay. Any others?
17 A    Eventually she got assistant manager
18 and then management.
19 Q    When you say management --
20 A    Store manager. I'm sorry.
21 Q    Which store did she manage?
22 A    I think she started managing the one
23 in -- 1601 I think it is. The one over there

Page 59

1  in -- behind Pepperell, somewhere in there.
2  Not Pepperell. I can't remember the name of
3  it.
4  Q    Okay. Do you consider Ms. Whitlock a
5  good friend?
6  A    Now she is, yes.
7  Q    At some point in the past she was
8  not?
9  A    Oh, no.
10 Q    Tell me why she wasn't a good friend
11 when y'all were working together.
12 A    She didn't like me because she said I
13 took her position.
14 Q    And which position was that?
15 A    Third key.
16 Q    That was right after you got hired?
17 A    Yes, sir.
18 Q    Well, why did you get the third key
19 position and she did not, if you know?
20 A    I don't know at that point.
21 Q    No idea sitting here today?
22 A    No.
23 Q    Now, you and Ms. Whitlock worked

Page 60

1  together subsequent to your time at Dollar
2  General, correct?
3  A    Yes -- yes, sir. She was up under
4  me.
5  Q    I'm sorry?
6  A    She was up under me, yes, sir.
7  Q    Okay. At which employer?
8  A    Wendy?
9  Q    Yes. Did you work together at any
10 subsequent employers?
11 A    Oh, besides that? Yeah, we work
12 together at Piggly Wiggly now. But that's
13 it.
14 Q    She didn't work at Target with you?
15 A    No, sir.
16 Q    Y'all both work at Piggly Wiggly
17 right now together?
18 A    She's no longer there, but yeah, we
19 did.
20 Q    Do you know what the circumstances of
21 her leaving Piggly Wiggly were?
22 A    We don't know. That's what she was
23 told. She was working in the deli and the

Page 61

1  deli manager come to her and told her she
2  didn't need her.
3  Q    You don't know if she did anything
4  that precipitated her termination?
5  A    No.
6  Q    You just don't know?
7  A    No, she didn't. Mainly she took
8  charge when the lady was out sick and she was
9  in fear of her job. So, she had to get rid
10 of her basically.
11 Q    And where did you learn that?
12 A    It was just her attitude. She had
13 told a few people and a few people come told
14 us, so we was like, okay, whatever.
15 Q    So, you're hearing it third hand?
16 A    Yes.
17 Q    Okay. Now, do you know who gave Ms.
18 Whitlock her promotions at Dollar General?
19 A    Charles.
20 Q    He was store manager or district
21 manager at the time of her promotions? Do
22 you know?
23 A    For assistant manager? Yeah, he was

Page 62

1   district manager, I believe.  I think.
2   Q      Okay.  Now, as far as you know, Ms.
3   Whitlock does not work for Dollar General
4   anymore?
5   A      No, sir.
6   Q      Do you know why?
7   A      She went out on medical leave with
8   her foot and then she come back.  From what
9   she told me, she wanted to step down and just
10  be a cashier because she couldn't handle it
11  on her foot.
12         MS. MUHAMMAD: I'm going to object to
13  the form of what someone else told her.
14  She's not here to testify.  It's going to be
15  hearsay.
16  Q      Okay.  You can continue to answer.
17  She's just stating an objection for the
18  record.
19  A      Okay.  She told me that Dennis Long
20  would not let her step down, so she just went
21  out.
22  Q      Okay.  So, she had --
23  A      Medical issues.

Page 63

1   Q      Okay.
2   A      Basically.
3   Q      So, she left of her own volition?
4   A      Yes, yes.
5   Q      Do you know what she's doing now?
6   A      Sitting at home enjoying it.
7   Q      Do you know how she is making a
8   living?
9   A      Her husband.
10  Q      All right.  And where does she live?
11  A      Out past Mike's Grocery out there in
12  Beauregard.
13  Q      And when was the last time you talked
14  to her?
15  A      Yesterday.
16  Q      Okay.  Did you talk about this case
17  with her?
18  A      No, sir.
19  Q      Didn't even mention the fact?
20  A      No, sir.
21  Q      The fact that you were subpoenaed for
22  this deposition and --
23  A      I told her I was subpoenaed to it.

Page 64

1   And she said, really?  And I said, yeah.  But
2   that's it.  Nothing other.
3   Q      Did she ask you whether you thought
4   that she was going to be subpoenaed to
5   testify in this case?
6   A      No.
7   Q      Other than Ms. Whitlock, since your
8   employment ended in November of '05, have you
9   had any conversations with any Dollar General
10  employees that you previously worked with?
11  A      Yeah, I talked to her.
12  Q      Who is that?  I'll just make a short
13  list.
14  A      Tammy.
15  Q      What's her last name?
16  A      Stephens.
17  Q      Okay.  Who else?
18  A      Julie, when I see her.
19  Q      Julie Morrison?
20  A      Yes, sir.  And that's about the only
21  two.
22  Q      Okay.  When did you last talk to
23  Julie?

Page 65

1   A      She was in Piggly Wiggly the other
2   day.  Some time this week.  I think it might
3   have been Monday.  Monday she was in there,
4   think.
5   Q      Did you tell her you were subpoenaed
6   to testify in this case?
7   A      No.
8   Q      Did you talk about Ms. Love at all in
9   that conversation with Ms. Morrison?
10  A      No, sir.
11  Q      When was the last time you talked to
12  Tammy Stephens?
13  A      I seen her last night when I went in
14  to purchase something.
15  Q      Which store is that?
16  A      6519.
17  Q      And what's Tammy's position there
18  now, if you know?
19  A      Third key.
20  Q      Okay.  Did you mention to her that
21  you were going to testify in this case today?
22  A      No.
23  Q      Did you talk about the lawsuit at all

Page 66

1  with her?
2  A    No, sir.
3  Q    Do you talk to Ms. Whitlock about
4  every day?
5  A    Sometimes, but sometimes not.
6  Q    Well, in a given seven day week,
7  about how many times do you --
8  A    At least every other day.
9  Q    And that's been true since you left
10 Dollar General?
11 A    Yes, sir.
12 Q    Do you ever take any trips with her?
13 A    No, sir.
14 Q    Ever socialize with her outside of
15 the home or when you were at Piggly Wiggly?
16 A    Yes, sir.
17 Q    What were some of the things that
18 y'all would do together?  Go shopping?
19 A    Yeah, go shopping, go pay bills, go
20 get our hair cut.  That's about it.  We never
21 discussed Dollar General or nothing.
22 Q    Do your husband or her husband get
23 along all right?

Page 67

1  A    Yes, sir.
2  Q    All right.  Since your employment
3  ended in November of 2005 with Dollar
4  General, can you describe for me what your
5  best judgment is as to the number of
6  conversations you've had with Kinera Love
7  since then?
8  A    It's not been many.  I mean, it's not
9  been but 20, 30, somewhere up in there.  Not
10 an everyday thing.
11 Q    So, it's been over two years.  And
12 your best judgment is 20 to 30 conversations
13 --
14 A    Yeah.
15 Q    -- with Ms. Love?
16 A    Not many.
17 Q    Okay.  In those conversations with
18 Ms. Love, have you talked about anything
19 other than this lawsuit?
20 A    I just told her she needed to come up
21 to Piggly Wiggly and put an application in,
22 you know, or something like that.
23 Q    Did she ever go put an application in

Page 68

1  there?
2  A    I'm not sure.
3  Q    But you encouraged her to do that?
4  A    Yeah, she's a hard worker.  She's a
5  good worker, so yeah.
6  Q    Do you think she was qualified to
7  work at Piggly Wiggly?
8  A    She is well qualified to.
9  Q    Did she ever indicate to you why she
10 hadn't applied for employment there?
11 A    It was just the other day I told
12 her.  I mean, it's not been like, it's been a
13 month or so.  It was just two or three days
14 ago.
15 Q    All right.  Would you put in a good
16 word for her if she did apply?
17 A    Yes, I would.  I already have.
18 Q    But she just hasn't applied as far as
19 you know?
20 A    I don't know if she has gotten back
21 to the manager and took the application.  No,
22 I don't know that.
23 Q    Do you know of any other jobs that

Page 69

1  Ms. Love has applied for since her employment
2  ended?
3  A    No, sir, I don't.
4  Q    Did you ever encourage her to apply
5  for another job --
6  A    No.
7  Q    -- other than at Piggly Wiggly?
8  A    Just the Pig.
9  Q    Why were you terminated from Dollar
10 General?
11 A    I had a bounced check.
12 Q    It was actually four bounced checks,
13 wasn't it?
14 A    No, it was one bounced check for $45.
15 Q    Okay.  Which bank were those checks
16 from?
17 A    Royal.
18 Q    I'm sorry?
19 A    Royal.
20 Q    Royal Bank?
21 A    Royal Federal Credit Union.  It's
22 Four Seasons now.  They changed the name.
23 Q    But it was Royal Federal Credit Union

Page 70

1  back then?
2  A    Yes, sir.
3  Q    And which branch location is that?
4  A    I use the branch over here by
5  Wal-Mart.  It was on Pepperell.
6  Q    You said Pepperell?
7  A    Yes, sir.
8  Q    And was the account in your name
9  only?
10  A    Yes, sir.
11  Q    It wasn't a joint account?
12  A    My name.
13  Q    And what name were you using at that
14  time?
15  A    Tiffany Cross.
16  Q    And tell me again, when did you get
17  married to Mr. Wilson.
18  A    March 17th of -- this year will be
19  two years.
20  Q    Of '06?
21  A    Yeah.
22  Q    All right.  But it's your testimony
23  sitting here today that it was only one

Page 71

1  check, not four, that bounced?
2  A    Yes, it was only one check.
3  Q    Okay.  And these were checks that you
4  had written out to Dollar General, correct?
5  A    (Witness nods head.)
6  Q    Is that a "yes"?
7        MS. MUHAMMAD:  Object.  I think she
8  said one check and you are saying checks.
9  A    One check bounced.
10  Q    I understand.  But the checks that
11  you wrote, they were written to Dollar
12  General Corporation, correct?
13  A    Yes, sir.
14  Q    And you are saying that only one
15  check bounced?
16  A    Yes, sir.
17  Q    And it was for $45?
18  A    Yes, sir.  Because I paid $75 to get
19  it.
20  Q    I'm sorry?
21  A    I paid $75 to get it.  The fee you
22  have to pay.  It was a total of $75.
23  Q    All right.  Now, you knew it was a

Page 72

1  violation of company policy to bounce a check
2  at Dollar General?
3  A    Well, it wasn't like I intentionally
4  done it.
5  Q    I understand.  But you understood it
6  was a violation of company policy, correct?
7  A    Actually, at that time I did not.  I
8  figured it out later, yes.
9  Q    And Mr. Long terminated your
10  employment over that bounced check, correct?
11  A    Yes, sir.
12  Q    And you admitted to Mr. Long that you
13  had bounced that check, correct?
14  A    Yes, sir, because I knew about it
15  then.
16  Q    When Mr. Long came back and
17  terminated your employment on November 13,
18  was that the first time that you had actually
19  seen him in months?
20  A    Yes, sir.
21  Q    By the way, what is Mr. Long's race,
22  if you know?
23  A    His race?

Page 73

1  Q    Yeah.  Is he white, Hispanic, black?
2  A    Black.
3  Q    Just by way of background, where did
4  you work just prior to coming to Dollar
5  General?
6  A    Top Notch Cleaning.
7  Q    What is that?  What kind of business?
8  A    It's a cleaning service.
9  Q    Are they still in business?
10  A    Yes, sir.
11  Q    Where are they located?
12  A    Fredericks Road.
13  Q    Who runs that business?
14  A    Chris Warren.
15  Q    Warren?
16  A    Yeah, Warren.
17  Q    What kind of job did you have with
18  them?
19  A    I was a maid.
20  Q    Okay.  Were you an hourly employee?
21  A    Yes, sir.
22  Q    Did you supervise any employees?
23  A    No.  I was made up to crew leader,

Page 74

1  but that was it.
2  Q     How long did you work there?
3  A     Two years, a year and a half or two
4  years.
5  Q     Okay.
6  A     I've went back since then, too.
7  Q     Okay. Prior to Top Notch Cleaning,
8  where did you work?
9  A     Golden Corral.
10 Q     What was your job there?
11 A     Server.
12 Q     Did you ever receive any other
13 promotions there?
14 A     No, sir.
15 Q     And that's the Golden Corral here in
16 Auburn?
17 A     Opelika, yes, sir.
18 Q     Okay. Did you ever receive any
19 discipline or counseling at Golden Corral?
20 A     Not that I can remember.
21 Q     Why did you leave there?
22 A     I went to Top Notch when I left
23 there.

Page 75

1  Q     Okay. That was the reason why you
2  left?
3  A     Yes, I put in my two weeks notice.
4  Q     You weren't fired?
5  A     No, sir.
6  Q     Prior to coming to Dollar General,
7  had you had any management experience?
8  A     None. Well, yes, I did. I'm sorry.
9  I'm sorry. I was assistant manager of
10 Sbarro's.
11 Q     Okay.
12 A     In the mall.
13 Q     Which mall is that?
14 A     Well, it used to be in Colonial Mall.
15 Q     And Sbarro's is the pizza place?
16 A     Yes, sir.
17 Q     How long did you work as an assistant
18 manager at Sbarro's?
19 A     About three years -- three to four
20 months.
21 Q     How old were you at that time?
22 A     18.
23 Q     Was it just during the summer or was

Page 76

1  it --
2  A     No, it was my full-time job.
3  Q     Okay. Were you a salaried employee?
4  A     No, sir.
5  Q     You were hourly?
6  A     Hourly.
7  Q     Why did you leave Sbarro's?
8  A     I was just young. I don't know.
9  Q     You weren't fired?
10 A     No, sir, I quit.
11 Q     Now, do you know why Ms. Love's
12 employment with Dollar General was
13 terminated?
14 A     I don't know the whole story. I just
15 know what I've heard. I mean, I don't know
16 exactly why they actually come in and
17 terminated her.
18 Q     Well, what have you heard from
19 others?
20    MS. MUHAMMAD: Object to that
21 question, object to the form.
22 Q     You can answer.
23 A     Well, at one time, they was trying to

Page 77

1  say she was stealing. I think I heard that.
2  Yeah. And that's the only other thing I've
3  heard was that.
4  Q     Okay. Who told you that, about her
5  stealing?
6      MS. MUHAMMAD: Object to the form.
7  A     Wendy, Wendy brought it to my
8  attention and said that to me.
9  Q     Wendy Whitlock?
10 A     Yes, sir.
11 Q     Now, was she still working at Dollar
12 General?
13 A     Yes, sir, she was.
14 Q     Anything else you remember Wendy
15 telling you about that?
16 A     That was it.
17 Q     All right. And, again, everything
18 you know about her termination came from what
19 Wendy Whitlock told you, correct?
20 A     Yes, sir.
21 Q     All right. Do you know where Kinera
22 Love has worked since her employment with
23 Dollar General ended?

(Pages 78 to 81)                                                21

Page 78

1   A   No, sir.
2   Q   Do you know whether she has worked at
3   all?
4   A   No, sir.
5   Q   Do you know who the regional manager
6   was while you worked at Dollar General?
7   A   Yes, sir.
8   Q   Who was that?
9   A   Jeff Weaver.
10  Q   Okay. Have you ever met him?
11  A   Yes, sir.
12  Q   How many times have you actually met
13  him in person?
14  A   Four or five times.
15  Q   Is that when he would come to one of
16  your stores?
17  A   Well, if we had a meeting and he was
18  there and if he come to the store.
19  Q   Okay. How often did he come to your
20  store when you were a store manager at 6519?
21  A   He come to my store twice.
22  Q   Any particular reason?
23  A   Yes.

Page 79

1   Q   Tell me about the reasons why he
2   came.
3   A   One was to get Wendy promoted up.
4   Q   Okay. Any other reasons why he came
5   down to your store?
6   A   The other time he was just showing
7   someone around or something.
8   Q   Did you get along with Mr. Weaver
9   okay?
10  A   Yes.
11  Q   Now, in one of your affidavits I
12  notice you mention an October 4, 2005
13  managers meeting at a Phenix City store.
14  A   Yes, sir.
15  Q   Where Jack Trawick, I think you say,
16  told McDonald and Jeff Jennings, "You need to
17  get rid of Kinera Love because she could
18  cause some trouble." Do you recall putting
19  that in one of your affidavits?
20  A   Yes, sir.
21  Q   Do you know anything about Mr.
22  Trawick's investigation that he was
23  conducting that day?

Page 80

1   A   Not until after it was over I didn't.
2   Q   So, that day you didn't know?
3   A   I knew he was fixing to leave the
4   meeting and go straight to Kinera.
5   Q   Okay. But do you know anything about
6   his investigation?
7   A   No, sir.
8   Q   Do you know what it was about?
9   A   No, sir.
10  Q   And you never asked him, did you?
11  A   No, sir.
12  Q   Now, who is Jeff Jennings?
13  A   That's Jeff -- isn't that Jeff that
14  used to be the store manager of Auburn?
15  Q   Right. You mentioned Jeff Jennings
16  in one your affidavits. Do you know who he
17  is?
18  A   Yeah. He's the one that worked --
19  that was my manager in Auburn.
20  Q   Okay. So, he was a store manager --
21  A   Yes, sir.
22  Q   -- when you were hired?
23  A   Yes, sir.

Page 81

1   Q   Okay. I thought you said that Mr.
2   McDonald was the store manager when you were
3   hired?
4   A   He was. But when I got promoted to
5   assistant manager, I went to his store in
6   Auburn. So, then he became my store manager.
7   Q   Okay. Now, are you related to Jeff
8   Jennings in anyway?
9   A   No, sir.
10  Q   Now, at this Phenix City store in
11  October of 2005 where you saw Jack Trawick
12  there?
13  A   Uh-huh, yes, sir.
14  Q   You said it was a manager's meeting?
15  A   Yes, sir.
16  Q   Okay. What typically happens at a
17  manager's meeting if you remember?
18  A   Go in and talk about your sales for
19  the week, if you're doing everything that
20  you're supposed to be doing on time, your
21  weekly activity reports, all that stuff.
22  Q   Okay. Are these weekly meetings
23  typically?

Page 82

1  A    No. I think they are monthly or
2  quarterly or something. I can't remember.
3  Q    Okay. Do you know what Mr. Trawick's
4  position with the company was at that time?
5  A    Trawick? Jack?
6  Q    Yes.
7  A    He was asset protection.
8  Q    Asset protection manager, does that
9  sound right?
10 A    Yes, sir.
11 Q    And you say he said that she could
12 cause some trouble, referring to Ms. Love,
13 correct?
14 A    Yes, sir.
15 Q    Did he say anything else?
16 A    No, sir.
17 Q    That's all you heard him say?
18 A    That's all I heard him say.
19 Q    All right. Do you know what he meant
20 by "she could cause some trouble"?
21 A    No, not quite.
22 Q    Who was he talking to when he said
23 that?

Page 83

1  A    Charles and Jeff.
2  Q    Okay. And you just happened to
3  overhear it?
4  A    Yes.
5  Q    Were they trying to carry on a
6  private conversation?
7  A    Well, we was all standing out there
8  smoking, taking a smoke break.
9  Q    Okay. This was outside of the Phenix
10 City store?
11 A    Yes, sir. We was all standing around
12 smoking from our meeting.
13 Q    So, it was you, Mr. McDonald,
14 Mr. Jennings?
15 A    No, I wasn't right there with them
16 now. I was right here beside Wendy. And me
17 and Wendy was standing there talking.
18 Q    Okay. But you were within earshot?
19 A    Yeah.
20 Q    You were out in front of the store?
21 A    Well, on the side of it more. Away
22 from the door.
23 Q    Okay. Because you're not supposed to

Page 84

1  smoke in front?
2  A    That's right.
3  Q    Now, Mr. McDonald, Mr. Trawick and
4  Mr. Jennings, you and Wendy, were all outside
5  smoking. Was anybody else out there smoking
6  at that time?
7  A    Yes, all the managers.
8  Q    Every single one of them?
9  A    Every single manager was outside
10 taking a break.
11 Q    About how many total?
12 A    Anywhere between 15 -- 10 to -- in
13 between 10 and 20, I know. 10, 15, somewhere
14 up in there.
15 Q    Now, did you go and tell Ms. Love
16 about what you had overheard in that
17 conversation?
18 A    Not until after she had come back and
19 told me that she had been suspended because
20 she was hurt really bad.
21 Q    Well, when you say hurt, you mean
22 emotionally?
23 A    Yeah, she was really upset.

Page 85

1  Q    Okay. Was she crying?
2  A    Oh, yes.
3  Q    And was that the very same day?
4  A    Yes, sir.
5  Q    All right. And did she tell you why
6  she had been suspended?
7  A    She just told me what he had said and
8  I said oh.
9  Q    And what did he say?
10 A    She just --
11     MS. MUHAMMAD: Object to the form.
12 Q    What did she tell you he said?
13 A    From what she told me, they was
14 sitting there talking and she said she wanted
15 a lawyer present. And he told her, give me
16 your keys. And so she handed him her keys.
17 And then he took her Dollar General keys off,
18 slung her keys back to her and told her she
19 was suspended until further notice.
20 Q    Okay. And this happened that same
21 day of the Phenix City manager's meeting?
22 A    Yes, I think. I'm pretty sure.
23 Q    And when we're talking about "he" --

(Pages 86 to 89)                                              23

Page 86

1   A    Jack Trawick.
2   Q    Okay.
3   A    I'm sorry.
4   Q    I just want to make sure we are clear
5   for the record.  All right.  And that
6   information about her wanting to go get a
7   lawyer and that sort of thing, that's what
8   Ms. Love told you that day, correct --
9   A    Yes, sir.
10  Q    -- that she had said?
11  A    Yes, sir.
12  Q    All right.  Now, I believe you say in
13  your affidavit, correct me if I'm wrong, that
14  you believe that Kinera Love was qualified
15  for an assistant manager position that went
16  to Donna Tally; is that correct?
17  A    She was very qualified.
18  Q    Give me all the qualifications that
19  you believe that she had at that time.  And
20  I'm referring to Ms. Love.  Can you list
21  those for me?
22  A    What, like the things that you need?
23  Okay.  She knew how to do the paperwork, she

Page 87

1   knew how to count down tills, she done the
2   pickups promptly every time.  If it said
3   pickup, she was up there getting it.  She
4   knew how to close down, count the safe down.
5   I taught her how to do the on-hands and the
6   stock counts.  She done that.  And she knew
7   how to receive the truck and send it away.
8   That's all I can think about.  I mean, I
9   taught her everything I knew.
10  Q    Okay.  So, she knew how to do the
11  paperwork.  What paperwork would that be?
12  A    The deposits.
13  Q    Bank deposits?
14  A    Yes, sir.
15  Q    And she had done those as third key?
16  A    Yes, sir.
17  Q    Okay.  Any other paperwork that she
18  was --
19  A    Invoices.  She knew how to do the
20  invoices.
21  Q    All right.  And were these vendor
22  invoices?
23  A    Yes, sir.

Page 88

1   Q    What exactly did you have to do with
2   the vendor invoices?
3   A    You had to log it on a piece of paper
4   and then get the retail value.
5   Q    And you have to send it to corporate?
6   A    Yeah, later on you have to send it.
7   I think you left it in the office.  I'm not
8   sure.  I can't remember.
9   Q    All right.  Any other kind of
10  paperwork that you believe she was capable --
11  that she was qualified for the assistant
12  manager position?  Let me strike that.
13       She knew how to do paperwork.  Was
14  there anything else that she did with the
15  paperwork prior to Donna Tally getting the
16  assistant manager position that you believe
17  Kinera Love was capable of doing?
18       MS. MUHAMMAD:  Object to the form.
19  A    What now?  I'm sorry.
20  Q    That was a bad question.  I'm sorry.
21  I tell you what, let's take a quick break.  I
22  need a cup of coffee.
23       (BREAK TAKEN).

Page 89

1   Q    Ms. Cross, I was asking and we were
2   talking a little bit about how you felt that
3   Ms. Love was qualified for the assistant
4   manager position that Donna Tally received at
5   Dollar General.  And you provided me with a
6   list of various things.  Is there anything
7   else, other than what you have already
8   testified to, as to why you believe Ms. Love
9   was qualified for that assistant manager
10  position?
11  A    She had been with the company longer.
12  Q    Okay.  How long had she been with the
13  company at that time?
14  A    I'm not quite sure.
15  Q    Okay.  So, sitting here today, you
16  don't know?
17  A    Yeah, I'm not real sure.
18  Q    Okay.  Any other reasons why you
19  believe she was qualified for that job, other
20  than what you've already testified to?
21  A    Yeah.  She just had experience --
22  more experience to me.
23  Q    Tell me about her experience that she

Page 90

1    had at that time, that you had personal
2    knowledge of at that time.
3    A     I don't know.  All I knew of was that
4    I trained her.  I mean, me and Wendy had
5    trained her.  That's all the experience I
6    knew she had.  And I knew Donna was coming in
7    with none.
8    Q     Okay.  And we'll get to that in a
9    minute.  Okay.
10        So other than what you've already
11   testified to, is there anything else that you
12   would add as to how you believe she was
13   qualified for the assistant manager
14   position?  Again referring to Ms. Love.
15   A     No, sir.  Just how I knew how she
16   worked and everything.
17   Q     Okay.  Do you know if Ms. Love ever
18   actually applied for the assistant manager
19   position?
20   A     Yes, she did.
21   Q     And how do you know that?
22   A     We had talked about it, me and her.
23   And that was one of the reasons she was being

Page 91

1    transferred to Jeff's store because we knew
2    that he needed an assistant manager.  And
3    Jeff told me to send her on and that he would
4    do what he could do.
5    Q     And so she transferred over to Jeff
6    Jennings' store?
7    A     Yes, sir.
8    Q     And she was still working as a third
9    key for a time there?
10   A     Yes, sir.
11   Q     While you were still at the other
12   store?
13   A     Yes, sir.
14   Q     And you are assistant manager or
15   store manager?
16   A     Store manager.
17   Q     And who was your assistant manager at
18   that time?
19   A     I'm wanting to say it was Wendy.
20   Q     Okay.  And you didn't have another
21   assistant manager position available at your
22   store at that time; is that right?
23   A     No, sir.

Page 92

1    Q     Is it fair to say that most Dollar
2    General stores only have one assistant
3    manager?
4    A     One assistant manager and a third
5    key.
6    Q     Right.  Did you ever actually see Ms.
7    Love fill out an application for the
8    assistant manager position at Jeff Jennings'
9    store?
10   A     I didn't know you had to fill out an
11   application for it.
12   Q     Okay.  But did you ever see her
13   actually fill one out?
14   A     No.  We spoke with Jeff together
15   about it.
16   Q     Okay.  And was this before or after
17   she transferred over there as third key?
18   A     Actually before.
19   Q     Okay.  About how long before?
20   A     Right before, a week or so before.
21   Q     Okay.  Were you --
22   A     Because Jeff was needing someone.
23   Q     Were you aware of the sign that Jeff

Page 93

1    placed in the window about needing an
2    assistant manager, apply within?
3    A     No, sir.
4    Q     You don't recall seeing that?
5    A     No, sir.
6    Q     All right.  Now, you mentioned
7    something a few minutes ago about your
8    believing that Donna didn't have the
9    experience for the assistant manager position
10   or something to that effect; is that right?
11   A     Yes, sir.
12   Q     And in your affidavit that you
13   submitted to the Court under oath in this
14   case, you say, "Donna has never worked as a
15   manager in a video store."  Is that what you
16   wrote in there?
17   A     Yes, sir.
18   Q     And you're testifying under oath.  Do
19   you still stand by that testimony today?
20   A     Yes, sir.
21   Q     Okay.  How do you know that Donna has
22   never worked as a manager in a video store?
23   A     My dad told me.  He told me she

(Pages 94 to 97)                                                                                          25

Page 94

1  worked there.  She did work there in high
2  school.
3  Q      Okay.  And this is your stepfather?
4  A      Yes, sir.
5  Q      Donnie Tally?
6  A      Yes, sir.
7  Q      That's where you are getting the
8  information that you testified to in your
9  affidavit?
10  A      Yes, sir, yes, sir.
11  Q      Okay.  What exactly did Mr. Tally
12  tell you about Donna's not working as a
13  manager in a video store?
14  A      He just told me that she had worked
15  there as a -- selling videos or whatever.
16  But she never worked as a manager there.
17  Q      Okay.  Do you know the name of the
18  store?
19  A      No, I do not know the name of it.
20  Q      Do you know where it was?
21  A      No, sir.
22  Q      Do you recall ever going to that
23  store?

Page 95

1  A      It closed down I think right when I
2  come.  I can't -- no, I never went there.
3  Q      Okay.  Did Donnie Tally ever tell you
4  that he worked at that store at one time?
5  A      No, I don't recall it.
6  Q      Okay.  And, again, everything you
7  know about Donna Tally's experience working
8  at that video store came from what Mr. Donnie
9  Tally has told you, correct?
10  A      Yes, sir.
11  Q      Okay.  And you never personally
12  observed her working at that store, correct?
13  A      No, sir.  She wasn't even working
14  there whenever I moved down here.
15  Q      Okay.  You were still up in
16  Moundville?
17  A      Yes, sir.
18  Q      While she was working at that store?
19  A      I was in Moundville.
20  Q      And, again, I think you testified
21  earlier that it was subsequent to your mom's
22  second marriage that she began dating Donnie
23  Tally, correct?

Page 96

1  A      Yes, sir.
2  Q      When did you first meet Donna Tally?
3  A      On a weekend that we come down
4  here -- come up here or over here to visit.
5  Q      How long had you known Donnie Tally
6  before you met Donna?
7  A      Maybe a few weeks, a month.
8  Q      Do you know, sitting here today, when
9  Ms. Donna Tally first began to work at that
10  video store?
11  A      No, sir, I don't.
12  Q      And sitting here today, do you have
13  any personal knowledge as to when her
14  employment with that video store ended?
15  A      No, sir.
16  Q      And sitting here today, do you have
17  any personal knowledge as to the length of
18  time that Ms. Tally worked at that video
19  store?
20  A      No, sir.
21  Q      Do you know who owned the video
22  rental store?
23  A      Yes, sir.

Page 97

1  Q      Who?
2  A      Charles McDonald and Jeff Jennings.
3  Q      All right.  And Mr. McDonald is
4  sitting here today, correct?
5  A      Yes, sir.
6  Q      Now, how do you know that Jeff
7  Jennings had any ownership interest in that
8  video store?
9  A      They had just told me that they was
10  part owner in it or something like that.
11  Q      Who told you that?
12  A      Donnie.  And Jeff actually.  Jeff has
13  mentioned it a few times too working in
14  Auburn.
15  Q      Jeff actually told you that he was a
16  part owner --
17  A      Yes, sir.
18  Q      -- of that video rental store?
19  A      Yes, sir.
20  Q      But other than Jeff and Donnie
21  telling you that, you don't have any other
22  personal knowledge as to who actually owned
23  it, correct?

Page 98

1  A    No, sir.
2  Q    Is that correct?
3  A    Yes, sir.  I'm sorry.
4  Q    All right.  What's the age
5  differential between Donnie and Donna Tally?
6  Who's older?
7  A    Donnie.
8  Q    Do you know how much older?
9  A    No, sir, I don't.
10  Q    Do you know what Donna Tally's birth
11  date is?
12  A    No, sir, I don't.
13  Q    Do you know what year she was born?
14  A    No, sir, I don't.
15  Q    Do you know roughly how old she is
16  today?
17  A    In her thirties.  She's around 32,
18  33, somewhere in there.
19  Q    But you're not sure sitting here
20  today?
21  A    No, sir.  No, I'm not sure.  I don't
22  even know how old my husband is.
23  Q    All right.  Now, do you have any

Page 99

1  personal knowledge as to what Ms. Tally's job
2  duties were when she was employed at the
3  video store?
4  A    No, sir, I don't.
5  Q    Okay.  Do you know that Ms. Tally
6  provided direct supervision of other
7  employees when Mr. McDonald was not in the
8  store?
9  A    Do what now?
10  Q    Do you know that Ms. Tally provided
11  direct supervision of other employees when
12  Mr. McDonald was not at the store?
13  A    No, I don't know that.
14  Q    Well, do you have any reason to
15  dispute that?
16  A    No.
17  Q    Do you know that Ms. Tally supervised
18  all aspects of the store's operations when
19  Mr. McDonald was not at the store?
20  A    No, I don't know that.
21  Q    Okay.  Do you have any reason to
22  dispute that?
23  A    No.

Page 100

1  Q    Did you know that Ms. Tally trained
2  and developed new store employees when they
3  were hired at the video store?
4  A    No, I did not know that.
5  Q    Do you dispute that?
6  A    No.
7  Q    Did you know that Ms. Tally was
8  responsible for maintaining financial
9  controls for the store, including shrink,
10  labor and operating expenses when Mr.
11  McDonald wasn't able to do so?
12  A    No, I don't know that.
13  Q    Do you have any reason to dispute
14  that?
15  A    No.
16  Q    And did you know that she engaged in
17  various transactions with vendors and other
18  third parties on behalf of the store?
19  A    No.
20  Q    And do you have any reason to dispute
21  that?
22  A    No.
23  Q    Now, in your affidavit you say,

Page 101

1  "Donna had been on the job at Dolgencorp for
2  two weeks before she was promoted to
3  assistant manager."  That's a false
4  statement, correct?
5  A    I'm not sure.  I didn't -- look, I
6  was just estimating.  I don't really know how
7  long she had been there.  It wasn't long.
8  Q    Okay.  Well, she had actually worked
9  for one and a half months before being
10  promoted, correct?
11  A    Okay.
12  Q    Correct?
13  A    Yeah.
14  Q    Do you have any reason to dispute
15  that?
16  A    No.  I mean, I'm not 100 percent sure
17  of when, you know.
18  Q    You were just guessing?
19  A    Yes, sir.
20  Q    Is there anything else in your
21  affidavit that you were just guessing at when
22  you put it down in the affidavit?
23  A    Just some dates.  I mean, I can't

Page 102

1    remember everything.
2    Q    Okay.
3    A    Maybe a few dates might be wrong.
4    Q    Do you have any problems with your
5    memory at all?
6    A    No. Well, a little bit.
7    Q    Okay. Now, there's also a quote in
8    one of your affidavits where you say, "It
9    takes at least two months to train to become
10    an assistant manager."
11        Now, that's a false statement, isn't
12    it?
13    A    Well, to me, to know what you're
14    doing and do it right, yes.
15    Q    Okay. Well, do you know of any other
16    individuals who were promoted to assistant
17    manager, other than Donna Tally, in less than
18    two months?
19    A    No, I don't -- no, I just know -- no.
20    Q    Okay. Do you know of any assistant
21    managers in Mr. McDonald's district that were
22    promoted with less than two months of
23    experience at a Dollar General store?

Page 103

1    A    Not that I know of, no.
2    Q    Do you know of any store -- I'm
3    sorry. Do you know of any store clerks in
4    Mr. McDonald's district who were promoted to
5    store manager without even being an assistant
6    manager?
7    A    No.
8    Q    Okay. Is it possible that Mr.
9    McDonald has previously promoted other
10    employees in less than two months to the
11    assistant manager position?
12    A    Not that I know of. I mean, I
13    don't --
14    Q    But is it possible that he did?
15    A    I don't know.
16    Q    Okay. Do you know of anything in
17    writing at Dollar General while you were
18    working there that says that it takes at
19    least two months of training before someone
20    can be promoted to assistant manager --
21    A    No, there is nothing in writing. I'm
22    sorry. No, there is nothing in writing.
23    Q    Okay. So, it was just your opinion

Page 104

1    that you were referring to two months?
2    A    Yes, yes.
3    Q    And no one told you that there was
4    any requirement?
5    A    No.
6    Q    Okay. Now, in your affidavit you
7    said something to the effect, "Charles has
8    shown he is prejudiced against blacks on
9    other occasions." Do you recall putting that
10    in your affidavit?
11    A    Yes, sir, I do.
12    Q    Okay. What I would like for you to
13    do is -- I'm going to make a list of every
14    instance where you believe that Mr. McDonald
15    has shown he is prejudiced against blacks
16    with respect to the Dollar General
17    workplace. You mentioned a couple in your
18    affidavit.
19        But if you would please, list for me
20    every instance that you have personal
21    knowledge of.
22    A    I don't remember every incident. I
23    just remember the ones I listed in the

Page 105

1    affidavit.
2    Q    Okay. That's fair enough. So,
3    whatever you put in the affidavit are the
4    ones that you know of?
5    A    Yeah, that I can recall.
6    Q    All right. I'm going to show you,
7    Ms. Cross, what I'm marking as Defendant's
8    Exhibit 4. Now, is that the affidavit that
9    you signed under oath on February 1st 2008 in
10    this case?
11        (Defendant's Exhibit
12            No. 4 was marked for
13            identification).
14    A    Yes, sir.
15    Q    Okay. I would like to direct your
16    attention down to paragraph five, which is on
17    Page 3 of Defendant's Exhibit 5. I'm sorry.
18    Defendant's Exhibit 4 rather. Do you see
19    that paragraph, "Besides this occasion of
20    discriminating against Kinera, Charles has
21    shown he is prejudiced against blacks on
22    other occasions." Do you see that?
23    A    Yes, sir.

Page 106

1   Q    "On one occasion in the spring of
2   2005, a black lady came into the Opelika
3   store on the Marvin Parkway where I was
4   working and asked Charles if we were hiring.
5   He told her no. That afternoon of the same
6   day, he hired two white females, one of whom
7   was a white girl named Amy."
8   A    Uh-huh. It might not have been
9   2005. I'm not sure about the date. I'm
10  going to tell you.
11  Q    Okay. So, spring of 2005, that might
12  not be accurate?
13  A    Yes, sir.
14  Q    Is there anything else in that
15  paragraph that is inaccurate?
16  A    Unh-unh.
17  Q    Okay. Now, who is Amy? Do you know
18  what her last name was?
19  A    I don't remember her last name.
20  Q    Do you know which store? You said it
21  was the Marvin Parkway store.
22  A    Yes, sir, she's -- yes, sir.
23  Q    And you're certain of that?

Page 107

1   A    I'm certain of that. She was working
2   at Charles' store.
3   Q    And do you know who the other white
4   female was that was hired?
5   A    No, sir, I'm not sure. I remember
6   Amy because I talked to her.
7   Q    When did you last talk to her?
8   A    Right after she -- I think she got
9   fired.
10  Q    Okay. Did you have anything to do
11  with her termination?
12  A    No, sir.
13  Q    Do you know why she was fired?
14  A    I think she got kind of hostile with
15  Mr. Long.
16  Q    Okay. Mr. Dennis Long?
17  A    Yes, sir.
18  Q    Okay. Now, do you know who the black
19  lady was who came into the store?
20  A    No, I do not. It was just a random
21  person that come in and asked for an
22  application.
23  Q    Do you know what position she wanted

Page 108

1   to apply for?
2   A    Anything.
3   Q    Okay. Do you know what her
4   experience was?
5   A    No, I don't.
6   Q    Do you know -- did she talk to only
7   Mr. McDonald when she came into the store?
8   A    Yes. Well, we was standing right
9   there, me and Charles was, putting up
10  something. We was kind of up front.
11  Q    Okay. And he was the store manager
12  at the time?
13  A    Yes, sir.
14  Q    And you were the assistant?
15  A    Yes, sir. I might have been third --
16  yeah, I was assistant I do believe, yeah.
17  Q    Did you have any authority to hire
18  and fire at that time?
19  A    No, sir.
20  Q    Did he have the authority to hire and
21  fire at that time?
22  A    Yes, sir.
23  Q    And Mr. Dennis Long was the district

Page 109

1   manager at that time, correct?
2   A    Yes, sir.
3   Q    Now, at the time that this black lady
4   supposedly came into the Opelika store on
5   Marvin Parkway, did you have anything to say
6   to her yourself?
7   A    Yeah, I told her she ought to do
8   something about it because I knew we was
9   hiring.
10  Q    And you said that in front of
11  Mr. McDonald?
12  A    No, she had walked away. She had
13  stepped over to the side. I didn't want to
14  jeopardize my job. I needed my job, too.
15  But I told her we was hiring and she ought to
16  do something about it.
17  Q    Okay. Had you been interviewing
18  prospective employees at that time?
19  A    What do you mean "interviewing"?
20  Q    Well, you said that y'all needed to
21  hire some employees; is that right?
22  A    We was hiring at the point that she
23  come in and asked for a job.

Page 110

1  Q    Right.
2  A    We was needing help.
3  Q    So, had y'all interviewed any
4  employees prior to this black lady coming in?
5  A    There might have been one or two
6  hired.  I'm not sure.
7  Q    Was there anybody that you know of
8  that Mr. McDonald had interviewed and had
9  turned down just prior to the black lady
10 coming in?
11 A    Not that I know of.  I mean, I'm
12 not --
13 Q    Did Mr. McDonald keep you privy to
14 all of the interviews and conversations he
15 had with prospective employees at that time?
16 A    Did he what now?
17 Q    Did Mr. McDonald, back whenever it
18 was, spring of 2005 at this Opelika store,
19 when he was making hiring decisions, did he
20 tell you every single instance that he talked
21 to a prospective employee about a job?
22 A    I don't understand that.  I'm sorry.
23 Q    Well, you said that you were aware of

Page 111

1  this black lady coming in and Mr. McDonald
2  hiring two white females that same day or --
3  yeah, on the afternoon of that same day,
4  correct?
5  A    Yes.
6  Q    And you said that y'all were hiring,
7  that you needed to hire some folks at that
8  time, correct?
9  A    Yes, sir.
10 Q    Okay.  My question to you is, did
11 Mr. McDonald, in this time frame, inform you
12 every single time that he talked to a
13 prospective employee about any of those
14 positions?
15 A    No.
16 Q    So, there were times that Mr.
17 McDonald may have interviewed employees or
18 talked with prospective employees that he
19 didn't tell you about; is that correct?
20 A    Yeah.
21 Q    Okay.  And these two white females
22 that you say were hired on the afternoon of
23 the same day, sitting here today, you have no

Page 112

1  idea who they are; is that correct?
2  A    No, I just remember Amy.
3  Q    You just remember that first name?
4  A    Amy, yes.
5  Q    Is there anything that you have at
6  home that would help you remember the names
7  of these two individuals?
8  A    No, nothing.
9  Q    Because I'm going to tell you, we
10 went back and looked and we don't find an
11 Amy.
12 A    There was an Amy there.
13 Q    Okay.  I need to know.  Anything else
14 about Amy that you know that would help me
15 identify her?
16 A    I do not know her last name.  I don't
17 even know where she lives at anymore.  I know
18 she lives in Beulah somewhere now.
19 Q    Okay.
20 A    She's Sanders.
21 Q    Amy Sanders?
22 A    Yes.  Sanders.  Because of Sanders
23 Appliances.  That's her in-laws.

Page 113

1  Q    Okay.  Now, do you know what job she
2  was actually hired into that day?
3  A    Cashier.
4  Q    Store clerk, cashier?
5  A    Yeah, store clerk.
6  Q    And the same for the other female
7  that was hired?
8  A    Yes, sir.  She didn't last long.
9  Q    Do you know if Mr. McDonald was
10 related to Amy Sanders?
11 A    No, not that I know of.
12 Q    But you just don't know one way or
13 the other?
14 A    Yeah, no.
15 Q    How about the other white female that
16 he hired on that same day, do you know if he
17 was related to her?
18 A    No.
19 Q    All right.  The second paragraph of
20 that section five on Page 3 of Defendant's
21 Exhibit 4.  Do you see that paragraph that
22 you wrote, "On another occasion"?
23 A    Uh-huh.

| Page 114 | Page 116 |
|---|---|

**Page 114**

1　Q　"In the summer of 2005, Charles made
2　a comment to me about another employee of
3　Dolgencorp when we were working at the
4　Opelika store on 2nd Avenue, Wendy Whitlock,
5　a white female. He said that she would not
6　make it any further in Dollar General because
7　she was married to a" -- and I won't use the
8　word -- an F-ing N-R.
9　　　Was she married to an African
10　American at the time?
11　A　Yes, sir, she was.
12　Q　All right. Now, in the summer of
13　2005, was this at 6519?
14　A　No. We was -- I had just gotten --
15　Charles was fixing to get Dennis Long's
16　position.
17　Q　Okay.
18　A　So, the date may not be accurate
19　because I don't remember exact dates. But it
20　was right when he was fixing to take Dennis'
21　position for a while.
22　Q　All right. Well, if I told you they
23　had took over Dennis' position in February of

**Page 115**

1　2005, would you have any reason to dispute
2　that?
3　A　No.
4　Q　So, if you're saying now that it
5　actually happened in the summer of 2005, that
6　would be inaccurate, correct?
7　A　Yes, sir, it would be.
8　Q　Is there anything else that's
9　inaccurate in that paragraph that begins, "On
10　another occasion"?
11　A　Nothing but just the date.
12　Q　Okay. Now, you said your husband
13　heard this comment?
14　A　Yes.
15　Q　Where was he?
16　A　He was actually in the driver's seat
17　and I was in the passenger's seat.
18　Q　Okay. And where were you?
19　A　Sitting in the parking lot of 9600.
20　We was fixing to leave. Dennis was there
21　earlier, and then he left. And then Charles
22　was out there by my car.
23　Q　Okay. Who was he talking to, you,

**Page 116**

1　your husband, someone else?
2　A　Who was who talking to?
3　Q　Mr. McDonald when he made this
4　comment.
5　A　He was talking to me.
6　Q　And how did this conversation come
7　about out in the parking lot?
8　A　Because we had been -- I don't know.
9　Once you work somewhere, you talk about it
10　all the time. But we was talking it. And
11　Wendy had been wanting to move up, and she
12　was a hard worker, and I thought she needed
13　to. Somehow her name got brought up and he
14　throwed that comment in. And my husband
15　said, "He just messed up, didn't he?" And I
16　said, "Yes."
17　Q　Okay. What does your husband think
18　of Mr. McDonald?
19　　　MS. MUHAMMAD:　Object to the form.
20　Q　If you know. Has he ever said
21　anything about Mr. McDonald?
22　A　No.
23　Q　Not a thing?

**Page 117**

1　A　Not until he made me cry the last
2　night I was there, then he said something.
3　Q　Are you talking about the night you
4　were terminated?
5　A　No, the night I left Charles' store
6　going to the Auburn store for assistant
7　manager.
8　Q　Okay. I'm sorry. I don't
9　understand. Can you tell me what you are
10　talking about?
11　A　When I left Charles' store.
12　Q　Right.
13　A　Going to be Jeff's assistant
14　manager. I walked out of that store with
15　tears in my eyes. And that's the only time
16　my husband has ever had anything bad to say.
17　Q　Okay. Why did you have tears in your
18　eyes?
19　A　Because he downgraded me so bad until
20　I was like a little ant.
21　Q　Okay. What exactly happened?
22　A　I can't remember. He just told me I
23　wasn't worth a shit -- pardon my French.

(Pages 118 to 121)                                                31

## Page 118

1  That I would never make it no further. And
2  the only reason I made it that far was
3  because of him, and that I was no good and I
4  was basically worthless.
5  Q     Now, was he upset that you were
6  leaving to go to the other store?
7  A     I'm not sure.
8  Q     Was it possible that he was?
9  A     No because he had workers.
10 Q     But he had hired you and promoted
11 you, correct?
12 A     Yes, sir.
13 Q     Now, tell me about this thing. You
14 say you made a complaint to the home office?
15 A     Yes, sir.
16 Q     Within days after you and your
17 husband heard the comment that you allege
18 Mr. McDonald made?
19 A     Yes, sir.
20 Q     All right. What number did you call
21 at the home office?
22 A     We called the -- I'm not real sure.
23 Wendy had a list of numbers. She kept up

## Page 119

1  with everything. And we called whoever we
2  had to leave a message with Jack
3  Trawick -- no, Jeff Weaver. I'm sorry. I
4  get them mixed up.
5        But we left a number for him to
6  contact us back and explained what was going
7  on and everything. And he never called us.
8  Q     Jeff Weaver didn't?
9  A     Yes. Jeff Weaver never returned our
10 call the first time. And so we called back.
11 Q     And who did you call back?
12 A     The same person. And let him know
13 that -- because she said if he doesn't
14 contact us within two weeks to give her a
15 call back.
16 Q     Now, this was someone at Dollar
17 General Corporate?
18 A     Yes.
19 Q     Up in Goodletsville, Tennessee who
20 y'all called?
21 A     Yes, sir, a 1-800 number or
22 something.
23 Q     So, to your recollection, it was a

## Page 120

1  toll-free number?
2  A     Yes, sir.
3  Q     Okay. Was it the employee response
4  center that y'all called?
5  A     I'm not sure. It might have been
6  ERC.
7  Q     You know what ERC is, right?
8  A     Yes.
9  Q     Did you ever call ERC for any
10 reason?
11 A     Maybe once or twice.
12 Q     Other than this particular instance?
13 A     Yeah, maybe for -- maybe once or
14 twice after that -- before that. But it
15 wasn't to make no complaints or nothing. It
16 was just --
17 Q     Just store related stuff?
18 A     Yes, sir.
19 Q     Now, think back hard. Do you
20 remember if it was you or Wendy who actually
21 made that telephone call to corporate?
22 A     I made it.
23 Q     And which phone did you call from?

## Page 121

1  A     The store phone.
2  Q     And this was, again, at the 9600?
3  A     6519.
4  Q     Okay. And was it the same day that
5  Mr. McDonald allegedly made the comment?
6  A     It wasn't the same day. It was a day
7  or two later. It wasn't the same day.
8  Q     Okay.
9  A     Because that was on the weekend when
10 I was there at that store and he said that.
11 Q     Okay. Again, you were still working
12 as his assistant manager at that time?
13 A     No, sir.
14 Q     You were store manager?
15 A     Yes, sir, at that time. I do believe
16 I was store manager at that time, yes.
17 Q     And had you recommended at that time
18 that Wendy be promoted to the assistant
19 manager position?
20 A     Yes, sir.
21 Q     Okay. And did Mr. McDonald indicate
22 that he wanted to put someone else into that
23 position at that time?

Page 122

1  A    No, sir.
2  Q    Okay. Had Wendy actually applied for
3  the assistant manager position?
4  A    Yes, sir.
5  Q    And had you interviewed any other
6  candidates for the position?
7  A    No, sir.
8  Q    And just correct me if I'm wrong, but
9  did you mention to me a little while ago that
10 you had heard from Mr. McDonald that Dennis
11 Long didn't think that Wendy should be
12 promoted to the assistant manager position?
13 A    No, I didn't say that.
14 Q    Okay. Did Dennis Long have anything
15 to do with her not being promoted as far as
16 you know?
17 A    No, sir.
18 Q    Now, some time later she does get
19 promoted; is that correct?
20 A    Yes, sir. After the phone call was
21 made.
22 Q    Okay. Well, did you ever actually
23 talk to anybody, other than leaving a

Page 123

1  message?
2  A    Jeff Weaver actually contacted us
3  back.
4  Q    Okay. And did he call you? Did he
5  call Wendy? Who did he speak with, do you
6  know?
7  A    He spoke with both of us about it.
8  Q    Separately?
9  A    Yes, sir.
10 Q    Did he call the store and speak with
11 you or did he call you at home? Where did he
12 call you?
13 A    The store. He would have had to have
14 called me at the store because I didn't have
15 no phone at that time.
16 Q    Okay. Now, did you and Wendy speak
17 to him on the same day?
18 A    I'm not sure.
19 Q    How many conversations did you have
20 with Jeff Weaver about Wendy Whitlock and her
21 not getting the promotion to the assistant
22 manager position based on what Mr. McDonald
23 had said?

Page 124

1  A    I know once. All I can remember is
2  once.
3  Q    And how did that conversation go
4  between you and him?
5  A    I just let him know what was said,
6  and how I felt about it. And it wasn't
7  right.
8  Q    Okay. Did you mention to him about
9  the comment that Mr. --
10 A    Yes, sir.
11 Q    You actually used those words?
12 A    Yes, sir, I did.
13 Q    To Mr. Weaver?
14 A    Well, I said "F-ing." I didn't say
15 the words.
16 Q    Okay. But did you use the "N" word
17 with him?
18 A    Yes, sir, I did.
19 Q    Okay. And how did he respond when
20 you explained to him the situation from your
21 perspective?
22 A    He said he would see what he could do
23 about it.

Page 125

1  Q    And did he talk to you or Wendy first
2  that day?
3  A    I think he spoke with me first.
4  Q    Again, you were the store manager at
5  the time, correct?
6  A    Yes, sir.
7  Q    And this was after Mr. McDonald had
8  made you cry, correct?
9  A    Yes, sir, way after.
10 Q    Right. About how long after you had
11 this conversation by telephone with Jeff
12 Weaver did Wendy get promoted to the
13 assistant manager position?
14 A    It wasn't long after I don't guess.
15 I mean, a few weeks.
16 Q    Okay. Now, did Mr. McDonald promote
17 her up to that position?
18 A    I'm wanting to say so. I think. I'm
19 not 100 percent sure.
20 Q    I believe you testified to that
21 earlier.
22 A    I do believe.
23 Q    I just wanted to make sure. All

(Pages 126 to 129)                                                                 33

Page 126

1 right. And at some point later, Mr. McDonald
2 promoted her to the store manager position at
3 another store, correct?
4 A    Yes, sir. I believe.
5 Q    All right. So, other than what
6 you've already testified to in this
7 deposition, are there any other incidents
8 where Mr. McDonald engaged in any kind of
9 racially discriminatory conduct that you know
10 of at Dollar General?
11 A    Just by telling me that he couldn't
12 stand them "N" words.
13 Q    I'm sorry?
14 A    Just him telling me that he couldn't
15 stand the "N" words. You know, I'm sorry.
16 But I'm not going to be -- I don't like that
17 word.
18 Q    When did he say it?
19 A    He said it various times. I mean, I
20 don't remember dates or anything. It's been
21 a lot of times that he said he hates it.
22 Q    To you privately?
23 A    Not privately. I mean, yeah,

Page 127

1 basically, yeah, if it was just us back there
2 or something. Or if one would get in our
3 way -- not one. But if a black person would
4 get in our way when we was working or
5 something, he might say the comment, you
6 know. But I'm not a racist, so I don't say
7 it.
8 Q    Have you ever used the "N" word at
9 Dollar General?
10 A    No, not using it, no.
11 Q    You never used it as a pejorative
12 term while you worked at Dollar General?
13 A    No, no.
14 Q    Have you ever used the word "spick"?
15 A    No.
16 Q    You never referred to Mr. Vasquez
17 with that pejorative?
18 A    Who?
19 Q    I'm sorry. The gentleman we talked
20 about earlier in your deposition.
21 A    Oh, no.
22 Q    So, if he says that you did, would he
23 be lying?

Page 128

1 A    Yes, he would. The most I say it is
2 in a song or something, if it's in a song
3 that I listen to, but unh-unh.
4 Q    What kind of music do you listen to?
5 A    I listen to rap music.
6 Q    So, you listen to music where they
7 use the "N" word regularly?
8 A    Well, in some songs they do.
9 Q    Who are some of the artists?
10 A    I have no clue.
11 Q    You don't know who the artists are
12 that you listen to?
13 A    No, I do not.
14     MS. MUHAMMAD: Can we take a quick
15 break?
16     MR. DEERING: Sure. We can take five
17 minutes.
18     (BREAK TAKEN).
19 Q    Just so I'm clear, Ms. Cross, we just
20 finished up with our second break, correct?
21 A    Uh-huh.
22 Q    During either of the past two breaks,
23 have you had any conversations with Ms.

Page 129

1 Muhammad?
2 A    Not no conversation.
3 Q    You haven't talked to her at all on
4 the break?
5 A    She just told me that I was doing
6 great, just to calm down. And that was it.
7 Nothing more.
8 Q    All right. Now, we were talking a
9 little while ago about Amy Sanders being
10 hired on the day that you claim Mr. McDonald
11 turned away a black female who came in the
12 store looking for a job, correct?
13 A    Yes, sir.
14 Q    Now, isn't it true that you
15 recommended to Mr. McDonald that he hire Amy
16 Sanders?
17 A    I did not even know Amy Sanders.
18 Q    Isn't it true that Amy Sanders was
19 your babysitter?
20 A    After she had started working at
21 Dollar General.
22 Q    And it's your testimony that she
23 never babysat for you at any time prior to

Page 130

1  being hired at Dollar General?
2  A    No, sir.
3  Q    Did you ever -- do you recall
4  recommending to Mr. McDonald that he hire Amy
5  Sanders?
6  A    No, sir.
7  Q    That never happened?
8  A    No, sir.
9  Q    And you didn't know Amy Sanders until
10 the very day she came into that store
11 applying for a job?
12 A    Yes, sir.
13 Q    Okay. And I noticed in paragraph six
14 of Defendant's Exhibit 4, your affidavit, you
15 say, "I gave proof that it was a bank error
16 to Charles and he failed to give the bank
17 information to upper management to show the
18 error," talking about your bounced check.
19 A    No, I got proof, but it was too
20 late. It was too late.
21 Q    What was too late?
22 A    To give it to them.
23 Q    But you say you gave proof that it

Page 131

1  was a bank error to Charles.
2  A    No, I got the proof and it was too
3  late. When I asked Dennis about it -- when
4  Dennis come in that day, I asked him. And he
5  said it was too late.
6  Q    Well, you admitted to him that you
7  had bounced the check, correct?
8  A    Yeah, I knew about it then. Yeah,
9  you can't deny a bounced check. It's there.
10 Q    All right.
11 A    But only one.
12 Q    What was the proof that you said that
13 you could get?
14 A    I had gotten a bank statement showing
15 that my bank had actually made a mistake.
16 And whenever I found out about the bounced
17 check, I went and closed my accounts out with
18 that bank. And they printed me out a little
19 thing showing what was in this account and
20 what was in this account and all that. It
21 was just a little printout sheet from the
22 bank.
23 Q    Okay. That was just your bank

Page 132

1  statement basically?
2  A    Yes, sir.
3  Q    Now, are you testifying under oath
4  today that you gave that bank statement to
5  Mr. McDonald at some point?
6  A    No, I had it. I had it.
7  Q    Okay. And --
8  A    I never seen Charles that much
9  whenever he took district manager position.
10 Q    Okay.
11 A    It was there and --
12 Q    So, that statement, "I gave proof
13 that it was a bank error to Charles," that's
14 not accurate?
15 A    Yeah, that's not 100 percent
16 accurate, no. I just had it and it was too
17 late whenever it got down to it.
18 Q    All right. Other than what you have
19 already testified to today in this
20 deposition, is there anything else in
21 Defendant's Exhibit 4 that is inaccurate or
22 untruthful?
23 A    Unh-unh, not that I know of.

Page 133

1  Q    Did you ever file an internal
2  complaint with Dollar General concerning your
3  termination?
4  A    An internal complaint? What do you
5  mean?
6  Q    Did you ever complain to ERC or
7  anybody after your termination of employment
8  by Dennis Long?
9  A    I did about my mileage that I was
10 supposed to get paid for, but never got paid
11 for. But that was the only complaint I made.
12 Q    Who did you complain to?
13 A    To ERC. I think it was ERC.
14 Q    But you're not sure it was ERC?
15 A    Yeah, I'm not sure.
16 Q    Did you just call one time?
17 A    No, I've called several times.
18 Q    How much mileage are we talking
19 about?
20 A    Well, on the way to the manager's
21 training school, Charles got somebody that I
22 could ride with because I didn't have a
23 vehicle to take. Well, then she decided to

Page 134

1  go on down to Florida and I would have been
2  stuck. So, my mom had to come all the way to
3  Jacksonville to get me and then come all the
4  way back.
5          And then there was a time that I
6  think I drove to Eufaula or something, and to
7  Phenix City to a meeting. There was a few
8  meetings that never got filed for my driving
9  time.
10 **Q      And as store manager you're**
11 **responsible for filing that mileage?**
12 A     No, the district manager is.
13 **Q      But you have to provide the**
14 **information to the district manager?**
15 A     And I did.
16 **Q      And your beef was after your**
17 **termination you wanted to get your mileage?**
18 A     Well, I had been trying to get it all
19 through. And Charles and them kept telling
20 me to wait and that they would get it, they
21 would get it. And then they never got it.
22 And then I was terminated and still ain't got
23 it.

Page 135

1  **Q      Okay. So, other than that complaint**
2  **that you made internally with Dollar General**
3  **after your termination, did you make any**
4  **other complaints?**
5  A     No, that was it.
6  **Q      Would you like to go to work for**
7  **Dollar General now?**
8  A     I would love to. I miss my job.
9  **Q      Have you talked with anyone to try to**
10 **get a job at Dollar General?**
11 A     Yes. Actually, I asked Dennis Long.
12 **Q      When?**
13 A     Just right after I started at Piggly
14 Wiggly I seen him and asked him for my job
15 back.
16 **Q      And, again, he was the one that**
17 **terminated your employment, correct?**
18 A     Yes, sir.
19 **Q      And what did he say in response?**
20 A     "No, not a chance."
21 **Q      Those were his exact words?**
22 A     Yes.
23 **Q      Was he smiling when he said it?**

Page 136

1  A     No, he was serious.
2  **Q      Did he elaborate any further?**
3  A     No. Well, he just told me that I
4  knew what I done. And I was like, yeah, but
5  it was just one. So, he did tell me that.
6  **Q      All right. Have you ever been over**
7  **to Kinera Love's house or apartment?**
8  A     No, sir.
9  **Q      Has she ever been over to yours?**
10 A     Yeah, she's been to my house.
11 **Q      About how many times?**
12 A     Once.
13 **Q      When was that?**
14 A     Right after I moved in. I wanted her
15 to see it. I was proud of it.
16 **Q      And was this while y'all were still**
17 **employed together at Dollar General?**
18 A     Unh-unh, no, sir.
19 **Q      It was after both of your employment**
20 **had ended?**
21 A     Yes, sir.
22 **Q      Do you ever go shopping with her?**
23 A     No, sir.

Page 137

1  **Q      Let me show you what I am marking as**
2  **Defendant's Exhibit 5, Ms. Cross. If you**
3  **will, take a look at that and let me know if**
4  **you recognize that as being the affidavit**
5  **that you signed in this case back on October**
6  **11, 2006.**
7                    (Defendant's Exhibit
8                    No. 5 was marked for
9                    identification).
10 A     Yes, sir.
11 **Q      Now, correct me if I'm wrong, but I**
12 **notice that there are some similarities**
13 **between Defendant's Exhibit 5 and Defendant's**
14 **Exhibit 4; is that accurate? Is that true?**
15 A     Yes, sir.
16 **Q      Okay. But it appears that**
17 **Defendant's Exhibit 4, the newer affidavit,**
18 **just has some additional information that has**
19 **been added to what was contained in**
20 **Defendant's Exhibit 5; is that right?**
21 A     Yes, sir.
22 **Q      Now, what did you do to gather the**
23 **information that you put into Defendant's**

Page 138

1  Exhibit 4 that is not contained in
2  Defendant's Exhibit 5?
3  A    What do you mean what did I do?
4  Q    Well, there's a lot more information,
5  it's a lot longer affidavit, Defendant's
6  Exhibit 4, correct?
7  A    Yes, sir.
8  Q    My question is, what did you do to, I
9  guess, learn of more information that you put
10  into Defendant's Exhibit 4 that is not in 5?
11  Did you talk with anybody to try to fill in
12  the blanks? Anything like that?
13  A    With what, like with any particular
14  -- let me look right here on the bottom.
15      MS. MUHAMMAD: I'm going to object to
16  the form. If you have some specific areas,
17  like if you want to say like in item number
18  one, if that's different than item number
19  two.
20      MR. DEERING: I can do that, but
21  we'll be here another two hours.
22  A    No, no. If we have to, we can.
23  Q    Is there anything -- I'm asking a

Page 139

1  general question first. Is there anything --
2  what did you do between your drafting
3  Defendant's Exhibit 5 and then drafting
4  Defendant's Exhibit 4?
5  A    I sat down and thought a little more.
6  Q    Okay. Anything else?
7  A    No.
8  Q    Did you talk to anybody?
9  A    No. I spoke to my dad about Donna's
10  jobs, but that was it.
11  Q    Okay. Anything else that you did?
12  A    No.
13  Q    Okay. So, other than just thinking
14  back a little harder and talking to Donnie
15  Tally, you did nothing else -- strike that.
16  I'll just leave it at that.
17      Do you know why Donna Tally is no
18  longer employed by Dollar General?
19  A    Not technically I don't know why,
20  other than her basically saying it was too
21  stressful. She couldn't handle it.
22  Q    Okay. But as far as you know, there
23  was no performance issues involved with her

Page 140

1  leaving; is that right?
2  A    No, sir.
3  Q    Is that correct?
4  A    I mean, yes, sir, that's correct.
5  Q    Okay. When was the last time you
6  talked with Jeff Jennings?
7  A    Since that store meeting.
8  Q    Okay. The one in Phenix City that we
9  talked about?
10  A    Yes, sir. I haven't seen him since.
11  Q    Have you talked with Jeff Weaver
12  since your employment ended?
13  A    No, sir.
14  Q    And you never complained to him about
15  your termination?
16  A    No, I didn't figure it would do any
17  good.
18  Q    Well, he helped you out before,
19  didn't he?
20  A    Well, yeah.
21  Q    But you chose not to call him?
22  A    Yeah.
23      MR. DEERING: Okay. That's all I

Page 141

1  have.
2      MS. MUHAMMAD: I have got a few
3  questions, Ms. Cross, I need to ask you just
4  for clarification purposes.
5  EXAMINATION BY MS. MUHAMMAD:
6  Q    When you were at that manager's
7  meeting in Phenix City, do you know who the
8  other managers were that were attending that
9  meeting?
10  A    I don't remember all their names, no,
11  ma'am, I don't.
12  Q    Do you know some of their names?
13  A    Well, a few of them.
14  Q    Could you give those to me?
15  A    Shirley -- I don't remember her last
16  name. I don't know nobody's last name.
17  Johnny -- yeah, Johnny was there.
18  Q    Johnny Todd?
19  A    Yes, ma'am. And Wendy and me. I
20  don't remember the other ones.
21  Q    And when you say Wendy, Wendy
22  Whitlock?
23  A    Yes, ma'am.

Page 142

1   Q    Which store did Shirley work in?
2   A    She worked at one in the Phenix City
3   area.
4   Q    Were there other managers and you
5   just can't recall their names at this time?
6   A    Yes. There was more managers. I
7   just don't know their names.
8   Q    How many would you say were in
9   attendance at that meeting?
10  A    Anywhere between 10 to 20 -- 10 to
11  15, somewhere up in there.
12  Q    Do you know if any of them heard that
13  comment that Jeff made -- I'm sorry. That
14  Jack made or that you said Jack made to
15  Charles and Jeff?
16       MR. DEERING: Object to the form.
17  You can answer.
18  A    I really think it was just me and
19  Wendy standing close by. Because me and
20  Wendy always talked with Charles. So, when
21  we would go out to smoke, we would always
22  wait on Charles and we would all smoke
23  together.

Page 143

1   Q    So, you and Wendy would have been the
2   only ones?
3   A    We would have been the only ones that
4   heard it.
5   Q    Johnny Todd wouldn't have heard it?
6   A    No.
7   Q    Shirley wouldn't have heard it?
8       MR. DEERING: Object to the form.
9   A    No.
10  Q    When Donnie Tally told you that Donna
11  had not worked as a manager in the video
12  store, as you identified in your affidavit,
13  did you have any reason to not believe him?
14       MR. DEERING: Object to the form.
15  A    No, I don't.
16  Q    And you did testify that he told you
17  that she was never a manager of the store?
18       MR. DEERING: Object to the form.
19  A    Yes.
20  Q    Do you have any reason to believe or
21  disbelieve him today?
22       MR. DEERING: Object to the form.
23  A    No, I don't. Can I mention something

Page 144

1   else to you?
2   Q    Regarding the store?
3   A    Yes.
4   Q    Is it in relation to what he told
5   you?
6   A    Yes.
7       MR. DEERING: Object to the form.
8   Q    Did Donnie tell you anything that you
9   have not testified about today?
10       MR. DEERING: Object to the form.
11  A    Yes.
12  Q    What did he tell you?
13  A    He just told me that there would be
14  no proof to prove that she was not the
15  manager because the store is closed. So, it
16  would just be a he-she said thing -- kind of
17  thing, you know. That was the only thing he
18  told me though, that he knew for a fact that
19  she had never been the manager or nothing
20  like that.
21  Q    Did you have any reason to disbelieve
22  Jeff Jennings when he told you that he was
23  part owner with Charles in that store at one

Page 145

1   time?
2       MR. DEERING: Object to the form.
3   A    No, I didn't have no reason.
4   Q    To disbelieve him?
5       MR. DEERING: Same objection.
6   A    Yeah.
7   Q    And you did testify that he told you
8   that he did own the store?
9       MR. DEERING: Object to the form.
10  A    Do what now?
11  Q    You testified earlier that Jeff told
12  you that he and Charles owned that store?
13       MR. DEERING: Object to the form.
14  A    Yes.
15  Q    Amy Sanders, I want to be clear. I
16  think you testified that she was your
17  babysitter?
18  A    After her employment ended with
19  Dollar General.
20  Q    Okay. So, she did not work as your
21  babysitter while she was working at the
22  store?
23  A    No, ma'am. Cora Luta was my

Page 146

1  babysitter at that point in time actually.
2  Q    The comments that McDonald made to
3  you that made you cry, did your husband hear
4  it?
5  A    No, he didn't hear it.  It was
6  actually other employees in the store and he
7  sent them on out and told me to stay behind.
8  Q    Who sent them out?
9  A    Charles did.  And it was me and him
10  standing there waiting to set the alarm.
11  Q    Did your husband ever know of the
12  comments that were made?
13      MR. DEERING:  Object to the form.
14  A    Only what I told him.
15  Q    Only what you told him?
16  A    Yes.
17  Q    Did he ever say anything to Mr.
18  McDonald about --
19      MS. MUHAMMAD:  Object to the form.
20  A    No, ma'am.
21      MS. MUHAMMAD:  I have nothing
22  further.
23  FURTHER EXAMINATION BY MR. DEERING:

Page 147

1  Ms. Cross, have you ever known Donnie Tally
2  to tell a lie?
3  A    Not to me.
4  Q    To anybody.
5  A    No.
6  Q    He's never lied to your mom, LeeAnn?
7  A    Never.
8  Q    He's never lied to you as far as you
9  know?
10  A    Never.
11  Q    Did Mr. Tally ever explain to you how
12  he has any knowledge as to Donna Tally's work
13  history at Mr. McDonald's video store?
14  A    It was his sister, they're close.
15  Q    I know.  But did he ever explain to
16  you --
17  A    They talk about everything.
18  Q    Everything?
19  A    Well, when they was growing up.  Now,
20  they're -- they still talk a lot, you know.
21  Q    Okay.  But not as much as they used
22  to?
23  A    Yeah.

Page 148

1  Q    Is Donnie known for using the "N"
2  word himself?
3  A    No.
4  Q    You've never heard him use it?
5  A    No.
6  Q    Who are some of Donnie's best
7  friends?
8  A    Mike Littlejohn.  That's really his
9  only one that he talks to.  I mean, he has a
10  few that he works with.  There's Sammy.  He
11  lives in Georgia.
12  Q    Where does Mike Littlejohn live?
13  A    He lives here in Opelika.
14  Q    Where is Donnie Tally working now?
15  A    He's laid off at this moment.
16  Q    Where was he laid off of?
17  A    I think it was Contina.  I'm not
18  sure.  He's a pipe fitter.  He works for the
19  union, so I'm not sure.
20  Q    Okay.  But he wasn't fired?
21  A    No.  He was just doing a shutdown and
22  the job ended.  And now he has got to wait
23  for another one to come open.

Page 149

1  Q    Do you know if Donnie Tally has ever
2  been fired from a job?
3  A    No.
4  Q    You just don't know one way or the
5  other?
6  A    No.  Ever since I've known him, he
7  has worked at this same job.  He got this job
8  right after high school and he has been there
9  ever since.
10  Q    Okay.  Prior to going to the training
11  school in Jacksonville, Florida in July of
12  2005, had you ever submitted a mileage check
13  request before?
14  A    We filled it out and gave it to
15  Charles, but that was it.  For the little
16  meetings.
17  Q    Okay.  And you had gotten paid for
18  those?
19  A    No.
20  Q    So, sitting here today, you have
21  never been paid for any of your mileage?
22  A    None.
23  Q    Not even mileage that was accrued

(Pages 150 to 153)    39

Page 150

1 **prior to July of '05?**
2 A    Well, he had made a mistake on it or
3 something and we were supposed to redo it
4 again.  And we did.  And I haven't heard
5 nothing since.  And that was at that meeting
6 in the Phenix City store.
7 **Q    Okay.  Do you know if any of the**
8 **other store managers got theirs?**
9 A    I do believe.  I think Wendy got
10 hers, but the others I'm not sure because I
11 didn't really talk to them.
12 **Q    Okay.  And other than the time that**
13 **you saw Dennis Long at the Piggly Wiggly not**
14 **too long ago; is that right?**
15 A    Uh-huh.
16 **Q    Is that a "yes"?**
17 A    Yes, sir.
18 **Q    Okay.  Other than that occasion, have**
19 **you run into him or talked to him at all**
20 **since your termination of employment?**
21 A    No, sir, that was it.  I called and
22 spoke with him about my -- I did.  I called
23 and left him a message on his voice mail

Page 151

1 several times about my mileage fee.
2 **Q    Okay.**
3 A    And never heard nothing, so then I
4 called ERC.
5 **Q    Now, the mobile home on 1467 Lee Road**
6 **that you live in, is that titled in your**
7 **name?**
8 A    No.  The 1467?
9 **Q    Yes.**
10 A    That's my mom's old address.
11 **Q    Oh, okay.  The mobile home you live**
12 **in now that Kinera visited, do you own that?**
13 A    Yes, sir.
14 **Q    It's in your name alone?**
15 A    Mine and my husband's.
16     MR. DEERING:  All right.  That's all
17 I have.  Thank you, Ms. Cross.
18     THE WITNESS:  All right.  Thank you.
19     (END OF DEPOSITION).
20
21
22
23

Page 152

1     SIGNATURE OF WITNESS
2
3     I, _____, do
4 hereby certify that on this _____ day of
5 _____ 2008, I have read the
6 foregoing transcript and to the best of my
7 knowledge it constitutes a true and accurate
8 transcript of my testimony taken by oral
9 deposition on February 14, 2008.
10
11 _____
12     WITNESS
13
14 Subscribed and sworn to
15 before me this _____
16 day of _____,
17 2008.
18
19
20 _____
21 NOTARY PUBLIC
22
23

Page 153

1     C E R T I F I C A T E
2
3 STATE OF ALABAMA )
4 JEFFERSON COUNTY )
5
6     I hereby certify that the above
7 and foregoing deposition was taken down
8 by me in stenotype, and the questions and
9 answers thereto were reduced to computer
10 print under my supervision, and that the
11 foregoing represents a true and correct
12 transcript of the deposition given by
13 said witness upon said hearing.
14
15     I further certify that I am
16 neither of counsel nor of kin to the
17 parties to the action, nor am I in
18 anywise interested in the result of said
19 cause.
20
21 _____
     Cathy A. DeBardeleben, Commissioner
22
23

Page 154

1      E R R A T A  S H E E T
2
3   Page     Line     Correction    Reason
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**A**

ability 7:20
able 21:20 100:11
abuse 14:6
account 70:8,11
  131:19,20
accounts 131:17
accrued 149:23
accurate 106:12
  114:18 132:14
  132:16 137:14
  152:7
accurately 7:21
acknowledgme...
  45:9
acting 5:4
action 1:6 30:4
  153:17
activity 81:21
add 90:12
added 137:19
additional 137:18
address 9:13
  151:10
admitted 72:12
  131:6
adopt 11:10
adoption 11:9
affect 7:20
affidavit 24:4,9
  24:15,20 86:13
  93:12 94:9
  100:23 101:21
  101:22 104:6,10
  104:18 105:1,3
  105:8 130:14
  137:4,17 138:5
  143:12
affidavits 79:11
  79:19 80:16
  102:8
African 114:9
afternoon 106:5
  111:3,22
age 41:13 98:4
ago 19:10,12
  68:14 93:7
  122:9 129:9
  150:14

AGREED 1:14
  2:1,9
ain't 134:22
Alabama 1:2,21
  3:7,17 5:2,3,5
  5:10 8:16 9:1
  9:14 12:1 17:16
  153:3
alarm 146:10
alive 38:20
allege 118:17
allegedly 121:5
alteration 46:18
American 114:10
Amy 106:7,17
  107:6 112:2,4
  112:11,12,14,21
  113:10 129:9,15
  129:17,18 130:4
  130:9 145:15
Ansley 10:10,15
  10:20
answer 23:23
  62:16 76:22
  142:17
answers 153:9
ant 117:20
anybody 30:1
  84:5 110:7
  122:23 133:7
  138:11 139:8
  147:4
anymore 62:4
  112:17
anyway 81:8
anywise 153:18
apartment 9:18
  136:7
apologize 15:15
appear 45:2
appears 137:16
Appliances
  112:23
application 43:18
  67:21,23 68:21
  92:7,11 107:22
applied 43:18
  44:4 68:10,18
  69:1 90:18
  122:2

apply 21:13 22:6
  68:16 69:4 93:2
  108:1
applying 130:11
appreciate 40:19
approximately
  1:22 5:10 41:9
  49:15
April 31:22,22
  53:10
area 142:3
areas 138:16
arrest 17:4
artists 128:9,11
asked 15:14
  23:13 32:10
  80:10 106:4
  107:21 109:23
  131:3,4 135:11
  135:14
asking 8:9 17:7
  89:1 138:23
aspects 99:18
asset 82:7,8
assign 2:14
assistant 48:11
  48:13 49:14
  57:19 58:17
  61:23 75:9,17
  81:5 86:15
  88:11,16 89:3,9
  90:13,18 91:2
  91:14,17,21
  92:2,4,8 93:2,9
  101:3 102:10,16
  102:20 103:5,11
  103:20 108:14
  108:16 117:6,13
  121:12,18 122:3
  122:12 123:21
  125:13
attendance 142:9
attending 141:8
attention 77:8
  105:16
attitude 61:12
attorney 3:5,11
  6:1
Auburn 6:22,23
  13:11 27:13

28:18 49:3,6
  54:12,15 74:16
  80:14,19 81:6
  97:14 117:6
aunt 35:5
Austin 30:10
authority 108:17
  108:20
available 91:21
Avenue 3:16
  26:17 49:21,22
  52:10 114:4
Avery 54:2,4,5,10
aware 15:7 17:7
  17:9 33:17
  92:23 110:23
A-N-S-L-E-Y
  10:15
a.m 1:23 5:11

**B**

B 4:7
babysat 129:23
babysitter 129:19
  145:17,21 146:1
back 9:5 16:18
  18:1,8 28:3
  30:18,18 36:11
  44:5,20 45:9
  47:7 53:21 55:9
  56:13,18 58:5
  62:8 68:20 70:1
  72:16 74:6
  84:18 85:18
  110:17 112:10
  119:6,10,11,15
  120:19 123:3
  127:1 134:4
  135:15 137:5
  139:14
background 6:14
  7:23 40:22 73:3
bad 84:20 88:20
  117:16,19
Baker 14:21
bank 69:15,20
  87:13 130:15,16
  131:1,14,15,18
  131:22,23 132:4
  132:13

bankruptcy
  17:10,17
Barbara 43:11
based 13:7
  123:22
basically 61:10
  63:2 118:4
  127:1 132:1
  139:20
bathroom 29:14
  29:19
Beauregard
  25:23 26:2,10
  26:10 63:12
beef 134:16
began 95:22 96:9
beginning 47:21
  49:17,18
begins 115:9
behalf 3:3,9
  100:18
belabor 22:17
belaboring 40:21
believe 20:17
  24:11 30:17
  56:11 62:1
  86:12,14,19
  88:10,16 89:8
  89:19 90:12
  104:14 108:16
  121:15 125:20
  125:22 126:4
  143:13,20 150:9
believing 93:8
best 20:3,11
  49:10 67:5,12
  148:6 152:6
Beulah 112:18
big 35:23 37:8
bills 37:3 66:19
Birmingham
  3:17 5:2
birth 6:15 98:10
bit 25:16 31:18
  89:2 102:6
black 73:1,2
  106:2 107:18
  109:3 110:4,9
  111:1 127:3
  129:11

blacken 46:2
blackened 45:21
    45:23
blacks 104:8,15
    105:21
blanks 138:12
Bob 13:5,7
born 6:17 98:13
borrow 53:1,10
boss 55:20
bottom 21:23
    44:13 138:14
bounce 72:1
bounced 69:11
    69:12,14 71:1,9
    71:15 72:10,13
    130:18 131:7,9
    131:16
branch 70:3,4
breach 21:8
break 83:8 84:10
    88:21,23 128:15
    128:18,20 129:4
breaks 128:22
Breanna 10:9,14
    10:16 11:2,5
brother 35:2
brought 6:4 77:7
    116:13
business 29:18
    56:23 73:7,9,13
B-E-A-U-R-G-...
    26:5
B-R-E-A-N-N-A
    10:14

———————
        C
———————
C 3:1 153:1,1
call 39:1 118:20
    119:10,11,15
    120:9,21,23
    122:20 123:4,5
    123:10,11,12
    133:16 140:21
called 54:9
    118:22 119:1,7
    119:10,20 120:4
    123:14 133:17
    150:21,22 151:4
calm 129:6

candidates 122:6
capable 88:10,17
Capps 1:20 5:9
car 115:22
card 43:15
care 31:2,7
caretaker 31:11
carry 83:5
case 6:6 14:2,5
    18:20 19:3
    22:21 24:5,16
    40:18 41:2
    63:16 64:5 65:6
    65:21 93:14
    105:10 137:5
Cash 15:8
cashier 27:19
    62:10 113:3,4
Cathy 1:18 5:1
    153:21
cause 5:12 79:18
    82:12,20 153:19
center 120:4
certain 36:8
    106:23 107:1
certificate 51:6
certify 5:4 152:4
    153:6,15
chance 135:20
changed 69:22
charge 61:8
Charles 3:20 6:10
    32:9,11,13 56:4
    56:5,6 57:14,17
    58:8 61:19 83:1
    97:2 104:7
    105:20 106:4
    107:2 108:9
    114:1,15 115:21
    117:5,11 130:16
    131:1 132:8,13
    133:21 134:19
    142:15,20,22
    144:23 145:12
    146:9 149:15
check 69:11,14
    71:1,2,8,9,15
    72:1,10,13
    130:18 131:7,9
    131:17 149:12

checks 69:12,15
    71:3,8,10
children 10:5,23
chose 140:21
Chris 6:1 52:11
    73:14
Christmas 42:2
    43:15 49:19
    50:8,10
CHRISTOPH...
    3:10
Cierra 10:9,14,18
    11:2,8
circumstances
    18:20 60:20
city 12:12,16
    79:13 81:10
    83:10 85:21
    134:7 140:8
    141:7 142:2
    150:6
Civil 1:6 5:6
claim 129:10
claimed 55:16
clarification
    141:4
clean 52:20
cleaning 53:15,17
    54:1 55:2,12
    73:6,8 74:7
clear 32:18 46:14
    86:4 128:19
    145:15
clearly 21:8
clerk 47:2 52:19
    58:2 113:4,5
clerks 52:2,10
    103:3
client 20:17,19,22
    21:1,4,6,7,12,17
    22:4,14
close 57:7 87:4
    142:19 147:14
closed 95:1
    131:17 144:15
clue 12:17 39:5
    128:10
coffee 88:22
Colonial 75:14
come 18:15 32:7

35:19 56:12
    58:8 61:1,13
    62:8 67:20
    76:16 78:15,18
    78:19,21 84:18
    95:2 96:3,4
    107:21 109:23
    116:6 131:4
    134:2,3 148:23
coming 73:4 75:6
    90:6 110:4,10
    111:1
commencing 1:22
    5:10
comment 114:2
    115:13 116:4,14
    118:17 121:5
    124:9 127:5
    142:13
comments 146:2
    146:12
Commissioner
    1:19 5:4 153:21
communications
    21:7
company 6:5
    33:13,20 47:17
    53:5 72:1,6
    82:4 89:11,13
complain 133:6
    133:12
complained
    140:14
complaint 118:14
    133:2,4,11
    135:1
complaints
    120:15 135:4
completed 51:7
compliance 2:5
computer 153:9
concerning 133:2
conclusion 51:4
condition 7:20
conduct 126:9
conducting 79:23
conflict 29:6,11
consider 59:4
considered 16:9
    26:11

constitutes 152:7
contact 22:21,22
    119:6,14
contacted 22:23
    123:2
contacts 23:11
contained 24:4,9
    24:15,20 137:19
    138:1
Contina 148:17
continue 22:15
    62:16
controls 100:9
conversation
    21:19 24:8,13
    24:22 65:9 83:6
    84:17 116:6
    124:3 125:11
    129:2
conversations
    19:15 20:7,19
    21:2,3,10 64:9
    67:6,12,17
    110:14 123:19
    128:23
convicted 15:20
Cora 145:23
corporate 88:5
    119:17 120:21
Corporation 1:8
    6:2,11 71:12
Corral 74:9,15
    74:19
correct 7:8 23:18
    24:12,16 35:3
    39:12 45:3
    46:11,16 48:1,2
    49:23 51:17
    53:8 54:22
    57:20 60:2 71:4
    71:12 72:6,10
    72:13 77:19
    82:13 86:8,13
    86:16 95:9,12
    95:23 97:4,23
    98:2 101:4,10
    101:12 109:1
    111:4,8,19
    112:1 115:6
    118:11 122:8,19

125:5,8 126:3
128:20 129:12
131:7 135:17
137:11 138:6
140:3,4 153:11
Correction 154:3
counsel 1:16 2:11
2:13 5:7 6:9
153:16
counseled 51:23
52:7 53:13
counseling 28:10
51:21 74:19
count 87:1,4
counts 87:6
County 12:23
14:20 17:5,15
38:23 153:4
couple 104:17
court 1:1 2:6 5:1
8:7 10:12 15:11
22:1,4,14 32:18
40:18 93:13
Courthouse
12:22
co-worker 29:21
Credit 69:21,23
crew 73:23
crime 15:21 16:1
16:11
Cross 1:10,17
5:11,14,20,23
5:23 6:13 10:9
10:9 11:2,2,7,12
12:5,7,10 13:15
13:22 14:6
20:22 21:8,12
22:19 40:12,20
43:22 46:6,21
70:15 89:1
105:7 128:19
137:2 141:3
147:1 151:17
Crossing 49:7
Cross's 40:22
cry 117:1 125:8
146:3
crying 85:1
cup 88:22
current 9:13

currently 8:16
17:4
cut 66:20
cutoff 54:12
CV 1:8
C-I-E-R-R-A
10:15
_____

D

D 4:2
dad 93:23 139:9
dairy 26:22 28:6
date 5:5 6:14
98:11 106:9
114:18 115:11
dated 46:10
dates 101:23
102:3 114:19
126:20
dating 95:22
day 1:21 5:8
42:12 53:14,20
53:21 56:19
65:2 66:4,6,8
68:11 79:23
80:2 85:3,21
86:8 106:6
111:2,3,23
113:2,16 121:4
121:6,6,7
123:17 125:2
129:10 130:10
131:4 152:4,16
days 16:21,22,23
68:13 118:16
dead 31:10
Deakins 3:12
DeBardeleben
1:18 5:1 153:21
December 16:11
decided 133:23
decisions 110:19
Deering 3:10 4:4
5:17 6:1 20:22
21:5,22 22:9
36:10 40:7,11
45:22 128:16
138:20 140:23
142:16 143:8,14
143:18,22 144:7

144:10 145:2,5
145:9,13 146:13
146:23 151:16
Defendant 1:10
3:9
Defendant's 4:9
4:10,11,12,13
43:23 44:6,13
44:17,21 45:6
45:12 46:7
105:7,11,17,18
113:20 130:14
132:21 137:2,7
137:13,13,17,20
137:23 138:2,5
138:10 139:3,4
deli 60:23 61:1
Dennis 55:19
62:19 107:16
108:23 114:15
114:20,23
115:20 122:10
122:14 131:3,4
133:8 135:11
150:13
deny 131:9
deposition 1:9,16
2:3,4,16 8:5
15:16 18:14
45:3 63:22
126:7 127:20
132:20 151:19
152:9 153:7,12
depositions 2:7
deposits 87:12,13
describe 34:2
67:4
details 22:10
developed 100:2
different 11:3,5
138:18
differential 98:5
digits 46:2,15
direct 99:6,11
105:15
disagreement
35:23
disagreements
35:13,17,20
43:1

disbelieve 143:21
144:21 145:4
discipline 28:9,13
51:21 74:19
disclose 21:20
disclosed 21:7
disclosures 22:5
discriminating
105:20
discriminatory
126:9
discussed 20:18
22:12 24:19
66:21
dispute 32:5
99:15,22 100:5
100:13,20
101:14 115:1
district 1:1,2 6:10
17:16 33:16
55:17 56:1,15
61:20 62:1
102:21 103:4
108:23 132:9
134:12,14
DIVISION 1:3
divorce 13:21,22
14:2 39:4 40:1
divorced 13:17
divulge 20:21
document 46:8
46:16,19 51:6
documents 18:17
doing 11:9 31:3,4
56:11 63:5
81:19,20 88:17
102:14 129:5
148:21
Dolgencorp
101:1 114:3
Dollar 1:7 6:2,11
23:9 30:22,23
31:14,18,23
32:8 33:10 42:5
42:7 43:18 44:4
45:11 46:22
47:20,22 48:15
49:6 50:14
51:13,20 53:18
54:21 57:5,9,12

60:1 61:18 62:3
64:9 66:10,21
67:3 69:9 71:4
71:11 72:2 73:4
75:6 76:12
77:11,23 78:6
85:17 89:5 92:1
102:23 103:17
104:16 114:6
119:16 126:10
127:9,12 129:21
130:1 133:2
135:2,7,10
136:17 139:18
145:19
Don 37:16,20
38:1,6
Donna 34:20
35:4,10,14,17
35:20,21,22
36:5,13 37:11
40:14 57:3
86:16 88:15
89:4 90:6 93:8
93:14,21 95:7
96:2,6,9 98:5,10
101:1 102:17
139:17 143:10
147:12
Donna's 94:12
139:9
Donnie 34:19,23
35:1 38:2 41:7
41:9,12 94:5
95:3,8,22 96:5
97:12,20 98:5,7
139:14 143:10
144:8 147:1
148:1,14 149:1
Donnie's 148:6
door 83:22
doors 26:19
Dorothy 34:17
downgraded
117:19
drafting 139:2,3
drive 25:5
driver's 8:17,19
9:2 16:7,12
115:16

**driving** 16:6,12
  134:8
**drove** 134:6
**duly** 5:15
**duties** 99:2
**dwelling** 9:17
**dynamics** 41:1

———————

**E**

**E** 3:1,1 4:2,7
  153:1,1 154:1,1
  154:1
**earlier** 95:21
  115:21 125:21
  127:20 145:11
**earshot** 83:18
**Easy** 56:9
**education** 25:17
**effect** 2:4 93:10
  104:7
**eight** 26:20
**either** 52:11
  128:22
**elaborate** 136:2
**emotional** 18:11
**emotionally**
  84:22
**employed** 23:9
  33:10 99:2
  136:17 139:18
**employee** 26:23
  29:23 73:20
  76:3 110:21
  111:13 114:2
  120:3
**employees** 27:2,6
  64:10 73:22
  99:7,11 100:2
  103:10 109:18
  109:21 110:4,15
  111:17,18 146:6
**employer** 60:7
**employers** 60:10
**employment**
  31:18 43:19
  44:3 45:10
  51:16 64:8 67:2
  68:10 69:1
  72:10,17 76:12
  77:22 96:14

133:7 135:17
  136:19 140:12
  145:18 150:20
**encourage** 69:4
**encouraged** 68:3
**ended** 51:17 64:8
  67:3 69:2 77:23
  96:14 136:20
  140:12 145:18
  148:22
**engaged** 100:16
  126:8
**enjoying** 63:6
**enter** 41:4
**entitled** 21:9
**ERC** 120:6,7,9
  133:6,13,13,14
  151:4
**error** 130:15,18
  131:1 132:13
**essentially** 57:1
**establish** 40:8
**established** 51:15
**estimating** 101:6
**Eufaula** 134:6
**Eventually** 58:17
**everyday** 67:10
**evidence** 2:16
**exact** 114:19
  135:21
**exactly** 24:1 34:2
  76:16 88:1
  94:11 117:21
**examination** 5:12
  5:17 141:5
  146:23
**examined** 5:15
**exhibit** 4:9,10,11
  4:12,13 43:23
  44:1,6,14,17,21
  45:6,7,12,19
  46:4,7 105:8,11
  105:17,18
  113:21 130:14
  132:21 137:2,7
  137:13,14,17,20
  138:1,2,6,10
  139:3,4
**expenses** 100:10
**experience** 75:7

89:21,22,23
  90:5 93:9 95:7
  102:23 108:4
**explain** 24:10
  147:11,15
**explained** 119:6
  124:20
**extra** 52:21
**eyes** 117:15,18

———————

**F**

**F** 153:1
**fact** 45:23 63:19
  63:21 144:18
**failed** 130:16
**fair** 8:14 36:10
  92:1 105:2
**fall** 37:8
**false** 101:3
  102:11
**family** 9:16 40:19
  40:23
**far** 18:7 25:5 62:2
  68:18 118:2
  122:15 139:22
  147:8
**father** 11:3,5,6,11
  38:14,18
**fault** 16:4
**fear** 61:9
**February** 1:22
  5:8 44:20 105:9
  114:23 152:9
**federal** 3:14
  17:18 18:4
  69:21,23
**fee** 71:21 151:1
**felt** 89:2 124:6
**female** 107:4
  113:6,15 114:5
  129:11
**females** 106:6
  111:2,21
**figure** 140:16
**figured** 72:8
**file** 14:5 17:14
  133:1
**filed** 13:22 14:3
  14:19 15:5,7
  17:10 18:9 24:5

24:15 134:8
**filing** 134:11
**fill** 43:17 92:7,10
  92:13 138:11
**filled** 43:20 44:4
  149:14
**financial** 100:8
**find** 112:10
**fine** 32:22 37:18
**finished** 128:20
**fire** 57:1 108:18
  108:21
**fired** 56:19 75:4
  76:9 107:9,13
  148:20 149:2
**firing** 38:1
**first** 5:15 15:18
  19:7 24:8,13,22
  46:2,15 54:8
  55:18 56:23
  72:18 96:2,9
  112:3 119:10
  125:1,3 139:1
**Fisher** 13:6,7
**fitter** 148:18
**five** 20:5 25:11
  41:21,21 46:2
  46:15 78:14
  105:16 113:20
  128:16
**fixing** 80:3
  114:15,20
  115:20
**Florida** 50:21
  134:1 149:11
**folks** 111:7
**following** 5:13
**follows** 5:16
**foot** 62:8,11
**force** 2:4
**foregoing** 5:6
  152:6 153:7,11
**forgetting** 32:20
**forgot** 15:10
**form** 2:12 62:13
  76:21 77:6
  85:11 88:18
  116:19 138:16
  142:16 143:8,14
  143:18,22 144:7

144:10 145:2,9
  145:13 146:13
  146:19
**forms** 44:3
**found** 131:16
**four** 10:19,20,21
  13:16 69:12,22
  71:1 75:19
  78:14
**frame** 111:11
**Fredericks** 73:12
**French** 117:23
**friend** 59:5,10
**friends** 57:7,8
  148:7
**front** 83:20 84:1
  108:10 109:10
**full** 2:5 5:18
**fully** 40:19
**full-time** 28:4,7
  76:2
**further** 2:1,9
  85:19 114:6
  118:1 136:2
  146:22,23
  153:15
**F-ing** 114:8
  124:14

———————

**G**

**garnishment**
  15:9
**Gary** 30:12,13
**gather** 137:22
**general** 1:7 6:2
  6:11 22:18 23:9
  30:22,23 31:14
  31:19 32:8
  33:10 42:6,8
  43:19 44:5
  45:11 46:22
  47:21,22 49:6
  51:13,20 53:19
  54:22 57:5,9,12
  60:2 61:18 62:3
  64:9 66:10,21
  67:4 69:10 71:4
  71:12 72:2 73:5
  75:6 76:12
  77:12,23 78:6

85:17 89:5 92:2
102:23 103:17
104:16 114:6
119:17 126:10
127:9,12 129:21
130:1 133:2
135:2,7,10
136:17 139:1,18
145:19
**generally** 22:11
**General's** 31:23
48:15 50:14
**gentleman** 39:12
127:19
**Georgia** 8:22
148:11
**getting** 28:2 87:3
88:15 94:7
123:21
**girl** 106:7
**give** 10:7 21:19
85:15 86:18
119:14 130:16
130:22 141:14
**given** 8:4,13
15:15 52:3 66:6
153:12
**go** 19:2 25:1,20
25:22 29:19,20
29:20 42:17,18
46:21 50:14
52:20 66:18,19
66:19,19 67:23
80:4 81:18
84:15 86:6
118:6 124:3
134:1 135:6
136:22 142:21
**going** 9:21 11:10
20:16 21:14
22:9,15,16
23:21 29:14
36:7 40:4 45:18
51:10 56:9
62:12,14 64:4
65:21 94:22
104:13 105:6
106:10 112:9
117:6,13 119:6
126:16 138:15

149:10
**Golden** 74:9,15
74:19
**good** 25:7 26:4
59:5,10 68:5,15
118:3 140:17
**Goodletsville**
119:19
**gosh** 19:9 39:5
49:17
**gotten** 23:6 68:20
114:14 131:14
149:17
**government** 18:4
**graduate** 25:18
**grandmother**
34:6,10,11,16
**great** 129:6
**grew** 57:8
**Grocery** 63:11
**grounds** 2:14
**growing** 147:19
**guess** 6:7 7:4
16:15 26:4
55:21 125:14
138:9
**guessing** 101:18
101:21
**guilty** 15:23 16:2
16:5,10,16

—————
**H**
**H** 4:7 154:1
**hair** 66:20
**Hale** 17:5 38:23
**half** 6:21,21 74:3
101:9
**Hampton** 1:20
5:9
**hand** 61:15
**handed** 85:16
**handle** 62:10
139:21
**happen** 9:4
**happened** 23:2,4
24:2 52:17 56:7
83:2 85:20
115:5 117:21
130:7
**happens** 81:16

**harassing** 30:14
**hard** 43:3 68:4
116:12 120:19
**harder** 139:14
**Harris** 38:19 40:2
**Hatch** 54:14,16
**hates** 126:21
**head** 39:13 71:5
**hear** 146:3,5
**heard** 76:15,18
77:1,3 82:17,18
115:13 118:17
122:10 142:12
143:4,5,7 148:4
150:4 151:3
**hearing** 61:15
153:13
**hearsay** 62:15
**held** 8:19 33:13
**help** 110:2 112:6
112:14
**helped** 17:21
140:18
**he-she** 144:16
**high** 25:17,20
26:7,10 94:1
149:8
**Highway** 3:6
**hire** 108:17,20
109:21 111:7
129:15 130:4
**hired** 31:20 32:1
32:7,22 46:23
47:1 55:18 58:6
59:16 80:22
81:3 100:3
106:6 107:4
110:6 111:22
113:2,7,16
118:10 129:10
130:1
**hiring** 106:4
109:9,15,22
110:19 111:2,6
**Hispanic** 73:1
**history** 40:20
147:13
**home** 9:19 25:6
36:3 63:6 66:15
112:6 118:14,21

123:11 151:5,11
**honest** 18:16
**Honestly** 30:17
30:19
**hostile** 107:14
**hourly** 26:23
27:1 73:20 76:5
76:6
**hours** 138:21
**house** 9:17,22
13:9 41:18 42:4
42:17 55:4,5
136:7,10
**houses** 52:20
53:15,17,23
55:2
**Howard** 29:8
30:1,14
**hurt** 84:20,21
**husband** 10:1
63:9 66:22,22
98:22 115:12
116:1,14,17
117:16 118:17
146:3,11
**husband's** 10:2
151:15

—————
**I**
**idea** 14:17 59:21
112:1
**identification**
44:8,23 45:14
105:13 137:9
**identified** 143:12
**identify** 112:15
**immediately** 40:1
**important** 8:7
40:17
**inaccurate**
106:15 115:6,9
132:21
**incident** 104:22
**incidents** 126:7
**including** 100:9
**income** 55:7
**indicate** 68:9
121:21
**individuals** 40:15
102:16 112:7

**inform** 47:4
111:11
**information** 6:14
46:5 86:6 94:8
130:17 134:14
137:18,23 138:4
138:9
**informed** 47:2
**Inn** 1:20 5:9
**instance** 104:14
104:20 110:20
120:12
**insurance** 14:15
**intentionally**
72:3
**interest** 97:7
**interested** 153:18
**internal** 17:23
133:1,4
**internally** 135:2
**interviewed**
110:3,8 111:17
122:5
**interviewing**
109:17,19
**interviews**
110:14
**investigate** 30:6
**investigation**
79:22 80:6
**invoices** 87:19,20
87:22 88:2
**involved** 41:5
139:23
**in-laws** 112:23
**IRS** 18:8
**issue** 22:17
**issues** 40:21
62:23 139:23
**item** 138:17,18

—————
**J**
**Jack** 79:15 81:11
82:5 86:1 119:2
142:14,14
**Jacksonville**
50:21 134:3
149:11
**Jacques** 52:12
**jail** 16:21 17:1

January 16:6
Jeff 78:9 79:16
  80:12,13,13,15
  81:7 83:1 91:3
  91:5 92:8,14,22
  92:23 97:2,6,12
  97:12,15,20
  119:3,8,9 123:2
  123:20 125:11
  140:6,11 142:13
  142:15 144:22
  145:11
JEFFERSON
  153:4
Jeff's 91:1 117:13
Jennings 79:16
  80:12,15 81:8
  83:14 84:4 91:6
  92:8 97:2,7
  140:6 144:22
jeopardize
  109:14
Jim 39:15
job 28:4,7 29:3
  32:9,10 38:1
  43:17 53:14
  61:9 69:5 73:17
  74:10 76:2
  89:19 99:1
  101:1 109:14,14
  109:23 110:21
  113:1 129:12
  130:11 135:8,10
  135:14 148:22
  149:2,7,7
jobs 68:23 139:10
Joe 38:19
John 11:7,10,12
  12:5,7,10 13:14
  13:22 14:6
Johnny 141:17
  141:17,18 143:5
joint 70:11
judgment 20:3,11
  49:11 67:5,12
Julie 64:18,19,23
July 42:2,5 46:10
  50:18,18 51:2
  149:11 150:1
June 9:21

jury 40:18,23

—————————
        K
—————————
keep 32:20
  110:13
kept 118:23
  134:19
Kevin 10:4 11:3
  11:10 12:7,19
key 40:15 47:14
  47:17 48:4
  58:15 59:15,18
  65:19 87:15
  91:9 92:5,17
keys 52:3 85:16
  85:16,17,18
kids 10:1
kin 153:16
kind 51:6,6,21
  73:7,17 88:9
  107:14 108:10
  126:8 128:4
  144:16
Kinera 1:4 3:21
  22:23 67:6
  77:21 79:17
  80:4 86:14
  88:17 105:20
  136:7 151:12
knew 71:23 72:14
  80:3 86:23 87:1
  87:4,6,9,10,19
  88:13 90:3,6,6
  90:15 91:1
  109:8 131:8
  136:4 144:18
know 12:14 15:6
  16:2,3,8 17:3
  18:5,7 20:5
  22:11 26:5 29:8
  31:21 32:20
  33:9,12,18,19
  34:20 36:15
  37:16,19,22,23
  41:12 43:3,4,5
  43:10 44:2,18
  45:8 55:10,13
  56:8 57:5,6
  58:5,9,10 59:19
  59:20 60:20,22

61:3,6,17,22
62:2,6 63:5,7
65:18 67:22
68:19,20,22,23
72:22 76:8,11
76:14,15,15
77:18,21 78:2,5
79:21 80:2,5,8
80:16 82:3,19
84:13 89:16
90:3,17,21
92:10 93:21
94:17,19,20
95:7 96:8,21
97:6 98:8,10,13
98:15,22 99:5
99:10,13,17,20
100:1,4,7,12,16
101:6,17 102:13
102:15,19,20
103:1,2,3,12,15
103:16 105:4
106:17,20 107:3
107:13,18,23
108:3,6 110:7
110:11 112:13
112:14,16,17,17
113:1,9,11,12
113:16 116:8,20
119:12 120:7
122:16 123:6
124:1,5 126:9
126:15 127:6
128:11 129:17
130:9 132:23
137:3 139:17,19
139:22 141:7,12
141:16 142:7,12
144:17 146:11
147:9,15,20
149:1,4 150:7
knowledge 36:12
38:3 90:2 96:13
96:17 97:22
99:1 104:21
147:12 152:7
known 96:5
147:1 148:1
149:6
knows 36:8

—————————
        L
—————————
L 1:12 4:7
labor 100:10
lady 31:2 61:8
  106:2 107:19
  109:3 110:4,9
  111:1
laid 148:15,16
Large 1:20 5:3
late 37:3 130:20
  130:20,21 131:3
  131:5 132:17
Lateefah 3:4 6:8
Law 3:5,11
laws 2:6
lawsuit 6:4 14:3
  14:18 15:1,7
  40:6,16 65:23
  67:19
lawsuits 14:13
  15:4
lawyer 22:13,20
  23:14,18,20
  85:15 86:7
leader 73:23
leading 2:12
learn 61:11 138:9
leave 27:22 29:5
  42:7 52:14 62:7
  74:21 76:7 80:3
  115:20 119:2
  139:16
leaving 53:13
  60:21 118:6
  122:23 140:1
Lee 5:20,21 9:14
  12:23 14:20
  17:15 151:5
LeeAnn 35:9
  38:5,11 147:6
left 31:14 42:5
  52:2,19 63:3
  66:9 74:22 75:2
  88:7 115:21
  117:5,11 119:5
  150:23
Legal 17:20
length 96:17
let's 31:17 46:21

88:21
license 8:17,19
  9:2,9 16:7,12
lie 147:2
lied 147:6,8
line 21:23 40:5,8
  154:3
list 64:13 86:20
  89:6 104:13,19
  118:23
listed 104:23
listen 128:3,4,5,6
  128:12
little 11:18,19
  25:16 31:17
  36:16 39:22
  89:2 102:6
  117:20 122:9
  129:9 131:18,21
  139:5,14 149:15
Littlejohn 148:8
  148:12
live 11:20 12:1
  31:9 38:22
  54:11 63:10
  148:12 151:6,11
lived 9:20 11:14
lives 9:22 112:17
  112:18 148:11
  148:13
living 12:12 63:8
Loans 15:8
located 33:7 49:7
  73:11
location 26:16
  70:3
log 88:3
long 9:20 12:18
  13:14 26:18
  27:20 31:13
  33:9,19 38:5
  39:18 40:10
  47:16 49:15
  50:22 55:19
  56:7 62:19 72:9
  72:12,16 74:2
  75:17 89:12
  92:19 96:5
  101:7,7 107:15
  107:16 108:23

113:8 122:11,14
125:10,14 133:8
135:11 150:13
150:14
**longer** 30:11
39:21 60:18
89:11 138:5
139:18
**Long's** 72:21
114:15
**look** 44:1,18 45:7
46:7 101:5
137:3 138:14
**looked** 112:10
**looking** 129:12
**lot** 115:19 116:7
126:21 138:4,5
147:20
**Louisiana** 11:21
12:15
**love** 1:4 3:21 6:4
6:5,9 22:20
23:11 65:8 67:6
67:15,18 69:1
77:22 79:17
82:12 84:15
86:8,14,20
88:17 89:3,8
90:14,17 92:7
135:8
**Love's** 22:13,20
76:11 136:7
**Luta** 145:23
**lying** 127:23
**L-E-E** 5:21

**M**

**maid** 73:19
**mail** 150:23
**maintaining**
100:8
**making** 63:7
110:19
**mall** 75:12,13,14
**manage** 57:15
58:21
**management**
50:4 58:18,19
75:7 130:17
**manager** 6:10

26:22 28:6 29:9
29:10 33:4,16
33:16 48:11,13
49:14 50:5,20
52:1 53:1 55:18
56:1,15 57:16
57:17,19 58:17
58:20 61:1,20
61:21,23 62:1
68:21 75:9,18
78:5,20 80:14
80:19,20 81:2,5
81:6 82:8 84:9
86:15 88:12,16
89:4,9 90:13,18
91:2,14,15,16
91:17,21 92:3,4
92:8 93:2,9,15
93:22 94:13,16
101:3 102:10,17
103:5,6,11,20
108:11 109:1
117:7,14 121:12
121:14,16,19
122:3,12 123:22
125:4,13 126:2
132:9 134:10,12
134:14 143:11
143:17 144:15
144:19
**managers** 79:13
84:7 102:21
141:8 142:4,6
150:8
**manager's** 81:14
81:17 85:21
133:20 141:6
**managing** 58:22
**March** 12:20
31:16 70:18
**marital** 40:22
**mark** 44:16
**marked** 44:7,22
45:13 46:14
105:12 137:8
**marking** 43:23
45:5 105:7
137:1
**marriage** 34:1
35:5 40:13,14

95:22
**marriages** 12:8
**married** 12:5,19
12:21 13:14
38:11 39:2,3,11
39:18,20,21
40:9 70:17
114:7,9
**marry** 39:23
**Marvin** 33:8
106:3,21 109:5
**Matilda** 14:21
16:3
**matter** 22:12
**matters** 20:18
**ma'am** 19:1
141:11,19,23
145:23 146:20
**McDonald** 3:20
6:10 32:12,13
32:22 33:9,22
34:3 37:17,21
38:1 40:13
42:22 46:23
48:4 56:5,6
57:4 79:16 81:2
83:13 84:3 97:2
97:3 99:7,12,19
100:11 103:9
104:14 108:7
109:11 110:8,13
110:17 111:1,11
111:17 113:9
116:3,18,21
118:18 121:5,21
122:10 123:22
125:7,16 126:1
126:8 129:10,15
130:4 132:5
146:2,18
**McDonald's** 33:2
34:9 41:17 42:4
42:17 43:9
55:20 102:21
103:4 147:13
**mean** 9:18 18:15
19:1,5 30:16
67:8 68:12
76:15 84:21
87:8 90:4

101:16,23
103:12 109:19
110:11 125:15
126:19,23 133:5
138:3 140:4
148:9
**meant** 82:19
**medical** 62:7,23
**medications** 7:14
7:17
**meet** 96:2
**meeting** 78:17
79:13 80:4
81:14,17 83:12
85:21 134:7
140:7 141:7,9
142:9 150:5
**meetings** 81:22
134:8 149:16
**memory** 102:5
**mental** 18:10
**mention** 63:19
65:20 79:12
122:9 124:8
143:23
**mentioned** 80:15
93:6 97:13
104:17
**message** 119:2
123:1 150:23
**messed** 116:15
**met** 78:10,12
96:6
**Middle** 17:16
**Mike** 148:8,12
**Mike's** 63:11
**mileage** 133:9,18
134:11,17
149:12,21,23
151:1
**military** 13:19
**mind** 35:19
**mine** 21:2 26:4
151:15
**minute** 90:9
**minutes** 25:7,7
93:7 128:17
**mistake** 131:15
150:2
**mixed** 119:4

**MLK** 3:6
**mobile** 9:19 36:3
151:5,11
**mom** 35:16 36:6
37:6 38:5,11
39:2 42:18,21
43:6 134:2
147:6
**moment** 148:15
**mom's** 35:7 37:5
95:21 151:10
**Monday** 65:3,3
**money** 36:5 52:21
53:1,11,17 55:1
**Montgomery**
17:17
**month** 27:21
36:17,20 47:18
47:18 68:13
96:7
**monthly** 82:1
**months** 26:20
72:19 75:20
101:9 102:9,18
102:22 103:10
103:19 104:1
**Morris** 14:21
**Morrison** 64:19
65:9
**mother** 36:14
41:3
**Moundville** 12:1
12:3 38:23
95:16,19
**move** 116:11
**moved** 95:14
136:14
**moving** 47:3,5
**Muhammad** 3:4
4:5 6:8 10:11
18:23 19:8 20:8
20:16 21:1,16
22:7 23:21 24:8
24:13,19,23
36:7 40:4,9
45:18 62:12
71:7 76:20 77:6
85:11 88:18
116:19 128:14
129:1 138:15

141:2,5 146:19
146:21
**Muhammad's**
19:18
**multi-page** 44:1
45:7
**music** 128:4,5,6

___

**N**

N 1:12 3:1 4:2
124:16 126:12
126:15 127:8
128:7 148:1
**name** 5:18 6:1
10:3 29:8 30:9
30:12,13 34:5
34:15,18 35:8
37:4,5,6 39:14
43:10 52:11
54:6,8 59:2
64:15 69:22
70:8,12,13
94:17,19 106:18
106:19 112:3,16
116:13 141:16
141:16 151:7,14
**named** 106:7
**names** 10:8 112:6
141:10,12 142:5
142:7
**Nash** 3:12
**nature** 29:12
**necessary** 2:10
**need** 61:2 79:16
86:22 88:22
112:13 141:3
**needed** 67:20
91:2 109:14,20
111:7 116:12
**needing** 92:22
93:1 110:2
**neither** 153:16
**never** 9:10 15:23
39:2 41:15
47:22 52:6,8,17
52:19 66:20
80:10 93:14,22
94:16 95:2,11
118:1 119:7,9
127:11,16

129:23 130:7
132:8 133:10
134:8,21 140:14
143:17 144:19
147:6,7,8,10
148:4 149:21
151:3
**new** 27:12 56:1
100:2
**newer** 137:17
**night** 28:2,23
65:13 117:2,3,5
**nobody's** 141:16
**nods** 39:13 71:5
**non-prescription**
7:16
**normally** 53:22
**north** 3:16 54:12
54:14,16
**NORTHERN** 1:2
**Notary** 1:19 5:2
152:21
**Notch** 73:6 74:7
74:22
**notice** 45:20 75:3
79:12 85:19
137:12
**noticed** 130:13
**November** 31:15
42:11 51:17
56:21 64:8 67:3
72:17
**number** 20:3
46:3 67:5
118:20 119:5,21
120:1 138:17,18
**numbers** 118:23
**N-R** 114:8

___

**O**

O 1:12
**oath** 7:8 93:13,18
105:9 132:3
**object** 20:16
23:21 36:7 40:4
45:18 62:12
71:7 76:20,21
77:6 85:11
88:18 116:19
138:15 142:16

143:8,14,18,22
144:7,10 145:2
145:9,13 146:13
146:19
**objection** 21:15
22:8 36:11
62:17 145:5
**objections** 2:11
2:14
**observed** 95:12
**occasion** 105:19
106:1 113:22
115:10 150:18
**occasions** 41:23
42:16 104:9
105:22
**occur** 23:1
**October** 49:10
79:12 81:11
137:5
**offered** 2:16
**office** 19:16,18
20:4 25:1,2
88:7 118:14,21
**Ogletree** 3:12
**oh** 16:14 19:9
30:9 37:12
49:17 59:9
60:11 85:2,8
127:21 151:11
**okay** 5:23 7:4,7
7:13 8:4,7,22
9:13,16,20,22
10:2,20 11:6,17
13:12,17 14:10
14:18 15:20
16:5,18 17:3,16
18:6 19:7,14
20:14 23:11,15
23:17 24:3
25:10,16 27:4,8
27:17 28:4,12
28:20 29:15
32:3,7,11 33:19
34:8,11,20
35:10,11 36:23
37:10,13,15
38:11,14,16
39:4,11 41:8,23
42:11,21 43:12

43:17 46:10,20
47:4,7,10,20
48:19 50:7,13
50:17 51:4,15
51:23 52:9
54:18 55:14
56:12,17,20
57:11,15,19,23
58:13,16 59:4
60:7 61:14,17
62:2,16,19,22
63:1,16 64:17
64:22 65:20
67:17 69:15
71:3 73:20 74:5
74:7,18 75:1,11
76:3 77:4 78:10
78:19 79:4,9
80:5,20 81:1,7
81:16,22 82:3
83:2,9,18,23
85:1,20 86:2,23
87:10,17 89:12
89:15,18 90:8,9
90:17 91:20
92:12,16,19,21
93:21 94:3,11
94:17 95:3,6,11
95:15 99:5,21
101:8,11 102:2
102:7,15,20
103:8,16,23
104:6,12 105:2
105:15 106:11
106:17 107:10
107:16,18 108:3
108:11 109:17
111:10,21
112:13,19 113:1
114:17 115:12
115:18,23
116:17 117:8,17
117:21 120:3
121:4,8,11,21
122:2,14,22
123:4,16 124:8
124:16,19
125:16 130:13
131:23 132:7,10
135:1 137:16

139:6,11,13,22
140:5,8,23
145:20 147:21
148:20 149:10
149:17 150:7,12
150:18 151:2,11
**old** 7:5 10:16
11:22 36:18
39:6 41:9 75:21
98:15,22 151:10
**older** 98:6,8
**once** 17:13 20:10
20:11 30:10
116:9 120:11,13
124:1,2 136:12
**ones** 104:23
105:4 141:20
143:2,3
**one's** 29:18
**on-hands** 87:5
**Opelika** 1:21 5:9
7:3,3 9:14
26:11,17 27:9
27:15 30:11
49:23 74:17
106:2 109:4
110:18 114:4
148:13
**open** 148:23
**opened** 26:19
**operating** 100:10
**operations** 99:18
**opinion** 103:23
**oral** 5:12 152:8
**order** 14:7,9 22:1
56:23
**originally** 11:11
**ought** 109:7,15
**outside** 66:14
83:9 84:4,9
**overhear** 83:3
**overheard** 84:16
**owe** 18:8 36:6
**owed** 17:23 18:2
**owes** 36:13,15,22
**owned** 96:21
97:22 145:12
**owner** 97:10,16
144:23
**ownership** 97:7

**P**

**P** 1:12 3:1,1
**page** 45:19 46:7
    105:17 113:20
    154:3
**pages** 44:13
**paid** 31:5 71:18
    71:21 133:10,10
    149:17,21
**painter** 13:5
**paper** 88:3
**papers** 39:8,10
**paperwork** 43:20
    86:23 87:11,11
    87:17 88:10,13
    88:15
**paragraph**
    105:16,19
    106:15 113:19
    113:21 115:9
    130:13
**pardon** 117:23
**parking** 115:19
    116:7
**Parkway** 33:8
    49:20 106:3,21
    109:5
**part** 49:10 97:10
    97:16 144:23
**particular** 78:22
    120:12 138:13
**parties** 1:15 2:13
    100:18 153:17
**part-time** 28:5
**passenger's**
    115:17
**pay** 35:22 37:1
    51:9 66:19
    71:22
**paying** 36:23
**payment** 35:22
    36:18,21
**pejorative** 127:11
    127:17
**people** 61:13,13
**Pepperell** 59:1,2
    70:5,6
**percent** 101:16
    125:19 132:15

**performance**
    139:23
**period** 37:20
**permission** 21:17
    21:19
**person** 43:4
    78:13 107:21
    119:12 127:3
**personal** 53:2,11
    90:1 96:13,17
    97:22 99:1
    104:20
**personally** 95:11
**perspective**
    124:21
**Phenix** 12:12
    79:13 81:10
    83:9 85:21
    134:7 140:8
    141:7 142:2
    150:6
**phone** 20:9
    120:23 121:1
    122:20 123:15
**physical** 18:11
**pickup** 87:3
**pickups** 87:2
**picture** 41:10
**piece** 88:3
**Pig** 69:8
**Piggly** 26:15 27:9
    27:11 28:6,12
    28:16 60:12,16
    60:21 65:1
    66:15 67:21
    68:7 69:7
    135:13 150:13
**pipe** 148:18
**pizza** 75:15
**place** 3:14 6:20
    19:15 49:9
    75:15
**placed** 93:1
**plaintiff** 1:5 3:3
    6:6
**plead** 16:10,16
**pleading** 16:5
**please** 5:18 10:7
    104:19
**pled** 15:23 16:2

**point** 17:22 47:10
    55:23 56:12
    59:7,20 109:22
    126:1 132:5
    146:1
**policy** 53:5 72:1,6
**position** 26:21
    28:21 33:2 47:1
    47:11,13 49:14
    57:23 59:13,14
    59:19 65:17
    82:4 86:15
    88:12,16 89:4
    89:10 90:14,19
    91:21 92:8 93:9
    103:11 107:23
    114:16,21,23
    121:19,23 122:3
    122:6,12 123:22
    125:13,17 126:2
    132:9
**positions** 33:12
    111:14
**possible** 103:8,14
    118:8
**precipitated** 61:4
**prejudiced** 104:8
    104:15 105:21
**prepare** 18:13
**prescription** 7:13
    6:12 85:15
**presently** 26:12
**pretty** 85:22
**previously** 12:4
    38:1,12 47:22
    64:10 103:9
**print** 153:10
**printed** 131:18
**printout** 131:21
**prior** 2:16 27:8
    28:15 30:20
    41:12 47:20
    51:13 73:4 74:7
    75:6 88:15
    110:4,9 129:23
    149:10 150:1
**private** 83:6
**privately** 126:22
    126:23

**privilege** 20:17
    21:9,13 22:6
**privileges** 20:21
**privy** 110:13
**probably** 17:17
    20:1 36:9
**problem** 40:11
**problems** 18:11
    102:4
**Procedure** 5:6
**proceeding** 17:18
    17:18
**proceedings** 5:13
**promote** 125:16
**promoted** 47:11
    47:17 48:10,13
    48:16 58:15
    79:3 81:4 101:2
    101:10 102:16
    102:22 103:4,9
    103:20 118:10
    121:18 122:12
    122:15,19
    125:12 126:2
**promotion** 48:8
    48:20 49:16
    50:3 123:21
**promotions**
    51:12 58:3,11
    58:13 61:18,21
    74:13
**prompted** 22:19
**promptly** 87:2
**proof** 130:15,19
    130:23 131:2,12
    132:12 144:14
**prospective**
    109:18 110:15
    110:21 111:13
    111:18
**protection** 14:6
    82:7,8
**protects** 46:4
**proud** 136:15
**prove** 144:14
**provide** 134:13
**provided** 89:5
    99:6,10
**Public** 1:19 5:3
    152:21

**purchase** 65:14
**purposes** 8:8
    141:4
**pursuant** 5:5
**put** 67:21,23
    68:15 75:3
    101:22 105:3
    121:22 137:23
    138:9
**putting** 79:18
    104:9 108:9
**P.C** 3:13

**Q**

**qualifications**
    86:18
**qualified** 68:6,8
    86:14,17 88:11
    89:3,9,19 90:13
**quarterly** 82:2
**question** 8:10
    46:4 76:21
    88:20 111:10
    138:8 139:1
**questioning** 40:5
**questions** 2:12,13
    6:3 8:1 21:10
    21:14 22:16,18
    141:3 153:8
**quick** 88:21
    128:14
**quit** 76:10
**quite** 82:21 89:14
**quote** 102:7

**R**

**R** 3:1 153:1 154:1
    154:1
**race** 72:21,23
**racially** 126:9
**racist** 127:6
**raise** 51:9
**raised** 6:19 12:2
**random** 107:20
**rap** 128:5
**read** 152:5
**reading** 2:2
**real** 9:5 13:13
    89:17 118:22
**really** 17:6 29:18

34:13 35:23
64:1 84:20,23
101:6 142:18
148:8 150:11
**reason** 32:4 75:1
78:22 99:14,21
100:13,20
101:14 115:1
118:2 120:10
143:13,20
144:21 145:3
154:3
**reasons** 79:1,4
89:18 90:23
**recall** 16:5,20
17:19 31:19
48:12 51:23
52:5 56:17
79:18 93:4
94:22 95:5
104:9 105:5
130:3 142:5
**receive** 16:23
28:9 48:8 51:5
51:9,21 58:14
74:12,18 87:7
**received** 28:13
49:15 51:5
58:11 89:4
**recognize** 44:2,19
45:8 137:4
**recollection**
119:23
**recommended**
121:17 129:15
**recommending**
130:4
**record** 5:19 6:7
10:11 22:8
40:17 46:13
51:16 62:18
86:5
**records** 32:1
48:16
**redo** 150:3
**reduced** 153:9
**referred** 127:16
**referring** 32:12
34:12 82:12
86:20 90:14

104:1
**regarding** 20:18
144:2
**regional** 78:5
**regularly** 128:7
**related** 33:22
34:3 40:12,14
81:7 113:10,17
120:17
**relating** 2:6
**relation** 144:4
**relationship** 38:6
41:4
**relationships**
40:23
**relatives** 57:4
**relevance** 40:6,10
**remember** 24:21
31:22 39:6
47:15 48:14
50:18 51:22
52:9,13 57:13
59:2 74:20
77:14 81:17
82:2 88:8 102:1
104:22,23
106:19 107:5
112:2,3,6
114:19 117:22
120:20 124:1
126:20 141:10
141:15,20
**rental** 96:22
97:18
**report** 30:1,8
55:6
**reported** 30:10
**reporter** 5:2
10:12 32:19
**reporter's** 8:8
**reports** 81:21
**represent** 22:3
**representing**
22:13
**represents**
153:11
**request** 149:13
**requirement**
104:4
**respect** 13:21

52:7 104:16
**respective** 1:15
**respond** 8:11
124:19
**response** 8:13
120:3 135:19
**responsibilities**
29:3
**responsible** 100:8
134:11
**restraining** 14:7
14:9
**result** 22:15
153:18
**retail** 88:4
**returned** 119:9
**returns** 55:7
**Revenue** 17:23
**review** 18:17
**revocation** 9:6
**revoked** 9:2,10
9:11 16:13,14
**Rhodes** 31:8 54:2
**Richardson**
14:22
**rid** 61:9 79:17
**ride** 133:22
**right** 7:2 10:7,22
11:14 12:4,18
13:2 15:4,11
16:20 17:22
18:19 23:2,2
25:12 26:12,17
27:16 28:15
30:20 31:17
34:15 35:7 37:4
37:8 38:8,18
42:14,16 43:7
43:14 46:1 47:6
47:15 48:3,17
49:13,18 50:2,9
50:19 51:1,12
53:23 55:17
59:16 60:17
63:10 66:23
67:2 68:15
70:22 71:23
77:17,21 80:15
82:9,18 83:15
83:16 84:2 85:5

86:5,12 87:21
88:9 91:22 92:6
92:20 93:6,10
95:1 97:3 98:4
98:23 102:14
105:6 107:8
108:8 109:21
110:1 113:19
114:12,20,22
117:12 118:20
120:7 124:7
125:10 126:1,5
129:8 131:10
132:18 135:13
136:6,14 137:20
138:14 140:1
149:8 150:14
151:16,18
**Road** 9:14 54:16
73:12 151:5
**room** 6:7
**roughly** 36:13
39:7 47:16
98:15
**Royal** 69:17,19
69:20,21,23
**Rule** 5:5
**rules** 2:6 5:6
**run** 150:19
**runs** 73:13

───────
**S**

**S** 1:12,12 3:1 4:7
154:1
**safe** 53:2,11 87:4
**salaried** 76:3
**salary** 26:23
**sales** 81:18
**Sammy** 148:10
**Sanders** 112:20
112:21,22,22
113:10 129:9,16
129:17,18 130:5
130:9 145:15
**sat** 139:5
**saw** 41:15 46:14
81:11 150:13
**saying** 71:8,14
115:4 139:20
**says** 103:18

127:22
**Sbarro's** 75:10
75:15,18 76:7
**school** 25:17,20
26:7,11 50:20
51:10 94:2
133:21 149:8,11
**schools** 50:15
**Seasons** 69:22
**seat** 115:16,17
**second** 29:1
53:14 95:22
113:19 128:20
**section** 113:20
**Security** 46:15
**see** 40:5 64:18
92:6,12 105:18
105:22 113:21
124:22 136:15
**seeing** 38:9 93:4
**seen** 65:13 72:19
132:8 135:14
140:10
**selling** 94:15
**send** 43:14,16
87:7 88:5,6
91:3
**sent** 146:7,8
**sentence** 16:23
**sentenced** 16:21
**Separately** 123:8
**September** 39:9
48:16
**serious** 136:1
**serve** 13:19
**served** 44:20
52:23
**Server** 74:11
**service** 18:1 73:8
**Services** 17:20
**set** 146:10
**seven** 66:6
**sexually** 30:14
**sheet** 131:21
**shift** 28:23 29:1
**Shirley** 141:15
142:1 143:7
**shit** 117:23
**shopping** 66:18
66:19 136:22

**short** 64:12
**shortly** 48:22
**show** 32:1 43:22
  45:5 48:16
  105:6 130:17
  137:1
**showing** 51:7
  79:6 131:14,19
**shown** 104:8,15
  105:21
**shows** 45:20
**shrink** 100:9
**shutdown** 148:21
**sick** 61:8
**side** 83:21 109:13
**sign** 92:23
**signature** 2:2
  46:8 152:1
**signatures** 44:12
**signed** 39:8,9
  45:9,9 105:9
  137:5
**similarities**
  137:12
**simply** 6:3
**single** 9:16 84:8,9
  110:20 111:12
**sir** 5:22 7:6,9,12
  7:15,18,22 8:3,6
  8:15,18,21,23
  9:3,11,19 10:6
  11:1,13,16 12:6
  12:9,11,13 13:1
  13:3,20 14:4,12
  15:13,17,19
  16:17,19 17:11
  18:9,18 19:1,11
  23:10,19 24:6
  24:17 25:4,9,15
  25:19,21 26:8
  26:13 27:7,14
  27:16 28:8,11
  28:14,19 29:4
  29:16 31:6,12
  32:13,17 33:1
  33:21 34:22
  35:1,6,12 36:4
  37:14 38:4,10
  38:13,15 41:11
  41:14,16,19

42:19 43:13,16
44:11,15 45:1,4
45:15,17 46:9
46:12,17 47:9
47:12,23 48:2,6
48:9,21 49:1,5
49:12,22 50:1,6
50:12 51:3,8,8
51:11,18 52:8
52:18,22 53:3,6
53:9,12,16 54:7
54:20,23 55:22
56:2,6,14,16,22
57:2 59:17 60:3
60:6,15 62:5
63:18,20 64:20
65:10 66:2,11
66:13,16 67:1
69:3 70:2,7,10
71:13,16,18
72:11,14,20
73:10,21 74:14
74:17 75:5,16
76:4,10 77:10
77:13,20 78:1,4
78:7,11 79:14
79:20 80:7,9,11
80:21,23 81:9
81:13,15 82:10
82:14,16 83:11
85:4 86:9,11
87:14,16,23
90:15 91:7,10
91:13,23 93:3,5
93:11,17,20
94:4,6,10,10,21
95:10,13,17
96:1,11,15,20
96:23 97:5,17
97:19 98:1,3,9
98:12,14,21
99:4 101:19
104:11 105:14
105:23 106:13
106:22,22 107:5
107:12,17
108:13,15,19,22
109:2 111:9
113:8 114:11
115:7 118:12,15

118:19 119:21
120:2,18 121:13
121:15,20 122:1
122:4,7,17,20
123:9 124:10,12
125:6,9 126:4
125:13 130:2,6
130:8,12 132:2
135:18 136:8,18
136:21,23
137:10,15,21
138:7 140:2,4
140:10,13
150:17,21
151:13
**sister** 34:22,23
  35:2 147:14
**sisters** 34:7,10
**sitting** 18:6 20:2
  20:23 21:11
  22:2 32:14 46:1
  49:11 59:21
  63:6 70:23
  85:14 89:15
  96:8,12,16 97:4
  98:19 111:23
  115:19 149:20
**situation** 124:20
**six** 10:19 130:13
**slung** 85:18
**smiling** 135:23
**Smoak** 3:13
**smoke** 83:8 84:1
  142:21,22
**smoking** 83:8,12
  84:5,5
**Social** 45:20 46:3
  46:15
**socialize** 66:14
**sold** 35:21
**somebody** 133:21
**song** 128:2,2
**songs** 128:8
**sorry** 7:3 11:19
  22:20 26:5
  32:21 35:2
  36:19 44:11
  45:16 54:13
  58:20 60:5
  69:18 71:20

75:8,9 86:3
88:19,20 98:3
103:3,22 105:17
110:22 117:8
119:3 126:13,15
127:19 142:13
**sort** 86:7
**sound** 42:14
  48:17 82:9
**SOUTHERN** 1:3
**speak** 23:13 37:9
  37:11 123:5,10
  123:16
**speaking** 8:11
**specific** 138:16
**spell** 10:12 26:3
**spick** 127:14
**spoke** 19:8 24:14
  92:14 123:7
  125:3 139:9
  150:22
**spoken** 18:19
**spring** 106:1,11
  110:18
**stand** 93:19
  126:12,15
**standing** 83:7,11
  83:17 108:8
  142:19 146:10
**start** 8:14 57:18
**started** 15:9 19:6
  38:9 47:6 56:10
  57:14,22 58:22
  129:20 135:13
**state** 1:19 5:3,18
  8:20 11:15 18:2
  153:3
**statement** 101:4
  102:11 131:14
  132:1,4,12
**STATES** 1:1
**stating** 62:17
**stay** 146:7
**stealing** 77:1,5
**stenotype** 153:8
**step** 62:9,20
**stepdad** 34:4
  37:10
**stepdad's** 37:6
**stepfather** 37:16

38:17 94:3
**stepfather's**
  34:18
**Stephens** 64:16
  65:12
**stepped** 56:4
  109:13
**step-grandmot...**
  34:13
**Stewart** 3:13
**STIPULATED**
  1:14 2:1,9
**stipulation** 5:7
**stock** 47:2 58:2
  87:6
**store** 27:12 30:11
  30:12 33:5
  48:23 49:2,3,7
  49:21 50:5 52:1
  52:2,3,4,10,10
  52:14,19,20,23
  53:2,11 56:10
  57:13,14,16,17
  58:20,21 61:20
  65:15 78:18,20
  78:20,21 79:5
  79:13 80:14,20
  81:2,5,6,10
  83:10,20 91:1,6
  91:12,15,16,22
  92:9 93:15,22
  94:13,18,23
  95:4,8,12,18
  96:10,14,19,22
  97:8,18 99:3,8
  99:12,19 100:2
  100:3,9,18
  102:23 103:2,3
  103:5 106:3,20
  106:21 107:2,19
  108:7,11 109:4
  110:18 113:4,5
  114:4 117:5,6
  117:11,14 118:6
  120:17 121:1,10
  121:14,16
  123:10,13,14
  125:4 126:2,3
  129:12 130:10
  134:10 140:7

142:1 143:12,17
144:2,15,23
145:8,12,22
146:6 147:13
150:6,8
**stores** 50:15
78:16 92:2
**store's** 99:18
**story** 76:14
**straight** 41:7 80:4
**stressful** 139:21
**strike** 88:12
139:15
**stuck** 134:2
**stuff** 24:3 81:21
120:17
**subject** 22:11
**submitted** 93:13
149:12
**subpoena** 22:1
44:19
**subpoenaed**
63:21,23 64:4
65:5
**Subscribed**
152:14
**subsequent** 60:1
60:10 95:21
**substances** 21:2
**sued** 14:10,15,16
14:22
**suffering** 7:19
**Suite** 3:15
**summer** 75:23
114:1,12 115:5
**supervise** 27:2,6
73:22
**supervised** 99:17
**supervision** 99:6
99:11 153:10
**supervisor** 48:5
**supervisory** 29:2
**supposed** 81:20
83:23 133:10
150:3
**supposedly** 36:6
109:4
**sure** 9:5 13:13
18:18 19:13,19
54:9 55:10 58:7

58:8 68:2 85:22
86:4 88:8 89:14
89:17 98:19,21
101:5,16 106:9
107:5 110:6
118:7,22 120:5
123:18 125:19
125:23 128:16
133:14,15
148:18,19
150:10
**suspended** 9:2,12
16:7 17:2 84:19
85:6,19
**suspension** 9:6,8
**sworn** 5:15
152:14

**T**

**T** 1:12,12 4:7,7
153:1,1 154:1,1
**take** 6:20 7:13
19:15 30:4 44:1
44:18 45:6 46:6
49:9 66:12
88:21 114:20
128:14,16
133:23 137:3
**taken** 1:18 88:23
128:18 152:8
153:7
**takes** 37:1 102:9
103:18
**talk** 8:8 21:17
22:19 31:17
37:20 63:16
64:22 65:8,23
66:3 81:18
107:7 108:6
116:9 122:23
125:1 138:11
139:8 147:17,20
150:11
**talked** 20:9,15
32:9 63:13
64:11 65:11
67:18 90:22
107:6 110:20
111:12,18
127:19 129:3

135:9 140:6,9
140:11 142:20
150:19
**talking** 8:14 15:2
23:5 36:3 37:15
82:22 83:17
85:14,23 89:2
115:23 116:2,5
116:10 117:3,10
129:8 130:18
133:18 139:14
**talks** 148:9
**Tally** 34:17,19,21
35:1,5,9,11
36:13 38:6
40:14 41:4 57:4
86:16 88:15
89:4 94:5,11
95:3,9,23 96:2,5
96:9,18 98:5
99:5,10,17
100:1,7 102:17
139:15,17
143:10 147:1,11
148:14 149:1
**Tally's** 34:23
95:7 98:10 99:1
147:12
**Tammy** 64:14
65:12
**Tammy's** 65:17
**Target** 27:10,10
27:12,18 28:10
28:16 60:14
**taught** 87:5,9
**tax** 55:7
**taxes** 18:1,8,9
**tears** 117:15,17
**technically**
139:19
**telephone** 20:7
24:23 120:21
125:11
**tell** 7:11 14:13
22:3 23:16,20
25:16 29:13,15
35:19 50:17
58:10 59:10
65:5 70:16 79:1
84:15 85:5,12

88:21 89:23
94:12 95:3
106:10 110:20
111:19 112:9
117:9 118:13
136:5 144:8,12
147:2
**telling** 21:12
77:15 97:21
126:11,14
134:19
**Tennessee** 119:19
**term** 127:12
**terminated** 23:6
69:9 72:9,17
76:13,17 117:4
134:22 135:17
**termination** 61:4
77:18 107:11
133:3,7 134:17
135:3 140:15
150:20
**terms** 20:17
**testified** 5:16
15:11 24:11
89:8,20 90:11
94:8 95:20
125:20 126:6
132:19 144:9
145:11,16
**testify** 7:21 20:20
22:2 62:14 64:5
65:6,21 143:16
145:7
**testifying** 41:2
93:18 132:3
**testimony** 9:9
18:7 52:6 54:18
70:22 93:19
129:22 152:8
**Thank** 151:17,18
**Thanksgiving**
42:2
**theirs** 150:8
**thereto** 2:17
153:9
**thing** 8:12 67:10
77:2 86:7
116:23 118:13
131:19 144:16

144:17,17
**things** 19:2 20:14
20:20 21:18
24:14 66:17
86:22 89:6
**think** 15:14 25:11
26:19 30:12
36:16 45:20
49:18 51:16
54:17 56:9,19
58:7,7,22,23
62:1 65:2,4
68:6 71:7 77:1
79:15 82:1
85:22 87:8 88:7
95:1,20 107:8
107:14 116:17
120:19 122:11
125:3,18 133:13
134:6 142:18
145:16 148:17
150:9
**thinking** 26:20
42:10 50:9
139:13
**third** 47:14,17
48:4 58:15
59:15,18 61:15
65:19 87:15
91:8 92:4,17
100:18 108:15
**thirties** 98:17
**Thomas** 52:11
**thought** 64:3
81:1 116:12
139:5
**three** 10:1,5 20:6
44:13 68:13
75:19,19
**throwed** 116:14
**Thursdays** 53:22
54:19
**Ticket** 16:9
**Tiffany** 1:10,17
5:11,14,20
40:20,22 70:15
**Tiger** 27:16 49:7
**tills** 87:1
**time** 2:15,15
15:18 19:4,7

24:19 31:14
33:3 37:20 40:8
42:3,20 45:10
46:22 48:5,7
50:13 51:19
52:23 53:18
55:23 57:20
60:1 61:21
63:13 65:2,11
70:14 72:7,18
75:21 76:23
79:6 81:20 82:4
84:6 86:19 87:2
89:13 90:1,2
91:9,18,22 95:4
96:18 108:12,18
108:21 109:1,3
109:18 110:15
111:8,11,12
114:10 116:10
117:15 119:10
121:12,15,16,17
121:23 122:18
123:15 125:5
129:23 133:16
134:5,9 140:5
142:5 145:1
146:1 150:12
**times** 17:12 19:17
19:23 20:3
25:11 30:3
41:20 66:7
78:12,14 97:13
111:16 126:19
126:21 133:17
136:11 151:1
**Timothy** 12:10
**title** 29:22
**titled** 151:6
**today** 6:12 7:8,21
18:6,14 20:2,23
21:11 22:2,14
32:14 45:3
49:11 59:21
65:21 70:23
89:15 93:19
96:8,12,16 97:4
98:16,20 111:23
132:4,19 143:21
144:9 149:20

**Todd** 141:18
143:5
**told** 23:16 31:23
42:11 48:15
60:23 61:1,13
61:13 62:9,13
62:19 63:23
67:20 68:11
77:4,19 79:16
84:19 85:7,13
85:15,18 86:8
91:3 93:23,23
94:14 95:9 97:9
97:11,15 104:3
106:5 109:7,15
114:22 117:22
129:5 136:3
143:10,16 144:4
144:13,18,22
145:7,11 146:7
146:14,15
**toll-free** 120:1
**Tommie** 31:8
54:2
**Top** 73:6 74:7,22
**total** 71:22 84:11
**Town** 27:16
**trailer** 35:21 36:2
36:17,21
**train** 102:9
**trained** 90:4,5
100:1
**training** 50:14,15
50:20 51:5,10
103:19 133:21
149:10
**transactions**
100:17
**transcript** 152:6
152:8 153:12
**transfer** 48:23
49:9
**transferred** 91:1
91:5 92:17
**Trawick** 79:15
81:11 82:5 84:3
86:1 119:3
**Trawick's** 79:22
82:3
**trial** 2:15

**trip** 25:10
**trips** 66:12
**trouble** 79:18
82:12,20
**truck** 30:19 87:7
**true** 66:9 129:14
129:18 137:14
152:7 153:11
**truth** 7:11
**truthfully** 7:21
22:2
**try** 8:8,12,12
135:9 138:11
**trying** 40:7 76:23
83:5 134:18
**turned** 110:9
129:11
**Tuscaloosa** 6:18
6:21 12:3
**Tuskeegee** 3:7
25:3,5
**twice** 20:10,12
78:21 120:11,14
**two** 9:21 12:20
19:12 20:5
50:23,23 64:21
67:11 68:13
70:19 74:3,3
75:3 101:2
102:9,18,22
103:10,19 104:1
106:6 110:5
111:2,21 112:7
119:14 121:7
128:22 138:19
138:21
**typically** 19:15
42:18 55:1
81:16,23

_____

**U**

**U** 1:12
**uh-huh** 7:1,6
25:13 32:15
44:9 81:13
106:8 113:23
128:21 150:15
**understand** 6:5,8
7:7,10 8:1 21:5
21:22 40:19

41:1 71:10 72:5
110:22 117:9
**understood** 53:7
72:5
**unh-unh** 27:7
38:4 106:16
128:3 132:23
136:18
**union** 69:21,23
148:19
**UNITED** 1:1
**Unloader** 28:22
**unloading** 30:18
**untruthful**
132:22
**upbringing** 6:20
**upper** 130:17
**upset** 84:23 118:5
**use** 53:2,11 70:4
114:7 124:16
128:7 148:4

_____

**V**

**valid** 8:16
**value** 88:4
**various** 89:6
100:17 126:19
**Vasquez** 127:16
**vehicle** 133:23
**vendor** 87:21
88:2
**vendors** 100:17
**video** 93:15,22
94:13 95:8
96:10,14,18,21
97:8,18 99:3
100:3 143:11
147:13
**videos** 94:15
**Village** 49:20
**violation** 53:5
72:1,6
**violations** 16:9
**visit** 96:4
**visited** 151:12
**voice** 150:23
**volition** 63:3
**VS** 1:6

_____

**W**

**wages** 15:10
**wait** 8:10,10,12
134:20 142:22
148:22
**waiting** 146:10
**waived** 2:3
**walked** 109:12
117:14
**Wal-Mart** 28:17
29:5 30:2,4,20
31:1 70:5
**want** 22:11,17
30:13 39:1 86:4
109:13 138:17
145:15
**wanted** 29:13
30:16 62:9
85:14 107:23
121:22 125:23
134:17 136:14
**wanting** 42:9
86:6 91:19
116:11 125:18
**warrant** 17:4
**Warren** 73:14,15
73:16
**wasn't** 9:11 59:10
69:13 70:11
72:3 83:15
95:13 100:11
101:7 117:23
120:15 121:6,7
124:6 125:14
148:20
**way** 1:20 5:9 25:8
33:23 72:21
73:3 113:12
125:9 127:3,4
133:20 134:2,4
149:4
**Weaver** 78:9 79:8
119:3,8,9 123:2
123:20 124:13
125:12 140:11
**week** 50:19,20
65:2 66:6 81:19
92:20
**weekend** 96:3
121:9
**weekly** 81:21,22

weeks 50:23,23
  75:3 96:7 101:2
  119:14 125:15
Wendy 57:11,20
  60:8 77:7,7,9,14
  77:19 79:3
  83:16,17 84:4
  90:4 91:19
  114:4 116:11
  118:23 120:20
  121:18 122:2,11
  123:5,16,20
  125:1,12 141:19
  141:21,21
  142:19,20 143:1
  150:9
Wendy's 57:23
went 17:20 18:21
  20:4 23:17 25:2
  30:23 32:10
  49:19 50:18,20
  62:7,20 65:13
  74:6,22 81:5
  86:15 95:2
  112:10 131:17
weren't 75:4 76:9
West 3:6
we'll 45:23 46:1
  90:8 138:21
we're 11:9 46:1
  85:23
we've 21:3 51:15
whichever 38:23
white 73:1 106:6
  106:7 107:3
  111:2,21 113:15
  114:5
Whitlock 57:11
  58:6 59:4,23
  61:18 62:3 64:7
  66:3 77:9,19
  114:4 123:20
  141:22
wife 34:6,9 43:9
Wiggly 26:15
  27:9,11 28:6,12
  28:16 60:12,16
  60:21 65:1
  66:15 67:21
  68:7 69:7

135:14 150:13
willingly 23:17
Williston 39:15
  39:16,19,23
  41:3
Wilson 5:20,23
  10:4,10 11:4
  12:8,19 13:2
  70:17
window 93:1
Winn-Dixie 49:8
witness 2:3 5:11
  39:13 40:12
  71:5 151:18
  152:1,12 153:13
witnesses 40:15
woman 30:17
word 68:16 114:8
  124:16 126:17
  127:8,14 128:7
  148:2
words 9:17
  124:11,15
  126:12,15
  135:21
work 13:2,4
  26:12 27:8 28:3
  28:15 30:21
  31:13 53:14
  57:5,12 60:9,11
  60:14,16 62:3
  68:7 73:4 74:2
  74:8 75:17 94:1
  96:9 116:9
  135:6 142:1
  145:20 147:12
worked 27:10,11
  28:17 47:22
  51:19 52:1
  53:18 56:10
  57:9 59:23
  64:10 77:22
  78:2,6 80:18
  90:16 93:14,22
  94:1,14,16 95:4
  96:18 101:8
  127:12 142:2
  143:11 149:7
worker 68:4,5
  116:12

workers 118:9
working 26:14
  28:16 47:20
  48:3 54:21
  57:16,20 59:11
  60:23 77:11
  91:8 94:12 95:7
  95:12,13,18
  97:13 103:18
  106:4 107:1
  114:3 121:11
  127:4 129:20
  145:21 148:14
workplace
  104:17
works 13:5
  148:10,18
worth 117:23
worthless 118:4
wouldn't 143:5,7
wreck 14:14
writing 103:17
  103:21,22
written 71:4,11
wrong 24:12 35:4
  86:13 102:3
  122:8 137:11
wrote 71:11
  93:16 113:22
W-I-L-L-I-S-T...
  39:17

_____
X
_____
X 4:2,7

_____
Y
_____
yeah 12:2 14:8,9
  16:8,14 17:2,2
  20:13 25:13
  34:14 39:3
  42:13,23 43:8
  45:22 50:23
  58:4 60:11,18
  61:23 64:1,11
  66:19 67:14
  68:4,5 70:21
  73:1,16 77:2
  80:18 83:19
  84:23 88:6
  89:17,21 101:13

105:5 108:16,16
  109:7 111:3,20
  113:5,14 120:13
  126:23 127:1
  131:8,8 132:15
  133:15 136:4,10
  140:20,22
  141:17 145:6
  147:23
year 19:10 31:16
  39:22 43:15
  55:11,15,15
  70:18 74:3
  98:13
years 7:5 9:21
  12:20 13:16
  19:12 36:15,18
  36:19 38:7 41:9
  67:11 70:19
  74:3,4 75:19
Yesterday 63:15
young 76:8
y'all 20:15 59:11
  60:16 66:18
  109:20 110:3
  111:6 119:20
  120:4 136:16

_____
$
_____
$100 55:3
$400 36:16,17,20
$45 69:14 71:17
$50 55:5
$61 18:2
$75 71:18,21,22

_____
0
_____
05 31:15 42:9
  46:10 64:8
  150:1
06 70:20

_____
1
_____
1 4:9 43:23 44:7
  44:14
1st 105:9
1-800 119:21
10 10:17 11:23
  19:23 36:15,18
  36:19 39:8

41:21,22 84:12
  84:13,13 142:10
  142:10
100 3:15 101:16
  125:19 132:15
105 4:12
11 11:23 137:6
11:00 28:2 29:1
1147-MHT 1:8
13 42:11 51:17
  56:21 72:17
137 4:13
14 38:7,8 41:9,13
  152:9
14th 1:21 5:8
141-146 4:5
146-151 4:4
1467 151:5,8
15 84:12,13
  142:11
16th 31:15
1601 58:23
17th 12:20 70:18
18 48:17 75:22
1819 3:16
186 9:14

_____
2
_____
2 4:10 44:17,22
2nd 26:17 49:21
  49:22 52:10
  114:4
2:00 29:1
20 19:20 25:7,7
  67:9,12 84:13
  142:10
2000 9:5
2001 16:6,11,18
2002 13:18
2004 32:2 44:5
  45:10 47:8,21
  48:17 49:10
  50:11
2005 42:12 51:2
  51:17 53:10
  55:9,10 56:21
  67:3 79:12
  81:11 106:2,9
  106:11 110:18
  114:1,13 115:1

115:5 149:12
**2006** 137:6
**2008** 1:22 5:8
  44:20 105:9
  152:5,9,17
**25th** 39:9
**27** 7:4
**28th** 32:1

**3**
**3** 4:11 45:6,13
  46:8 105:17
  113:20
**3/21/80** 6:16
**30** 5:5 16:21,22
  16:23 25:7 67:9
  67:12
**3000** 1:20 5:9
**32** 98:17
**33** 98:18
**35203** 3:17
**36083** 3:7
**36804** 9:15
**3805** 3:6

**4**
**4** 4:12 46:10
  79:12 105:8,12
  105:18 113:21
  130:14 132:21
  137:14,17 138:1
  138:6,10 139:4
**4th** 42:2,5 50:18
  50:19
**420** 9:14
**44** 4:9
**45** 4:10,11

**5**
**5** 4:13 105:17
  137:2,8,13,20
  138:2,10 139:3
**5th** 3:16
**5-140** 4:4

**6**
**6** 44:20
**6519** 49:19,20
  65:16 78:20
  114:13 121:3

**7**
**7:00** 28:3

**8**
**8665** 49:4,14

**9**
**9:00** 1:23 5:11
**9600** 33:6,7 46:23
  48:4,19 55:18
  57:14 115:19
  121:2

# DOLLAR GENERAL EMPLOYMENT FORM

0 1



Social Security # | 5 | 2 | 6 | 1 |

## TO BE COMPLETED BY THE EMPLOYEE

Write Name as it appears on the Social Security card to ensure the Social Security Administration properly credits social security benefits. *Managers should visually inspect the social security card for accuracy.*

**Last Name** Cross    **First Name** Tiffany    **Middle Initial**

Street Address 1462 Lee Rd 47

Apt #                    P.O. Box (if applicable)

City Opelika    State AL    Zip Code 36804

Phone Number AREA CODE 334 745 7694    County

**EMERGENCY CONTACT**    Name Kevin Wilson    Phone 703 7395    Relationship Friend

Date of Birth 3-21-90

Malden Name Harris

Marital Status ☑ Single ☐ Married

Gender ☐ Male ☑ Female

### ETHNICITY (Race/National Origin):
☐ American Indian or Alaskan Native
☐ Asian or Pacific Islander
☐ Black    ☐ Hispanic
☐ White (Caucasian)    ☐ Multi Racial
(Multi racial = having parents of different races)

## EMPLOYER SECTION

**YES NO** Is the primary reason for hiring this employee for: fixture/set-up a new store, relocate or permanently close a store, conduct disaster/remodeling work, or work ONLY during seasonal months as his/her regular job?
☐ ☑

**YES NO** If "NO" was checked above, Will the employee average working 30 or more hours a week?
☑ ☐

DATE HIRED: May 28, 04
☑ New Hire    OR    ☐ Rehire

Store # or Cost Center 9600
Work State Alabama

**Employee's Position: (Check one below)**
☐ Store Manager    ☐ Ass't Manager
☐ Lead Clerk (3ʳᵈ Key)    ☑ Clerk
☐ Learning Center Intern
☐ OTHER _____
(DC/Corp/Field Mgmt)

Hourly Base Rate $ 5.35 (paid weekly)
OR
Annual Base Salary $ _____
(Stores paid weekly. All others paid semi-monthly) Store paychecks are distributed at the store each Friday before noontime

### DG and Corporate ONLY
Supervisor _____
Work Schedule _____
Shift Code _____
Status ☐ AF ☐ AP ☐ AT

## LOCAL TAXES by WORK STATE

**INDIANA:** In which County do you live?

**MARYLAND:** In which County do you live? _____
Do you live in Baltimore City? ☐ YES ☐ NO

**NEW YORK:** Do you live in New York City? ☐ YES ☐ NO
Are you a resident of Yonkers City? ☐ YES ☐ NO

**OHIO:** In which City or Town do you live? _____
In which Public School District do you live? _____

**PENNSYLVANIA:** Do you live in a: ☐ Township OR ☐ Borough OR ☐ City?
What is the *name* of the Township/Borough/City? _____
In which County do you live? _____
In which Public School District do you live? _____

**KENTUCKY:**
| | YES NO |
|---|---|
| Employees *working* in BOONE COUNTY | |
| Do you *live* AND work in the Boone County School District? | ☐ ☐ |
| Do you *work ONLY* in the Boone County School District? | ☐ ☐ |
| Employees *working* in CUMBERLAND COUNTY | |
| Do you *live* in the Cumberland County School District? | ☐ ☐ |
| Employees *working* in JEFFERSON COUNTY | |
| Do you *live* in the Jefferson County School District? | ☐ ☐ |
| Employees *working* in LEXINGTON/FAYETTE URBAN COUNTY | |
| Do you *live* in the Lex/Fayette Urban Co. School District? | ☐ ☐ |
| Employees *working* in MARSHALL COUNTY | |
| Do you *live* in the Marshall County School District? | ☐ ☐ |
| Employees *working* in SCOTT COUNTY | |
| Do you *live* in the Scott County School District? | ☐ ☐ |
| Employees *working* in WARREN COUNTY | |
| Do you *live* in the Warren County School District? | ☐ ☐ |
| Do you *live* in the Bowling Green School District? | ☐ ☐ |

This document is intended to comply with Section 41-10-30 of the S.C. Code of Laws, 1976, as amended.

X _~Tiffany Cross~_
**Employee Signature** (I certify the above information is correct)
Date: 5/28/04

X _Michael C. McDonald_
**Manager/Supervisor Signature**
Date: May 28 04

3 Round

White=HR    Yellow=Employee    Pink=Manager

DEFENDANT'S EXHIBIT

PENGAD 800-631-6989



# Dollar General
# Background Check Authorization

Social Security # | 5 | 2 | 6 | 1

**OR DOLLAR GENERAL USE ONLY**

anagers call GIS to process. Authorization #: 3964808

iee envelope for processing instructions)

Date of Birth: 03 / 2 / 80
month   day   year

Are you at least 18 years of age:
☑ Yes   ☐ No

*Please print all information (Use black ink only.)*

Tiffany Lee Cross | Harris | 1 yr. | 6512773
Full Name (print) | Maiden/Other Names Used | Year of Name Change | Driver's License Number

AL | 1462 Lee Rd 47 | Opelika | AL | 36804
State of Issue | Current Street Address | City | State | Zip Code

Lee | 10yr
County of Residence | How long at current address?

**Please list all former addresses for the past five years:**

| City | State | County | mo./yr. | to | mo./yr. |
|---|---|---|---|---|---|
| City | State | County | mo./yr. | to | mo./yr. |
| City | State | County | mo./yr. | to | mo./yr. |
| City | State | County | mo./yr. | to | mo./yr. |

Have you ever been convicted of a crime (Other than a minor traffic violation)   ☐ Yes   ☑ No
f yes, please provide city and state of conviction _____

I hereby authorize Dollar General, or its agents, to obtain a consumer report regarding information as to my character, credit history, employment history, criminal record history, driving record history, general reputation, personal characteristics, mode of living, or any other information that may be permissibly obtained under applicable law. I understand that this information will be used for employment purposes, including evaluating me for employment, promotion, reassignment or retention as an employee of Dollar General.

I hereby authorize and direct all persons who may have information, relevant to this consumer report to disclose it to Dollar General or its agents, and I hereby release all persons, including those disclosing the information. Dollar General and its agents, from liability on account of such disclosure. I also hereby authorize the Company or its agents to request and obtain the above described information for as long as I am employed by the Company.

I. According to the Fair Credit Reporting Act I am entitled to know if the position for which I am applying is denied because of information obtained from a consumer reporting agency. If so, I will be notified and be given, among other information, the name of the agency providing that report.

II. I hereby further authorize that a telephone facsimile (FAX) or photographic copy of my signed authorization may be considered as valid as the original.

Tiffany Cross | Tiffany Lee Cross | 8-19-04
Employee's signature (required) | Print Full Name | Date

13  Return to HR

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB No. 11 15-0136
**Employment Eligibility Verification**

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. ANTI-DISCRIMINATION NOTICE. It is illegal to discriminate against work eligible individuals. *EMPLOYERS CANNOT SPECIFY WHICH DOCUMENT(S) THEY WILL ACCEPT FROM AN EMPLOYEE.* The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1. EMPLOYEE Information and Verification.** To be completed and signed *by employee* at the time employment begins

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|
| Cross | Tiffany | L | Harris |

| Address (Street Name and Number) | Apt. # | Date of Birth (month/day/year) |
|---|---|---|
| 462 Lee Rd 47 | | 3-21-90 |

| City | State | Zip Code | Social Security # |
|---|---|---|---|
| Opelika | AL | 36804 | 5261 |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
☑ A citizen or national of the United States
☐ A Lawful Permanent Resident (Alien # A ___
☐ An alien authorized to work until 5-19-04
(Alien # or Admission # ___

| Employee's Signature | Date (month/day/year) |
|---|---|
| X Tiffany Cross | 5-19-04 |

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Preparer's/Translator's Signature | Print Name |
|---|---|
| | |

| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|
| | |

**Section 2. EMPLOYER Review and Verification.** To be completed and signed *by employer.* Examine one document from List A OR examine one document from List B *and* one from List C as listed on the reverse of this form and record the title, number and expiration date, if any, of the document(s)

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| DOCUMENT TITLE: ___ | | Ala. Drivers | | Social Security |
| ISSUING AUTHORITY: ___ | | State of ala | | |
| DOCUMENT #: ___ | | 651773 | | 5261 |
| Expiration Date (if any): / / | | 4/21/05 | | / / |
| Document #: ___ | | | | |
| Expiration Date (if any): / / | | | | |

**CERTIFICATION -** I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (month/day/year) 5/19/04 is eligible to work in the United States. (State employment agencies may omit the date the employee began and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment).

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|
| X | William C McDaniel | Manager |

| Business or Organization Name | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|---|
| DOLLAR GENERAL 9600 | 2000 Pepperell PKWY Opelika A | 05-28-04 |

**Section 3. Updating and Reverification.** To be completed and signed by employer

| A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable) |
|---|---|
| | |

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

| Document Title: ___ | Document #: ___ | Expiration Date (if any): / / |
|---|---|---|

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|
| Tiffany Cross | 05/28/04 |

Form I-9 (Rev. 11-21-91) N

5

# United States District Court

___MIDDLE___ DISTRICT OF ___ALABAMA, EASTERN DIVISION___

KINERA LOVE,

         V.

## SUBPOENA IN A CIVIL CASE

DOLLAR GENERAL CORPORATION
d/b/a DOLGENCORP, INC.

CASE NUMBER: 3:06-CV-1147-MHT

TO:

    Tiffany Cross
    186 Lee Road 420
    Opelika, AL 36804

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| * | * |
| | DATE AND TIME |
| | * |

X YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Conference Room<br>Hampton Inn & Suites Opelika<br>3000 Capps Way<br>Opelika, AL 36804 | Thursday, February 14, 2008<br>9:00 a.m. |

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| | DATE AND TIME |
|---|---|
| | |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| * | * |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *(signature)* Christopher W. Deering, Esq.<br>Attorney for Defendant | February 6, 2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Christopher W. Deering, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Federal Place, Suite 1000
Birmingham, AL 35203-2118
205/328-1900



DEFENDANT'S
EXHIBIT
2

PENGAD 800-631-6989

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | 02/06/08 | 186 Lee Road 420 Opelika, AL 36804 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| TIFFANY CROSS | PERSONAL |
| SERVED BY (PRINT NAME) | TITLE |
| Sarah Hart | PROCESS SERVER |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ___2/6/2008___
DATE

___Sarah Hart___
SIGNATURE OF SERVER

1 Fed. Place, Ste. 1000, 1819 5th Ave. N., Birmingham, AL 35203
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:
(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

5330896.1

Does not apply to Corporate based and DC employees

# Physical Requirements
# To Work in a Store

Please review the following list of physical requirements necessary to work in a position at a Dollar General Store and indicate below whether you are able to perform these essential job functions with or without a reasonable accommodation.

| | |
|---|---|
| 1. | Frequent walking and standing |
| 2. | Frequent bending, stooping and kneeling to run check out station, stock merchandise and unload trucks |
| 3. | Frequent handling of merchandise and equipment such as hand-held scanners, pricing guns, box cutters, merchandise containers, two-wheel dollies and U-boats (six-wheel carts) |
| 4. | Frequent and proper lifting of up to 40 pounds; occasional lifting of up to 55 pounds |
| 5. | Occasional climbing (using step ladder) up to heights of six feet |
| 6. | Fast-paced environment; moderate noise level |
| 7. | Occasional exposure to outside weather conditions |
| 8. | *Occasional or regular driving/providing own transportation to make bank deposits, attend management meetings and travel to other Dollar General stores. (Store Managers and Assistant Managers only)* |

I have read and understand Dollar General's physical requirements necessary to work in a position at a Dollar General store. I agree that I can perform all essential job functions listed above with or without a reasonable accommodation.

Tiffany Cross
**Printed Name**

▓▓▓-52-61
**Social Security Number**

_(signature)_
**Employee Signature**

05-19-04
**Date**



9

DEFENDANT'S
EXHIBIT

3

PENGAD 800-631-6989

# Code of Business Conduct & Ethics



Social Security Number

## CERTIFICATION FORM

I have received the Dollar General Code of Business Conduct and Ethics. I have read the Code and understand that it represents Dollar General policy. I understand that by signing my name below I am certifying that I am familiar with and will comply with the requirements of the Code, will comply with the rules, regulations and laws of federal, state and local governments applicable to Dollar General, and will report immediately any information concerning a violation or possible violation to the person(s) designated in the Code or to the Whistleblower Hotline. I agree to use the Whistleblower Hotline only in good faith. I also understand that a violation of the Code may subject me to discipline up to and including termination of my employment.

I certify that I have listed in the space provided below (or on an additional attached page if the space provided is not sufficient) all positions as director, officer, or partner that I hold in companies other than Dollar General, including charitable organizations, and all other conflicts or potential conflicts of interest I may have with Dollar General, regardless of whether or not the conflict has been approved by the Board of Directors, a committee of the Board, my supervisor or any other Dollar General personnel. If I leave the space below blank, I certify that I have no such positions or conflicts of interest to report.

_____

_____

*I understand and agree that nothing in the Code is intended to create an express or implied contract of employment, and that the maintenance of the Code or other policies, procedures or benefit plans, does not modify the employment-at-will relationship that exists between Dollar General and its employees.*

Employee Signature: X *Tiffany Cross*          Date: 5-19-04

PRINT Name 🖙 Tiffany Cross

Position Title 🖙 Sales Clerk

White=HR          Yellow=Employee



11

# Dollar General Anti-Discrimination and Harassment Policy



Social Security Number **6 2 6 1**

All Dollar General employees have the right to work in an environment free from all forms of discrimination and conduct which can be considered harassing, coercive or disruptive. Dollar General values and respects the rights and dignity of each person and will not tolerate discrimination or harassment based on race, color, religion, sex (including pregnancy, child birth and related conditions), national origin, age, disability, citizenship or any other characteristic protected by law. All employees should, therefore, be aware of the following:

## Discrimination

Discrimination on the basis of race, color, religion, sex (including pregnancy, child birth and related conditions), national origin, age, disability, citizenship status or any other characteristic protected by law is strictly prohibited. This includes, but is not limited to the following: hiring, placement, upgrading, transfer, demotion or promotion, treatment during employment, rates of pay or other forms of compensation, benefits, layoff or discharge, recruitment or solicitation of employment and all other terms and conditions of employment.

Harassment on the basis of any protected characteristic is also strictly prohibited. Under this policy, harassment is speaking to or treating an employee in a way that is degrading or in a way that exhibits dislike for, hostility or hatred toward, an individual (or that of his/her relatives, friends or associates) because of race, color, religion, sex (including pregnancy, child birth and related conditions), national origin, age, disability, citizenship or any other characteristic protected by law.

## Sexual Harassment

Sexual harassment in any situation is strictly prohibited. This includes sexual harassment by managers, supervisors, co-workers, or third parties such as vendors or customers. It is particularly damaging when it exploits the interdependence and trust between employees or between supervisors and their employees.

## Non-employees of Dollar General

Dollar General applies its Anti-Discrimination and Harassment Policy to its vendors and customers. Dollar General will not tolerate unlawful discrimination by or against non-employees of Dollar General. Dollar General will provide reasonable accommodation for its disabled customers as required by law (e.g. allowing disabled customers to shop with service animals).

## Examples of conduct prohibited by this Policy include, but are not limited to:

Offering or implying an employment related reward (such as a promotion or raise) in exchange for sexual favors or submission to sexual conduct
Threatening or taking of a negative employment action (such as termination, demotion, or denial of a leave of absence) if sexual conduct is rejected
Unwelcome sexual advances or repeated flirtations
Unwelcome intentional touching of another person or other unwanted intentional physical contact (including patting, pinching, or brushing against another person's body)
Unwelcome whistling, staring, or leering at another person
Asking unwelcome questions or making unwelcome comments about other person's sexual activities, dating, personal or intimate relationships, or appearance
Unwelcome sexually suggestive or flirtatious gifts, letters, notes, e-mail, or voicemail
Conduct or remarks that are sexually suggestive or that demean or show dislike for a person or class of persons because of gender (including jokes, pranks, teasing, obscenities, obscene or rude gestures or noises, slurs, epithets, taunts, negative stereotyping, threats, blocking of physical movement)
Displaying or circulating pictures, objects, or written materials (including graffiti, cartoons, photographs, pinups, calendars, magazines, figurines or novelty items) that are sexually suggestive or that demean or show hostility to a person because of a protected characteristic

These guidelines also apply to other forms of unlawful harassment, including conduct based on race, national origin, etc.

## Zero Tolerance

An individual found to be guilty of sexual harassment, creating a hostile work environment or any other form of discrimination is subject to disciplinary action for violations of this policy, up to and including termination from the Company. Accordingly, it is the Company's intention that this policy go beyond the legal requirements and includes conduct we otherwise believe to be inappropriate.

## Retaliation

Dollar General prohibits retaliation against an employee who has made a report of alleged discrimination or harassment or who has participated in certain, investigations or administrative proceedings.

## Reporting Harassment and Discrimination

Any employee who believes that he/she has been the subject of any form of harassment or discrimination by anyone, at Dollar General or by any person who does business with Dollar General or who has witnessed harassment, discrimination or retaliation should immediately report the matter to the Employee Response Center (ERC) at 1-888-237-4114.

In all cases, an investigation will be conducted. The investigation will be conducted on a confidential basis; sensitive information will be disclosed on a need-to-know basis. There will be no retaliation against any employee who reports such conduct or participates in the investigation in good faith. Any attempt to interfere with an investigation or retaliate against an employee for reporting conduct or participation in an investigation will result in immediate termination.

I have received Dollar General's Anti-Discrimination and Harassment Policy.

I understand and am fully aware that Dollar General is committed to a work environment free from discrimination and harassment. I understand that if I feel I have been the victim of discrimination, retaliation or harassment, I should immediately report the incident to the Employee Response Center without fear of retaliation or any adverse employment action. I understand that Dollar General's Anti-Discrimination and Harassment Policy and the number for reporting discrimination or harassment can be located on this policy, in my employee handbook and on the Federal and State posters found in the break room, stock room or service center.

X _Wendy Cross_                          _3-19-04_
**EMPLOYEE SIGNATURE**                    **DATE**

White=HR          Yellow=Employee

12  Return to HR

# SIGNATURE PAGE



5 2 6 1 1

Social Security Number

## WAGE & HOUR POLICY ACKNOWLEDGEMENT

I understand that *working off the clock*, instructing someone to work off the clock, *allowing friends and/or family to work in the store* or *accepting merchandise or cash for work* is a serious violation of Company policy. I also understand that employees must be paid for all hours worked, *including time spent making deposits*, within the week they were actually worked. Employees will be paid through the regular payroll system for all hours they work, no exceptions. Any violation may result in immediate termination of employment for the responsible employee, even for the first offense. I understand that it is my responsibility to contact the Employee Response Center at 1-888-237-4114 if I have not been paid for all hours worked.

## PAY POLICY ACKNOWLEDGEMENT

I understand that it is Company policy and State and Federal Law that all non-exempt employees must accurately record ACTUAL HOURS WORKED and employees are to be paid for all hours worked. I understand that Company policy requires that all employees be at least 18 years of age, except for specific states that are authorized by Human Resources to hire 16 and 17 year old employees. I FURTHER UNDERSTAND THAT FAILURE TO FOLLOW POLICY WILL RESULT IN TERMINATION OF EMPLOYMENT OF THE EMPLOYEE WHO FALSIFIES THE TIME RECORD AS WELL AS FOR ANY MANAGEMENT EMPLOYEE WHO INSTRUCTS OR KNOWINGLY PERMITS THE EMPLOYEE TO FALSIFY THE TIME RECORDS.

## DRUG & ALCOHOL TESTING ACKNOWLEDGEMENT

I hereby certify that Dollar General has provided me with a copy of its Drug & Alcohol Policy; that I have read and understand the Policy; and that I agree to abide by the terms and conditions of the Policy. I understand that, where permitted by law, I am subject to drug and/or alcohol testing, including pre-employment, random/suspicionless, post-accident and reasonable suspicion testing. I hereby give my consent to be tested in accordance with the Policy. *I further understand that if I will be employed in a key carrying position, that I must report for pre-employment testing within 2 business days (Mon-Fri) of date signed below. Failure to do so will result in immediate termination.*

**I acknowledge that I have read ALL the above policies and agree to fully adhere to these Company policies. I further acknowledge that I should contact the Employee Response Center at 1-888-237-4114 to report any violations of these policies.**

Employee Signature: X *Tiffany Cross*                     Date: 5-19-04

## EMPLOYMENT ACKNOWLEDGEMENT

I acknowledge that I have received a copy of the Dollar General Employee Handbook outlining the policies and procedures of Dollar General. I have read the Table of Contents, and I know what kind of information I can find in the Handbook. I acknowledge that it is my responsibility to read and understand the information contained in this Handbook. I am aware that the Company may revise, add to or delete any policies, procedures, or benefits without notice as deemed necessary for the efficient operation of the Company. If I have any questions, I understand that I should contact my immediate supervisor or Human Resources.

As a condition of my employment and continued employment at Dollar General, I agree to follow the policies and procedures of the Company. I understand that, unless otherwise agreed in writing signed by an officer of the Company and subject to any applicable law, all Dollar General employees are employed on an at-will basis. This means that employment is not guaranteed for any specific duration of time, and Dollar General retains the right to terminate an individual's employment at any time, with or without cause. No oral representations made by a Dollar General employee with respect to continued employment can alter this relationship.

*I understand if I steal from Dollar General, I may be terminated and prosecuted.*

I further understand that no supervisor, manager or representative of the Company, other than the Chairman, has any authority to enter into any agreement for employment for any specified period of time or make any agreement contrary to the foregoing.

Employee Signature: X *Tiffany Cross*                     Date: 5-19-04

White=HR                     Yellow=Employee

10    Return to HR

**Dollar General's Travel and Expense Policy**

**DOLLAR GENERAL**

# Travel and Expense Policy Acknowledgement Form

**Social Security Number** ~~████████~~ 6 2 6 1 1

**Printed Name:** _Tiffany Cross_

I have read and understand Dollar General's Travel and Expense Policy and have completed the Travel Profile included as the last page of this booklet. I understand that violations of the Travel and Expense Policy may result in disciplinary action up to and including termination, even for the first offense. I understand that if I have any questions regarding this policy, I may contact the Human Resources Department for general policy inquiries, Expense Payable Department regarding expense inquiries or the Travel Department regarding travel inquiries.

_Tiffany Cross_
**Printed Name**

_Tiffany Cross_
**Social Security Number**

_____
**Department**

_July 4, 05_
**Date**

_Tiffany Cross_
**Employee Signature**

_J. Wade_
**Supervisor Signature**

---

**Immediately send the completed Acknowledgement Form to the Imaging Department at the Store Support Center:**

Imaging Department
100 Mission Ridge
Goodlettsville, TN 37072

02/05

## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| KINERA LOVE, | ) | |
|     Plaintiff, | ) | |
| | ) | CASE NO.: |
| v. | ) | 03-06cv1147-MHT-SRW |
| | ) | |
| DOLLAR GENERAL CORPORATION, | ) | |
|   d/b/a DOLGENCORP, INC., | ) | |
|     Defendant. | ) | |

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| LEE COUNTY | ) |

### AFFIDAVIT AND TESTIMONY OF TIFFANY CROSS

The Affiant, being first duly sworn, says and affirms the following:

1.  My name is Tiffany Cross. The facts stated in this affidavit are known to me of my own personal knowledge and, if called upon to testify to the matters in this affidavit, I could and would competently do so;

2.  I am a former store manager of Dollar General, Opelika, Alabama store at 1515 Second Avenue. I was initially hired as a cashier in April of 2004 at the Marvin Parkway store. I was promoted to third key clerk, then to assistant manager at the Marvin Parkway store. I was promoted after that to manager of the Auburn and then transferred to the Second Avenue store. Employees who are successfully trained are generally promoted this way. I worked in three Dollar General stores between April 2004 and November 13, 2005. I am a White female;

3.  I recall an incident that occurred in the Phenix City

DEFENDANT'S
EXHIBIT
4

340 800-631-6989

store on an occasion when there was a managers' meeting. I attended the meeting. It was on or about the 4th day of October, 2005. Jack Trawick had just arrived from the Auburn store where he investigated a complaint that Kinera Love, a Black female, made to ERC because she did not get the position of assistant manager. Jack was talking to Charles McDonald and Jeff Jennings, and I heard him tell Jeff and Charles that they needed to get rid of Kinera because "she could cause them some trouble."

4. I know that instead of them hiring Kinera, whom I know was capable and qualified, for the assistant manager's position, they hired a White female, Donna Tally, Charles' niece. Donna and I are also relatives. I know that Donna Tally had no managerial experience when they hired her because the majority of her working life has been in assembly line jobs. She has worked at Master Brand, a cabinet-making plant in Auburn in the late 1990's, Master Lock, a lock-making plant in Auburn in the early 1990's, Capitol Vale, an M&M candy packaging plant in Auburn in the middle 1990's and MDT, a batteries plant in Auburn in 2005, a company from which she quit when she got married that year because of the company policy that prohibited husbands and wives from working there at the same time.

Donna has never worked as a manager in a video store. She did work in a video warehouse business, owned by Charles McDonald and Jeff Jennings, when she was a high school student during the after-school hours in 1989-90, when she was about 16-years-old but she was not the manager.

2

In addition, Donna worked at the Opelika Wal-Mart for about two weeks as a jewelry clerk in 1998 or 1999. She has never held one job for a long period of time. When Dolgencorp, Inc. hired her, she was between jobs after having quit at the MDT plant in Auburn.

Donna had been on the job at Dolgencorp for only two weeks before she was promoted to assistant manager. It takes at least two months to train to become an assistant manager. Kinera was in line for the promotion when she was transferred to the Auburn store from the Opelika store, having been trained for the two months as third key clerk by Julie Morrison. As third key clerk, Kinera practically ran the Auburn store. When Charles promoted Donna, Kinera was required to train her;

5. Besides this occasion of discriminating against Kinera, Charles has shown he is prejudice against Blacks on other occasions. On one occasion in spring of 2005, a Black lady came into the Opelika store on the Marvin Parkway where I was working and asked Charles if we were hiring. He told her "no." That afternoon of the same day, he hired two white females, one of whom was a white girl named Amy.

On another occasion, in the summer of 2005, Charles made a comment to me about another employee of Dolgencorp when we were working at the Opelika store on Second Avenue, Wendy Whitlock, a white female. He said that she would not make it any further in Dollar General because she is married to a "F_____g N_____r." Wendy had been hired to work at Dolgencorp before I was, but

3

could not get a promotion because of her Black husband. She was stuck in the position of a third key clerk until I made a complaint to the Home Office to Jeff Weaver within days after my husband and I heard his racist comment. The outcome was that Wendy finally got her well-deserved promotion to assistant manager by Charles, about two or three months later, and transferred to the Midway Plaza store. Later, she was transferred to the Marvin Parkway store as manager.

6.  I know what Charles and Jeff did to Kinera is not right. I know they will try to discredit me by saying I was terminated from Dolgencorp, Inc. for a bouncing check; however, I gave proof that it was a bank error to Charles and he failed to give the bank information to upper management to show the error. I know I could have fought it but I choice not to because I knew it was best for me to move on. I am presently working as a manager in another store.

I declare under penalty of perjury that the foregoing is true and correct.
DONE this _____1st_____ day of February, 2008.

Tiffany Cross                                    2-1-08

STATE OF ALABAMA          )
                          )
LEE COUNTY                )



### AFFIDAVIT

I, the undersigned Affiant, hereby acknowledge the following:

1. My name is Tiffany Cross. I am a former store manager of the Dollar General, Opelika, Alabama store at 1515 2nd Avenue. I am a white female. I am freely giving this statement in support of Kinera Love because it is the right thing to do

2. I recall an incident that occurred in the Phenix City store on an occasion when there was a managers' meeting. Jack Trawick had just returned from the Auburn store investigating a complaint that Kinera Love called into ERC because she did not get the position of assistant manager. Jack was talking to Charles McDonald and Jeff Jenning, and I heard him tell Jeff and Charles that they needed to get rid of Kinera because she could cause them some trouble.

3. I recall that instead of them hiring Kinera, whom I know was capable and qualified, for the assistant manager position, they hired a white female, Donna Talley, Charles' niece. I know that Donna had no managerial experience when they hired her. I know that she had been on the job at Dollar General for only two weeks before the position was given to her. I know that she came to Dollar General from a factory assembly line. I know that Kinera was in line to be promoted to the assistant manager position when she was sent to the Auburn store from the Opelika store, having been trained by Julie Morrison. I know that Kinera practically ran the Auburn store and that when they hired Donna, Kinera had to train her. I know Charles to be prejudice against Blacks.

4. I know Charles to be prejudice against a Black person on another occasion. A Black lady came into the Opelika store once and asked about a job, and Charles told her he was not hiring. That same day, he hired two white females.

DEFENDANT'S
EXHIBIT

5

PENGAD 800-631-6989

Affidavit of Tiffany Cross
Page 2

The Affiant further saith not

_____
Tiffany Cross, Affiant

**SWORN AND SUBSCRIBED BEFORE ME** this ___11th_____ day of
October, 2006.

SEAL

_____
Notary Public

My Commission expires. 12/03/08

EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| KINERA LOVE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO.: |
| | ) | |
| DOLLAR GENERAL | ) | 3:06-CV-1147-MHT |
| CORPORATION, | ) | |
| d/b/a DOLGENCORP, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SUPPLEMENTAL DECLARATION OF CHARLES MCDONALD

1.    My name is Charles McDonald. I am over the age of 21 years, and I am suffering from no legal disability.

2.    I am currently a District Manager for Dolgencorp, Inc. ("Dolgencorp"). This declaration is based upon personal knowledge and my review and inspection of certain business records of Dolgencorp. Those records were created and maintained in the regular course of business.

3.    Prior to my employment with Dolgencorp, beginning in 1986 and through approximately 1989, I owned and operated a retail video rental store in Opelika, Alabama, called Video City Rentals, Inc.

4.    During that time, I hired Donna Tally ("Ms. Tally") to manage Video City Rentals, Inc.

5.    While at Video City Rentals, Inc., Ms. Tally provided direct supervision of

1

other employees and supervised all aspects of the store's operations. In her position at Video City Rentals, Tally's job duties included, but were not limited to, training and developing store employees; maintaining financial controls for the store including shrink, labor and operating expenses; developing rapport and good will with the store's customers to drive business; ensuring the store's compliance with all state and federal laws; coaching and counseling store employees; and engaging in various transactions with vendors and other third parties on behalf of the store.

6.    Ms. Tally managed the Video City Rentals store in Opelika for approximately three years.

7.    I have reviewed Dolgencorp records and, during the Spring of 2005, such records fail to show that an individual named "Amy" worked at Dolgencorp's Opelika, Alabama, store.

8.    Training is not a prerequisite for obtaining the Assistant Store Manager position.

9.    I never told anyone that Dolgencorp was "not hiring" because of his or her race.

10.    I never said the words "F_____g N_____r" to anyone, and specifically deny that I ever said that to anyone concerning Wendy Whitlock.

11.    Any internal investigation performed in response to a complaint of discrimination by an employee against a District Manager would have been conducted by the Regional Manager, not an Asset Protection Supervisor.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___15___ day of February, 2008.

_Charles McDonald_
Charles McDonald

3